UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BENJAMIN HEETER
Lake View, NY 14085,

MARK BRAIMAN
Cazenovia, NY 13035,

JOSEPH WURTENBERG                              **FIRST AMENDED**
Fairport, NY 14450, *and*                      **COMPLAINT**

FIREARMS POLICY COALITION, INC.                Civil Action No.:
5550 Painted Mirage Road, Suite 320
Las Vegas, Nevada  89149,                      1:24-cv-00623-JLS

                    Plaintiffs,

          v.

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York
Office of the Attorney General
The Capitol
Albany, NY 12224,

STEVEN G. JAMES, in his official capacity as
Superintendent of the New York State Police
1220 Washington Avenue, Building 22
Albany, NY 12226,

MICHAEL J. KEANE, in his official capacity as
Acting District Attorney for Erie County, New York
Erie County District Attorney's Office
25 Delaware Avenue
Buffalo, New York 14202,

WILLIAM G. GABOR, in his official capacity as
District Attorney for Madison County, New York
Madison County District Attorney's Office
Veteran's Memorial Building
Wampsville, New York 13163, *and*

SANDRA DOORLEY, in her official capacity as
District Attorney for Monroe County, New York
Monroe County District Attorney's Office
47 S. Fitzhugh St.
Rochester, New York 14614,

                    Defendants.

_____

        Plaintiffs, by and through counsel of record, bring this Complaint against

Defendants, New York officials responsible for enforcing state laws infringing the right of

law-abiding, peaceable citizens to purchase body armor for defense of self and family and

for other lawful purposes, and allege as follows:

## **INTRODUCTION**

        1.      The Second Amendment to the United States Constitution

guarantees "the right of the people to keep and bear Arms."  U.S. CONST. amend. II.  Under

this constitutional provision, Plaintiffs, and other law-abiding residents of New York, have a

fundamental, constitutionally-guaranteed right to keep common arms for their own defense

and the defense of their household.

        2.      Despite this guarantee, Defendants have enforced New York

State's flat prohibition on the purchase and sale of the most common and ergonomic body

armors by ordinary citizens, making it criminal for law-abiding, peaceable citizens (who are

not in so-called "eligible professions") to exercise their fundamental right to acquire, keep,

bear, and sell such arms.  N.Y. PENAL LAW § 270.21 & 22; N.Y. GENERAL BUSINESS LAW

("GBL") § 396-eee ("Body Armor Ban" or "Ban").

3.      New York's Body Armor Ban, and Defendants' enforcement thereof, deny individuals who reside in New York, including Plaintiffs, their fundamental, individual right to keep and bear defensive arms in common use.

4.      Under *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022), and *D.C. v. Heller*, 554 U.S. 570 (2008), the State of New York has no lawful basis to pick and choose which of its citizens have access to the full suite of rights protected by the Second Amendment.  "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."  *Heller*, 554 U.S. at 582.

## JURISDICTION & VENUE

5.      This Court has subject matter jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.

6.      Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988.

7.      Venue lies in this Court under 28 U.S.C. §§ 1391(b)(1) and (b)(2).

## PARTIES

8.      Plaintiff Benjamin Heeter is a natural person, a resident of New York, an adult over the age of 21, a citizen of the United States, and otherwise legally eligible to purchase and possess body armor but for New York's Ban.  18 U.S.C § 931. Plaintiff Heeter is a member of Firearms Policy Coalition, Inc. ("FPC").

9.      Plaintiff Mark Braiman is a natural person, a resident of New York, an adult over the age of 21, a citizen of the United States, and otherwise legally

eligible to purchase and possess body armor but for New York's Ban.  18 U.S.C § 931.

Plaintiff Braiman is a member of FPC.

10.     Plaintiff Joseph Wurtenberg is a natural person, a resident of New

York, an adult over the age of 21, a citizen of the United States, and otherwise legally

eligible to purchase and possess body armor but for New York's Ban.  18 U.S.C § 931.

