**TABLE OF CONTENTS**

TABLE OF AUTHORITES ................................................................................................ iii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF UNDISPUTED FACTS .................................................................... 3

      I.      New York passes the Body Armor Ban; AG James
              claimed to have participated in passing the Ban,
              and enthusiastically applauded its enactment. .............................................. 3

      II.     FPC's New York members have been and continue to be
              injured by the Body Armor Ban. .................................................................... 5

      III.    The Body Armor Ban is a recent law
              that is regularly enforced by Defendants. ..................................................... 6

      IV.    Body armor is in common use for lawful purposes. ...................................... 7

ARGUMENT ..................................................................................................................... 8

POINT I
The Body Armor Ban regulates conduct within
the plain text of the Second Amendment ........................................................................... 9

      A.   Body armor is not unusual, but is in common use for lawful purposes. ..... 14

          1.   Body armor was commonly used during both
              the Founding and Reconstruction Eras. ............................................... 14

          2.   Body armor continues to be in common use for lawful purposes. .......... 15

          3.   Body armor is used for self-defense, a lawful purpose. ......................... 17

POINT II
The Body Armor Ban Is Inconsistent with This Nation's History of Firearm Regulation .. 19

      A.   Arms in common use cannot be banned consistent with the history
          of firearm regulation. ................................................................................. 19

      B.   Body armor is neither dangerous nor unusual, so it cannot be banned. ..... 22

          1.   Body armor is not dangerous. .............................................................. 22

2.    Body armor is not unusual, but is in common use for lawful purposes.  24

CONCLUSION ................................................................................................. 24

## TABLE OF AUTHORITES

**Cases**                                                       **Page**

*Alden v. Maine,*
527 U.S. 706,(1999) ...................................................................................... 12

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.,*
910 F.3d 106 (3d Cir. 2018).......................................................................... 24

*Avitabile v. Beach,*
368 F. Supp. 3d 404 (N.D.N.Y. 2019) ........................................................... 15

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) ..................................................................................16, 17

*Christian v. James,*
No. 22-CV-695 (JLS), 2024 WL 4458385 (W.D.N.Y. Oct. 10, 2024) ......................19, 20

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .................................................................................passim

*Friedman v. City of Highland Park,*
136 S. Ct. 447 (2015)...................................................................................... 24

*Maloney v. Singas,*
351 F. Supp. 3d 222 (E.D.N.Y. 2018)............................................................. 15

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
804 F.3d 242 (2d Cir. 2015).............................................................. 15, 18, 24

*Nat'l Ass'n for Gun Rts. v. Lamont,*
153 F.4th 213, 223 (2d Cir. 2025) .............................................................2, 20, 22, 24

*New York State Rifle and Pistol Association v. Bruen,*
597 U.S. 1 (2022) ....................................................................................passim

*People v. Webb,*
131 N.E. 3d 93 (Ill. 2019) .............................................................................. 17

*Ramirez v. Commonwealth,*
94 N.E. 3d 809 (Mass. 2018) ......................................................................... 17

*Snope v. Brown,*
145 S. Ct. 1534 (2025)..................................................................................... 16

*Teter v. Lopez*,
   76 F.4th 938 (9th Cir. 2023), *vacated by* 93 F.4th 1150 (9th Cir. 2024)) ........................... 2

*United States v. Gomez*,
   159 F.4th 172 (2d. Cir. 2025) ......................................................................... 14, 20

*United States v. Miller*,
   307 U.S. 174 (1939) ........................................................................................ 21

*United States v. Patton*,
   451 F.3d 615 (10th Cir. 2006) ......................................................................... 22

*United States v. Rahimi*,
   602 U.S. 680 (2024) ............................................................................. 10, 12, 14

*United States v. Stevens*,
   559 U.S. 460 (2010) ........................................................................................ 24

## **Other Authorities**

Bashford Dean*, Helmets and Body Armor in Modern Warfare* (1920) ...................................... 15

Spartan Armor Systems, *Body Armor Laws By State 2023
- Know Your Rights* (January 4, 2023) ................................................................. 23

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*
   50 J. LEGIS. 223 (2024) ................................................................................... 20

Drew A. Swank, *Body Armor and the Law: A Survey of Current Federal and State Statutes*,
   28 T.M. Cooley L. Rev. 389 (2011) ................................................................. 23

Giles Jacob, *A new law-dictionary: containing the interpretation and definition of words and terms
   used in the law; as also the whole law and practice thereof*, (8th ed. 1762) ............................. 11

Henry Campbell Black, *A Dictionary of Law Containing Definitions of the Terms and Phrases of
   American and English Jurisprudence Ancient and Modern* (1st ed. 1891) ............................. 12

J.J.S. Wharton, *The Law Lexicon, on Dictionary of Jurisprudence* (1848) ................................ 11

Jaclyn Diaz, *Sales of body armor are on the rise. Who's buying and why?,*
   National Public Radio, June 14, 2022 .......................................................................... 18

John Bouvier, *A Law Dictionary Adapted to the Constitution and Laws of the United States of
America*, 10th ed. 1860, Vol. I, p. 120 .......................................................................... 12

iv

John Wilkins, *An Essay towards a Real Character and a Philosophical Language*
(London 1668) ................................................................................................. 10

Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*,
23 Geo. J.L. & Pub. Pol'y 1 (2025) ................................................................ 15

Joseph Nicol Scott, *A New Universal Etymological English Dictionary* (London, 1755) .......... 11

Joseph Worcester, *A Comprehensive Pronouncing and Explanatory
Dictionary of the English* (1831)....................................................................... 11

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied
Heller in Arms-Ban Cases-Again*,
Harv. J.L. & Pub. Pol'y Per Curiam (Sept. 27, 2023)..................................... 21

Mark W. Smith., *'Not All History Is Created Equal': In the Post-Bruen World, the Critical Period
for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868*
(October 1, 2022) ............................................................................................ 12

N. WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)................ 10, 11

Peter A. Patterson, *Common Use Is Not a Plain-Text Question*,
Per Curiam, Harv. J. L. & Pub. Pol'y (Aug. 4, 2025)..................................... 21

Samuel Johnson, *Dictionary of the English Language* (4th ed. 1773) ..................................... 11

