# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENJAMIN HEETER, et al., <br><br>   Plaintiffs, <br><br> v. <br><br> LETITIA JAMES, et al., <br><br>   Defendants. | **AMICUS CURIAE BRIEF OF AR-MORED REPUBLIC HOLDINGS LLC IN SUPPORT OF PLAIN-TIFFS' SUMMARY JUDGMENT MOTION** <br><br> Civil Action No.: <br><br> 1:24-cv-00623-JLS-HKS |

Joseph Brown
In-House Counsel
Armored Republic Holdings LLC
11226 N. 23rd Avenue, Suite 102B
Phoenix, Ariz. 85029
Telephone (719) 367-3338
jbrown@armoredrepublic.com

*Lead Counsel for Amicus*

*(Pro Hac Vice Application Pending)*

Dated: April 7, 2026

Randy Elf, N.Y. No. 2863553
Post Office Box 525
Lakewood, N. Y. 14750
Telephone (202) 423-2122
ForEFilingOnly@gmail.com

*Local Counsel for Amicus*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. I

TABLE OF AUTHORITIES ............................................................II

CORPORATE DISCLOSURE STATEMENT ............................................ 1

INTERESTS OF AMICUS CURIAE ................................................... 1

ARGUMENT ........................................................................ 1

I.   The Body Armor Ban violates both the civil and political dimensions of Second Amendment rights. ..................................................... 3
   A.   The Second Amendment protects an individual right to both personal protection and militia readiness. ............................................ 3
   B.   The Body Armor Ban violates New Yorkers' rights to be virtuous citizens prepared for militia service. ............................................. 10
   C.   The Body Armor Ban amounts to a civic-caste system. ................. 14

II.  Body armor is at the zenith of Second Amendment protection, because it is an essential part of the arms with which modern militiamen would respond to a muster. .................................................... 17
   A.   *Miller* Links "Common Use" to Militia Service, and *Heller* Preserved That Link. ..................................................................... 18
   B.   Body Armor is Standard Equipment for Modern Militia Service. ........ 19
      1.   Military and National Guard Use. .................................... 20
      2.   Law Enforcement Use. ................................................ 23

CONCLUSION ..................................................................... 25

CERTIFICATE OF SERVICE ........................................................ 26

i

# TABLE OF AUTHORITIES

## Cases

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................................. 3, 4, 19

*Dred Scott v. Sandford,* 60 U.S. (19 How.) 393 (1857) ................................................ 15

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ............................................................... 15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...................................................... 16

*Mills v. Alabama*, 384 U.S. 214 (1966) .......................................................................... 4

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) .................................................. 5

*Perpich v. Dep't of Defense*, 496 U.S. 334 (1990) ......................................................... 10

*United States v. Miller*, 307 U.S. 174 (1939) ........................................ 2, 18, 19, 20, 25

## Constitutional Provisions

Colo. Const. art. XVII ...................................................................................................... 10

Tex. Const. art. XVI ......................................................................................................... 10

U.S. Const. amend. II ........................................................................................................ 1

U.S. Const. art. I, § 8 ....................................................................................................... 23

U.S. Const. art. IV, § 4 ..................................................................................................... 17

Wis. Const. art. IV ........................................................................................................... 10

## Statutes

10 U.S.C. 246 .................................................................................................................... 10

20 Ill. Comp. Stat. 1805 ................................................................................................... 10

51 Pa. Stat. Ann. 301 ....................................................................................................... 10

Act of May 2, 1792, ch. 28, 1 Stat. 264 ........................................................................... 23

Ala. Code 31 ...................................................................................................................... 10

Alaska Stat. 26 .................................................................................................................. 10

An Act to Punish Certain Offenses Therein Named, and for Other Purposes, § 1,
   Miss. Laws, 1st Sess. 1865 (1865) ............................................................................ 16

Ariz. Rev. Stat. 26 ............................................................................................................ 10

Ark. Code Ann. 12 ............................................................................................................ 10

Cal. Mil. & Vet. Code 120 ................................................................................................ 10

Colo. Rev. Stat. 28 ............................................................................................................ 10

Conn. Gen. Stat. 27 ........................................................................................................... 10

Del. Code Ann. tit. 20 ...................................................................................................... 10

Fla. Stat. 250 ..................................................................................................................... 10

Ga. Code Ann. 38 .............................................................................................................. 10

Haw. Rev. Stat. 121 .......................................................................................................... 10

Idaho Code 46 ................................................................................................................ 10

Ind. Code 10 .................................................................................................................. 10

Iowa Code 29A .............................................................................................................. 10

Kan. Stat. Ann. 48 ........................................................................................................ 10

Ky. Rev. Stat. Ann. 38 .................................................................................................. 10

La. Stat. Ann. 29:3 ........................................................................................................ 10

Mass. Gen. Laws ch. 33 ................................................................................................ 10

Md. Code Ann., Pub. Safety 13 .................................................................................... 10

Me. Rev. Stat. tit. 37-B ................................................................................................. 10

Mich. Comp. Laws 32 ................................................................................................... 10

Minn. Stat. 190 ............................................................................................................. 10

Miss. Code Ann. 33 ...................................................................................................... 10

Mo. Rev. Stat. 41 .......................................................................................................... 10

Mont. Code Ann. 10 ..................................................................................................... 10

N.C. Gen. Stat. 127A .................................................................................................... 10

N.D. Cent. Code 37 ...................................................................................................... 10

N.H. Rev. Stat. Ann. 110 .............................................................................................. 10

N.J. Stat. Ann. 38A ....................................................................................................... 10

N.M. Stat. Ann. 20 ....................................................................................................... 10

N.Y. Exec. 144-a ....................................................................................................... 2, 11

N.Y. Gen. Bus. 396 .................................................................................................... 2, 12

N.Y. Mil. 2 ................................................................................................................. 2, 11

N.Y. Mil. 5 ..................................................................................................................... 11

N.Y. Mil. 7 ..................................................................................................................... 11

N.Y. Mil. 8 ..................................................................................................................... 11

N.Y. Mil. Law 17 ........................................................................................................... 12

N.Y. Mil. Law 18 ........................................................................................................... 12

N.Y. Mil. Law 2 ....................................................................................................... 10, 12

N.Y. Mil. Law 47 ........................................................................................................... 12

N.Y. Penal 270 ........................................................................................................... 2, 12

Neb. Rev. Stat. 55 ......................................................................................................... 10

Nev. Rev. Stat. 412 ....................................................................................................... 10

Ohio Rev. Code Ann. 5923 ........................................................................................... 10

Okla. Stat. tit. 44 .......................................................................................................... 10

Or. Rev. Stat. 396 .......................................................................................................... 10

R.I. Gen. Laws 30 .......................................................................................................... 10

S.C. Code Ann. 25 ......................................................................................................... 10

S.D. Codified Laws 33 ................................................................................................... 10

