UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BENJAMIN HEETER, JOSEPH WURTENBERG, and
FIREARMS POLICY COALITION, INC,

Plaintiffs,

v.

LETITIA JAMES, in her official capacity as Attorney General of the State of New York, STEVEN G. JAMES, in his official capacity as Superintendent of the New York State Police, and MICHAEL J. KEANE, in his official capacity as District Attorney for the County of Erie, and SANDRA DOORLEY, in her official capacity as District Attorney for the County of Monroe,

Defendants.

No. 24-cv-00623 (JLS)

## STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT

LETITIA JAMES
Attorney General
State of New York
350 Main Place, Suite 300A
Buffalo, New York 14202

Ryan L. Belka
James M. Thompson
Assistant Attorneys General
Of Counsel

**Table of Contents**

Contents ......................................................................................................... i

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND............................................................................. 3

STANDARD OF REVIEW .............................................................................. 5

ARGUMENT................................................................................................... 6

    I.   PROCEDURAL DEFECTS REQUIRE SUMMARY JUDGMENT FOR THE STATE DEFENDANTS IN WHOLE OR IN PART ...........................................................6

       A.  The Organizational Plaintiff Does Not Have Standing Because It Has Suffered No Injury of Its Own............................................................................. 6

       B.  Individual Plaintiffs Lack Standing And Their Claims Are Not Ripe For Adjudication ............................................................................................... 7

       C.  Attorney General James Is Not A Proper Party.................................. 8

    II.  PLAINTIFFS HAVE BROUGHT A DISFAVORED FACIAL CHALLENGE................10

    III. BODY ARMOR IS NOT AN "ARM" PROTECTED UNDER THE SECOND AMENDMENT ..........................................................................................11

       A.  The Right Guaranteed By The Second Amendment Does Not Extend To Body Armor Under The Ordinary Historical Understanding Of The Term "Arms" ................... 11

       B.  Plaintiffs Have Not Demonstrated That Body Armor Is In Common Use................. 16

       1.  Plaintiffs Have Ignored The Federal Rules ................................. 17

       2.  Under Any Standard, Plaintiffs Have Not Carried Their Burden.............................. 19

       C.  Body Armor Is At Most A Regulable Tactical Accessory, Not An "Arm" In Itself.. 22

    IV. HISTORY AND TRADITION DEMONSTRATE THAT THE CHALLENGED PROVISIONS ARE CONSTITUTIONAL...................................................................23

       A.  There Is A Centuries-Long Anglo-American Tradition of Armor Regulation .......... 24

       B.  Plaintiffs' Discussion Of History Consists Of A Bad-Faith Effort To Pass Their Own Argument Off As Scholarship ................................................................ 28

       C.  Modern Ballistic Body Armor Is A Dangerous And Unusual Article ....................... 30

       D.  Modern Ballistic Body Armor May Be Prohibited Based On Its Propensity To Terrify The Public ................................................................................. 33

    V.  ANY INJUNCTION SHOULD BE DENIED, OR ALTERNATIVELY, LIMITED TO THE INDIVIDUAL PLAINTIFFS AND STAYED PENDING APPELLATE REVIEW ................................................................................................35

CONCLUSION............................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**

*Conn. Citizens Defense League, Inc. v. Thody*, No. 23-724, 2024 WL 177707, at *3 (2d Cir. Jan. 17, 2024) .................................................................................................................................. 6

*Alden v. Maine*, 527 U.S. 706, 715 (1999 ....................................................................................... 24

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986) ........................................................ 5

*Antonyuk v. Chiumento*, 89 F.4th 271, 294 (2d Cir. 2023) ......................................................... 7

*Antonyuk v. James*, 120 F.4th 941, 972 (2d Cir. 2024 ......................................................... 14, 27

*Aymette v. State*, 21 Tenn. 154, 159 (1840 ................................................................................. 33

*Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) .............................................................. 21

*Binderup v. Att'y Gen.*, 836 F.3d 336, 369 (3d Cir. 2016) ........................................................ 27

*Bruen*, 597 U.S. 1 (2022 .......................................................................................................... 17, 33

*Calce v. Tisch*, No. 25-861-cv, 2026 WL 980092, at *1 (2d Cir. Apr. 13, 2026 ...................... 17

*Carney v. Adams*, 592 U.S. 53, 58 (2020) .................................................................................... 6

*Cf. FTC v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) ................ 17

*Christian v. James*, No. 22 Civ. 695 (W.D.N.Y. ........................................................................ 12

*Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*, 471 F. Supp. 2d 295, 305 (W.D.N.Y. 2007) ........................................................................................................................ 8

*Connecticut Citizens Def. League Inc. v. Lamont*, 6 F.4th 439 (2021) ......................................... 6

*Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 110 (2d Cir. 2003) .................................... 10

*Diaz v. Pataki*, 368 F. Supp. 2d 265, 274 (S.D.N.Y. 2005 ........................................................ 10

*District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) ................................................... passim

*Fulkerson v. Unum Life Ins. Co. of Am.*, 36 F.4th 678, 682 (6th Cir. 2022) ............................. 13

*Gazzola v. Hochul*, No. 22 Civ. 1134, 2025 WL 2771835, at *10 (N.D.N.Y. Sept. 26, 2025) ...... 9

*Giambalvo v. Suffolk County*, 155 F.4th 163, 176 (2d Cir. 2025) ............................................. 16

*HealthNow N.Y., Inc. v. New York*, 739 F.Supp.2d 286, 294 (W.D.N.Y. 2010 ........................... 9

*Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) ...................................................................... 6

*Hughes v. Ester C Co.*, 330 F. Supp. 3d 862, 873 (E.D.N.Y. 2018 ........................................... 29

*Isaacs v. City of New York*, No. 10 Civ. 4177, 2012 WL 314870 ................................................ 8

*Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts*, 852 F.3d 178, 184 (2d Cir. 2017 .................................................................................................... 10

*Kelly v. New York State Civ. Serv. Comm'n*, No. 14 Civ. 716, 2015 WL 861744, at *3 (S.D.N.Y. Jan. 26, 2015) ............................................................................................................................. 9

*Lane v. Cacace*, No. 22 Civ. 10989, 2025 WL 903766, at *5 (S.D.N.Y. Mar. 25, 2025 ........... 18

*Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122 (2d Cir. 2020) ...................... 9, 10

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ................................................. 6, 7, 8, 9

*Maryland v. King*, 567 U.S. 1301, 1303 (2012 .......................................................................... 35

*Mikulec v. Town of Cheektowaga*, 302 F.R.D. 25, 29 (W.D.N.Y. 2014) ................................... 17

*Muscarello v. United States* ....................................................................................................... 15

*N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131-32 (2d Cir. 2008) .......................... 8

*N.Y. State Firearms Ass'n v. James*, No. 23 Civ. 6524, 2024 WL 1932050, at *3-4 (W.D.N.Y. May 2, 2024) ............................................................................................................................... 6

*Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 234 (2d Cir. 2025) .......................... 16, 30

*NYSRPA v. Cuomo*, 804 F.3d 242, 254-55 (2d Cir. 2015) ................................................... 17, 21

*Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 386-87 (D.R.I. 2022 ............ 22
*Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013 ................................................................. 18
*Restaurant L. Ctr. v. City of New York*, 360 F. Supp. 3d 192, 208 (S.D.N.Y. 2019) .................. 10
*Schneider v. Revici*, 817 F.2d 987, 991 (2d Cir. 1987 ................................................................ 29
*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ........................ 2
*Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025 ........................................................................... 35
*Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ............................................................ 7
*Syracuse Mtns. Corp. v. Petroleos de Venezuela S.A.*, No. 21 Civ. 2684, 2024 WL 3637997, at
  *7 n.8 (S.D.N.Y. Aug. 1, 2024 .......................................................................................... 18
*Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 568 (2012) ............................................. 15
*Trump v. New York*, 141 S. Ct. 530, 535 (2020) ......................................................................... 8
*United States v. Berger*, 715 F. Supp. 3d 676, 700 (E.D. Pa. 2024 .......................................... 23
*United States v. Cooperman*, No. 22-CR-146, 2023 ................................................................... 23
*United States v. Cox*, 906 F.3d 1170, 1176 (10th Cir. 2018 ..................................................... 22
*United States v. Davis*, 906 F. Supp. 2d 545, 552-58 (S.D.W. Va. 2012) .............................. 2, 11
*United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) ............................................... 10, 28
*United States v. Gomez*, 159 F.4th 172, 178 (2d Cir. 2025 ...................................................... 17
*United States v. Rahimi*, 602 U.S. 680, 701 (2024) ............................................................ passim
*United States v. Rowson*, 652 F. Supp. 3d 436, 469 (S.D.N.Y. 2023 ...................................... 33
*United States v. Saleem*, No. 23-4693, 2024 WL 5084523 (4th Cir. Dec. 12, 2024 ................ 22
*United States v. Salerno*, 481 U.S. 739, 745 (1987) ................................................................. 10
*United States v. Sprague*, 282 U.S. 716, 731 (1931) ............................................................. 1, 11
*Vt. Fed. of Sportsmen's Clubs v. Birmingham*, No. 23 Civ. 710, 2024 WL 2150522, at *3-4 (D.
  Vt. May 14, 2024) ............................................................................................................. 13
*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008 ...................... 10
*Young*, 209 U.S. 123 (1908) ..................................................................................................... 9