Plaintiff Wurtenberg is a member of FPC.

11.     Plaintiff FPC is a nonprofit membership organization incorporated

in Delaware with a primary place of business in Clark County, Nevada.  FPC works to

create a world of maximal human liberty and freedom, and to promote and protect

individual liberty, private property, and economic freedoms.  It seeks to protect, defend, and

advance the People's rights, especially but not limited to the inalienable, fundamental, and

individual right to keep and bear arms, and protect, defend, and advance the means by

which individuals may exercise the right to carry, possess, and use firearms.  FPC serves its

members and the public through legislative advocacy, grassroots advocacy, litigation and

legal efforts, research, education, outreach, and other programs.  FPC's members reside

both within and outside New York.

12.     FPC brings this action on behalf of its members, including the

named Plaintiffs herein, who are injured by the operation and enforcement of the Body

Armor Ban.[1]

---

[1] FPC recognizes that "[i]t is the law of this Circuit that an organization does not have
standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983", *Nnebe
v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011), but FPC contends that this circuit precedent is
erroneous and should be overruled by a court competent to do so, particularly in light of
*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199
(2023) ("Either the organization can claim that it suffered an injury in its own right or,

13.     FPC, as an organization, has been directly injured by the
enactment of the Body Armor Ban and Defendants' enforcement of the laws, regulations,
policies, practices, and customs challenged herein.  FPC has and continues to spend time
and other resources, including funding, addressing and responding to the enactment of the
Body Armor Ban, consuming resources that would have been directed elsewhere.  For
example, FPC has incurred costs in legal fees analyzing how the Body Armor Ban affects its
members.  FPC has also designed and implemented a New York Hotline program to answer
questions and provide legal information to its New York members and the public.  FPC will
incur ongoing expenses to operate the Hotline, including internal FPC staff time and
expenses related to outside counsel who will assist with the Hotline.  FPC expects to
continue to be required to expend additional resources addressing New York's laws
affecting the right to keep and bear arms, including the Body Armor Ban, unless and until
New York's unconstitutional laws are enjoined.

14.     Defendant Letitia James is the Attorney General of the State of
New York.  As Attorney General, she exercises, delegates, or supervises all the powers and
duties of the New York Department of Law, which is responsible for enforcing New York's
restrictions on the sale of body armor imposed by GBL § 396-eee ("Unlawful sale or
delivery of body armor").  Her official address is Office of the Attorney General, The
Capitol, Albany, NY 12224-0341.  She is being sued in her official capacity.

---

alternatively, it can assert 'standing solely as the representative of its members . . . ,'"
quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).

15.      Defendant Steven G. James is the Superintendent of the New York State Police.  As Superintendent, subject to the oversight and supervision of the Governor, he exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, including executing and enforcing New York's laws and regulations governing the possession of arms, including the criminalization of purchase and sale of body armor, at PENAL LAW § 270.21 & 22.  His official address is New York State Police Office of the Superintendent, Building 22, 2220 Washington Avenue, Albany, New York 12226.  He is being sued in his official capacity.

16.      Defendant Michael J. Keane is the Acting District Attorney for Erie County, New York, where Plaintiff Heeter resides.  As District Attorney, Defendant Keane "is the prosecutorial officer with the responsibility to conduct all prosecutions for crimes and offenses cognizable by the courts of the county in which he serves."  *People v. Di Falco,* 44 N.Y.2d 482, 486 (1978).  His official address is Erie County District Attorney's Office, 25 Delaware Avenue, Buffalo, New York 14202.  He is being sued in his official capacity.

17.      Defendant William G. Gabor is the District Attorney for Madison County, New York, where Plaintiff Braiman resides.  As District Attorney, Defendant Gabor "is the prosecutorial officer with the responsibility to conduct all prosecutions for crimes and offenses cognizable by the courts of the county in which he serves."  *People v. Di Falco,* 44 N.Y.2d 482, 486 (1978).  His official address is Madison County District Attorney's Office, Veteran's Memorial Building, Wampsville, New York 13163.  He is being sued in his official capacity.