*Sources of English Constitutional History*
(Carl Stephenson & Frederick George Marcham, eds., 1937) ....................... 13

Thomas Sheridan, *A complete dictionary of the English language* (1790)............................... 11

William Blackstone*, Commentaries on the Laws of England*, Book the First (1765-1769)........ 13

Yelina Dzhanova, *Companies that make bulletproof backpacks for kids are seeing a spike in sales
after the Texas school shooting that left at least 19 children dead*,
Business Insider, May 25, 2022 ..................................................................... 18

## Constitutional Provisions, Rules, Statutes, and Laws

18 U.S.C. § 931 ........................................................................................................ 23

Penal Law § 270.20 .................................................................................................... 5

Penal Law § 270.22 .................................................................................................... 6

U.S. CONST. amend. II. ...................................................................................... 8, 10, 15

## PRELIMINARY STATEMENT

This case seeks to enjoin enforcement of New York State's Body Armor Ban. The Ban prohibits the purchase, acquisition, or sale of any "protective body covering intended to protect against gunfire," by anyone who is not a member of several "eligible professions." The Ban violates the Second Amendment protected rights of all law-abiding New Yorkers with ordinary self-defense needs who desire body armor, including the individual Plaintiffs, and other similarly situated members of Plaintiff Firearms Policy Coalition, Inc. ("FPC").

In *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Supreme Court "employ[ed] and elaborate[d] on the text, history, and tradition test that *Heller* and *McDonald* require[d] for evaluating whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense." 597 U.S. at 79 (Kavanaugh, J., concurring). *Bruen* thus made more explicit how the Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), had arrived at its test for determining whether a ban on a type of arm is consistent with the Second Amendment, but it did not disturb *Heller*'s test. Application of that test in this case makes clear that New York's ban on popular body armor, commonly owned for self-defense and other lawful purposes, is unconstitutional.

*Bruen* explained that Second Amendment analysis starts with the text, consistent with *Heller*. The key aspect of the text at issue here is "arms." Evaluating Founding-Era dictionaries, *Heller* interpreted "arms" to mean "weapons of offence, or armour of defence." 554 U.S. at 581 (cleaned up). "Arms" thus includes "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* Numerous other dictionaries and textual sources spanning from the Middle Ages through the Founding, through Reconstruction, to the present confirm that the Supreme Court was

1

correct.  "Arms" encompasses body armor.  New York's Body Armor Ban therefore implicates the plain text of the Second Amendment.

As *Bruen* explains, once the plain text of the Second Amendment is implicated, the government then bears the burden to establish that the challenged law "is consistent with the Nation's historical tradition of firearm regulation."  597 U.S. at 24.  In an arms ban case such as this, however, *Heller* already has determined what the applicable tradition of firearm regulation is:  "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  554 U.S. at 627.  Because only "dangerous and unusual" arms can be banned, the government bears the burden to show both that a banned arm is dangerous (*i.e.*, that it has "uniquely dangerous propensities," *Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023), *vacated by* 93 F.4th 1150 (9th Cir. 2024)); and that it is unusual (*i.e.*, that it is "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625).

The Second Circuit has added the gloss that "dangerous and unusual" equates to "unusually dangerous," which it deemed to encompass "novel weapons that are particularly suited for criminal violence" or "uniquely designed to create mayhem."  *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 223, 242 (2d Cir. 2025) ("*NAGR*").  While Plaintiffs maintain that this test, established by *NAGR*, is in contravention of Supreme Court precedent and should be overturned by a court competent to do so, it does not change the result here— body armor does not fit into the category of arms that can be banned under the Supreme Court's test, or the Second Circuit's "unusually dangerous" formulation.

To the extent there could have been any doubt about these principles, *Bruen* resolved them.  In describing *Heller*, *Bruen* explained that "we found it fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons that the

2

Second Amendment protects the possession and use of weapons that are in common use at the time." 597 U.S. at 21 (quotation marks omitted). *Bruen* dispensed with any further analysis of the types of arms at issue because no one "dispute[d] that handguns are weapons in common use today for self-defense." *Id*. at 32 (quotation marks omitted). And *Bruen* distinguished colonial laws that arguably restricted the carrying of handguns by reasoning that "whatever the likelihood that handguns were considered dangerous and unusual weapons during the colonial period, they are indisputably in common use for self-defense today." *Id*. at 47. In sum, *Bruen* makes clear that arms that are in common use for lawful purposes are protected by the Second Amendment and cannot be banned.

These principles resolve this case, because body armor is commonly owned for self-defense, a lawful purpose. Further, New York simply cannot show that body armor is both dangerous and unusual, nor "unusually dangerous." First, body armor is not dangerous, serving only defensive purposes. Second, because body armor is in common use for self-defense, it is not unusual, and no historical evidence the State could put forward could possibly justify the Ban. Indeed, New York is the first state to ban body armor for law-abiding citizens. The Body Armor Ban is a novel outlier that emerged more than 200 years after the Founding. There is no mainstream tradition from which Defendants could attempt to piece together potential analogues. Summary judgment should be granted in Plaintiffs' favor.

## STATEMENT OF UNDISPUTED FACTS

**I. New York passes the Body Armor Ban; AG James claimed to have participated in passing the Ban, and enthusiastically applauded its enactment.**

In the summer of 2022, New York State enacted a raft of new firearms restrictions, ostensibly in response first to mass shootings in Buffalo, New York and Uvalde, Texas, and

3

a few weeks later, to the U.S. Supreme Court's decision in *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022). Governor Hochul signed the first such "landmark legislative package" on June 6, 2022, at a signing ceremony with Defendant New York State Attorney General Letitia James ("AG James"). Pl.'s Statement of Undisputed Material Facts ("SUMF) ¶¶ 2-4. This "comprehensive bill package" "ban[ned] body armor sales outside of people in select professions." *Id.* AG James enthusiastically commended the legislation, proclaiming: "[w]ith this new package of gun laws, New York will continue to lead in imposing reasonable gun laws that keep our people safe, and I urge other states to follow suit." *Id.*

Approximately two weeks later, on June 23, 2022, the Supreme Court issued its decision in *Bruen*, which struck down the "proper cause" requirement of New York State's concealed carry permitting scheme, because that "special need" scheme prevented citizens with ordinary self-defense needs from exercising their constitutionally protected right to keep and bear arms, and clarified that means-ends tiered scrutiny analysis has no place in Second Amendment challenges. In response, AG James vowed:

> In the days to come, **my office will be taking action** to address the potential harm that this ruling may cause, and we will continue to defend the constitutionality of our state's laws, as we've always done. **We will work with the Governor and Legislature** to amend our licensing statute that will continue to protect New Yorkers. I want to reassure all New Yorkers that our robust gun protection laws remain intact and **we will be working with our partners in government to further strengthen them**.