Tenn. Code Ann. 58 ........................................................................................... 10

Utah Code Ann. 39............................................................................................ 10

Va. Code Ann. 44 .............................................................................................. 10

Vt. Stat. Ann. tit. 20 ........................................................................................ 10

W. Va. Code 15 .................................................................................................. 10

Wash. Rev. Code 38 .......................................................................................... 10

Wyo. Stat. Ann. 19 ............................................................................................ 10

## Regulations

19 NYCRR 905 ............................................................................................. 11, 12

19 NYCRR Ch. XIX............................................................................................. 2

## Rules

Fed. R. Civ. P. 7 .................................................................................................. 1

W.D.N.Y. Loc.R.Civ.P. 5.1 ............................................................................... 26

## Law Reviews

Akhil Reed Amar, *How America's Constitution Affirmed Freedom of Speech Even Before the First Amendment*, 38 Cap. U. L. Rev. 503 (2010) .................................... 6

Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 Yale L.J. 1131 (1991) ... 3

Cass Sunstein, *Beyond the Republican Revival*, 97 Yale L.J. 1539 (1988) ................. 3

David Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. Crim. L. & Criminology 761 (2015) ................................................................................................................... 23

Don Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983)................................................................ 5

Don Kates, *The Second Amendment and the Ideology of Self-Protection*, 9 Const. Comment. 87 (1992) ........................................................................................... 5

Don Kates, *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (1986) ................................................................................................................... 5

Engdahl, *Soldiers, Riots and Revolution: The Law and History of Military Troops in Civil Disorders*, 57 Iowa L. Rev. 1 (1971).............................................................. 24

Frank Michelman, *Conceptions of Democracy in American Constitutional Argument: Voting Rights*, 41 Fla. L. Rev. 443 (1989)............................................................... 4

Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009) ................................................................................................... 15

Kurt Lash, *The Enumerated-Rights Reading of the Privileges or Immunities Clause: A Response to Barnett and Bernick*, 95 Notre Dame L. Rev. 591 (2020) ................. 3

iv

Michael McConnell, *The Originalist Justification for Brown*: *A Reply to Professor Klarman*, 81 Va. L. Rev. 1937 (1995) ........................................................... 3

Patrick Charles, *The Second Amendment Was Adopted to Protect Liberty, Not Slavery: A Reply to Professors Bogus and Anderson*, 20 Geo. J.L. & Pub. Pol'y 575 (2022) ................................................................................................................... 15

Randy Barnett & Evan Bernick, *The Privileges or Immunities Clause, Abridged: A Critique of Kurt Lash on the Fourteenth Amendment*, 95 Notre Dame L. Rev. 499 (2020) ................................................................................................................... 3

Randy Elf, *The Constitutionality of State Law Triggering Burdens on Political Speech and the Current Circuit Splits,* 29 Regent U.L. Rev. 35 (2016) ................. 14

## Treatises

1 William Blackstone, *Commentaries on the Laws of England* (1765).............. 3, 9, 23

Joseph Story, 3 Commentaries on the Constitution of the United States (1833) ....... 9

## Press

"Extra Body Armor Would Have Saved Lives, Report Finds," Baltimore Sun (Jan. 7, 2006) ..................................................................................................................... 22

"U.S. Troops' Injuries in Iraq Showed Body Armor's Value," Washington Post (May 4, 2003) ............................................................................................................... 21

## Other Authorities

"From IOTV to MSV: The Evolution of Military Body Armor," AET Gear (2025) .... 20

"New York Central Issue Facility Strives to Get National Guard Troops Latest Gear," U.S. Army (Aug. 11, 2010) ...................................................................... 21

"What Body Armor Does the Military Use?," Premier Body Armor .......................... 21

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ............ 4, 6

Armored Republic, *About Us* ..................................................................................... 1

*BJA/PERF Body Armor National Survey: Protecting the Nation's Law Enforcement Officers, Phase II Final Report to BJA, August 9, 2009* ......................................... 24

Britannica, "When Has the U.S. National Guard Been Deployed?" ......................... 22

Bureau of Justice Statistics, *Census of State and Local Law Enforcement Agencies, 2018 – Statistical Tables* ................................................................................... 24

C.S. Lewis, *The Abolition of Man* 26 (HarperOne 2001) (1943) ............................... 13

Ctr. for Army Lessons Learned, *Civil Disturbance Operations: District of Columbia National Guard Special Study* (2023) ................................................................ 22

Don Kates, *Firearms and Violence: Issues of Public Policy* (1984) ............................ 5

George Mason, speech at the Virginia Ratifying Convention (June 14, 1788) .......... 8

George Orwell, *Animal Farm* (1945) ....................................................................... 14

George Washington, First Annual Message to Congress (Jan. 8, 1790) ..................... 8

James Madison, *Federalist No. 46* (1788) ....................................................................... 7

Joseph Greenlee, *The Tradition of Armor Use and Regulation in America* .............. 20

Noah Webster, *An Examination into the Leading Principles of the Federal Constitution* (1787) ..................................................................................................... 8

Patrick Henry, speech at the Virginia Ratifying Convention (June 5, 1788) ............. 9

Richard Henry Lee, *Letters from the Federal Farmer* (1788) ..................................... 7

Saul Cornell, *Founding Fantasies vs. Historical Realities in the Second Amendment Debate*, Duke Ctr. for Firearms L. (Sept. 19, 2023) ................................................. 15

St. George Tucker, Blackstone's Commentaries 1:App. 300 (1803) ........................... 17

Stephen Halbrook, *Securing Civil Rights: Freedmen, the Fourteenth Amendment, and the Right to Bear Arms* (Indep. Inst. 2010) ....................................................... 16

Task & Purpose, "The Number of National Guard Personnel … Tripled from 5,000 to More Than 17,000" (June 1, 2020) ..................................................................... 22

*The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law*, R42659 (CRS 2018) .......................................................................... 24

U.S. Army Special Operations Command, "This Vest May Save Your Life!: U.S. Army Body Armor from World War II to Present," *ARSOF History* (2020) .......... 22

Virginia Declaration of Rights (1776) ......................................................................... 8

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 7.1, Armored Republic Holdings LLC ("Armored Republic") discloses that it is wholly owned by Republic Defense, Inc., a Delaware corporation.

## INTERESTS OF AMICUS CURIAE

Armored Republic exists to "provide free men with tools of liberty to defend their God-given rights."[1] As an expression of its commitment to constitutional ordered liberty under a republican form of government, Armored Republic's company motto is "No King But Christ." To promote the republican civic virtue of citizen soldiers being prepared and equipped to resist tyrants and criminals, Armored Republic has become the top provider of body-armor products to American civilians. Armored Republic's interests in this matter are: (1) promoting the ability of all American citizens in all states, not just select professionals, to acquire body armor to be prepared to defend their God-given liberties; (2) ensuring it can make sales to customers in all 50 states; and (3) promoting an historically-informed understanding of the original meaning of the Second Amendment that includes the full scope of liberties that the amendment protects, including the right to acquire defensive armor.