## Statutes
Executive Law § 144-a ................................................................................................................. 5
Fed. R. Civ. P. 56 (c)(1) .............................................................................................................. 5
Local Rule 56(a)(1&2) ................................................................................................................. 5
N.Y. C.P.L. § 2.10 ....................................................................................................................... 5
N.Y. Penal Law §§ 270.21-22; 2022 N.Y. Laws Ch. 210 (S. 9407-B) ............................... 4, 5, 20
New York Executive Law § 144- ................................................................................................. 8

Defendants Steven G. James, sued in his official capacity as Superintendent of the New York State Police (the "Superintendent") and Letitia James, sued in her official capacity as Attorney General of the State of New York (the "Attorney General"), respectfully submit this memorandum of law, together with the State's Disputed and Undisputed Statement of Facts, and the Declarations of Dr. Dennis Baron, dated August 20, 2025 ("Baron Decl."); Professor Benjamin Carp, with Exhibit A, dated August 18, 2025 ("Carp Decl."); Dr. Jaclyn Schildkraut, with Exhibits A-D, dated August 29, 2025 ("Schildkraut Decl.");and Ryan L. Belka, Esq., with Exhibits A-R, dated April 27, 2026 ("Belka Decl."), in opposition to Plaintiffs' Motion for Summary Judgment ("Mot.") [ECF No. 69] and in support of the State's Cross-Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Plaintiffs' lawsuit demands a post-hoc, ahistorical rewriting of the Second Amendment that defies two and a half centuries of established jurisprudence. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. The Supreme Court instructs that "the most natural meaning of 'keep arms' in the Second Amendment is to 'have weapons,' *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), but Plaintiffs now seek to expand "arms" to include body armor.  [Amended Complaint, ECF No. 19 ¶¶ 1-4.]

In interpreting the Second Amendment, the Supreme Court has consistently cautioned that "[t]he Constitution was written to be understood by the voters" and its words and phrases must be understood "in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576–77 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). Because no court from the Founding to the present has ever adopted Plaintiffs' radical interpretation, the relief they seek is entirely divorced from the original public meaning of the "right to keep and bear arms."

1

Federal courts routinely reject such transparent attempts to rewrite history and have explicitly rejected this argument historically. *See, e.g., United States v. Davis*, 906 F. Supp. 2d 545, 552-58 (S.D.W. Va. 2012) (Finding that *Heller* does not equate an antiquated concept of "armour of defense" with constitutional "Arms").[1]

As a threshold matter, this lawsuit suffers from fatal procedural defects that require immediate dismissal. The Organizational Plaintiffs lack Article III standing, as their alleged injuries are untethered to any concrete harm. Furthermore, the Individual Plaintiffs also lack standing and their claims of future harm are not ripe for adjudication. Finally, Attorney General James is not a proper party to this action, as the alleged injuries are not fairly traceable to her conduct, and she must be dismissed from the suit.

If the Court reaches the merits, Plaintiffs' facial challenge fails at the first step of the *Bruen*/*Rahimi* test because body armor is not an "Arm" as the term would have been commonly understood in 1791 or 1868. As rigorous corpus linguistics analysis demonstrates, the terms "arms" and "armor" occupied entirely distinct lexical categories during the Founding Era; the ordinary public understanding of "arms" never included defensive apparel. This linguistic reality mirrors the historical battlefield. Defensive body armor was functionally obsolete and unused by civilians or militias during the Founding period. Stripped of any textual or historical foundation, Plaintiffs also fail to demonstrate that modern ballistic armor is in "common use" for civilian self-defense under the Second Circuit's objective statistical standard. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015). And at most, body armor is better understood as a tactical accessory to firearms, but federal courts have repeatedly held that such accessories are not covered by the Second Amendment's scope.

---

[1]      "*Heller* did not hold that "amour of defense – whatever that may have been in the 18th century and whatever that may be now – equates with "Arms" under the second amendment." *Davis*, 906 F. Supp. 2d at 556.

2

Even if this Court were to recognize body armor as an "arm" for the first time in American history, New York's Body Armor Law would nonetheless pass muster at the second stage of the *Bruen*/*Rahimi* test, as it is the heir to a long and uncontradicted Anglo-American tradition of armor regulation.  The undisputed history before the Court demonstrates that whenever body armor was in common use, English and American governments would regulate it to protect public safety, generally by prohibiting its use by the public but allowing it to be worn by peacekeepers, just as New York's Body Armor Law does. Furthermore, modern ballistic armor is a "dangerous and unusual" tactical asset: in the hands of civilians, body armor flips the script on first responders, rendering law enforcement responders and civilian concealed-carriers vulnerable while harming their ability to stop an active shooter. As recent data confirms, mass shooters increasingly utilize this military-grade gear to neutralize armed resistance and consciously prolong their attacks. This is not a theoretical abstraction: it is the precise tactical advantage exploited during the racist mass shooting at the Tops Supermarket for which the challenged regulations were put in place.  New York's Body Armor Law is also legally justified by a long-standing historical tradition of prohibiting weapons and gear that cause public fear or terror. Just as wearing armor frightened citizens under ancient common law, modern ballistic vests continue to signal potential mass violence, triggering panic and lockdowns.

Because body armor was never historically protected as an "Arm," is not in common use, and presents a danger to the public peace, Plaintiffs' motion for summary judgment should be denied, and State Defendants' cross-motion should be granted.

## FACTUAL BACKGROUND

On May 14, 2022, Payton Gendron committed a racially-motivated massacre at the Tops on Jefferson Street in Buffalo New York.  In planning the massacre, Mr. Gendron took pains to

select body armor that would allow him to prolong the attack so he could kill as many African-Americans as possible. (SOF, ¶ 15-16) Body armor was central to that plan. The shooter thought it was "100% guaranteed" that he would face "[p]olice handgun threats with duty ammo," and he found his "Solution: NIJ certified II or IIIa armor for helmet and vest," along with "NIJ certified III armor plates." (SOF, ¶¶ 17-20) Gendron's quest for a tactical edge over law enforcement was frustrated in part by the policies of several responsible body-armor manufacturers: as he discovered "Avon Protection, Gentex, BAE systems, United Shield, ArmorSource, Safariland PROTECH, and Point Blank PARACLETE all make great [armor], but the mass majority of them are only available to the government and police." (Schildkraut Decl*.,* at 12; *see also id.* at 38 (armor from certain major retailers is "harder to find on the civilian market" and suggesting acquiring them through online resellers or used); *id.* at 39 ("Unfortunately, many of the S+ tier IIIA armor . . . are only available to certain [military or law enforcement] credentials because of [expletive] companies.")). Ultimately, he acquired body armor from another company with plates that he believed "would stop all pistol threats." *Id.* at 33.

It worked. After murdering five innocent patrons and shooting another, Mr. Gendron was engaged by a good guy with a gun: retired Buffalo Police Officer Aaron Salter. (SOF, ¶ 14-25) But for the plated body armor, Salter would have ended the massacre. *Id.* Instead, four more innocents were killed, and two more were shot. (*Id.*) The pattern would repeat itself several years later at the other end of New York State, when a gunman from out-of-state wearing body armor entered a Park Avenue office building on July 28, 2025, killing Didarul Islam, an off-duty NYPD officer who was working security, before continuing on to murder others. (*Id.*)

In response to the Buffalo shooting, on June 6, 2022 New York enacted restrictions on body armor sales to persons not employed in qualified professions. *See* N.Y. Penal Law §§ 270.21-

4

22; 2022 N.Y. Laws Ch. 210 (S. 9407-B) (the "Body Armor Law"). The law includes exceptions for purchases by persons in "eligible professions," including police officers; "peace officers," an extensive list of non-police professions relating to law enforcement, from agricultural investigators to harbor masters to officers of societies for the prevention of cruelty to animals, *see* N.Y. C.P.L. § 2.10; and "such other professions designated by the department of state." N.Y. Penal Law § 270.21. The administrative framework for eligible professions, including allowing individuals or entities to request that their professions be added, was set in motion by the Department of State as defined in Executive Law § 144-a. *See* 19 N.Y.C.R.R. 905.1 *et seq.*; https://dos.ny.gov/body-armor.

For a complete recitation of the facts, Defendants respectfully refer the court to the State's Disputed Statement of Material Facts and its Undisputed Statement of Material Facts filed separately herewith. *See* Fed. R. Civ. P. 56 (c)(1) and Local Rule 56(a)(1&2).

## STANDARD OF REVIEW

Summary judgment is only appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## ARGUMENT

**I.    PROCEDURAL DEFECTS REQUIRE SUMMARY JUDGMENT FOR THE STATE DEFENDANTS IN WHOLE OR IN PART**

A.    <u>The Organizational Plaintiff Does Not Have Standing Because It Has Suffered No Injury of Its Own</u>

As a threshold matter, the organizational Plaintiff, Firearms Policy Coalition, Inc. ("FPC") lacks standing to sue.  "The doctrine of standing [requires] that a litigant 'prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'"  *Carney v. Adams*, 592 U.S. 53, 58 (2020) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)).  And the injury has to be *real*: "an 'injury in fact' [] must be 'concrete and particularized,' as well as 'actual or imminent.'  It cannot be 'conjectural or hypothetical.'"  *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  Plaintiffs have not made the requisite showing.