18.     Defendant Sandra Doorley is the District Attorney for Monroe County, New York, where Plaintiff Wurtenberg resides.  As District Attorney, Defendant Doorley "is the prosecutorial officer with the responsibility to conduct all prosecutions for crimes and offenses cognizable by the courts of the county in which [she] serves."  *People v. Di Falco,* 44 N.Y.2d 482, 486 (1978).  Her official address is Monroe County District Attorney's Office, 47 S. Fitzhugh St., Rochester, New York 14614.  She is being sued in her official capacity.

## I.     NEW YORK'S ILLEGAL BODY ARMOR BAN

19.     In the weeks immediately after *Bruen* was decided, New York enacted some of the most sweeping arms restrictions in American history, many of which have been already challenged in court.  *See, e.g., Hardaway v. Nigrelli*, 639 F. Supp. 3d 422 (W.D.N.Y. 2022) (enjoining ban on guns in places of worship), *vacated* as moot following legislative amendment, *Antonyuk v. Chiumento*, 89 F.4th 271, 345 (2d Cir. 2023); *Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022) (challenging numerous restrictions passed in the wake of *Bruen*), *vacated* in part, *Antonyuk v. Chiumento*, 89 F.4th 271, 387-88 (2d Cir. 2023); *Christian v. Nigrelli*, 642 F. Supp. 3d 393 (W.D.N.Y. 2022) (enjoining New York's attempt to establish a default rule turning all private property into a gun-free zone), *affirmed Antonyuk v. Chiumento*, 89 F.4th 271, 387 (2d Cir. 2023); *Srour v. New York City, New York*, No. 22-CV-3, 2023 WL 7005172, at *5 (S.D.N.Y. Oct. 24, 2023).

20.     As part of its illogical[2] regulatory scheme, New York bans the purchase of body armor, which the state broadly defines as:  "any product that is a personal

---

[2] *Cf.* Drew A. Swank, *Body Armor and the Law: A Survey of Current Federal and State Statutes*, 28 COOLEY L. REV. 389, 415 (2011) (explaining that prohibitions on the purchase of body armor are illogical).

protective body covering intended to protect against gunfire, regardless of whether such product is to be worn alone or is sold as a complement to another product or garment." N.Y. PENAL LAW § 270.20.

21.    Under New York law, "[a] person is guilty of the unlawful purchase of body armor when, not being engaged or employed in an eligible profession, they **knowingly purchase or take possession** of body armor . . . .  This section shall not apply to individuals or entities engaged or employed in eligible professions, which shall include police officers . . . , peace officers . . . , persons in military service in the state of New York or military or other service for the United States, and such other professions designated by the department of state in accordance with . . . the executive law.  Unlawful purchase of body armor is a class A misdemeanor for a first offense and a class E felony for any subsequent offense."  N.Y. PENAL LAW § 270.21 (emphasis added).

22.    Nor does New York allow anyone to "sell, exchange, give or dispose of body armor . . . to an individual whom they know or reasonably should have known is not engaged or employed in an eligible profession . . . .  Unlawful sale of body armor is a class A misdemeanor for a first offense and a class E felony for any subsequent offense."  *Id.* § 270.22.[3]

23.    New York's Body Armor Ban not only makes it illegal for non-eligible persons (*i.e.* most New York State residents) to possess body armor, but also eliminates the market for body armor in New York by prohibiting both the purchase and sale of this purely defensive arm.  *Id.* (criminalizing body armor sales to most New York

---

[3] The term "dispose of" under New York's Penal Law is defined to mean "to dispose of, give, give away, lease, loan, keep for sale, offer, offer for sale, sell, transfer and otherwise dispose of."  N.Y. Penal Law § 265.00(6).