SUMF ¶ 6. (emphasis added).

AG James and Governor Hochul did just that. Over the course of the following week, Governor Hochul called lawmakers back to Albany for a special session, and on July 1, 2022, passed the second of that summer's "landmark" packages of gun restrictions,

4

known as the Concealed Carry Improvement Act ("CCIA").  The CCIA amended the Body Armor Ban as enacted a few weeks earlier, to greatly expand the definition of "body armor" from soft body-vests to "any product that is a personal protective body covering intended to protect against gunfire, regardless of whether such product is to be worn alone or is sold as a complement to another product or garment."  Penal Law § 270.20.

In the words of AG James, the CCIA "expand[ed] the scope of bullet-resistant protective equipment prohibited in New York [to encompass], for example, the steel-plated vest worn by the shooter in the [sic] Buffalo, New York."  SUMF ¶ 9.  The expanded Body Armor Ban thus covers not only steel plates, but also bulletproof backpacks and inconspicuous garments like Wonderhoodie's bulletproof sweatshirts and flannels.  AG James enthusiastically applauded the amended Body Armor Ban.  *Id.* ¶ 10.

## II.    FPC's New York members have been and continue to be injured by the Body Armor Ban.

FPC is a 501(c)(4) nonprofit membership organization with members residing in New York State, including Plaintiffs Heeter and Wurtenberg.  SUMF ¶ 16.  FPC's members throughout the state, who have plans to purchase and/or acquire body armor for lawful purposes, but who are not in a profession deemed "eligible" by the state, have been prohibited from doing so since July 6, 2022, when the amended Body Armor Ban took effect.  *Id.*  These FPC members are and will continue to be injured by the Body Armor Ban unless and until enforcement is enjoined.  The individual Plaintiffs in this case are but two examples of FPC's members who have a continuing desire to purchase and/or acquire body armor and are injured by the Ban.  *Id.*

Plaintiff Heeter is a resident of Erie County, and wishes to purchase body armor for lawful purposes, including to protect himself in the event of civil unrest similar to the riots of

2020.  SUMF ¶ 17.  He is a medical device salesman, which is not an eligible profession.  *Id.* Plaintiff Wurtenberg is a resident of Monroe County, and wishes to purchase body armor for lawful purposes, including to have it available for his "graveyard shift" commute during late night hours in downtown Rochester, and to incorporate into his range training equipment to prevent accidental injury.  *Id.* ¶ 18.  Plaintiff Wurtenberg is a 911 dispatcher, which is not an eligible profession.  *Id.*  Although these two Plaintiffs (and other FPC members across the state) want to purchase and/or acquire body armor to protect themselves and their loved ones, they recognize that the Body Armor Ban makes that illegal, and they do not want to break the law and fear enforcement if they do so.

Further, no one can legally sell body armor to them anyway (including out of state retailers), because the legal body armor marketplace in New York has been eliminated by Defendants' enforcement of the Ban, which imposes both criminal (Penal Law § 270.22) and civil penalties of up to $10,000 per transaction ($5,000 minimum) (GBL § 396-eee) on anyone who sells or gives body armor to someone who is not in an eligible profession.

### III.    The Body Armor Ban is a recent law that is regularly enforced by Defendants.

Defendant AG James and Governor Hochul enthusiastically touted New York State's first-in-the-nation (and only) Body Armor Ban as a key part of their 2022 "landmark legislation" restricting firearms.  SUMF ¶ 11.  Neither have distanced themselves from the law, nor treated it as obsolete.  The State Police warned shortly after enactment that they have "zero tolerance" for violations of the CCIA, which encompasses the Body Armor Ban. *Id.* ¶ 13.  If "you violate this law, you will be arrested.  Simple as that." *Id.*  The Ban has been consistently enforced by the State Police, including multiple arrests after enactment. *Id.* ¶ 14.  The new crimes of selling and purchasing body armor are included in the state's

pattern jury instructions. *Id.* ¶ 15.  Neither the State Police, nor Defendants Keane or Doorley, have walked back from vigorous enforcement, nor disavowed enforcement against the Plaintiffs nor Plaintiff FPC's similarly situated members.

## IV.    Body armor is in common use for lawful purposes.

Body armor is legal in all states other than New York, creating a robust market for civilian body armor.  There are at least 70 manufacturers that sell body armor to the civilian marketplace, demonstrating strong consumer demand.  SUMF ¶ 19.  A recent analysis of the body armor market by Precedence Research ("Precedence") concluded that American civilians spent $41.9 million on body armor in 2022.  SUMF ¶ 20; Declaration of Nicolas Rotsko, dated March 27, 2026 ("Rotsko Decl.") Ex. 3 (see U.S. tab).[1]  Precedence projected that U.S. civilian expenditures on body armor would increase to $69.2 million by 2034, as the materials to make body armor become more and more lightweight, thereby increasing its popularity.  Rotsko Decl. Ex. 3 (see U.S. tab).

Likewise, Grand View Research ("Grand View") analyzed the North American body armor market using a detailed research methodology and data from 2021-2025. SUMF ¶ 21; Rotsko Decl. Ex. 1.  Grand View estimated that civilians spent $61.9 million on body armor in 2023, $65.7 million in 2024, and $69.8 million in 2025.  *Id.* (data table at the end of the report).  Grand View projected that civilian expenditures on body armor would increase to $111.5 million by 2033.  *Id.*

Multiple additional market research firms consider civilian use to be a driver of industry growth.  Fortune Business Insights identified the civilian market as a growth

---

[1] The same market analysis found that the U.S. military spent $387.5 million on body armor that year, and law enforcement spent $271.4 million on body armor.