## ARGUMENT

The individual right to "keep and bear arms" undergirds the "well-regulated militia" that is "necessary to the security of a free State." U.S. Const. amend. II. New York law requires "all able-bodied male residents of the state between the ages

---

[1] *See* Armored Republic, *About Us*, https://www.ar500armor.com/about-armored-republic-2/.

of seventeen and forty-five" to report for militia service upon the governor's summons "in case of invasion, disaster, insurrection, riot, breach of the peace or imminent danger thereof." N.Y. Mil. 2(2), 5, 7. However, New York also forbids most of these same citizens from acquiring body armor that would protect them from obvious perils during militia service. *See* N.Y. Gen. Bus. 396-eee; N.Y. Penal 270.21; N.Y. Penal 270.22; N.Y. Exec. 144-a; 19 NYCRR Ch. XIX, Part 905 (collectively, the "Body Armor Ban").

As demonstrated by Plaintiffs' summary-judgment brief, body-armor products are "arms" within the meaning of the Second Amendment. *See* Pls.' Summ. J. Br. at 9-14, ECF No. 69-1. Their prohibition for law-abiding citizens therefore amounts to a deprivation of Second Amendment rights. The Second Amendment, correctly understood through its original meaning, protects not only a *civil* right to personal self-defense, but also a *political* right to be prepared for militia service as a citizen in the defense of one's state. The Body Armor Ban violates both facets of the right and is unconstitutional. This brief further asserts that body-armor products that the Body Armor Ban prohibits are at the zenith of Second Amendment protection, because they are the kind of "arms" in common use that militiamen today would be expected to supply for themselves and report with if they were called into militia service. *See United States v. Miller*, 307 U.S. 174, 179 (1939) ("[W]hen called for service [militiamen] were expected to appear bearing arms supplied by themselves and of the kind in common use at the time").

2

**I.    The Body Armor Ban violates both the civil and political dimensions of Second Amendment rights.**

**A. The Second Amendment protects an individual right to both personal protection and militia readiness.**

The Second Amendment protects an *individual* right to keep and bear arms. *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) ("the Second Amendment conferred an individual right to keep and bear arms"). That individual right is compound. Individual rights can be understood in at least two categories: civil rights and political rights. The former describes the rights to conduct one's affairs free from undue government restriction. The latter describes the rights to participate as a citizen in the body politic. *See* 1 William Blackstone, *Commentaries on the Laws of England* 119 (1765) (distinguishing "absolute" rights belonging to individuals "merely as individuals or single persons" from "relative" rights "incident to them as members of society").[2] Civil rights are those that say to the state "Leave me alone!," while political rights cry "Let me in!"[3]

---

[2] Scholars have especially emphasized this "civil/political" distinction in the context of the operative clauses of the Fourteenth Amendment's first section. *See, e.g.,* Michael McConnell, *The Originalist Justification for Brown*: *A Reply to Professor Klarman*, 81 Va. L. Rev. 1937, 1950-51 (1995); Randy Barnett & Evan Bernick, *The Privileges or Immunities Clause, Abridged: A Critique of Kurt Lash on the Fourteenth Amendment*, 95 Notre Dame L. Rev. 499 (2020); Kurt Lash, *The Enumerated-Rights Reading of the Privileges or Immunities Clause: A Response to Barnett and Bernick*, 95 Notre Dame L. Rev. 591 (2020) (all describing this distinction).
[3] Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 Yale L.J. 1131, 1162-73 (1991) ("The rights of the people — to assemble, petition, and speak — are not merely individual rights of self-expression; they are the rights of the people collectively to participate in democratic self-governance"). Other scholars have employed the dichotomy of "private," "negative," or "liberal rights" contrasted with "political," "positive" or "public rights." *See* Cass Sunstein, *Beyond the Republican Revival*, 97 Yale L.J. 1539, 1541-42 (1988) ("Political rights, on the republican view, are not simply devices to protect private interests; they are constitutive of self-governance and of

3

The Second Amendment right to keep and bear arms is a "hybrid" right, having dimensions of both civil and political liberty. In its civil dimension, it protects the individual right of self-defense and prevents a complete dependence of individuals upon the state for their own security. *Heller*, 554 U.S. at 599 ("the inherent right of self-defense has been central to the Second Amendment right"); *id.* at 628-29 (handgun ban unconstitutional because it forces citizens to rely on state for self-defense). In its political dimension, it enfranchises citizens with the power to participate in the collective defense of their own communities. *Id.* at 595-96 ("The Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia"); Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998) ("The militia was not a select group of paid professionals, but the entire adult (white male) citizenry, who were expected to own their own arms and turn out when needed to defend their community"). The Second Amendment is not alone in this hybrid character. The First Amendment rights to speech, petition, press, and assembly also have dual civil and political dimensions, protecting the rights to express oneself freely without government interference as well as the power to participate in the public discourse of the body politic as an active, informed, and engaged citizen. *See Mills v. Alabama*, 384 U.S. 214, 218 (1966)

---

the identity of citizens as free and equal members of the political community"); Frank Michelman, *Conceptions of Democracy in American Constitutional Argument: Voting Rights*, 41 Fla. L. Rev. 443, 444-45 (1989) ("Political rights — paradigmatically the right to vote — are the rights by which citizens participate in the formation of the public will. Civil rights — paradigmatically freedom from unreasonable searches — are the rights by which citizens are protected from that public will's coercive exercise").

("The Constitution specifically selected the press, which includes not only newspapers, books, and magazines, but also humble leaflets and circulars, to play an important role in the discussion of public affairs"); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions... [w]e consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open").

Constitutional scholars writing on the original meaning of the Second Amendment have commented extensively on the political dimension of the right to militia participation and preparedness. Perhaps the best and most extensive scholarship on this topic is that of Don Kates, whose articles on the Second Amendment have focused on the founding-era ideas of classical republicanism, the civic virtue of an armed citizenry, and the notion of bearing arms as a characteristic of being a free person with political agency in the body politic. *See generally* Don Kates, *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983); Don Kates, *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (1986); Don Kates, *Firearms and Violence: Issues of Public Policy* (1984); Don Kates, *The Second Amendment and the Ideology of Self-Protection*, 9 Const. Comment. 87 (1992).