FPC lacks standing because they cannot bring suit vicariously on behalf of their members, and because they cannot demonstrate any injury in their own right. SOF, ¶¶ 1-4; ECF No. 69-4 ¶¶ 1-7 ("FPC has members residing in New York State . . . who want to purchase body armor . . . [t]hrough this lawsuit, FPC seeks to defend the Second Amendment rights of its members").] The analysis is governed by the Second Circuit's recent decision in *Connecticut Citizens Def. League Inc. v. Lamont*, 6 F.4th 439 (2021).  Accordingly, federal courts in this Circuit regularly dismiss claims brought by organizations seeking to raise derivative Second Amendment claims on behalf of their members.  *See, e.g., Conn. Citizens Defense League, Inc. v. Thody*, No. 23-724, 2024 WL 177707, at *3 (2d Cir. Jan. 17, 2024) (summary order); *N.Y. State Firearms Ass'n v. James*, No. 23 Civ. 6524, 2024 WL 1932050, at *3-4 (W.D.N.Y. May 2, 2024); *see also Christian v. Nigrelli*,

6

642 F. Supp. 3d 393, 399 n.4 (W.D.N.Y. 2022) (recognizing the applicability of this binding precedent and that the organizational Plaintiff in this case did not dispute it).

Even if the Second Circuit's well-established bar on associational standing in Section 1983 cases did not apply, organizational standing would be improper in this case because the organizational plaintiff has identified no affected members other than the individual Plaintiffs, who are already represented separately. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ("our prior cases [] have required plaintiff organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm. . . .  This requirement of naming the affected members has never been dispensed with"); *see also* [ECF No. 69-4] (Combs Decl., ¶¶ 1-7) (identifying no affected members other than Plaintiffs Heeter and Wurtenberg, and a former plaintiff who withdrew his claim).

### B.    Individual Plaintiffs Lack Standing And Their Claims Are Not Ripe For Adjudication

Article III of the Constitution limits federal court jurisdiction to actual cases and controversies requiring a plaintiff to establish standing through an injury-in-fact that is concrete, particularized, and "actual or imminent, not conjectural or hypothetical*." Lujan*, 504 U.S. at 560; *see also Antonyuk v. Chiumento*, 89 F.4th 271, 294 (2d Cir. 2023). Here, the individual Plaintiffs lack standing because they already possess body armor and have suffered no actual injury from the challenged statute. Their alleged harm is predicated entirely on an expressed desire to purchase replacement body armor at some unspecified time in the future when their current equipment expires. SOF, ¶¶ 5-7, 10-12 (testifying he owns body armor but that he may want to replace Kevlar body armor, that he has never worn, once it expires); SOF, ¶¶ 5, 8-10, 13-14 (testifying that the body armor he owns is sufficient for him and his family but, when it expires, at some future date, he may want to purchase more body armor).  However, the Second Circuit and district courts

within it have repeatedly held that such "'some day' intentions, without any description of concrete plans . . . do not support a finding of the 'actual or imminent' injury" required for Article III standing. *Citizens Against Casino Gambling in Erie Cnty. v. Kempthorne*, 471 F. Supp. 2d 295, 305 (W.D.N.Y. 2007) (quoting *Lujan*, 504 U.S. at 564). Because Plaintiffs currently own body armor and have no immediate need to purchase more, they face no imminent deprivation and thus lack standing to sue.

Similarly, Plaintiffs' claims fail under the closely related doctrine of ripeness, which prevents courts from prematurely adjudicating disputes "that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 141 S. Ct. 530, 535 (2020); *see N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 131-32 (2d Cir. 2008) (holding that a claim is not ripe if it rests on contingent future events). It is a bedrock principle of federal jurisprudence that a live, immediate controversy must exist at the time of filing. Because Plaintiffs merely intend to purchase body armor at an indeterminate future date, their alleged injury is wholly contingent on their own future actions and the hypothetical future enforcement of the statute against them at that time. *See Isaacs v. City of New York*, No. 10 Civ. 4177, 2012 WL 314870, at *3 (E.D.N.Y. Feb. 1, 2012) (dismissing claims as unripe where the alleged future injury was contingent and speculative). Moreover, Plaintiffs have failed to verify whether their employment status qualifies them for an exemption under New York Executive Law § 144-a. *See* SOF, ¶¶ 5-14. Consequently, because the Individual Plaintiffs have not taken necessary steps to purchase body armor and there is no immediate, real-world controversy to resolve today, Plaintiffs' claims are unripe for adjudication and must be dismissed as a matter of law.

C.    Attorney General James Is Not A Proper Party

Plaintiffs' claims against Attorney General James must be dismissed for lack of Article III

standing and Eleventh Amendment immunity, as she is not a proper party to this lawsuit. To establish standing, a plaintiff must demonstrate that their injury is "fairly traceable" to the defendant's conduct and likely to be redressed by the requested relief. *Lujan*, 504 U.S. at 560-61. Here, Plaintiffs' alleged injuries stem solely from the legislature's enactment of a body armor regulation, not from any action taken by the Attorney General. Because Attorney General James has no specific role in implementing or enforcing the challenged statute, she neither caused the unavailability of the armor nor possesses the power to provide the requested relief. *See Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122 (2d Cir. 2020) (holding the Attorney General is not a proper party in challenges to New York's firearms laws because injuries are not fairly traceable to her), *abrogated in part on other grounds by Bruen*, 597 U.S. at 19 n.4.

Furthermore, Eleventh Amendment immunity precludes this official-capacity suit because the narrow exception under *Ex parte Young*, 209 U.S. 123 (1908), is inapplicable. To pierce sovereign immunity, Plaintiffs must allege the Attorney General has "both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty," rather than a mere general obligation to enforce state laws. *Kelly v. New York State Civ. Serv. Comm'n*, No. 14 Civ. 716, 2015 WL 861744, at *3 (S.D.N.Y. Jan. 26, 2015); *see also HealthNow N.Y., Inc. v. New York*, 739 F.Supp.2d 286, 294 (W.D.N.Y. 2010). Championing the passing of a law or cheerleading enforcement of that law does not meet the duty and willingness needed to subject one to suit. *See Gazzola v. Hochul*, No. 22 Civ. 1134, 2025 WL 2771835, at *10 (N.D.N.Y. Sept. 26, 2025) ("general allegations regarding [defendant's] support for the firearms laws and participation in their enactment" are insufficient to pierce Eleventh Amendment immunity).  Because Plaintiffs allege no such specific enforcement duty or willingness on the part of the Attorney General, the injury is not traceable to her, and she cannot provide the requested relief, requiring her dismissal.

9

## II.    PLAINTIFFS HAVE BROUGHT A DISFAVORED FACIAL CHALLENGE

Plaintiffs' claims are fatally flawed because they advance a pre-enforcement facial challenge, subjecting them to a high burden of proof that they cannot meet. A long line of precedent within the Second Circuit dictates that any "pre-enforcement" challenge to a state law brought "before [any plaintiffs] have been charged with any violation of law" must be strictly construed and evaluated solely as a facial challenge. *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts*, 852 F.3d 178, 184 (2d Cir. 2017); *accord Restaurant L. Ctr. v. City of New York*, 360 F. Supp. 3d 192, 208 (S.D.N.Y. 2019). Moreover, as Plaintiffs do not make any argument regarding why the Body Armor Law is unconstitutional in their particular case, but rather direct their arguments to the statute as a whole, their claim is facial in nature. *See Libertarian Party of Erie Cty. v. Cuomo*, 300 F. Supp. 3d 424, 439 (W.D.N.Y. 2018) ("A claim is facial if it challenges application of the law more broadly.  A claim is as-applied if it is limited to a plaintiff's particular case."), *aff'd in part, appeal dismissed in part*, 970 F.3d 106 (2d Cir. 2020).

To succeed on their facial challenge, Plaintiffs face the tremendously high bar of establishing that "no set of circumstances exists under which the [statute] would be valid, *i.e.*, that the law is unconstitutional in all of its applications," or at least that it lacks any "plainly legitimate sweep." *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987). This creates a steep uphill battle, as it is exceedingly difficult to demonstrate that the mere enactment of legislation inherently violates constitutional rights without any concrete application to evaluate. *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 110 (2d Cir. 2003); *see also Diaz v. Pataki*, 368 F. Supp. 2d 265, 274 (S.D.N.Y. 2005). It also means that if the Court were to determine that the law is constitutional in some cases but not others—for instance, if it were constitutional to prohibit the sort of Level II and Level III armor pieces that the Buffalo shooter

10

utilized, but not a more basic Kevlar vest—the Court must uphold the law. *See United States v. Rahimi*, 602 U.S. 680, 701 (2024) (courts evaluating facial challenges must "consider the circumstances in which [the challenged law] was most likely to be constitutional," not "focus[] on hypothetical scenarios where [the law] might raise constitutional concerns.").

### III.   BODY ARMOR IS NOT AN "ARM" PROTECTED UNDER THE SECOND AMENDMENT

#### A.   The Right Guaranteed By The Second Amendment Does Not Extend To Body Armor Under The Ordinary Historical Understanding Of The Term "Arms"

The Supreme Court has consistently instructed that constitutional text must be interpreted according to its "normal and ordinary" meaning as understood by the voters who ratified it. *Heller*, 554 U.S. at 576–77 (quoting *Sprague*, 282 U.S. at 731). Under this exacting standard, Plaintiff's attempt to shoehorn modern body armor into the constitutional definition of "Arms" fails entirely. For over two and a half centuries, the ordinary public understanding of the right to keep and bear arms has never encompassed passive, defensive apparel. *See Heller*, 554 U.S. at 581. Federal courts have rejected such creative attempts to rewrite historical realities in order to expand constitutional protections beyond their original scope. *See United States v. Davis*, 906 F. Supp. 2d 545, 552-58 (S.D.W. Va. 2012) (expressly finding that "armour of defense" does not equate to "Arms" under the Second Amendment). Because no court from the Founding to the present has adopted Plaintiff's radical interpretation, it is evident that the relief sought defies the plain, public understanding of the Constitution's text.