State residents); *see also* GBL § 396-eee(4) (imposing fines of up to $10,000 per sale of body

armor to "any individual or entity not engaged or employed in an eligible profession . . . .").

## II.    THE SCOPE OF THE SECOND AMENDMENT INCLUDES BODY ARMOR

24.    Throughout history and cross-culturally, people have worn armor

to ensure their own safety while travelling or appearing in public. *See Body Armor History*,

GlobalSecurity.org (last accessed June 5, 2024),

https://www.globalsecurity.org/military/systems/ground/body-armor2.htm.

25.    Body armor is a purely defensive class of arms, as opposed to the

inherent dual-use nature of projectile weapons. As such, up to and including the present

day, body armor remains extremely popular among Americans.[4] This is because, in part,

body armor can be employed in a variety of situations; for example, a parent concerned

about school shootings may wish to provide their child a backpack with protective lining[5]

(which is illegal under New York's Body Armor Ban); or, citizens concerned about the

violent civil unrest that swept the country during the summer leading up to the 2020

Presidential election—such as the May 30, 2020 riot in Niagara Square, Buffalo, New

---

[4] *See* Jaclyn Diaz, *Sales of body armor are on the rise. Who's buying and why?*, NPR (June 14, 2022, 5:00AM), https://www.npr.org/2022/06/14/1103935711/body-armor-sales-increase-rise-mass-shootings-bans ("Dave Goldberg, the CEO of National Body Armor, said his company experienced a boost in sales immediately following the mass shooting at a grocery store in Buffalo.").

[5] Elaina Athans, *'Anything to keep kids safe': Parent considers bulletproof backpacks*, ABC 11 NEWS (March 30, 2023), https://abc11.com/school-safety-student-guns-at-shooting/13051540/.

York—may wish to obtain body armor as a precautionary measure (which again is illegal under New York's Body Armor Ban).



(Niagara Square, Buffalo, New York, May 30, 2020; WBEN/Tim Wenger)

26.     The tradition of keeping and bearing armor has a long and rich history in America, spanning the early European explorers' heavy reliance on armor, through Colonial-era mandates requiring able-bodied men and municipalities to keep armor ready at hand, to the mass market for bullet proof garments that began during the Civil War era and continues to the present.  In essence, Americans have always "used armor when the benefits outweighed the burdens", with very little regulation.  Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America* (manuscript, at 42), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4679833.

27.     The history of the United States is replete with examples of American citizens choosing to wear protective vestments in order to protect themselves. The history of body armor on the North American continent long predates the American Revolution.  *See* BASHFORD DEAN, HELMETS AND BODY ARMOR 287 (Yale University Press, 1920) ("Curiously enough, soft armor was quite in vogue at the time of the colonization of America.  In 1663, Roger North records that 'an abundance of silken back

and breast plates were made and sold that were pretended to be pistol proof in which any man dressed was safe as in a house . . ."); *See also* Greenlee, *The Tradition of Armor Use and Regulation in America* (manuscript, at 7-28) (detailing common armor used during exploration and early colonization of America).

28.     The United States Court of Appeals for the Tenth Circuit recognized the continuing utility of body armor for at-risk 21st-century Americans in a notable pre-*Heller* case.  *United States v. Patton*, 451 F.3d 615, 629 (10th Cir. 2006) ("[W]earing body armor is not an inherently threatening act.  Much of the time, wearing body armor is an act of self-defense, which reduces rather than increases crime.  This case illustrates the point: Mr. Patton was not armed at the time he was apprehended and—according to his story—was wearing the vest solely because his prior gang activity, now abandoned, made him vulnerable to attack.").