7

opportunity, because new "[m]odular body armor systems offer flexibility and versatility, . . . [and] are becoming increasingly popular among civilians seeking personal safety." SUMF ¶ 22; Rotsko Decl. Ex. 5, at 2. According to Fortune Business Insights, North America held the largest share of the global body armor market in 2024, in part because of "increasing civilian demand for personal protective gear amid rising security threats." Rotsko Decl. Ex. 5, at 5.

Similarly, Cognitive Market Research observed "[r]ising crime rates and growing concerns about personal safety have driven increased demand for body armor among civilians, particularly in high-risk areas." SUMF ¶ 23; Rotsko Decl. Ex. 6, at 4. Discussing the mass shooting in Buffalo, New York in May 2022, and the Pittsburgh synagogue shooting in 2018, Cognitive Market Research observed that "[t]hese events, along with numerous civil protests and violent confrontations, have underscored the critical need for body armor for both law enforcement and civilians." Rotsko Decl. Ex. 6, at 5. Cognitive Market Research observed that "the Covert segment dominates the market. Covert body armor is designed to be worn under clothing, providing discreet protection without drawing attention. This feature makes it particularly appealing for civilians, including high-net-worth individuals, executives, and security personnel, who require personal safety but do not want to reveal that they are wearing protective gear." *Id.* at 10.

## ARGUMENT

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *Bruen*, the Supreme Court clarified the standard that is to be applied in all Second Amendment challenges:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

597 U.S. at 24 (internal quotation marks omitted). Applying that standard here is straightforward. Indeed, *Heller* already has done the work of interpreting the Second Amendment's text and identifying the relevant tradition (or lack thereof) of regulation for cases like this one challenging the prohibition of a type of arm. The body armor banned by New York is an "arm," which means that purchasing, acquiring, selling, possessing, and using body armor is conduct covered by the plain text of the Second Amendment. And the banned body armor at issue here is in common use for lawful purposes—and is not unusually dangerous, nor even dangerous in itself—which means that banning body armor is inconsistent with the historical tradition of regulating dangerous and unusual arms.

## POINT I

### THE BODY ARMOR BAN REGULATES CONDUCT WITHIN THE PLAIN TEXT OF THE SECOND AMENDMENT

The threshold analysis under *Bruen* is whether the "plain text" of the Second Amendment protects the conduct in which the Plaintiffs wish to engage but is banned by the statute, here, purchasing or taking possession of body armor. *Bruen* repeatedly emphasized that the subject of this inquiry is the Amendment's "plain text," 597 U.S. at 17, 24, 32, 33, or "bare text," *id.* at 44 n.11. In other words, the focus is only upon the words of the Amendment and their historical (or original public) meaning. This burden is met if the law at issue "regulates" Americans' "arms-bearing conduct." *United States v. Rahimi*, 602 U.S.

9

680, 691 (2024). Distinctions that do not appear on the face of the text cannot be found at this stage of the analysis and *must* be derived, if at all, later, through history.

The plain text of the Second Amendment states that it protects the right "keep and bear [a]rms." U.S. CONST. amend. II. The question here, then, is what was understood by the term "arms" at the Founding. *Heller* has already answered this question. "The 18th-century meaning is no different from the meaning today." *Heller*, 554 U.S. at 581. "The 1773 edition of Samuel Johnson's dictionary defined 'arms' as 'weapons of offence, or armour of defence.'" *Id*. And "Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id*. The Court also cited, without quoting, Webster's 1828 American Dictionary of the English Language, which gave as its first definition of arms "weapons of offense, or armor for defense and protection of the body." N. WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828). Body armor is plainly encompassed within "arms."

The Court's textual analysis in *Heller* is confirmed by multiple dictionaries dating from the late Seventeenth Century through the late Nineteenth Century, which show that the word "arms" included armor (as it does today), and the word "armor/armour" was understood to mean "defensive arms" (as it is still understood today):

- **John Wilkins (1668)**: This dictionary clarified the difference between "weapon," which referred to "*arms* offensive," and "armour," which referred to "defensive *arms.*"[2]

---

[2] John Wilkins, *An Essay towards a Real Character and a Philosophical Language* (London 1668), at 278; Rotsko Decl. Ex. 41.

10

- **Joseph Nicol Scott (1755)**:  Defining the verb "to arm" as "to put into, or furnish with armour of defence, or weapons of offence" and "unarmed" as "having no armour or weapons."[3]

- **Giles Jacob (1762)**:  Similar to Cunningham, this legal dictionary provided a single definition for "armour and arms," as "any thing that a man wears for his defense or takes into his hands or useth in anger to strike or cast at another."[4]

- **Samuel Johson (1773)**:  In addition to defining "arms" as "weapons of offence, or armour of defence," (discussed above), Johnson also defined "armour" as "defensive arms."[5]

- **Thomas Sheridan (1790)**:  Like Johnson, this dictionary defined "arms" as "weapons of offence, or armour of defence," and defined "armour" as "defensive arms."[6]

- **Noah Webster (1828)**:  In addition to defining "arms" as "weapons of offense, or armor for defense and protection of the body," Webster also defined "armor" as "defensive arms."[7]

- **Joseph Worcester (1831)**:  "Armor" is defined as "defensive arms for the body."[8]

- **J.J.S. Wharton (1848)**: Providing a single definition for "armour and arms" as "things which a person wears for defence , or takes in hand, or uses in anger to strike or cast at another"; translating the Latin phrase "*Armorum appellation, non solum scuta et gladii, et galese, sed et fustes et lapides continentur*" as "Under the words arms are included not only shields and swords and helmets, but also clubs and stones."[9]

---

[3] Joseph Nicol Scott, *A New Universal Etymological English Dictionary* (London, 1755); Rotsko Decl. Ex. 12.

[4] Giles Jacob, *A new law-dictionary: containing the interpretation and definition of words and terms used in the law; as also the whole law and practice thereof*, (8th ed. 1762); Rotsko Decl. Ex. 13.

[5] Samuel Johnson, 1 *Dictionary of the English Language* 107 (4th ed. 1773); Rotsko Decl. Ex. 7.