Other scholars such as Professor Akhil Reed Amar have emphasized the communitarian and democratic character of the Second Amendment and likened the rights it protects to the civic participatory rights such as voting and jury service:

> At the [f]ounding, the militia was the people and the people were the militia. Indeed, the earlier draft of the amendment linked the two clauses with linchpin language speaking of "a well regulated militia, composed of the body of the people." The stylistically clumsy linchpin was later pulled out, but the final version makes the same point in fewer words. A modern translation of the amendment might thus be: "An armed and militarily trained citizenry being conducive to freedom, the right of the electorate to organize itself militarily shall not be in-fringed ... . The rest of the Bill of Rights confirms this communitarian reading. The core of the First Amendment's assembly clause, which textually abuts the Second Amendment, is the right of "the people"—in essence, voters—to "assemble" in constitutional conventions and other political conclaves. So, too, the core rights retained and reserved to "the people" in the Ninth and Tenth Amendments were rights of the people collectively to govern themselves democratically. ... If we want an image of the people's militia at the [f]ounding, we should think first of the militia's cousin, the jury. Like the militia, the jury was a local body countering imperial power, summoned by the government but standing outside it, representing the people, collectively."

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 46-48 (1998). Un-der this republican understanding of the Second Amendment, it protects not merely a right to personal, domestic self-defense, but more broadly protects the right to be a virtuous citizen armed and prepared to participate in the defense of a common-wealth in which one enjoys a status as a free person with civic duties concomitant with civic privileges. Both are *individual* rights, but the former has a private end while the latter's end is public. Just as the First Amendment effectually "*parliamentized*" all citizens,[4] the Second Amendment effectually *militarized* all cit-

---

[4] *See* Akhil Reed Amar, *How America's Constitution Affirmed Freedom of Speech Even Before the First Amendment*, 38 Cap. U. L. Rev. 503, 507 (2010) (describing

izens, extending to them the right to participate as free citizen-soldiers with their peers in maintaining, protecting, and defending a republican civic order on the local and state level. Hence why the amendment protects what is "necessary to the security of a *free* state." Put another way, the Second Amendment does not merely protect an individual right to be *independent* of political power, nor does it merely protect a right to *resist* political power; rather the Amendment's original meaning was focused on protecting the right of the people to *exercise* political power. This is democracy.

This republican conception of the Second Amendment was the overwhelming consensus among the founders and framers when it was ratified:

> A militia when properly formed are in fact the people themselves … and include, according to the past and general usage of the states, all men capable of bearing arms … . Whereas, to preserve liberty, it is essential that the *whole body* of the people always possess arms, and be taught alike, especially when young, how to use them; nor does it follow from this, that all promiscuously must go into actual service on every occasion. The mind that aims at a *select* militia, *must be influenced by a truly anti-republican principle.*

Richard Henry Lee, *Letters from the Federal Farmer*, Letter XVIII (1788)

(emphasis added).

> Besides the advantage of being armed, which the Americans possess over the people of almost every other nation, ... Notwithstanding the military establishments in the several kingdoms of Europe, which are carried as far as the public resources will bear, *the governments are afraid to trust the people with arms.*

James Madison, *Federalist No. 46* (1788) (emphasis added).

---

how the First Amendment is a democratic parallel to the Speech and Debate Clause, giving citizens the power to engage in political discourse and making "the people" sovereign rather than Congress).

7

> That a well-regulated militia, *composed of the body of the people*, trained to arms, is the proper, natural and safe defense of a free state; that standing armies, in time of peace, should be avoided as dangerous to liberty; and that, in all cases, the military should be under strict subordination to, and governed by, the civil power.

Virginia Declaration of Rights, § 13 (1776), drafted by George Mason (emphasis added).

> A free people ought not only to be armed, but disciplined; to which end a uniform and well-digested plan is requisite; and their safety and interest require that they should promote such manufactories as tend to render them independent of others for essential, particularly for military, supplies.

George Washington, First Annual Message to Congress (Jan. 8, 1790) (emphasis added).

> I ask, sir, what is the militia? It is the whole people, except a few public officers … . *To disarm the people is the best and most effectual way to enslave them.*

George Mason, speech at the Virginia Ratifying Convention (June 14, 1788), in 3 Elliot's Debates 425-26 (emphasis added).

> Before a standing army can rule, the people must be disarmed, as they are in almost every kingdom in Europe. The supreme power in America cannot enforce unjust laws by the sword; because *the whole body of the people are armed*, and constitute a force superior to any band of regular troops that can be, on any pretense, raised in the United States.

Noah Webster, *An Examination into the Leading Principles of the Federal Constitution* 43 (1787) (emphasis added).

> Guard with jealous attention the public liberty. Suspect everyone who approaches that jewel. Unfortunately, nothing will preserve it but downright force. Whenever you give up that force, you are ruined … . *The great object is that every man be armed. Everyone who is able might have a gun.*

Patrick Henry, speech at the Virginia Ratifying Convention (June 5, 1788), in

3 Elliot's Debates 45 (emphasis added).

> The militia is the natural defence of a free country against sudden foreign invasions, domestic insurrections, and domestic usurpations of power by rulers. ... . The right of the citizens to keep and bear arms has justly been considered, as *the palladium of the liberties of a republic*; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them.

Joseph Story, 3 Commentaries on the Constitution of the United States §§

1890-91 (1833) (emphasis added). Blackstone himself described the right to

arms as an auxiliary right that simultaneously served the private purpose of

self-defense *and* the civic purpose of acting "in concert in defense of the

state." 1 Blackstone, Commentaries 140 (1765). From the founding, therefore,

the right to arms was understood as both a private right and a public duty.

It is Armored Republic's concern that courts should not lose sight of this original understanding of the right to bear arms and that Second Amendment jurisprudence not become myopically focused on personal self-defense. Once arms-bearing is properly understood as not only an individual right of self-defense, but also a function of civic engagement, a political right, then the scope of activities protected by the amendment becomes more faithful to the original meaning. Its protections will include not only rights to acquire and carry arms, but also a broader right to be prepared for militia service without reliance upon a state armory, including the right to train and drill. They will also include less individualized rights and more collective, associative rights, as well as recognition of legitimate state interests in promoting and providing for the armament, training, and preparation of its unor-

9

ganized militia.[5] The immediate relevance of this understanding of the Second Amendment to this action is that the amendment not only protects individuals' right to own weapons for their personal self-defense, but also protects every citizen's right to be equipped and prepared for modern militia service, including being equipped and prepared with body armor.