The clearest source for understanding the meaning of "arms" comes from the Founding Fathers themselves, who used the term regularly in legislation designed to ensure "the security of a free state," U.S. Const. Amend. II, but always in a way that encompassed weapons rather than armor. On May 22, 1794, Congress passed "An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same." Ch. 33, 1 Stat. 369

11

(1794) (State Defendants' Undisputed Statement of Material Facts (hereinafter "SOF") ¶ 26). The law explained what was covered by the term "Arms," namely "any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenados [sic], gunpowder, sulphur, or saltpetre," *Id.* § 1—weapons and ammunition, in other words, not armor. The Fifth Congress re-enacted the law in 1979 with minor changes, again covering the same enumerated list of "Arms." Ch. 2, 1 Stat. 520 (1797) (SOF, ¶¶ 28-30). The following year, the Fifth Congress passed "An Act to enable the President of the United States to Procure Cannon, Arms and Ammunition, and for other purposes."  Ch. 38, 2 Stat. 555 (1798) (SOF, ¶¶ 30-31). Again, the law made clear that the "Arms" contemplated were "a supply of small arms," making no mention at all of armor. *Id.* § 1; *see also id.* § 2 (explaining that these were "the cannon and arms hereby required" and authorizing the President to lease "one or more suitable place or places where cannon or small arms may be advantageously cast and manufactured"). If the Founding Fathers had intended the term "Arms" to cover body armor, they would surely have included it when using the term, or included body armor in the arms that they viewed as necessary to the young nation's survival.  (*Id.;* SOF, ¶¶ 26-31, 35-44.)

The same historical understanding of the term of arms is supported by corpus linguistics data, which this Court has previously emphasized as important to conducting the textual-historical analysis at the heart of this case. *See* Hearing Transcript, *Christian v. James*, No. 22 Civ. 695 (W.D.N.Y.), at 30:24-31:25 (Sep. 12, 2024) (Belka Decl., ¶ 15, Ex. C) (explaining that corpus linguistics "can be helpful. It can be something that maybe I'll ask the lawyers to look at in the right case.  But, you know, when you are talking about what a word like gun means in 1791, perhaps, that could be something useful. . . . In the right case, I might be prompted to ask the lawyers to take a look at that."). Corpus linguistics is a scientific method that utilizes large bodies

12

of digitized historical text to determine the meaning of usage of words in context.  (*See* SOF, ¶ 36); *cf. Fulkerson v. Unum Life Ins. Co. of Am.*, 36 F.4th 678, 682 (6th Cir. 2022) (finding that "corpus linguistics is a helpful tool in assessing common usage" and surveying its use by judges and scholars).  State Defendants have advanced Dr. Dennis Baron, an expert in corpus linguistics analysis, whose previous scholarship was cited by both the majority and the dissent in *Heller*. 554 U.S. at 577, 586, 646-47; *see also Vt. Fed. of Sportsmen's Clubs v. Birmingham*, No. 23 Civ. 710, 2024 WL 2150522, at *3-4 (D. Vt. May 14, 2024) (adopting Professor Baron's corpus linguistics analysis considering the original understanding of the term "arms"). Professor Baron examined the historical use of the terms "arms" and "armour" during the Founding Era and the period surrounding Reconstruction and the ratification of the Fourteenth Amendment. Utilizing massive digitized databases of historical texts including the Corpus of Founding Era American English (COFEA), the Corpus of Early Modern English (COEME), the Corpus of Reconstruction Era American English (COREA), the Corpus of Historical American English (COHA), and contemporaneous newspaper databases, Prof. Baron evaluated hundreds of millions of words to capture the everyday language of the American public, circumventing any potential "elite" bias in statutory texts. (SOF, ¶¶ 35-39.).

The corpus data definitively demonstrates that during the Founding Era, the use of the term "arms" as a general category that included "armour" or other military equipment was exceedingly rare. Furthermore, when the word "armor" was used to refer to defensive or protective garments, it was strictly within the context of war, not personal self-defense. By the time of the Founding Era, this literal sense of "armor" had become rare or even entirely obsolete in everyday American English. In his comprehensive review of the corpora, Prof. Baron found zero examples of "armor" being used by the American military, militias, British soldiers, or civilians during the Founding

13

Era. (Baron Decl., ¶ 3-5, 25-31). Soldiers of that era did not wear metal suits or chain mail, and the protective leather gear of that pre-Kevlar era was notoriously ineffective against bullets, meaning civilians did not typically wear such body protection either. (SOF, ¶ 40.) Instead of referring to personal protective gear analogous to modern body armor, the Founders understood the term "armor" in entirely different contexts. According to the corpus data, "armor" typically referred to the protective gear worn by knights, soldiers, or royalty in the distant past, periods long before the Founding Era. Alternatively, the term was used metaphorically. For instance, Founding-era texts frequently reference the religious "armor of God" used by believers to fight sin and Satan, the secular emotional "armor" politicians adopt to debate opponents, or the physical characteristics animals use to protect themselves, such as the "armor" of a hedgehog. (SOF ¶, 40). In total, "the evidence from the corpus data" makes "clear that the word 'arms' in the Second Amendment does *not* include "armor."  (SOF, ¶¶ 26-44)

This linguistic reality remained unchanged during the ratification of the Fourteenth Amendment.  *Cf. Antonyuk v. James*, 120 F.4th 941, 972 (2d Cir. 2024) ("the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis."). Data from COREA and late-nineteenth-century newspapers confirms that during the Reconstruction Era, the term "armor" still did not refer to personal protective equipment. Rather, it referred historically to the defensive suits worn by knights of old, or, in a contemporary sense, to the protective iron-cladding utilized on nineteenth-century warships and field artillery. (SOF, ¶ 42-44). Just as in the Founding Era, the normal and ordinary meaning of "arms" in the later nineteenth century plainly did not include personal "armor." (*Id.*).

Plaintiffs, for their part, base their textual argument largely on a selection of historical dictionary definitions, many of which simply quote each other.  [*See* ECF No. 69-1 at 10-12.]  But

dictionary definitions only go so far: as the Supreme Court teaches us, "[t]hat a definition is broad enough to encompass one sense of a word does not establish that a word is *ordinarily* understood in that sense." *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 568 (2012) (Alito, J.) (emphasis in the original). This is the key advantage of corpus linguistics' scientific approach: by analyzing large quantities of data from the relevant period, rather than a selection of dictionaries quoting each other, corpus linguistics tells us how a term was *actually used*. *See Rahimi*, 602 U.S. at 715 (Kavanaugh, J., concurring) ("The first and most important rule in constitutional interpretation is to heed the text – that is, the actual words of the Constitution – and to interpret that text according to its ordinary meaning as originally understood."); *Heller*, 554 U.S. at 576–77 ("[t]he Constitution was written to be understood by the voters" and its words and phrases must be understood "in their normal and ordinary as distinguished from technical meaning."). And even Plaintiffs' dictionaries indicate that the ordinary meaning of "Arms" was weapons, not armor, as many or most of those definitions define "Arms" as weapons first, with armor later or secondarily. *See, e.g.,* ECF No. 69-5 Ex. 8 at 2 (defining "Arms" first as "all kinds of weapons," then as "the sword, pistol, musquet, bayonet, &c.," before any mention of armor); ECF No. 69-5 Ex. 10 at 2 (defining "Arms" as "all portable weapons"); ECF No. 69-5 Ex. 11 at 2 (defining "Arms" as "in general, all kinds of weapons," with no mention of armor until the third definition).

The ordinary meaning of "Arms" as "weapons" is also consistent with the guidance provided to us by the Supreme Court. Although the Court has not directly ruled on the subject – to our knowledge no federal court has except the district court in *Davis*, which decisively rejected Plaintiffs' argument – justices from across the political spectrum have stated in dicta that "arms" means "weapons." In 1998, Justice Breyer wrote for the majority in *Muscarello v. United States* that "[n]o one doubts that one who bears arms on his person 'carries a weapon.'" 524 U.S. 125,

15

130 (1998). Justice Ginsburg's dissent in that case, joined by Chief Justice Rehnquist, Justice Scalia, and Justice Souter, cited to the same definition of "carry arms or weapons," which she understood as "carry[ing] the weapon on or about his person 'for the purpose of being armed and ready for offensive and defensive action in case of a conflict.'" *Id.* at 139-40 (Ginsburg, J., dissenting) (citing Black's Law Dictionary 214 (6th ed. 1990)). Years later, Justice Scalia wrote in *Heller*, the decision announcing the modern authoritative meaning of the Second Amendment, that "[w]e think that Justice Ginsburg accurately captured the natural meaning of 'bear arms,'" and that the phrase concerned "the carrying of the weapon." 554 U.S. at 584. Elsewhere in *Heller*, Justice Scalia emphasized that "the most natural meaning of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* at 582. And by "[p]utting all of these textual elements together," the court concluded "that they guarantee the individual right to possess and carry *weapons* in case of confrontation." *Id.* at 592 (emphasis added).