29.     Moreover, some of the greatest developments in the history of body armor have been discovered by Americans.  Initially, American-made body armor remained unwieldy and relatively ineffectual, including the examples created in the early 20th Century—*e.g.*, the Brewster Body Shield, created in 1917 by Dr. Guy Otis Brewster of Dover, New Jersey.  *See* Adrian Burrows, *Bizarre World War I – The New Body Armor that Failed*, HISTORY IS NOW MAGAZINE (March 5, 2014), https://www.historyisnowmagazine.com/blog/2014/3/5/bizarre-world-war-i-the-body-armor-invention-that-failed.

30.     In 1965, the great Polish-American inventor Stephanie Louise Kwolek, synthesized Kevlar while working at DuPont.  *See Kevlar Inventor Stephanie Kwolek Dies*, BBC NEWS (June 21, 2014), https://www.bbc.com/news/world-us-canada-27951043.

Because Kevlar is easily used to fashion effective body armor, "the material has saved thousands of lives," *id.*, but cannot be purchased by most residents of New York State. Penal Law § 270.21 & 22; GBL § 396-eee.

31.     Body armor is frequently used in non-military applications, including to protect civilians who are at risk of being targeted by criminals by virtue of their occupation (*e.g.*, security guards and journalists).  U.S. Department of Justice, Office of Justice Programs, *National Institute of Justice Guide: Body Armor*, NATIONAL INSTITUTE OF JUSTICE (December 2014), https://www.ojp.gov/pdffiles1/nij/247281.pdf.  This is because "**wearing body armor saves lives**"  *Id.* at 3.

32.     Body armor is in common use in every state for lawful purposes. Indeed, a recent analysis of the body armor market concluded that American civilians spent $41.9 million on body armor in 2022, which is projected to increase to $69.2 million by 2034, as the materials to make body armor become more and more lightweight, thereby increasing the popularity of body armor.  PRECEDENCE RESEARCH, BODY ARMOR MARKET (2023).[6]

33.     Among those who commit crimes, by contrast, only a negligible percentage choose to wear body armor while perpetrating their crimes.  For example, in 1984, New York enacted Penal Law § 270.20, which made it a felony to wear a "body vest"

---

[6] The same market analysis found that the U.S. military spent $387.5 million on body armor that year, and law enforcement spent $271.4 million on body armor.

during commission of crime in possession of a gun, but research discloses only a handful of cases applying that statute in the 40 years since its enactment.

34.     New York's Body Armor Ban is, therefore, a ban on acquiring and keeping arms that are commonly possessed and used for lawful purposes, including self-defense in public and at home.

**A.     New York's Body Armor Ban is unconstitutional.**

35.     The Supreme Court in *Heller* left no doubt that body armor is protected by the Second Amendment:

> Before addressing the verbs 'keep' and 'bear,' we interpret their object:  'Arms.'  The 18th-century meaning is no different from the meaning today.  The 1773 edition of Samuel Johnson's dictionary defined 'arms' as 'weapons of offence, **or armour of defence.**'  Timothy Cunningham's important 1771 legal dictionary defined 'arms' as '**anything that a man wears for his defence**, or takes into his hands, or useth in wrath to cast at or strike another.'

554 U.S. at 581 (internal citations omitted and emphasis added); s*ee also Maloney v. Singas*, 351 F. Supp. 3d 222, 235 (E.D.N.Y. 2018) (determining that nunchaku fall within the ambit of the Second Amendment, despite not being firearms).

36.     "Self-defense is a basic right, recognized by many legal systems from ancient times to the present day."  *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010).

37.     To codify this preexisting right, the Second Amendment to the United States Constitution provides:  "A well-regulated Militia being necessary to the

security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. CONST. amend. II.

38. The term "arms" had an expansive meaning at the time of the ratification of the Bill of Rights, and included tools that have a purely defensive purpose, such as body armor.  *Heller*, 554 U.S. at 581; *Cf.* Stephen A. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to 'Bear Arms,'* 49 LAW AND CONTEMPORARY PROBLEMS 401–12 (1986).

39. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."  *Heller*, 554 U.S. at 634–35.