[6] Thomas Sheridan, *A complete dictionary of the English language* (1790); Rotsko Decl. Ex. 14.

[7] N. Webster, *American Dictionary of the English Language* (1828); Rotsko Decl. Ex. 9.

[8] Joseph Worcester, *A Comprehensive Pronouncing and Explanatory Dictionary of the English* (1831); Rotsko Decl. Ex. 15.

[9] J.J.S. Wharton, *The Law Lexicon, on Dictionary of Jurisprudence* (1848); Rotsko Decl. Ex. 16.

11

- **John Bouvier (1868)**: Like the earlier dictionaries, Bouvier also defined "arms" as "Any thing that a man wears for his defence, or takes in his hands, or uses in his anger, to cast at, or strike at another."[10]

- **Henry Campbell Black (1891)**: The first edition of Black's Law Dictionary defined the Latin term "Arma" as "Arms; weapons, offensive and defensive; armour" and the English term "Arms" as "Anything that a man wears for his defense, or takes in his hands as a weapon."[11]

In addition to the more than three hundred years spanned by these examples, subsequent dictionaries from the 1890s to the present, including the 12th Edition of Black's Law Dictionary (2024), continue to define "arms" as encompassing armor. Regardless of whether the relevant time period is the ratification of the Bill of Rights in 1791 or the ratification of the Fourteenth Amendment in 1868, [12] the "arms" protected by the Constitution include armor.[13]

The common understanding that defensive armor is "arms" goes back much further than the Seventeenth Century. Sir William Blackstone, who the U.S. Supreme Court has called "the preeminent authority on English law for the founding generation,"[14] commenting on the 1181 Assize of Arms and the 1285 Statute of Winchester, stated:

---

[10] John Bouvier, *A Law Dictionary Adapted to the Constitution and Laws of the United States of America*, 10th ed. 1868, Vol. I, p. 120; Rotsko Decl. Ex. 19.

[11] Henry Campbell Black, *A Dictionary of Law Containing Definitions of the Terms and Phrases of American and English Jurisprudence Ancient and Modern* (1st ed. 1891); Rotsko Decl. Ex. 21.

[12] Plaintiffs recognize the Court referenced an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope[.]" *Bruen*, 597 U. S. at 37; *United States v. Rahimi*, 602 U.S. 680, 692 n.1. Plaintiffs' position is that the critical period for determining both the scope of Second Amendment rights and any historical analogues that justify modern regulations is the ratification of the Second Amendment in 1791, not the that of the Fourteenth Amendment in 1868. *See* Mark W. Smith., *'Not All History Is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868* (October 1, 2022), available at SSRN: https://ssrn.com/abstract=4248297. Nevertheless, this issue in immaterial here because the textual and historical arguments are the same regardless of which relevant historical period is applicable.

[13] Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, at 2-4.

[14] *Alden v. Maine*, 527 U.S. 706, 715 (1999).

> In the mean time we are not to imagine that the kingdom was left wholly without defence in case of domestic insurrections, or the prospect of foreign invasions. Besides those who by their military tenures were bound to perform forty days' service in the field, first the assize of arms, enacted 27 Hen. II., and afterwards the statute of Winchester, under Edward I., obliged every man, according to his estate and degree, to provide a determinate quantity of such **arms** as were then in use, in order to keep the peace: and constables were appointed in all hundreds by the latter statute, to see that such **arms** were provided.[15]

Blackstone here refers to the instruments which the Assize of Arms and the Statute of Winchester required men to keep and provide—both weapons and armor—as "arms."  King Henry II issued the first Assize of Arms in 1181, requiring "every free layman" to have, depending on his chattels, either "a shirt of mail, a helmet, a shield, and a lance," or "a hauberk, an iron cap, and a lance," and referring to all of these items, both weapons and armor, as "arms."[16]  The subsequent Statute of Winchester (1285), similarly "commanded that every man have in his house *arms* for keeping the peace," specified that the "arms" which a man was required to have included a "hauberk" (a type of chainmail shirt that covers the torso and reaches down to the thighs), a "haubergeon" (a shorter version of a hauberk, typically reaching only to the waist or hips), and a "helmet of iron," all three of which were armor rather than weapons.[17]  Both Blackstone and the medieval laws he commented upon show that "arms" includes defensive armor.

*Bruen* further confirmed that armor is encompassed under "arms" because the Statute of Northampton's prohibition on "going or riding 'armed'" was "centrally concerned with

---

[15] William Blackstone*, Commentaries on the Laws of England*, Book the First, 410-11 (1765-1769) (emphasis added); Rotsko Decl. Ex. 38.

[16] *The Assize of Arms (1181), reprinted in Sources of English Constitutional History* 85-87 (Carl Stephenson & Frederick George Marcham, eds., 1937); Rotsko Decl. Ex. 26.

[17] *See* 13 Edw. 1. St. 2 (1285), *reprinted in Sources of English Constitutional History*, supra, at 174; Rotsko Decl. Ex. 27.

the wearing of armor," 597 U.S. at 41, which prohibition by the time of the Founding was applicable only in "such Circumstances as are apt to terrify the People." *Id.* at 45. This passage from *Bruen,* as well as the definitions of "arms" and "bear" in *Heller,* demonstrate that the Court—like everyone else since the Middle Ages—understands the term "arms" as inclusive of both "weapons" and "armor." In sum, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582. And all armor is "arms." Because the New York laws challenged here ban arms, the plain text is implicated, and the burden is on the State to justify its laws.

A.    **Body armor is not unusual, but is in common use for lawful purposes.**

The Supreme Court left no doubt that the threshold textual inquiry of the *Heller/Bruen* test involves solely an analysis of the "plain text," *Bruen*, 597 U.S. at 17, 24, 32, 33, or "bare text," *id.* at 44 n.11, and that the plaintiff's burden at this textual threshold is met if the law at issue simply "regulates" Americans' "arms-bearing conduct." *Rahimi*, 602 U.S. at 691. The Second Circuit, however, has endeavored to wedge an empirical "common use for lawful purposes" test into *Bruen*'s threshold textual analysis. *United States v. Gomez*, 159 F.4th 172, 176 (2d. Cir. 2025). While the Second Circuit's *Gomez* test is contrary to Supreme Court precedent, it does not require a different outcome here, because as an empirical matter, body armor is in common use by law abiding citizens for lawful purposes, and has been during all relevant historical periods.