---

[5] The unorganized militia is not some obsolete relic of the founding era. Today, all 50 states and the federal government still classify able-bodied citizens within certain age ranges as members of the "unorganized militia, "reserve militia," or "secondary militia" who are subject to militia service when called by the governor or the president in the event of invasion, insurrection, riot, or other civic strife. None of these jurisdictions provide for the government arming and equipping of the unorganized militia; instead, they implicitly rely upon citizen-militia members to furnish their own arms and equipment when called to service. *See* 10 U.S.C. 246; Ala. Code 31-2-2, 31-2-5; Alaska Stat. 26.05.010; Ariz. Rev. Stat. 26-121, 26-122; Ark. Code Ann. 12-61-101; Cal. Mil. & Vet. Code 120; Colo. Const. art. XVII, § 1; Colo. Rev. Stat. 28-3-103(6); Conn. Gen. Stat. 27-2; Del. Code Ann. tit. 20, 101; Fla. Stat. 250.02; Ga. Code Ann. 38-2-3; Haw. Rev. Stat. 121-1; Idaho Code 46-102; 20 Ill. Comp. Stat. 1805/1; Ind. Code 10-16-6-2; Iowa Code 29A.3; Kan. Stat. Ann. 48-201; Ky. Rev. Stat. Ann. 38.010; La. Stat. Ann. 29:3; Me. Rev. Stat. tit. 37-B, 104; Md. Code Ann., Pub. Safety 13-201; Mass. Gen. Laws ch. 33, 2-3; Mich. Comp. Laws 32.509; Minn. Stat. 190.06; Miss. Code Ann. 33-5-1; Mo. Rev. Stat. 41.050; Mont. Code Ann. 10-1-101; Neb. Rev. Stat. 55-106; Nev. Rev. Stat. 412.026; N.H. Rev. Stat. Ann. 110-B:1; N.J. Stat. Ann. 38A:1-2; N.M. Stat. Ann. 20-2-2; N.Y. Mil. Law 2(2); N.C. Gen. Stat. 127A-1; N.D. Cent. Code 37-02-01; Ohio Rev. Code Ann. 5923.01; Okla. Stat. tit. 44, 41; Or. Rev. Stat. 396.105; 51 Pa. Stat. Ann. 301; R.I. Gen. Laws 30-1-2; S.C. Code Ann. 25-1-60; S.D. Codified Laws 33-2-1; Tenn. Code Ann. 58-1-104; Tex. Const. art. XVI, 24; Utah Code Ann. 39-1-2; Vt. Stat. Ann. tit. 20, 601; Va. Code Ann. 44-1, 44-4; Wash. Rev. Code 38.04.010; W. Va. Code 15-1-3; Wis. Const. art. IV, § 29; Wyo. Stat. Ann. 19-1-101. Courts have recognized the unorganized militia as legally operative. *See, e.g.*, *Perpich v. Dep't of Defense*, 496 U.S. 334, 340-41 (1990) (discussing the constitutional status of state militias). Moreover, recent civil unrest (2020 riots), natural disasters (Hurricane Katrina, COVID-19), and the stated concerns of Plaintiff Heeter (acquiring body armor in case of future civil unrest) confirm that militia-service scenarios remain possibilities in modern America.

**B. The Body Armor Ban violates New Yorkers' rights to be virtuous citizens prepared for militia service.**

The Body Armor Ban prohibits persons from acquiring body armor unless they are "engaged or employed in an eligible profession" that the New York Department of State determines has "duties [that] may expose the individual to serious physical injury that may be prevented or mitigated by the wearing of body armor." N.Y. Exec. 144-a. The Department of State regulations state that the definition of "eligible profession" specifically *excludes* "members of the unorganized militia." 19 NYCRR 905.1(d). Under New York law, the "unorganized militia":

> consist[s] of all able-bodied male residents of the state between the ages of seventeen and forty-five who are not serving in any force of the organized militia or who are not on the state reserve list or the state retired list and who are or who have declared their intention to become citizens of the United States, subject, however, to such exemptions from military duty as are created by the laws of the United States.

N.Y. Mil. 2(2). In addition to being subject to draft in the event of a militia call by the United States, N.Y. Mil. 5, members of the "unorganized militia" are subject to draft by New York's governor "in case of invasion, disaster, insurrection, riot, breach of the peace or imminent danger thereof." N.Y. Mil. 7. Indeed, it is a punishable offense for members of the "unorganized militia" not appearing when summoned. *See* N.Y. Mil. 8.

Despite being required to respond to risks of gunfire, shrapnel, explosion, and other physical injuries in the course of responding to "invasion, disaster, insurrection, riot, breach of the peace or imminent danger thereof," and despite being subject to legal penalties for not appearing when summoned by the governor to respond to such dangers, members of the "unorganized militia" in New York are categorical-

11

ly ineligible to acquire body armor to wear as protection when facing the perils of militia service. Unless they otherwise are engaged or employed in an "eligible profession," the Body Armor Ban requires members of the "unorganized militia" in New York either to break the law by not reporting for duty or to report for duty without sufficient personal protection against the hazards of their service.

While the New York Department of State has made members of the "unorganized militia" categorically ineligible to acquire body armor despite their obvious potential exposure to bodily harm in the line of duty, the department has, pursuant to the Body Armor Ban, recognized other "eligible professions" as being eligible to acquire body armor.[6] New York provides no mechanism for providing arms to members of the unorganized militia when they are called into service. Members of New York's *organized* militia[7] are armed by the state[8] (including body armor).[9] The re-

---

[6] The Body Armor Ban declares the following occupations as "eligible professions": (a) police officers; (b) peace officers; (c) persons in military service in New York or military or other service for the United States; and (d) other professions designated by the Department of State. N.Y. Penal 270.21; 19 NYCRR 905.1(d), 905.2(a). As of the date of this filing, the New York Department of State has designated 32 additional "eligible professions." *See* List of Eligible Professions, https://dos.ny.gov/body-armor.

[7] New York's "organized militia" consists of the New York Army National Guard, the New York Air National Guard, the inactive national guard, the New York Naval Militia, and the New York Guard whenever duly organized, plus such additional forces as the governor may create. N.Y. Mil. Law 2(1).

[8] *See* N.Y. Mil. Law 17, 18, 47 (providing that the adjutant general must purchase and issue military property for the organized militia and must maintain militia units).

[9] The Body Armor Ban itself provides exemptions for the state to furnish its chosen personnel with body armor. *See* N.Y. Gen. Bus. Law 396-eee(2) (expressly exempting from the in-person sale requirement "purchases made by federal, state, or local government agencies for the purpose of furnishing such body armor to employees in eligible professions").

sult is a system in which the *favored* military class (the organized militia) gets state-furnished body armor as a matter of course, while the *disfavored* class the (unorganized militia) is legally *compelled* to serve in the same dangers, legally *punished* for not showing up, yet legally *forbidden* from acquiring the same protection on their own.

The Body Armor Ban "remove[s] the organ and demand[s] the function."[10] An analogously-absurd regulation would be one that required all citizens to serve on a jury when called but forbad all but the foreperson from reading the jury instructions. Another would be an obligation to pay taxes paired with a prohibition of using a public accountant to do so. The Body Armor Ban specifically disarms the very class of people who should enjoy the clearest and highest level of Second Amendment protection, namely those subject to militia service. As demonstrated in Plaintiffs' summary-judgment motion, the Body Armor Ban violates the individual right to self-defense guaranteed by the Second Amendment. But beyond that, the Body Armor Ban prohibits most New York citizens from obtaining the means of more safely fulfilling their civic and statutory duty of militia service, depriving them of their rights under the political dimension of the Second Amendment, *supra* at 3-10. New York *legally compels* most of its male citizens to respond to gunfire, shrapnel, and riot conditions, *legally punishes* them for not appearing, and *legally forbids* them from acquiring the most basic protection against the very hazards of the ser-

---

[10] C.S. Lewis, *The Abolition of Man* 26 (HarperOne 2001) (1943) ("In a sort of ghastly simplicity we remove the organ and demand the function. We make men without chests and expect of them virtue and enterprise. We laugh at honour and are shocked to find traitors in our midst. We castrate and bid the geldings be fruitful").