Ultimately, the usage of the term by the Founding Fathers, the best scientific corpus linguistics analysis, and the Supreme Court's jurisprudence confirm that the ordinary public meaning of "arms" has never included body armor in the way Plaintiffs now envision. And that is dispositive: if the plain text does not cover the conduct at issue "the constitutional inquiry ends, and a plaintiff's challenge to the law fails." *Giambalvo v. Suffolk County*, 155 F.4th 163, 176 (2d Cir. 2025). The Court can and should resolve the case on this basis alone.

B.      Plaintiffs Have Not Demonstrated That Body Armor Is In Common Use

Under the Supreme Court's framework in *Heller* and its progeny, "the Constitution only protects possession of arms that are typically possessed and in common use by law-abiding citizens for lawful purposes (principally individual self-defense)." *Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 234 (2d Cir. 2025) (citing *Heller*, 554 U.S. at 625, 627). Within the Second Circuit,

16

this analysis has two prongs: first, whether the weapon, the cases have all been about weapons until this one, is "in common use, and second, whether it is "typically possessed by law-abiding citizens for lawful purposes." *NYSRPA v. Cuomo*, 804 F.3d 242, 254-55 (2d Cir. 2015), *abrogated in part on other grounds by Bruen*, 597 U.S. 1 (2022). "Plaintiffs bear the burden of proof" on these issues." *Calce v. Tisch*, No. 25-861-cv, 2026 WL 980092, at *1 (2d Cir. Apr. 13, 2026) (citing *United States v. Gomez*, 159 F.4th 172, 178 (2d Cir. 2025)).

1.    Plaintiffs Have Ignored The Federal Rules

Plaintiffs base their case for common use on a group of market research reports, (Rotsko Dec Exs 1, 3, 5 & 6), at least two of which they appear to have commissioned. (*See id.* Exs. 2 & 4; *cf. id.* Ex. 1 at 10 (indicating that the report was made "in response to requests/orders received").)  These sources are not offered by any witness with personal knowledge, as required by F. R. Evid. 602, but simply attached to the declaration of Plaintiffs' attorney. *Cf. FTC v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) ("An attorney's affidavit or declaration not based on personal knowledge carries no weight."). Plaintiffs did not disclose these documents to the State Defendants prior to their appearance in connection with this motion, did not disclose the identities of the persons who compiled these documents in their initial disclosures (SOF, ¶¶ 84-92), and have never allowed the State Defendants any opportunity to cross-examine any witness in connection with these documents. *Cf. Mikulec v. Town of Cheektowaga*, 302 F.R.D. 25, 29 (W.D.N.Y. 2014) ("The purpose of Rule 26 disclosures is to avoid surprise or trial by ambush." (quotation omitted)).

Furthermore, the statements in these reports, made without any attribution to a declarant with personal knowledge, are "out-of-court statement[s] offered to prove the truth of the matter asserted in the statement[s]," and therefore "inadmissible." *Porter v. Quarantillo*, 722 F.3d 94, 97

17

(2d Cir. 2013) (citing Fed. R. Evid. 802). While there is a hearsay exception for certain market "compilations that are generally relied on by the public or by persons in particular occupations," Fed. R. Evid. 803(17), the exception does not automatically admit any document described as a market report. Instead, "[t]hat exception requires a showing that the compilation is 'generally relied on by the public or by persons in particular occupations' to demonstrate that the data is trustworthy and reliable." *Syracuse Mtns. Corp. v. Petroleos de Venezuela S.A.*, No. 21 Civ. 2684, 2024 WL 3637997, at *7 n.8 (S.D.N.Y. Aug. 1, 2024) (finding that a plaintiff's counsel's statement was "insufficient foundation" for a purportedly reliable market report). And there is every reason to be skeptical about the trustworthiness of these documents, particularly when the companies contracted by Plaintiffs explicitly disclaim the reliability of their data. (*See* ECF No. 69-5 Ex. 1 at 10 (Grand View Research "does not offer warranty for the accuracy of the data" and "takes no responsibility for any inaccurate information"); ECF No. 69-5 Ex. 3 at 1 (Precedence Research "does not make any warranty for the accuracy of the data" and "will accept no accountability for actions taken on the basis of any information that could consequently prove to be incorrect."). ECF No. 69-5

All of this would have been tested in discovery if Plaintiffs had produced the documents in connection with a fact witness or expert; without having done so, Plaintiffs are asking the Court to take their word on it. Other federal courts have rejected this gambit from this specific organizational plaintiff and this particular counsel. *See Lane v. Cacace*, No. 22 Civ. 10989, 2025 WL 903766, at *5 (S.D.N.Y. Mar. 25, 2025) ("the Court refuses to consider Plaintiffs' 'legislative facts,' as they are inadmissible and have not been subjected to the adversarial process, which serves to ascertain the truth, minimize the risk of error, and exclude evidence that is irrelevant or lacking

18

indicia of reliability." (quotation omitted)). The Court should refuse to allow the plaintiffs to ignore the Federal Rules of Evidence and Procedure in this case as well.

> 2.      Under Any Standard, Plaintiffs Have Not Carried Their Burden

But even taking these self-serving industry estimates at face value, Plaintiffs' own numbers defeat their argument. Unlike traditional firearms, body armor is a highly specialized tactical asset predominantly reserved for, and utilized by, qualified professionals such as law enforcement, first responders, and the military. It is not an item historically or typically kept by regular citizens for ordinary self-defense, and Plaintiffs' documents, even if they were admissible, do not show that it is.

To the contrary, Plaintiffs' first report, from Grand View Research, estimates that civilians made up only 7% of the body armor market in 2024, the last year it characterizes as "including historical market data." (ECF No. 69-5 Ex. 1 at 11.) The remaining 93%—the overwhelming majority of the market—consists of sales to the military and law enforcement. Plaintiffs' second report does not explain whether any of its figures are based on actual sales (*see* ECF No. 69-5 Ex. 3), but its numbers say that sales to civilians make up only 6% of the market in 2025, with 94% of all sales going to the military and to law enforcement. (*Id.* at 4.)

But even these figures do not tell the full story. The reports attached to the Rotsko Declaration (ECF No. 69-5) do not define the term "civilians," but it bears emphasis that the Body Armor Law does not prohibit sales to "civilians." Instead, the law includes carve-outs that would cover the vast majority of civilians with need or desire to have armor, including "peace officers," an expansive list of non-police professions that may involve security risks from agricultural inspectors to park rangers to harbor masters to fire marshals to village court security employees to officers of societies for the prevention of cruelty to animals. *See* N.Y. Penal Law § 270.21; N.Y.

19

C.P.L. § 2.10. The Body Armor Law also allows for the designation of additional eligible professions by the Department of State; so far these have included security guards, armored car guards, firefighters, emergency medical technicians, and firearms dealers. *See* https://dos.ny.gov/body-armor.

There is every reason to think that peace officers and persons in eligible professions make up the bulk of the "civilian" subset of these market studies, particularly when the documents submitted by plaintiffs acknowledge that "[i]n the Body Armor Parts market, the rapidly growing sector is the Law Enforcement & Security Personnel," and that armor products are "particularly appealing for civilians, including . . . security personnel." (ECF No. 69-5 Ex. 6 at 10.) Plaintiffs' own figures show that sales to "civilians" are a tiny fraction of the armor market; sales to regular citizens who are not peace officers or members of eligible professions, in turn, are a tiny fraction of that tiny fraction. Plaintiffs' back-of-the envelope math, extrapolated from the inadmissible studies they commissioned, estimates that somewhere between 55,000 and 93,000 units of body armor were purportedly purchased nationwide annually in recent years. [ECF No. 71 at 16.] The actual number of units sold to persons outside of eligible professions would be a small portion of that number; in a country with a population exceeding 330 million, these unit estimates are statistically microscopic.[2]

---

[2]    Likewise, Plaintiffs' reliance on district court decisions regarding tasers and stun guns, such as *Avitabile* and *Maloney*, is entirely misplaced.  Subsequent developments have shown that both district courts misapplied the burden on the issue of common use, on which it is now clear that "Plaintiffs bear the burden of proof." *Calce*, 2026 WL 980092, at *1; *see Maloney* 351 F. Supp. 2d 222, 237 (E.D.N.Y. 2018) (placing the burden on "Defendant . . . to show, by clear and convincing evidence, that nunchakus are not in common use,"); *Avitabile*, 368 F. Supp. 3d 404, 412 (N.D.N.Y. 2019) (reaching its conclusion based on a lack of a "contrary evidentiary showing by the State, which ultimately bears the burden" (quotation omitted)). More broadly, those courts relied on concrete, admissible evidence: the parties in *Avitabile* had "stipulated" to the number of stun guns in use, 368 F. Supp. 3d at 411, while in *Maloney* "the parties collectively submitted nunchaku sales data from six American nunchaku distributors."  Here, the State Defendants have held Plaintiffs to their burden, and Plaintiffs have not adduced any comparable sales data.

Moreover, Plaintiffs' studies treat all "civilian" sales as interchangeable, without breaking them out by the type of armor purchased. Accordingly, even if the statistics could be interpreted as demonstrating that armor in general is in common use by civilians outside eligible professions, there is nothing in Plaintiffs' showing to indicate any significant use by ordinary citizens of the kind of Level II or Level III military grade armor used by the Buffalo Shooter and others. (*Cf.* Schildkraut Decl. ¶¶ 22, 27.) Accordingly, with no evidence at all that these armor types are in common use, the Body Armor Law has a plainly legitimate sweep and must be facially upheld. *See Rahimi*, 602 U.S. at 701 n.2 ("a facial challenge fails if the law is constitutional in at least some of its applications").