40. "The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon."  *Id.* at 634.

41. Courts in and outside of this state have long understood that body armor is a class of arms protected by the Second Amendment.  *United States v. Serrano*, 191 F. Supp. 3d 287, 292 (S.D.N.Y. 2016) ("[A]ssuming that 'body armor' is analogous to a firearm . . ."); *United States v. Smith*, No. CRIM. 09-20070, 2009 WL 3241992, at *1 (E.D. Mich. Oct. 8, 2009) ("Defendant Smith concedes that the term "arms" in the operative clause of the Second Amendment protects both weapons of offense and armor of defense.").

42.     Here, stripping the People of the ability to purchase, sell, and take possession of armor—arms that are inherently non-lethal—is contrary to the Second Amendment.[7]

43.     The Second Amendment is an "unqualified command." *Bruen*, 142 S. Ct. at 2130.  When a law, like New York's Body Armor Ban, prevents citizens from acquiring arms that are in common use for lawful purposes, then that law violates the Second Amendment. *Bruen*, 142 S. Ct. at 2129–30; *Heller*, 554 U.S. at 628.  New York's ban cannot be justified by reference to any countervailing governmental interest. *Bruen*, 142 S. Ct. at 2127.

44.     In order to justify a law that affects Plaintiffs' Second Amendment protected rights, the government bears the affirmative burden of proving that the regulation is consistent with our nation's history and tradition. *Bruen*, 142 S. Ct. at 2127.  As a matter of law, any regulation that flatly bans the purchase of an entire class of common arms frequently used for self-defense and other lawful purposes is inconsistent with this nation's history and tradition, and thus violates the Second Amendment. *Id.* at 2128; *Heller*, 554 U.S. at 624.

45.     New York cannot meet its burden; there exists no American tradition of depriving citizens of the ability to lawfully purchase, sell, or take possession of

---

[7] *See Caetano v. Massachusetts*, 577 U.S. 411, 421 (2016) ("Moreover, a weapon is an effective means of self-defense only if one is prepared to use it, and it is presumptuous to tell Caetano she should have been ready to shoot the father of her two young children if she wanted to protect herself. Courts should not be in the business of demanding that citizens use more force for self-defense than they are comfortable wielding.") (Alito, J., concurring in the judgment).

purely defensive arms and armor.  Indeed, there were no restrictions concerning body armor at all prior to 1900.  Greenlee, *The Tradition of Armor Use and Regulation in America* (manuscript, at 38-41).

46.     Moreover, in the present day, the overwhelming majority of states do not prohibit non-felons from purchasing, possessing, and wearing body armor regardless of the armor's level of protection.  *See Body Armor Laws By State 2023 - Know Your Rights*, Spartan Armor Systems (January 4, 2023), https://www.spartanarmorsystems.com/body-armor-laws-by-state-know-your-rights (conducting a state survey).

47.     Because New York's Body Armor Ban cannot pass muster under *Heller* and *Bruen*, and deprives Plaintiff Heeter, other FPC members, and most New Yorkers of their ability to acquire and possess an entire class of purely defensive arms, enforcement of the Body Armor Ban should be permanently enjoined.

## THE EFFECT ON PLAINTIFFS

48.     Plaintiff Heeter lives in Erie County, New York.  He is a medical device salesman, and therefore is not in a profession that New York deems eligible for body armor.  He intends to exercise his right to keep and bear body armor for lawful purposes. Specifically, if allowed, Plaintiff Heeter would purchase (and would have already purchased) Safe Life Defense Level IV armor,  BulletSafe Level IV armor, or another body armor offering a similar level of protection.  Plaintiff Heeter would immediately purchase and possess this armor (and would have done so already) were it not for Defendants' enforcement of New York's Ban.  In light of Defendants' actions, including the credible threat of arrest, confiscation, prosecution, fines, and imprisonment arising from New York's

Body Armor Ban and their recent actions to enforce it, Plaintiff Heeter has refrained from acquiring Safe Life Defense or BulletSafe body armor.