1.    **Body armor was commonly used during both the Founding and Reconstruction Eras.**

Body armor was widely available and commonly used during the Founding Era. Militia mandates in New York, North Carolina, Rhode Island, and Virginia required

14

citizens to keep various kinds of body armor for use in the cavalry as late as 1798.[18]  That Eighteenth Century militiamen were required to keep and furnish body armor when mustered for service demonstrates not just that armor was available for acquisition at the time of the Founding, but that armor was encompassed within the "arms" which "the People" could "keep and bear" to maintain a "well regulated militia."[19]

Body armor continued to be used by Americans throughout the Nineteenth Century. By the 1860s, bulletproof vests were widely available to the general public and were used by both Union and Confederate soldiers during the American Civil War.[20]  That body armor was in common use by Americans for lawful purposes in the Eighteenth and Nineteenth Centuries further demonstrates that the Ban is unconstitutional.  Americans have always "used armor when the benefits outweighed the burdens."[21]

### 2. Body armor continues to be in common use for lawful purposes.

In the Second Circuit, "[c]ommon use is an objective and largely statistical inquiry," that examines whether arms are "commonly owned."  *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015).  Courts within this circuit have held that this requirement is met when at least tens of thousands are owned.  *E.g., Avitabile v. Beach*, 368 F. Supp. 3d 404, 411-12 (N.D.N.Y. 2019) (finding that 300,000 tasers constituted "common use"); *Maloney v. Singas*, 351 F. Supp. 3d 222, 237 (E.D.N.Y. 2018) (finding that "at least 64,890 metal and wood nunchaku" was common use).

---

[18] Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 25-26 (2025) (citing to relevant militia mandates for armor items in each colony/state).

[19] U.S. Const. amend. II.

[20] Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 30-35 (2025); Bashford Dean*, Helmets and Body Armor in Modern Warfare* (1920), at 56-58.

[21] Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 35-40 (2025) (examining historical use and regulation of armor).

15

Body armor exceeds this threshold.  Precedence's recent analysis of the body armor market concluded that American civilians spent $41.9 million on body armor in 2022.  SUMF ¶ 20; Rotsko Decl. Ex. 3 (see U.S. tab).  Assuming conservatively that each unit of body armor purchased that year cost $750, that would be more than 55,000 units purchased in 2022 alone.  Grand View estimated that the North American civilian body armor market had $61.9 million in sales in 2023, $65.7 million in 2024, and $69.8 million in 2025.  SUMF ¶ 21; Rotsko Decl. Ex. 1 (data table).  With the same conservative assumption that each unit cost $750, this amounts to more than 82,000 units purchased in 2023, more than 87,000 purchased in 2024, and more than 93,000 units purchased in 2025.  Grand View projects civilian expenditures on body armor to reach $111.5 million by 2033.  *Id.*  Multiple other market research firms observe that civilian demand is driving overall body armor market growth.  SUMF ¶¶ 22-23; Rotsko Decl. Ex. 5, at 2, 5 & Ex. 6, at 4, 5, 10.  More than 70 manufacturers endeavor to meet this demand, SUMF ¶ 19, in all states but New York.

In addition to numeric commonality, that 49 states do not ban body armor means that it is jurisdictionally common as well.  *Snope v. Brown*, 145 S. Ct. 1534 (2025) (Kavanaugh, J.) ("And AR–15s are legal in 41 of the 50 States, meaning that the States such as Maryland that prohibit AR–15s are something of an outlier."); *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (that citizens "may lawfully possess [tasers] in 45 States" supports a finding of common use).

The Supreme Court's decision in *Caetano v. Massachusetts* further confirms that the arms banned by New York are in common use for lawful purposes.  577 U.S. 411 (2016).  That case concerned Massachusetts' ban on the possession of stun guns, which the Commonwealth's highest court had upheld on the basis that such weapons are not protected

16

by the Second Amendment.  With a brief *per curiam* opinion, the Supreme Court vacated

that decision.  *Id.* at 411–12.  Though the Court remanded the case back to the state court

without deciding whether stun guns are constitutionally protected, *see id.*, Justice Alito filed

a concurring opinion concluding that those arms "are widely owned and accepted as a

legitimate means of self-defense across the country," based on evidence that "hundreds of

thousands of Tasers and stun guns have been sold to private citizens."  *Id.* at 420 (Alito, J.,

concurring) (cleaned up).  Of course, that is far fewer than the vast quantity of body armor

owned by private citizens throughout the nation.

The Massachusetts Supreme Judicial Court got the message.  In a subsequent case,

that Court, relying on *Caetano*, held that because "stun guns are 'arms' within the protection

of the Second Amendment," the state's law barring "civilians from possessing or carrying

stun guns, even in their home, is inconsistent with the Second Amendment and is therefore

unconstitutional."  *Ramirez v. Commonwealth*, 94 N.E. 3d 809, 815 (Mass. 2018).  The

Illinois Supreme Court followed suit with a similar ruling in 2019, relying on *Caetano* and

*Ramirez* to conclude that "[a]ny attempt by the State to rebut the *prima facie* presumption of

[S]econd [A]mendment protection afforded stun guns and tasers on the grounds that the

weapons are uncommon or not typically possessed by law-abiding citizens for lawful

purposes would be futile."  *People v. Webb*, 131 N.E. 3d 93, 96 (Ill. 2019) (citation omitted).

This reasoning is sound, and necessarily entails the invalidity of New York's Ban, which

restricts arms that are much more common than stun guns.