13

vice it compels. No court has ever upheld an arrangement so structurally disparate and distorted.

### C. The Body Armor Ban amounts to a civic-caste system.

Under a republican form of government, citizens have a civic responsibility to participate in the body politic to protect and perpetuate the commonwealth. Duties necessarily imply rights to fulfill them. And because each citizen is equally accountable for these duties before God and his fellow citizens, each citizen has an equal right to the means of fulfilling these duties. These principles underlie the rights protected by our Constitution, including the Second Amendment. As stated in the Declaration of Independence, these rights come from our Creator. Accordingly, "unlike in America's mother country, where all power flows from the Crown, the framers established government with the consent of the governed, and government has only those powers that the governed surrendered to it in the first place." Randy Elf, *The Constitutionality of State Law Triggering Burdens on Political Speech and the Current Circuit Splits,* 29 Regent U.L. Rev. 35, 38-39 & nn.27-29 (2016), https://ssrn.com/abstract=5283417. If government exceeds its constitutional boundaries, the result is often government that purports to treat citizens equally but actually treats them unequally. By empowering citizens differently, the Body Armor Ban operates on an *Orwellian* view of equality: "All animals are equal, but some animals are more equal than others." George Orwell, *Animal Farm* 112 (Signet Classic ed. 1996) (1945).

Throughout Anglo-American history, those who were disarmed were also those who were excluded from the body politic and from the political rights of citi-

14

zenship.[11] The right to be armed was wrongly withheld from such persons on the same asserted grounds on which blacks were wrongly disenfranchised from voting and jury service: the erroneous belief that they were not full and free citizens who could be trusted with power. Hence why Chief Justice Taney, in his atrocious *Scott v. Sandford* opinion, infamously misunderstood the implications of recognizing blacks as citizens:

> It would give to persons of the negro race, who were recognized as citizens in any one State of the Union, the right to enter every other State whenever they pleased, singly or in companies, without pass or passport, and without obstruction, to sojourn there as long as they pleased, to go where they pleased at every hour of the day or night without molestation, unless they committed some violation of law for which a white man would be punished; and it would give them the full liberty of speech in public and in private upon all subjects upon which its own citizens might speak; to hold public meetings upon political affairs, *and to keep and carry arms wherever they went.*

60 U.S. (19 How.) 393, 417 (1857) (emphasis added). The architects of the Fourteenth Amendment, which reversed *Dred Scott* and incorporated the Second Amendment against the states, were intimately familiar with the use of arms re-

---

[11] *See Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are dangerous. Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons. Nor have the parties introduced any evidence that founding-era legislatures imposed virtue-based restrictions on the right; such restrictions applied to civic rights like voting and jury service, not to individual rights like the right to possess a gun"); *see also* Patrick Charles, *The Second Amendment Was Adopted to Protect Liberty, Not Slavery: A Reply to Professors Bogus and Anderson*, 20 Geo. J.L. & Pub. Pol'y 575 (2022); Saul Cornell, *Founding Fantasies vs. Historical Realities in the Second Amendment Debate*, Duke Ctr. for Firearms L. (Sept. 19, 2023), https://firearmslaw.duke.edu/2023/09/founding-fantasies-vs-historical-realities-in-the-second-amendment-debate/; Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695 (2009).

15

strictions as tools of civic subjugation. The Black Codes of the post-Civil War South specifically prohibited freedmen from possessing arms as a means of excluding them from the political community. Congress enacted the Civil Rights Act of 1866 and the Fourteenth Amendment partly in response to this disarmament, enshrining in the Constitution the principle that civic equality and the right to arms are inseparable.[12]

New York's occupation-based body armor ban follows the same degrading logic: it creates a class of disfavored citizens who—though subject to all the duties of citizenship, including compulsory militia service—are denied the tools of a free person. The Body Armor Ban in effect treats New Yorkers who are not in select profes-

---

[12] The Second Amendment is incorporated against the states through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010) ("It is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty"). *McDonald* expressly grounded this holding in the historical record of post-Civil War disarmament of freedmen: "These injustices prompted the 39th Congress to pass the Freedmen's Bureau Act of 1866 and the Civil Rights Act of 1866 to protect the right to keep and bear arms. Congress, however, ultimately deemed these legislative remedies insufficient, and approved the Fourteenth Amendment." 561 U.S. at 771. The Mississippi Black Code of 1865 — the first such code enacted after the Civil War and the model for those of other Southern states — provided by statute that "no freedman, free Negro, or mulatto ... shall keep or carry firearms of any kind, or any ammunition, dirk, or Bowie knife." An Act to Punish Certain Offenses Therein Named, and for Other Purposes, § 1, Miss. Laws, 1st Sess. 1865,at 165 (1865), *reprinted in* The American Yawp Reader, https://www.americanyawp.com/reader/reconstruction/mississippi-black-code-1865/. South Carolina's Black Code similarly prohibited freedmen from keeping firearms without a license. *See generally* Stephen Halbrook, *Securing Civil Rights: Freedmen, the Fourteenth Amendment, and the Right to Bear Arms* (Indep. Inst. 2010) (comprehensive scholarly treatment of the framers' intent, cited by Justice Scalia in *Heller* and Justice Alito in *McDonald*, demonstrating that the right to keep and bear arms was the central civil rights concern of the Fourteenth Amendment's framers and that the Black Codes' disarmament of freedmen directly prompted both the Civil Rights Act of 1866 and the Fourteenth Amendment).

sions as a plebeian-peasant underclass who cannot be trusted with liberty or political power, confined to civic serfdom and political infantilization. In the eyes of those who pass and enforce enactments like the Body Armor Ban, only the patrician-professional elite can be trusted with certain civic privileges. Such disparity violates the Second Amendment. St. George Tucker's 1803 *Blackstone's Commentaries* annotation—the *first* major American constitutional commentary on the Second Amendment—called the right "the true palladium of liberty" and emphasized that it extended to Americans *without the class-based English restrictions*: "the right of the people to keep and bear arms shall not be infringed ... *without any qualification as to their condition or degree*." St. George Tucker, Blackstone's Commentaries 1:App. 300 (1803) (emphasis added). Taxi drivers, janitors, farmers, fishermen, construction workers, and the unemployed are just as much part of "the people" as attorneys, physicians, and police officers. New York is attempting to replace "the people" with "the professionals," thereby in effect rejecting the republican form of government that our Constitution guarantees for each state. U.S. Const. art. IV, § 4.