Beyond the factual and evidentiary issues with Plaintiffs' "common use" showing, their attempt also fails because they have only attempted to take on part of their burden. The Second Circuit has held that the "common use" test is not satisfied by showing numbers alone, since it would turn constitutional analysis into "a 'trivial counting exercise' that would 'lead to absurd consequences' where unusually dangerous arms like the M-16 or 'the W54 nuclear warhead can 'gain constitutional protection merely because they become popular before the government can sufficiently regulate them.'" *NAGR*, 153 F.4th at 233 (quoting *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024)). Instead, a plaintiff must also show that their proposed weapon—it's always a weapon—is "typically possessed by law-abiding citizens for lawful purposes." *Cuomo*, 804 F.3d at 256 (quoting *Heller*, 554 U.S. at 625). While 'common use' is an objective and largely statistical inquiry, 'typical possession' requires us to look into both broad patterns of use and the subjective motives of gun owners." *Id.* Plaintiffs here have provided no evidence about the patterns by which citizens outside of eligible professions use body armor, nor their subjective motives in acquiring

21

it. Accordingly, even if Plaintiffs' numerical evidence were admissible and sufficient to show common use, they still would not have carried their burden.

        C.      <u>Body Armor Is At Most A Regulable Tactical Accessory, Not An "Arm" In Itself</u>

At most, body armor should be viewed as an accessory to protected weapons, and not a protected weapon itself. Courts have consistently held that the Second Amendment protects the actual firearms intrinsically necessary for self-defense, not the myriad of accessories, tactical enhancements, or range paraphernalia that may accompany them. As federal courts have recognized, there is a fundamental legal distinction between a functional weapon and a mere accessory. For instance, federal courts have rejected arguments that silencers are covered by the Second Amendment, holding that a silencer is not an "Arm" because it is simply a "firearm accessory" rather than a weapon itself. *United States v. Cox*, 906 F.3d 1170, 1176 (10th Cir. 2018); *see, e.g., United States v. Saleem*, No. 23-4693, 2024 WL 5084523 (4th Cir. Dec. 12, 2024) ("While a silencer may be a firearm accessory, it is not a "bearable arm" that is capable of casting a bullet. Moreover, while silencers may serve a safety purpose to dampen sounds and protect the hearing of a firearm user or nearby bystanders, it fails to serve a core purpose in the arm's function."); *see also Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 386-87 (D.R.I. 2022) ("In this Court's view, L[arge] C[apacity] M[agazines], like other accessories to weapons, are not used in a way that 'casts or strikes at another.'"), *aff'd on other grounds*, 95 F.4th 38 (1st Cir. 2024).

The Second Circuit has also embraced this distinction, affirming the State's broad authority to regulate firearm accessories, components, and tactical enhancements differently than the core firearms themselves. In *Cuomo*, the Second Circuit evaluated New York's regulation of specific tactical features and accessories, such as flash suppressors, telescoping stocks, and protruding

22

pistol grips, and upheld their restriction. 804 F.3d at 259-60. Even under modern Second Amendment jurisprudence, this framework underscores a legal reality: the core functional firearm is distinct from the broader universe of cosmetic features and tactical gear. These peripheral items may complement a user's tactical capabilities, but they are not the "Arms" themselves, and their regulation has historically been treated as a valid exercise of legislative authority that does not infringe upon the core right to armed self-defense.

Applied here, body armor is decidedly not a firearm; rather, it is functionally and legally analogous to the tactical accessories or paraphernalia. Body armor is not a mechanical component necessary for the operation of any firearm. *See United States v. Berger*, 715 F. Supp. 3d 676, 700 (E.D. Pa. 2024) ("courts are drawing a line for Second Amendment protection based on whether the particular firearm component is necessary or integral to a firearm's operation."); *United States v. Cooperman*, No. 22-CR-146, 2023 WL 4762710, at *1 (N.D. Ill. 2023) ("The plain text of the Second Amendment does not protect accessories that are not bearable arms"). Similar to a flash suppressor, a pair of night-vision goggles, or specialized range equipment, body armor is a supplemental, tactical item that a user might choose to utilize in conjunction with a firearm, but its absence in no way prevents the user from keeping or bearing the underlying weapon. Because body armor operates as a passive tactical accessory rather than an essential component required for a firearm's function, it falls outside the textual scope of the Second Amendment. Consequently, body armor has historically been, and should continue to be, treated under the law as a regulable tactical accessory rather than a constitutionally protected "Arm."

## IV.    HISTORY AND TRADITION DEMONSTRATE THAT THE CHALLENGED PROVISIONS ARE CONSTITUTIONAL

In their motion for summary judgment, Plaintiffs allege that body armor is implicated by the text of the Second Amendment, and that "there is no mainstream tradition from which

23

Defendants could attempt to piece together potential analogues." [ECF No. 69-1 at 6-8.] In fact, American law and history strongly support the ability of governments to regulate body armor.

### A. There Is A Centuries-Long Anglo-American Tradition of Armor Regulation

Should this court decide that body armor is an "arm" and that it is in common use, New York's Body Armor Law nonetheless passes muster at the second step of the *Bruen/Rahimi* test, as it is fully "consistent with the principles that underpin the Nation's regulatory tradition." *Rahimi*, 602 U.S. at 681.

A centuries-long historical tradition demonstrates one such principle: in periods when body armor has been in use, it has been subject to governmental regulation. Indeed, the tradition traces from the very foundation of Western Civilization, as Sir William Blackstone, who Plaintiffs acknowledge as "the preeminent authority on English law for the founding generation," [ECF No. 71 at 12 (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)], traces "[t]he offence of riding or going armed" all the way back to "the laws of Solon, [when] every Athenian was finable who walked about the city in armour." IV William Blackstone, *Commentaries on the Laws of England* 148-49 (Clarendon Press 1770) (SOF, ¶ 45); *see also* I John Potter, *Achaeologia Graeca: or the Antiquities of Greece* ch. 26 at 182 (Sam Palmer, Printer 1722) (*Id.*) (reprinting the ancient law's text: "He shall be fin'd who is seen to walk the City-streets with a Sword by his Side, or having about him other Armour, unless in case of exigency.")

In keeping with this tradition, English monarchs and parliaments regularly issued laws forbidding or restricting the wearing of armor, to prevent dangerous persons being better-equipped than legitimate authorities. These laws began in an outgrowth of what we would now call sensitive places laws, including a law from the late 13th century stating that "they who shall come to see [a] Tournament, shall not be armed with any Manner of Armour," and a 1313 law requiring that "every man shall come" to parliaments and assemblies "without all Force and Armour, well and

24

peaceably." (SOF, ¶¶ 46-47 ) In 1353 Edward III issued a "Proclamation for keeping the peace within the City" of London, ordering among other things "that every hosteler and herbergeour, within the franchise of the City, shall cause his guests to be warned that they must leave their arms and armour in their hostels where they are lodging." Henry Thomas Riley, *Memorials of London and London Life in the XIIth , XIVth, and XVth Centuries* 272 (Longmans, Green & Co. 1868), (SOF, ¶ 48).  The same law required "that no alien shall go in armour, or shall carry sword, knife with point, or other arms, in the City, or in the suburb thereof, on pain of imprisonment, and of losing such arms and armour." SOF, ¶¶ 47-48.  Edward III also issued the Statute of Northampton, which prohibited anyone to "go, nor ride armed by night, nor by day, in fairs markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King and their bodies to prison, at the king's pleasure."  John Collyer, *The Criminal Statutes of England* 4 (S. Sweet 1832), 2 Ed. 3, c. 3, (SOF, ¶ 50); (*see also* Carp. Decl. ¶ 7). Richard II later updated the Statute, adding a provision stating that "no lord, knight, nor other, little nor great, shall go, nor ride by night nor by day armed, nor bear sallet nor skull of iron, nor of other armour, . . . save and except the King's officers and minsters in doing their office." *Id.* at 5, 20 Ric. 2, c.1 (SOF, ¶ 51). In 1400, Henry IV issued a law prohibiting all Welshmen from "bear[ing] any manner of armour" within cities, boroughs, and merchant towns near the English border. II Danbey Pickering, *The Statutes at Large, from the Fiftheenth Year of King Edward III to the Thirteenth Year of King Henry IV, Inclusive* at 413 (Joseph Bentham, printer 1762) (SOF, ¶ 52). Over a century later, Henry VIII in 1534 issued a law forbidding anyone in Wales from bearing any "weapon, privy coat, or armour defensive" near court, or "to any town, church , fair, market or other congregation." IV Danby Pickering, *The Statutes at Large, from the First Year of King*

25

*Richard III to the Thirty-first year of King Henry VIII, Inclusive*, at 330 (Joseph Bentham, printer 1763) (SOF, ¶ 53).

His daughter Queen Elizabeth in 1597 (shortly before the first English settlement in America) issued "A Proclamation against the common use of Dagges, Handgunnes, Harqubuzes, Calliners, and Cotes of Defense." (SOF, ¶ 54). Concerned that diverse persons had worn "privie Cotes and Doublets of Defense . . . and presume audaciously to apparel themselves with the said privie Armour, not only in Cities, Townes, and publicke assemblie, but within her Majesties Court wheresover, . . to the great offence and contempt of her Highnes[s] and of her Laws, and to the hurt of divers her Majestie[']s good subjects," Queen Elizbeth's order "doth explicitly prohibit[] and forbid all and every of her subjects whatsoever, the wearing of any such Privie or secret kind of Cote, or Doublet of Defence," on pain of imprisonment. SOF, ¶¶ 54-55.