49.     Plaintiff Heeter's desire and intention to purchase body armor arose in large part from a close call he experienced in May 2020, as violent riots swept America's cities.  Plaintiff Heeter left work at the Buffalo Niagara Medical Campus on the evening of May 30, 2020, and took his normal route home through Niagara Square.  Shortly after he drove through the square, a protest turned into a violent mob, accosting motorists and lighting a vehicle on fire, resulting in a state of emergency.  Plaintiff Heeter narrowly missed being surrounded by the mob.  Plaintiff Heeter desires to purchase body armor, in part so that he can keep it in his car in the event of similar civil unrest, which concerns him as the next presidential election approaches.[8]



(Niagara Square, Buffalo, New York, May 30, 2020; Thomas O'Neil-White/WBFO News,)

---

[8] https://buffalonews.com/news/local/watch-now-protesters-beat-driver-smash-car-in-niagara-square/article_87493131-a9c8-5d62-867a-aba74ed4b188.html.

50.     Plaintiff Braiman lives in Madison County, New York.  He is an Emeritus Professor of Chemistry at Syracuse University (retired), and therefore is not in a profession that New York deems eligible for body armor.  He intends to exercise his right to keep and bear body armor for lawful purposes.  Specifically, if allowed, Plaintiff Braiman would purchase (and would have already purchased) Wonder Hoodie's Bulletproof Hoodie (NIJ-IIIA), Bulletproof Flannel Jacket (NIJ-IIIA), or other articles of bulletproof clothing offering a similar level of protection.  Plaintiff Braiman would immediately purchase and possess this bulletproof clothing (and would have done so already) were it not for Defendants' enforcement of New York's Ban.  In light of Defendants' actions, including the credible threat of arrest, confiscation, prosecution, fines, and imprisonment arising from New York's Body Armor Ban and their recent actions to enforce it, Plaintiff Braiman has refrained from acquiring Wonder Hoodie's bulletproof outerwear.

51.     Plaintiff Braiman's desire and intention to purchase bulletproof outerwear stems in large part from rising crime levels in Downtown Syracuse, where his son lives and owns a home.  In recent years, there have been 20 murders within a 10-block radius of his son's home.  Plaintiff Braiman's son was held up at gunpoint outside of his residence when returning from work.  If the Body Armor Ban and Defendants' enforcement thereof did not prevent him from doing so, Plaintiff Braiman would purchase bulletproof outerwear as a gift for his son, who, like Plaintiff Braiman, also does not work in a profession New York deems eligible for body armor.  Plaintiff Braiman would also purchase bulletproof outerwear for himself, to wear in situations that he considers high risk or unsafe. For example, Plaintiff Braiman seeks the opportunity to wear a bulletproof hoodie or flannel

jacket, should he choose to, when assisting his son with exterior repairs on his son's home in Downtown Syracuse.

52.     Plaintiff Wurtenberg lives in Monroe County, New York.  He is a 911 dispatcher in Downtown Rochester, and therefore is not in a profession that New York deems eligible for body armor.  He intends to exercise his right to keep and bear body armor for lawful purposes.  Specifically, if allowed, Plaintiff Wurtenberg would purchase (and would have already purchased) Safe Life Defense FRAS or HYPERLINE armor, or another body armor offering a similar level of protection.  Plaintiff Wurtenberg would immediately purchase and possess this armor (and would have done so already) were it not for Defendants' enforcement of New York's Ban.  In light of Defendants' actions, including the credible threat of arrest, confiscation, prosecution, fines, and imprisonment arising from New York's Body Armor Ban and their recent actions to enforce it, Plaintiff Wurtenberg has refrained from acquiring Safe Life Defense FRAS or HYPERLINE armor.