### 3.   Body armor is used for self-defense, a lawful purpose.

New York attempted to justify the Body Armor Ban by pointing to the body armor

worn by the mass-shooter at Tops in Buffalo, New York.  SUMF ¶ 9.  Nevertheless, use of

17

body armor by mass-shooters does not establish that body armor is not commonly owned for lawful purposes. According to a study published by the Federal Bureau of Investigation, less than 5% of perpetrators in mass-shooting incidents from 2000 to 2019 wore body armor.[22] That body armor has been used in a handful of tragic mass-shooting incidents does not outweigh that the overwhelming majority of body armor products are used for lawful purposes. The same FBI study found that nearly 70% of mass-shootings were committed using handguns.[23] Yet handguns cannot be banned under the Second Amendment, despite the fact that they are used in crimes far more frequently than is body armor.[24]

The threat posed by mass-shooters in fact increases the demand for body armor by law-abiding citizens, reinforcing both the "common use" of body armor and the unconstitutionality of the Ban. For example, Armored Republic reported a six-fold increase in sales of bulletproof backpacks after the Tops shooting and Uvalde school shooting in 2022.[25] Other manufacturers of bulletproof backpacks reported similar surges in sales after the Uvalde shooting.[26] While citizen demand for body armor naturally surged after these events, New York State somehow opted to ban it. New York parents cannot even buy bullet proof backpacks for their school children.

---

[22] *See* FBI, Active Shooter Incidents 20-Year Review, 2000-2019, available at https://www.fbi.gov/file-repository/active-shooter-incidents-20-year-review-2000-2019-060121.pdf/view.

[23] *See Id*.

[24] *See Heller*, 554 U.S. 570 (ruling that a handgun ban is unconstitutional); *see also Cuomo*, 804 F.3d at 256 ("[E]vidence of disproportionate criminal use did not prevent the Supreme Court from holding that handguns merited constitutional protection.").

[25] Jaclyn Diaz, *Sales of body armor are on the rise. Who's buying and why?,* National Public Radio, June 14, 2022, available at: https://www.npr.org/2022/06/14/1103935711/body-armor-sales-increase-rise-mass-shootings-bans.

[26] Yelina Dzhanova, *Companies that make bulletproof backpacks for kids are seeing a spike in sales after the Texas school shooting that left at least 19 children dead*, Business Insider, May 25, 2022, available at https://www.businessinsider.com/bulletproof-backpack-makers-seeing-sales-spike-after-texas-school-shooting-2022.

What these facts show is that the arms that New York State bans are common in all relevant respects:  (1) they are common categorically, as body armor is a basic self-defense article that has been used for centuries; (2) they are common numerically, as American civilians (non-law enforcement) own vast quantities of body armor and spend millions of dollars each year on it; and (3) they are common jurisdictionally, as they are lawful to possess and use in all states (except New York) now and throughout relevant history for lawful purposes including self-defense.

### POINT II

### THE BODY ARMOR BAN IS INCONSISTENT
### WITH THIS NATION'S HISTORY OF FIREARM REGULATION

**A.    Arms in common use cannot be banned consistent with the history
of firearm regulation.**

If the Body Armor Ban is to survive, New York must prove that it is "consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 17; *Christian v. James*, No. 22-CV-695 (JLS), 2024 WL 4458385, at *1 (W.D.N.Y. Oct. 10, 2024) ("Regulation in this area is permissible *only if* the government demonstrates that the new enactment is consistent with the Nation's historical tradition of sufficiently analogous regulations.").  Ordinarily, that would require the State to identify a relevant, well-established Founding Era tradition of regulation, and then show that the Body Armor Ban falls within that mainstream tradition.  There exists no American tradition, however, of depriving citizens of the ability to lawfully purchase, sell, or take possession of defensive armor.  From ratification of the Second Amendment in 1791 until well after ratification of

19

the Fourteenth Amendment in 1868, no American legislative body enacted any restrictions on the possession, transfer, or acquisition of body armor.[27]

Nor can Defendants fit the Body Armor Ban within the rule, derived from history, that only dangerous and unusual weapons may be banned, or its corollary that arms that are "in common use" for lawful purposes (therefore necessarily not dangerous and unusual) are protected and cannot be banned. *Christian*, 2024 WL 4458385, at *12 n.12.[28]

The Supreme Court first elucidated this rule in *Heller*. Like this case, *Heller* involved a ban on a type of arm (there, handguns). As explained above, *Heller* began by construing the plain text of the Second Amendment, from which the Court concluded that all handguns were "arms" and presumptively protected. 554 U.S. at 592. Likewise, as shown above, body armor is "arms" and is therefore presumptively protected. In Part III of *Heller*, the Court turned to historical limitations on the textual scope of the right. *See id.* at 626–28; *see also id.* at 595 ("Before turning to limitations upon the individual right, however, we must determine whether the prefatory clause of the Second Amendment comports with our interpretation of the operative clause."). It was through examining this history that the Court concluded that, despite its expansive textual scope, ultimately the Second Amendment "was not a right to keep and carry any weapon whatsoever." *Id*. at 626. Rather, the type of arms that are protected is limited by "the historical tradition of prohibiting the carrying of '*dangerous and unusual* weapons.'" *Id*. at 627 (emphasis added).

---

[27] David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900* (at 250), 50 J. LEGIS. 223 (2024), available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4393197 ("No armor restrictions existed in America [before 1900]").

[28] The Second Circuit employs the "common use" test at both the threshold textual inquiry, *Gomez*, 159 F.4th at 176, and as the relevant historical tradition for regulating arms, under the historical inquiry of the *Bruen* analysis. *NAGR*, 153 F.4th at 242.

20

Because only dangerous and unusual weapons can be banned, it follows that arms "in common use at the time" are protected given that they are *per se* not "unusual." *Id.* This conclusion was supported by history, because normally "when called for [militia] service, [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 624 (brackets in original) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).[29]

*Bruen* confirms that the exception for "dangerous and unusual weapons" (and correlative *protection* for arms "in common use") is a rule derived from history.[30] When *Bruen* explained its framework, "common use" was the example it chose for how to use the "historical understanding of the Amendment to demark the limits on the exercise of th[e] right." 597 U.S. at 21.[31] Once it was established that the arms at issue (handguns) were "in common use today for self-defense," there was no need for any further analysis of the type of arm at issue, textual or historical. *Id.* at 32. In distinguishing colonial laws that allegedly restricted the carrying of handguns, *Bruen* explained that regardless of what was true in colonial times, handguns are in common use today. That was significant because "colonial

---

[29] Although this particular quotation from *Heller* precedes its historical analysis, that is because this is the point of the opinion in which the Court was explaining that its textual interpretation of the Second Amendment was consistent with *United States v. Miller*. As part of that discussion, the Court stated that, "[w]e may as well consider at this point (for we will have to consider eventually) *what* types of weapons *Miller* permits." *Heller*, 554 U.S. at 624 (emphasis in original). Based in part on the quotation above about the use of common arms in militia service, the Court "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. That accords," the Court explained, "with *the historical understanding of the scope of the right*, see Part III, infra." *Id.* (emphasis added). Thus, even though this discussion took place outside of the Court's analysis of historical limits on the right, the Court made clear that those historical limits were what was being addressed.