17

II.     **Body armor is at the zenith of Second Amendment protection, because it is an essential part of the arms with which modern militiamen would respond to a muster.**

Plaintiffs' summary-judgment motion ably demonstrates that body armor is in "common use" for self-defense under the *Heller/Bruen* framework. *See* Pls.' Summ. J. Br., ECF No. 69-1, at 7-8, 14-18.[13] This brief adds a separate and reinforcing dimension: body armor not only satisfies the "common[-]use" test; it satisfies it in the most exalted way possible under the original framework articulated in *United States v. Miller,* 307 U.S. 174 (1939). Under *Miller*, the Second Amendment extends to arms "of the kind in common use at the time" that militiamen "were expected to appear bearing" when "called for service." *Id.* at 179. Body armor is today among the equipment with which American citizen-soldiers answer a call to duty. An arm that is not merely in common private use, but that is the universal equipment of modern militia service, stands at the zenith of the protection the Second Amendment was designed to guarantee.

A. *Miller* **Links "Common Use" to Militia Service, and** *Heller* **Preserved That Link.**

*Miller*'s holding turned on a straightforward inquiry: Does the arm in question bear "some reasonable relationship to the preservation or efficiency of a well regulated militia"? *Id.* at 178. The Court elaborated that the protected category of arms comprised those that are "part of the ordinary military equipment," *id.*, and specifically those that militiamen "were expected to appear bearing" when "called for service." *Id.* at 179. In other words, the militia-service function was the *origin* of

---

[13] Armored Republic's sales of body-armor products to American civilians (over 2.5 million) alone suffice to establish common use.

the "common-use" concept — arms in common use *among militiamen* were the paradigm of constitutionally protected arms.

*Heller* confirmed and preserved this origin. It "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625. In doing so, it quoted *Miller*'s precise language: "the sorts of weapons protected were those 'in common use at the time.'" *Id.* at 627 (quoting *Miller*, 307 U.S. at 179). *Heller* then explicitly described the historical practice underlying *Miller*: the militia comprised "the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." 554 U.S. at 627. The "common use" test is therefore not a departure from *Miller*'s militia-service framework — it is its modern expression.

The implication for this case is straightforward: When an arm is not only in common civilian use but is also the *standard issue* for modern militia and military service, it receives the strongest possible form of Second Amendment protection: it satisfies both the "common[-]use" prong and the underlying "militia-service" rationale from which that prong derives. Body armor satisfies both.

### B. Body Armor is Standard Equipment for Modern Militia Service.

Body armor has a long historical pedigree of common use for militia service. In the Anglo-American militia tradition, body armor has been a stable necessity in the self-furnished arsenals of yeomen soldiers and militiamen. Militia mandates in multiple founding-era states (ironically including New York) *required* militiamen to possess body armor. Joseph Greenlee, *The Tradition of Armor Use and Regulation*

19

*in America* 25-26 (Dec. 30, 2023) (forthcoming *23 Geo. J.L. & Pub. Pol'y*), https://ssrn.com/abstract=4679833. This is consistent with the deeper English history of requiring militiamen to furnish their own defensive armor for service. *See* Pls.' Summ. J. Br., ECF No. 69-1, at 12-13. Over the centuries, the importance and ubiquity of body armor have only increased in the context of activities within the constitutional scope of militia service, including among military and law enforcement, such that it is now more than ever "in common use."

### 1.    *Military and National Guard Use.*

*Miller* asked whether the arm is "any part of the ordinary military equipment." 307 U.S. at 178. There is no arm in the modern military inventory that more completely satisfies this test than body armor. It is not optional equipment, accessory gear, or a specialized tool — it is the foundational personal-protective equipment issued as standard kit to every soldier in the United States Army, every marine in the United States Marine Corps, and every member of the National Guard. The inquiry is not whether militia members are *permitted* to wear body armor — they are *required* to.

The United States Army's standard-issue torso protection is the Improved Outer Tactical Vest (IOTV), which replaced the Interceptor Body Armor (IBA) system in 2007.[14] The IOTV — a fully integrated system including soft Kevlar panels and hard ceramic ESAPI plates rated to stop .30-caliber armor-piercing ammunition

---

[14] *See* "From IOTV to MSV: The Evolution of Military Body Armor," AET Gear (2025), https://www.aetgear.com/from-iotv-to-msv-the-evolution-of-military-body-armor/.

— is issued to every soldier in the Army, including every soldier in the Army National Guard, through the federally mandated Central Issue Facility system.[15] The Marine Corps fields its own systems — the Modular Tactical Vest (MTV) and Scalable Plate Carrier (SPC).[16] Every branch of the armed forces has its own ballistic protection system; none deploy ground personnel into potential danger without it.

The reason body armor is universal standard issue is that it saves soldiers' lives — a fact documented in official military and Pentagon records. In the early stages of the Iraq War, the Washington Post reported that body armor had proven "remarkably effective," as evidenced by the fact that the vast majority of American soldiers who suffered life-threatening wounds were struck in the limbs — not the torso — demonstrating that the torso protection was working.[17]. A Pentagon-commissioned Armed Forces Medical Examiner study of Marine fatalities in Iraq, conducted between 2003 and 2005, found that body armor prevented torso casualties — and that where it had *gaps*, casualties resulted: as many as 42 percent of Marine casualties from isolated torso injuries could have been prevented with im-

---

[15] *See* "New York Central Issue Facility Strives to Get National Guard Troops Latest Gear," U.S. Army (Aug. 11, 2010) (documenting New York Army National Guard CIF processing approximately 14,000 equipment issues per year for the state's 10,500 Guard members),: https://www.army.mil/article/43555/.
[16] *See* "What Body Armor Does the Military Use?," Premier Body Armor., https://premierbodyarmor.com/blogs/pba/what-body-armor-does-the-military-use.
[17] *See* "U.S. Troops' Injuries in Iraq Showed Body Armor's Value," Washington Post (May 3, 2003), https://www.washingtonpost.com/archive/politics/2003/05/04/us-troops-injuries-in-iraq-showed-body-armors-value/12fc044e-d27f-4d96-a66e-302cc7682469/.

proved coverage in areas surrounding the plated zones.[18] In World War II, a 1944 Eighth Air Force study found that body armor reduced fatalities from chest wounds from 36 to 8 percent, and from abdominal wounds from 39 to 7 percent.[19] The military issued body armor as standard kit precisely *because* these data showed it saves lives in the conditions that militia service entails.