This tradition of prohibiting the wearing of armor made its way into the common law, such that by 1715 a guide for justices of the peace included a section on "Armour," containing not only the Statute of Northampton provision allowing for the arrest of persons who "go armed offensively," but also paragraph stating that persons who "shall go apparelled with privy Coats or Doublets" can have sureties imposed against them. Michael Dalton, *The Country Justice: Containing the Practice of the Justices of the Peace* 37 (John Walton, printer 1715) (SOF, ¶ 56); (*see* Carp. Decl. ¶ 10). In his discussion of "Affrays," William Hawkins wrote that "a Man cannot excuse the wearing of such Armour in Publick, by alledging that such a one threatened him, and that he wears it for the Safety of his Person from Assault." (Carp. Decl. ¶ 9 (quoting 1 William Hawkins, *A Treatise of the Pleas of the Crown*, 136, chap. 63, § 8 (London, 1716))). And this common-law tradition made its way across the Atlantic, as "[b]ooks about the common law and legislation deriving from the common law in early America still invoked the Statute of

26

Northampton when defining an "affray," including the now arcane passage about "armour," as well as Hawkins's commentary on wearing armor in public" (SOF, ¶¶ 56-58; *Id.* ¶ 11 (collecting sources).)

While additional new laws prohibiting or restricting armor diminished or disappeared prior to the founding of the United States, the explanation for the lack of such laws is straightforward: at the time of the Founding, personal body armor designed to defend against firearms was not in use. It was a functionally obsolete technology that had been entirely eclipsed by the advent of gunpowder. As Professor Benjamin Carp details in his expert declaration, the development of firearms had "far outpaced armorers' ability to provide soldiers with bodily defense of their persons." (Carp Decl., ¶ 14). By the eighteenth century, armor was not only wholly ineffective against musketry and artillery, but it was also dangerously impractical. The heavy metal suits of earlier eras robbed infantry of essential mobility and subjected soldiers to extreme health risks, including heat exhaustion during summer campaigns and the lethal threat of metal fragments being driven into the body by penetrating bullets. (*Id.* ¶¶ 15–16). Consequently, eighteenth-century militia statutes and Continental Army regulations never prescribed the wearing of body armor. (*Id.* ¶ 26). The only vestigial remnants of armor present during the Founding Era, such as the "gorgets" worn by officers like George Washington, were strictly ornamental symbols of rank and diplomacy that "served no protective function whatsoever." (*Id.* ¶¶ 19–20). Because defensive armor was a defunct, abandoned technology that possessed no utility for civilian self-defense, the lack of any specific armor regulations from the Founding (or Reconstruction) eras reflects "a lack of political demand rather than constitutional limitations." *Antonyuk*, 120 F.4th at 970 (quoting *Binderup v. Att'y Gen.*, 836 F.3d 336, 369 (3d Cir. 2016)); *see Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring) (cautioning courts against taking a "use it or lose it" approach to the authority of

27

founding-era legislatures because "[s]uch assumptions are flawed, and originalism does not require them.").

Finally, the body armor Plaintiffs seek to constitutionalize is an entirely modern, industrial invention that is conceptually and technologically divorced from the Founding Era. As the Second Circuit has recognized, constitutional analysis must adapt when confronting "dramatic technological changes" and novel items that did not exist at the Founding. *See United States v. Decastro*, 682 F.3d 160, 165 (2d Cir. 2012). The body armor at issue here, engineered from advanced synthetic materials like Kevlar to stop high-velocity ammunition, did not begin to emerge until the late 19th and 20th centuries. (Carp Decl., ¶¶ 28–29.) Earlier 19th-century experiments, such as steel breastplates sold to soldiers during the Civil War, were widely mocked as heavy, hot, ineffective, and "little more than technological curiosities." (*Id.* ¶ 27.) The modern incarnation of body armor was never contemplated by the Founders, was not possessed by early Americans, and descends from a historical lineage of tactical gear strictly regulated and restricted to the government's peaceable forces. SOF, ¶¶ 59-68.

B. Plaintiffs' Discussion Of History Consists Of A Bad-Faith Effort To Pass Their Own Argument Off As Scholarship

Plaintiffs, for their part, have adduced little or no history in their case-in-chief. The section of their principal brief addressing armor's role and its place in the laws of the Founding and Reconstruction eras is less than a page, and cites almost exclusively to a 2025 law review article by Joseph Greenlee. *See* [ECF No. 71] at 14-15 (repeatedly citing Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1 (2025)). While Plaintiffs cite to that article as if it were the work of a disinterested scholar, it is anything but.

Joseph Greenlee is not a historian; he is the Director of the NRA's Office of Litigation. *See* https://fedsoc.org/bio/joseph-greenlee. And at the time he wrote the article, Greenlee was

28

Director of Constitutional Studies at the FPC Action Foundation, a nonprofit affiliated with Plaintiff Firearms Policy Coalition and headquartered at the same address. *See* 23 Geo. J.L. & Pub. Pol'y at 1 n.a1. Plaintiffs do not disclose this affiliation in any of the five times they cite to Mr. Greenlee in their brief. [*See generally*, ECF No. 71 at 12, 15, 20.] SOF, ¶¶ 84-92.

And while Plaintiffs cite to Greenlee's article as if it were any other law review piece, they did not disclose to the Court that they themselves paid for its creation. Approximately halfway down Plaintiff FPC's July 2024 press release announcing the instant lawsuit, the organization states that "FPC commissioned research on the history and tradition of defensive armor use and regulation" leading to "a forthcoming law review article," namely the Greenlee piece. *See* https://www.firearmspolicy.org/fpc-sues-new-york-to-strike-down-body-armor-ban (last accessed April 26, 2026). Mr. Greenlee's article does not disclose that it was "commissioned" by Plaintiff FPC, nor that it was prepared for the purpose of litigation, nor that the litigation it was prepared for was this lawsuit. SOF, ¶ 91. If Plaintiffs believed that Greenlee is a historical expert whose testimony should influence the outcome of this case, they should have disclosed him as an expert, served an expert report as required by Fed R. Civ. P. 26(a)(2), and made him available for cross-examination. Given Plaintiffs' failure to do so, the Court should accord the Greenlee article no weight. *Hughes v. Ester C Co.*, 330 F. Supp. 3d 862, 873 (E.D.N.Y. 2018) (where "Plaintiffs have disclosed no expert testimony or report . . . [t]he scientific reports Plaintiffs rely on . . . are plainly inadmissible hearsay."); *Schneider v. Revici*, 817 F.2d 987, 991 (2d Cir. 1987) ("Rule 803(18) explicitly requires that to qualify under the learned treatise exception, a proper foundation as to the authoritativeness of the text must be laid by an expert witness."

Even if the Court were to consider the Greenlee article as a piece of historical scholarship, despite Plaintiffs having commissioned it and not having disclosed him as their expert, the piece

29

fails to undermine any of the history demonstrated in Section IV(A), above. Greenlee acknowledges that the use of armor "declined as evolving methods of warfare limited its usefulness later in the seventeenth-century." 23 Geo. J.L. &  Pub. Pol'y at 40. And the piece contains numerous mistakes: Greenlee makes much of the fact that certain militia statutes required a "breastplate" or a "crupper," *id.* at 25-26, but as explained in the Declaration of Dr. Carp (who actually is a military historian of the eighteenth century), those words are "equestrian terms for pieces of tack: they refer to leather straps that hold a horse's saddle in place." (Carp Dec. ¶ 18.) Indeed, Greenlee himself had acknowledged in an article five years earlier that the terms referred to pieces of horse tack.[3]  *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 524-25 (2019) (defining "breastplate" as "[s]traps that prevent the saddle or harness from sliding" and "crupper" as having "a similar function to a breastplate, except it attaches to the rear of the saddle or harness.").

C.    Modern Ballistic Body Armor Is A Dangerous And Unusual Article

To fall within the ambit of the Second Amendment, an arm must not only be in common use for self-defense but must also fall outside category of "dangerous and unusual" weapons. As the Supreme Court established in *Heller*, weapons that are "dangerous and unusual" enjoy no constitutional sanctuary. 554 U.S. at 627 (2008). The Second Circuit recently clarified this standard in *National Association for Gun Rights v. Lamont*, 153 F.4th 213 (2d Cir. 2025), tracing the history of the doctrine and explaining that "this historical tradition encompasses those arms that legislators determined were *unusually dangerous* because of their characteristics." *Id.* at 233 (emphasis in the original); *see id.* at 222 (explaining that historical antecedents "regulated []

---

[3]    Greenlee likewise emphasizes the wearing of "gorgets" during the Revolution, but as Dr. Carp shows (including by displaying the same portrait of George Washington that Greenlee references), gorgets were "status symbols . . . that were not worn for protection," and these necklaces "more closely resemble[] a badge, a medal, or jewelry rather than protective gear."  (Carp Decl. ¶ 20.)

30

unusually dangerous weapons unsuitable for and disproportionate to the objective of individual self-defense."). Modern ballistic body armor, a tactical asset originally engineered for the battlefield, is "unusually dangerous" precisely because it neutralizes the foundational premise of public defense: that the "good guy with a gun" (particularly a law enforcement officer) can stop the "bad guy with a gun." It fundamentally alters the dynamic of armed confrontation, transforming its wearer from a vulnerable participant into a fortified threat.