53.     Plaintiff Wurtenberg has multiple reasons why he desires and intends to purchase body armor.  Plaintiff Wurtenberg works the graveyard shift as a 911 dispatcher in Downtown Rochester, which is a relatively high crime area, prone to random violence, and Plaintiff Wurtenberg at times feels unsafe commuting for the graveyard shift. Plaintiff Wurtenberg would like to have the option to wear body armor, or carry it in his car, while commuting to work, particularly during times of civil unrest.  In addition, Plaintiff Wurtenberg desires to incorporate body armor into his firearms training equipment. If the Body Armor Ban and Defendants' enforcement thereof did not prevent him from doing so, Plaintiff Wurtenberg would wear body armor while practicing at the range or

taking firearms classes, to protect himself from being injured by an accidental discharge, errant shot, or ricochet.

54. Despite the obvious benefits of body armor, New York has deprived Plaintiffs Heeter, Braiman, and Wurtenberg of a marketplace to obtain it. By outlawing all transactions that would enable an ordinary law-abiding citizen to acquire body armor, the Ban has completely destroyed the civilian market for body armor (with the narrow exception of the "eligible professions"). Plaintiffs Heeter, Braiman, and Wurtenberg are unable to purchase body armor in New York because Defendants' enforcement of the Ban has extinguished any legal market for such arms.

## COUNT ONE - AGAINST ALL DEFENDANTS

**42 U.S.C. § 1983 ACTION FOR DEPRIVATION OF PLAINTIFFS' RIGHTS UNDER THE SECOND AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION**

55. Plaintiffs restate the above paragraphs as if fully set forth herein.

56. There is an actual and present controversy between the parties.

57. The Second Amendment to the United States Constitution guarantees ordinary, law-abiding citizens their fundamental right to keep and bear arms. The Fourteenth Amendment incorporates that individual right as against the states.

58. The right to keep and bear arms includes, but is not limited to, the right of individuals to acquire and possess common arms for all lawful purposes, including self-defense.

59. New York bans ordinary citizens from purchasing or possessing an entire class of arms—body armor—while authorizing the Department of State to exempt certain categories of favored groups.

60.     42 U.S.C. § 1983 creates a cause of action against government actors who deprive individuals of their federal constitutional rights under the color of law.

61.     Defendants, individually and collectively, under color of law and at all relevant times, have deprived residents of New York—including Plaintiffs Heeter, Braiman, and Wurtenberg, as well as other FPC members—of their individual rights through enforcement of the Body Armor Ban.

62.     For all the reasons asserted herein, Defendants have acted in violation of, and continue to act in violation of, 42 U.S.C. § 1983.

63.     Plaintiffs are therefore entitled to permanent injunctive relief against enforcement of the Body Armor Ban.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1.     A declaratory judgment that Plaintiffs have a fundamental right to keep and bear arms, including by acquiring body armor;

2.     A declaratory judgment that New York's Body Armor Ban, and all related regulations, policies, and/or customs designed to enforce or implement the same, prevent Plaintiffs from exercising their fundamental right to keep and bear arms, including by acquiring and possessing body armor, as guaranteed under the Second Amendment to the United States Constitution, and is thus unconstitutional;

3.     A permanent injunction prohibiting each Defendant, and Defendants' respective employees, officers, agents, representatives, and all those acting in concert or participation with them, from enforcing the challenged regulations making up, in

part, New York's Body Armor Ban, and all related regulations, policies, and/or customs designed to enforce or implement the same;

        4.        Attorneys' fees, expert fees, and costs pursuant to 42 U.S.C. § 1988, and any other applicable law; and

        5.        Any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.

Dated:  McLean, Virginia
         August 23, 2024

FLUET

By: /s/ Nicolas J. Rotsko
     Nicolas J. Rotsko, Esq.

*Attorneys for Plaintiffs*
1751 Pinnacle Drive
Suite 1000
Tysons, VA 22102
T: (703) 590-1234
F: (703) 590-0366
nrotsko@fluet.law