[30] *See* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases-Again*, Harv. J.L. & Pub. Pol'y Per Curiam (Sept. 27, 2023), https://bit.ly/49KhTKQ.

[31] *See also* Peter A. Patterson, *Common Use Is Not a Plain-Text Question*, Per Curiam, Harv. J. L. & Pub. Pol'y (Aug. 4, 2025), https://journals.law.harvard.edu/jlpp/common-use-is-not-a-plain-text-question-peter-patterson/.

21

legislatures sometimes prohibited the carrying of dangerous and unusual weapons," and *in Heller*, "[d]rawing from this *historical tradition*, [the Court] explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* at 47.  There can be no doubt that *Heller*'s statements about "common use" were derived from history.

> **B.    Body armor is neither dangerous nor unusual, so it cannot be banned.**

This case thus comes down to whether the banned armor is "dangerous and unusual."  It is not.  The Second Circuit recently added its gloss on this principle from *Heller* and *Bruen*, holding that the relevant historical tradition for arms ban cases is the "longstanding tradition of restricting novel weapons that are particularly suited for criminal violence." *NAGR*, 153 F.4th at 242.  The Second Circuit interpreted "dangerous and unusual" to mean "unusually dangerous," which it defined as "weapons that are so lethal that legislators have presumed that they are not used or intended to be used for lawful purposes, principally individual self-defense." *Id.* at 234.  Put another way, "unusually dangerous" arms are "uniquely designed to create mayhem." *Id.* at 223.  Body armor does not qualify as "dangerous and unusual" under *Heller* and *Bruen*, nor does it qualify as "unusually dangerous" under the Second Circuit's *NAGR* test.[32]

> **1.    Body armor is not dangerous.**

While body armor is an "arm," it is not inherently dangerous, so it cannot be banned.  It is exclusively defensive. *E.g.*, *United States v. Patton*, 451 F.3d 615, 629 (10th Cir. 2006) ("[W]earing body armor is not an inherently threatening act.  Much of the time,

---

[32] Plaintiffs maintain that the test set forth in *NAGR* is in contravention of the Supreme Court's precedent and reserve the right to challenge the Second Circuit's holding and rationale before a court competent to overturn that precedent, including in this matter.

wearing body armor is an act of self-defense, which reduces rather than increases crime. This case illustrates the point: Mr. Patton was not armed at the time he was apprehended and—according to his story—was wearing the vest solely because his prior gang activity, now abandoned, made him vulnerable to attack.").

The U.S. Transportation Security Administration even permits airline passengers to bring body armor onboard flights in carry-on bags.[33]  It is less dangerous than a box-cutter. Further demonstrating that even New York state does not consider body armor to be dangerous, members of the handful of special need "eligible professions" can acquire and possess body armor with no age, mental health, criminal background check, or permitting requirements.  And all forty-nine other states permit all law-abiding citizens to acquire body armor without any such requirements.[34]  Even under federal law, persons convicted of "crime[s] of violence" may still acquire body armor with a note from their employer.  18 U.S.C. § 931.  It should also go without saying that there can be no serious argument that body armor is comparatively more dangerous than other presumptively constitutionally protected arms (such as handguns).  If body armor was dangerous, instead of purely defensive, surely it would be treated differently.

Further, even under this Circuit's heightened standard, because body armor is not itself lethal or dangerous, it does not—and cannot—qualify as "unusually dangerous" under *NAGR*.  It is not a "novel weapon[] . . . particularly suited for criminal violence." *NAGR*,

---

[33] *See* TSA, *Body Armor*, available at: https://www.tsa.gov/travel/security-screening/whatcanibring/items/body-armor.

[34] *See Body Armor Laws By State 2023 - Know Your Rights*, Spartan Armor Systems (January 4, 2023), https://www.spartanarmorsystems.com/body-armor-laws-by-state-know-your-rights (conducting a 50 state survey); Drew A. Swank, *Body Armor and the Law: A Survey of Current Federal and State Statutes*, 28 T.M. Cooley L. Rev. 389, 403-16 (2011).

23

153 F.4th at 242. Body armor is not "uniquely designed to create mayhem." *Id.* at 223. Indeed, armor is the least dangerous of the arms protected by the Second Amendment, because its only function is to protect the wearer.

### 2. Body armor is not unusual, but is in common use for lawful purposes.

Because it is Defendants' burden to show that the Body Armor Ban "is consistent" with historical tradition, they must demonstrate that body armor is not in common use. *Bruen*, 597 U.S. at 24.[35] Defendants' task is impossible. Not only is body armor not dangerous, but as discussed above, the civilian market for body armor is substantial and growing, which is dispositive under *Heller* and *Bruen*. *See also Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting) (reasoning that "citizens . . . have a right under the Second Amendment to keep" "AR-style semiautomatic rifles" because "[r]oughly five million Americans own" them and "[t]he overwhelming majority . . . do so for lawful purposes[.]"); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned").

### CONCLUSION

For the foregoing reasons, the Court should grant judgment in Plaintiffs favor, declare the Body Armor Ban unconstitutional, and enjoin its enforcement.

---

[35] Any doubt about the nature of this burden was removed by *Bruen*'s comparison of its analytic framework to First Amendment caselaw. To head off the complaint that it was unfair to put the government to its proof in defending a challenged law, the Court noted that this was precisely how things work in the First Amendment context where the government also generally bears the burden of "point[ing] to *historical* evidence about the reach of the First Amendment's protections." *Id.* at 24–25 (citing *United States v. Stevens*, 559 U.S. 460, 468–71 (2010)).

24