The National Guard — the most direct modern successor to the "unorganized" militia of the founding era — deploys with body armor when called for service. During the 2020 civil unrest, when more than 30,000 National Guard members were activated across 23 states and the District of Columbia in the largest domestic deployment since the civil-rights movement, Guard soldiers responded wearing their government-issued body armor.[20] The National Guard's doctrine for civil-disturbance response contemplates full issue of standard personal-protective gear, including ballistic protection.[21]

---

[18] *See* "Extra Body Armor Would Have Saved Lives, Report Finds," Baltimore Sun (Jan. 7, 2006), https://www.baltimoresun.com/2006/01/07/extra-body-armor-would-have-saved-lives-report-finds/.

[19] *See* U.S. Army Special Operations Command, "This Vest May Save Your Life!: U.S. Army Body Armor from World War II to Present," *ARSOF History* (2020), https://arsof-history.org/articles/19oct_body_armor_page_1.html.

[20] *See* Britannica, "When Has the U.S. National Guard Been Deployed?" https://www.britannica.com/topic/When-Has-the-US-National-Guard-Been-Deployed (noting the scale of 2020 deployments); Task & Purpose, "The Number of National Guard Personnel … Tripled from 5,000 to More Than 17,000" (June 1, 2020) (reporting Minnesota National Guardsmen equipped with rifles and "ammunition stored in magazine pouches on their body armor") https://taskandpurpose.com/news/national-guard-civil-unrest/

[21] *See* Ctr. for Army Lessons Learned, *Civil Disturbance Operations: District of Columbia National Guard Special Study* 13 (2023) ("Civil disturbance gear is composed of the following items: shin guards, baton, helmet, face shield, and vest"), https://api.army.mil/e2/c/downloads/2023/01/31/6b9ad7bb/18134.pdf.

   2.     *Law Enforcement Use.*

In addition to universal use among American infantrymen, body armor is ubiquitous among law enforcement in the U.S. At the founding era, the militia and law enforcement were not distinct categories, but were deeply intertwined functions performed by the same armed citizenry. Blackstone states: "[F]or keeping the peace and pursuing felons, [the sheriff] may command all the people of his county to attend him; which is called the *posse comitatus*, or power of the county." 1 William Blackstone, Commentaries 332. The *posse comitatus* — the armed citizenry called to aid law enforcement — was the same body as the militia, summoned for the same purpose of domestic order. David Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. Crim. L. & Criminology 761 (2015) ("The posse comitatus and the militia are not identical, but they overlap and are intertwined to such a degree that the disarmament of the one would inevitably destroy the other. One consequence of the Second Amendment was to ensure that the citizenry will be armed so that there can be an effective posse comitatus"). This alter-ego relationship between the militia of the people and law enforcement is evident in the Calling Forth Clause, which gives Congress the power of "calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," (U.S. Const. art. I, § 8, cl. 15) as well as the Calling for Act of 1792 (Act of May 2, 1792, ch. 28, 1 Stat. 264) which President Washington invoked

23

to quell the Whiskey Rebellion in 1794.[22] Law enforcement is therefore one of the constitutional functions of "a well regulated militia" comprised of the whole body of the people.

According to a study produced by the Police Executive Research Forum ("PERF") and the U.S. Department of Justice, Bureau of Justice Assistance ("BJA"), almost all law-enforcement agencies (99.4 percent) nationwide reported that their officers wear body armor when on duty.[23] According to the U.S. Department of Justice, in 2018, there were at least 787,565 sworn, full-time law enforcement officers serving in the United States. [24] If only 75 percent of these officers wear body armor (a very conservative number based on the BJA/PERF survey), that translates into at least 590,000 body-armor products currently in use just by law enforcement alone.

The foregoing figures demonstrate that body armor bears a "reasonable relationship to the preservation or efficiency of a well regulated militia" and are arms "of the kind in common use" by those exercising militia functions today and "part of the ordinary military equipment" that militiamen would be "expected to appear

---

[22] *See* Engdahl, *Soldiers, Riots and Revolution: The Law and History of Military Troops in Civil Disorders*, 57 Iowa L. Rev. 1 (1971); *see also The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law*, R42659 (CRS 2018), https://www.congress.gov/crs-product/R42659, ("Congress empowered the President to call out the militia to overcome obstructions to law enforcement").
[23] *See The BJA/PERF Body Armor National Survey: Protecting the Nation's Law Enforcement Officers, Phase II Final Report to BJA, August 9, 2009*, https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/PERF_BodyArmor.pdf.
[24] *See* Bureau of Justice Statistics, *Census of State and Local Law Enforcement Agencies, 2018 – Statistical Tables*, https://bjs.ojp.gov/library/publications/census-state-and-local-law-enforcement-agencies-2018-statistical-tables.

24

bearing" when "called for service." *Miller*, 307 U.S. at 179. They therefore enjoy the highest degree of Second Amendment protection. Any regulations which restrict their ownership by law-abiding American citizens of any occupation or profession are therefore unconstitutional.

## CONCLUSION

The Body Armor Ban conditions the right to acquire certain arms on one's professional status. New York commands its male residents aged 17 to 45 to respond to invasion, riot, and insurrection when summoned by the governor and punishes those not appearing. Yet it expressly prohibits these same conscripted citizen-soldiers from buying body armor, an arm demonstrably in common use and which would protect their lives while they fulfill this compulsory duty. The Body Armor Ban defies the original republican understanding of the Second Amendment, a concept to which courts should refocus in the amendment's jurisprudence to maintain its status as the "true palladium of liberty."

Respectfully submitted,

/s/ *Joseph Brown*
Joseph Brown
In-House Counsel
Armored Republic Holdings LLC
11226 N. 23rd Avenue, Suite 102B
Phoenix, Ariz. 85029
Telephone (719) 367-3338
jbrown@armoredrepublic.com

*Lead Counsel for Amicus*

*(Pro Hac Vice Application Pending)*

Dated: April 7, 2026

/s/ *Randy Elf*
Randy Elf, N.Y. No. 2863553
Post Office Box 525
Lakewood, N. Y. 14750
Telephone (202) 423-2122
ForEFilingOnly@gmail.com

*Local Counsel for Amicus*

25

## CERTIFICATE OF SERVICE

I certify that today I filed the **AMICUS CURIAE BRIEF OF ARMORED REPUBLIC HOLDINGS LLC IN SUPPORT OF PLAINTIFFS' SUMMARY JUDGMENT MOTION** with the Court's electronic-filing system, *see* W.D.N.Y. Loc. R. Civ. P. 5.1(a), which will serve:

Nicolas Rotsko                    NRotsko@fluet.law

Ryan Lane Belka             Ryan.Belka@ag.ny.gov
James Thompson          James.Thompson@ag.ny.gov

Christopher Sasiadek       Christopher.Sasiadek@erie.gov
James Youngs               JYoungs@HancockLaw.com
Erica Masler                 Erica.Masler@gmail.com
Adam Clark                  AdamClark@MonroeCounty.gov
Robert John Shoemaker     BoShoemaker@MonroeCounty.gov

                                 /s/ *Randy Elf*_____
                                   Randy Elf

April 7, 2026

26