The unusually dangerous nature of modern ballistic body armor is demonstrated by the way it has become a key part of the modern mass shooter's toolkit. As detailed by Dr. Jaclyn Schildkraut, a leading expert on mass shootings, the use of tactical gear by mass shooters has steadily and alarmingly increased over the last two decades. (Schildkraut Decl., ¶¶ 16-17). The primary impetus for perpetrators utilizing body armor is chillingly pragmatic: the most common ballistic vests "can withstand fire from standard police-issued handguns," ensuring that a shooter "would likely be able to continue their killing until they are met with greater force." (*Id.* ¶ 10). The trend of armor use in mass shootings "began around 2008, reflecting that the use of body armor by mass shooting perpetrators is a newer development," and "the proportion of mass shooting incidents in which body armor was used continues to increase over time." (*Id.* ¶ 17.) Because mass shooters study and learn from the tactical successes of their predecessors, "it is expected that the rise in the use of body armor among mass shooters w[ill] continue to increase in the future."[4] (*Id.* ¶ 10.) SOF, ¶¶ 69-83.

---

[4]    In fact, the trend has continued, as actual and potential mass shooters have continued to utilize body armor in the time since Dr. Schildkraut prepared her report. *See, e.g.,* Press Release, U.S. Department of Justice, *After Two-Day Manhunt, Suspect Charged with Shooting Two Minnesota Lawmakers and Their Spouses* (June 16, 2025) (discussing how shooter "equipped himself with firearms and body armor"), https://tinyurl.com/yax367c7; Eli Sherman, *Guns, body armor, phones seized from storage unit where Brown shooting suspect died*, WPRI (Dec. 19, 2025), https://tinyurl.com/5xnz2x97; Elizabeth Worthington, *Student found with guns, body armor, diagram of Univ. of Delaware police department*: authorities, WPVI (Dec. 2, 2025), https://tinyurl.com/2nbskbcv.

The *Bruen* Court recognized that cases involving "unprecedented social concerns or dramatic technological changes" would "require a more nuanced approach" from reviewing courts. 597 U.S. at 27. Modern ballistic body armor—particularly the military-grade Level III armor and accessories chosen by the Buffalo shooter (*see* Schildkraut Decl. ¶¶ 22-23)—involves both. The "dramatic technological change" is the advent of armor that can stop a bullet, something that would have been unthinkable to the Founding or Reconstruction generations. Dr. Benjamin Carp explains that the armor of the late 18th century was "functionally obsolete," totally ineffective against musketry, and hazardous to the wearer's health. (Carp Decl., ¶¶ 14-16). And as the Second Circuit just recognized, there is "no direct historical precedent for the contemporary, growing societal concern over and fear of mass shootings resulting in ten or more fatalities." *NAGR*, 153 F.4th at 238; *see also id.* at 239 ("The Founders faced no problem comparable to a single gunman carrying out a mass murder in seconds.").

Modern ballistic body armor is also "unusually dangerous" in that it constitutes an unprecedented threat to law enforcement officers. Body armor companies are well aware of this danger, which is why market leaders in the armor industry do not sell to persons outside the military, law enforcement, and certain allied professions. The Buffalo shooter noted this multiple times in his manifesto, complaining that "many of the S+ tier IIIA armor like the Safariland Hardwire are only available to certain credentials because of [expletive] companies" (SOF, ¶¶ 18-19.), and that "Avon Protection, Gentex, BAE systems, United Shield, ArmorSource, Safariland PROTECH, and Point Blank PARACLETE all make great helmets but the mass majority of them are only available to the government and police." (*Id*.) The rationale for this policy was explained by the State Defendants' fourth expert, Michael Foreman, a retired Chief with 40 years of law enforcement experience who was Executive Vice President at Point Blank Enterprises until his

32

untimely    death    in    January    2026.    (*See*    Foreman    Dec.    at    21; https://www.dobbsfuneralhome.com/obituary/Michael-Foreman). Mr, Foreman wrote that body armor exists to "protect the protectors," and that "[r]estrictions on the sale and possession of body armor are an essential element in the steps necessary to protect those who serve." (Belka Decl. Ex. P at 8, 11.) "Law enforcement today faces far too many threats to their safety without making it easier to obtain body armor for non-qualifying individuals," which is why the "top [body armor] companies have chosen to make it their practice to only sell to qualifying professionals."[5] (*Id.* at 11-12.) The Body Armor Law simply codifies that practice, geared toward law enforcement safety.

Because armor capable of stopping a bullet did not exist at the Founding, and because its modern deployment in the public sphere creates a historically unprecedented and catastrophic threat to civilian life and law enforcement, it is "unusually dangerous" and outside the scope of the Second Amendment.

D.     Modern Ballistic Body Armor May Be Prohibited Based On Its Propensity To Terrify The Public

Lastly, the Body Armor Law is justified by a separate and sufficient American tradition of "laws prohibiting 'bearing firearms in a way that spreads fear or terror among the people.'" *United States v. Rowson*, 652 F. Supp. 3d 436, 469 (S.D.N.Y. 2023) (quoting *Bruen*, 597 U.S. at 50); *see, e.g., Aymette v. State*, 21 Tenn. 154, 159 (1840) (recognizing that state legislatures have a right to prohibit "wearing or keeping weapons dangerous to the peace and safety of the citizens" and may "preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce"). The *NAGR* Court explicitly recognized this "ancient common

---

[5]     Even without the Foreman Declaration, the existence and breadth of the corporate policy is documented in the manifesto excerpts in Exhibit D to the Schildkraut Declaration.

law tradition of singling out weapons capable of producing a terror." 153 F.4th at 245-46 (quotation omitted) (citing *Aymette*). The proposition is particularly supported by Judge Nathan's concurrence, a fully-incorporated part of the majority opinion, which identifies "a tradition of restrictions on public affray—that is, terrifying the public," and found that the pertinent historical sources "reveal a common concern about how 'terrifying' dangerous and unusual weapons are to the public." Id. at 251 (Nathan, J., concurring).[6]

Prohibiting the wearing of armor fits into this tradition – and always has.  As Dr. Carp explains, at common law "[t]he wearing of armor in public by people other than peacekeepers was understood to be terrifying to the people and therefore subject to prohibition."  (Carp Dec. ¶ 9; *see generally id.* ¶¶ 8-11.)  That fact is as true in modern America as it was in medieval England, as the wearing of modern ballistic body armor in public justifiably causes people to anticipate mass violence.  *See, e.g.,* Jeff Murray, *Weapons charges follow concerning Facebook live: Why Broome County Schools locked down*, Binghamton Press & Sun-Bulletin (Dec. 13, 2022) (discussing lockdowns in medical facilities and nine school districts after video "showing a man wearing what appeared to be ballistic body armor and displaying a handgun while operating a vehicle"); WEVVV, *Fairfield schools placed on lockdown Wednesday after armed man arrested nearby* (Feb. 26, 2026), https://tinyurl.com/yueknjjz (lockdown due to a man "found walking through a neighborhood armed with a loaded rifle and wearing body armor"); Bethany Fowler, *Lockdown lifted for SCC Jackson Campus following felon wearing body armor on the loose*, WSPA (June 7, 2022), https://tinyurl.com/mr38m6sw; *see also* Eric Scott, *Man Training for Marathon Triggers School Lockdown in Wildwood Crest, NJ*, New Jersey 101.5 (Sept. 20, 2022),

---

[6]    Although Judge Nathan's *NAGR* concurrence is written separately from Judge Walker's majority opinion, the entire panel joined it and incorporated its analysis in the text of the majority opinion. *See NAGR*, 153 F.4th at 234 ("We fully join in Judge Nathan's concurrence.").

34

https://tinyurl.com/y7ayh9rz (lockdown after weighted running vest mistaken for ballistic armor). The long tradition of public terror laws represents a separate and sufficient basis to find New York's Body Armor Law to be historically justified.

## V.    ANY INJUNCTION SHOULD BE DENIED, OR ALTERNATIVELY, LIMITED TO THE INDIVIDUAL PLAINTIFFS AND STAYED PENDING APPELLATE REVIEW

For the reasons discussed above, Plaintiffs' Second Amendment challenge must be dismissed in its entirety and summary judgement granted on State Defendants' motion.  But even if the Court were to rule in Plaintiffs' favor, any injunction must be limited to the individual plaintiffs. *See Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (Injunctions may not be "broader than necessary to provide complete relief to each plaintiff with standing to sue"). Similarly, if the Court were to issue an injunction, the State Defendants respectfully request that the Court stay the injunction pending appeal, or at a minimum, for fourteen days to allow them to seek emergency relief in the Second Circuit. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). The harm from the lack of a stay is especially heightened here given the practical impossibility of recovering pieces of ballistic body armor sold during an injunction, particularly if they are diverted to the criminal market.

## CONCLUSION

For the reasons set forth above, the Superintendent and Attorney General respectfully request that the Court deny Plaintiffs' motion for summary judgment, grant the State's cross-motion for summary judgment, and grant such other and further relief as it deems just and proper.

Dated: Buffalo, New York
      April 27, 2026

LETITIA JAMES
Attorney General
State of New York


By: */s/ Ryan L. Belka*
RYAN L. BELKA
Assistant Attorney General
350 Main Place, Suite 300A
Buffalo, NY 14202
(716) 853-8440
Ryan.Belka@ag.ny.gov

JAMES M. THOMPSON
Special Counsel
28 Liberty Street
New York, NY 10005
(212) 416-6556
James.Thompson@ag.ny.gov

36