UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BENJAMIN HEETER, JOSEPH WURTENBERG, and the
FIREARMS POLICY COALITION, INC,

                                                  Plaintiffs,

            v.

LETITIA JAMES, in her official capacity as Attorney General
of the State of New York, STEVEN G. JAMES, in his official
capacity as Superintendent of the New York State Police, and
MICHAEL J. KEANE, in his official capacity as District
Attorney for the County of Erie, and SANDRA DOORLEY,
in her official capacity as District Attorney for the County of
Monroe,

                                                  Defendants.

No. 24-cv-00623 (JLS)

**STATE DEFENDANTS'
LOCAL CIVIL RULE
56(a)(2) COUNTER-
STATEMENT AND
56(a)(1) STATEMENT OF
UNDISPUTED
MATERIAL FACTS**

Pursuant to Rule 56(a)(2) of the Local Rules of Civil Procedure for the United States

District Court for the Western District of New York, Defendants Letitia James, in her official

capacity as Attorney General of the State of New York, and Steven G. James, in his official

capacity as Superintendent of the New York State Police (collectively, the "State Defendants"),

respond to the Plaintiffs' Rule 56(a)(1) Statement, ECF No. 69-2, as follows:[1]

1.      In the summer of 2022, New York State enacted a raft of new firearms restrictions,

ostensibly in response first to mass shootings in Buffalo, New York and Uvalde, Texas, and a few

weeks later, to the U.S. Supreme Court's decision in *New York State Rifle and Pistol Association*

*v. Bruen*, 597 U.S. 1 (2022).

---

[1]      The State Defendants do not respond to the Plaintiffs' section headings, as they are not a proper part of the
Rule 56 Statement and no response is required under the Local Rules of Civil Procedure.  See Local Rule 56(a)(2)
("A party opposing a motion for summary judgment shall include a response to *each numbered paragraph* . . ."
(emphasis added)).  To the extent a response is deemed required, the State Defendants object to the section headings
as unsupported by "citation[] to admissible evidence."  Local Civil Rule 56(a); see Fed. R. Civ. P. 56(c)(2).

**Response to Paragraph 1**

Disputed.  The State Defendants note that Paragraph 1 is not supported by a citation to admissible evidence.  *See* Fed. R. Civ. P. 56(c)(2); Local Rule 56(a)(1).  In particular, Plaintiffs cite no evidence for their assertion that the legislature acted "ostensibly," rather than genuinely, in response to these events.

2.      Governor Hochul signed the first such "landmark legislative package" on June 6, 2022, at a signing ceremony with Defendant New York State Attorney General Letitia James ("AG James").  Pl.'s App'x **Exhibit A** is Governor Hochul's June 6, 2022 press release, "Governor Hochul Signs Landmark Legislative Package to Strengthen Gun Laws and Protect New Yorkers.  Also available at: https://www.governor.ny.gov/news/governor-hochul-signs-landmark-legislative-package-strengthen-gun-laws-and-protect-new-yorkers.

**Response to Paragraph 2**

Undisputed for purposes of this motion.

3.      This "comprehensive bill package" "ban[ned] body armor sales outside of people in select professions." *Id.*

**Response to Paragraph 3**

Paragraph 3 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement.  *See EEOC v. Green Lantern Inn, Inc.*, No. 19 Civ. 6704, 2022 WL 1507944, at *28 (W.D.N.Y. Mar. 8, 2022) (rejecting assertion in Local Civil Rule 56 statement that "is argument more than it is an assertion of fact.").  The State Defendants do not dispute that the Body

Armor Law prohibits the knowing purchase of body armor by persons outside of eligible professions, subject to additional exceptions.

4.      AG James enthusiastically commended the legislation, proclaiming: "[w]ith this new package of gun laws, New York will continue to lead in imposing reasonable gun laws that keep our people safe, and I urge other states to follow suit." *Id.*

**Response to Paragraph 4**

Undisputed for purposes of this motion.

5.      Approximately two weeks later, on June 23, 2022, the Supreme Court issued its decision in *Bruen*, which struck down the "proper cause" requirement of New York State's concealed carry permitting scheme, because that "special need" scheme prevented citizens with ordinary self-defense needs from exercising their constitutionally protected right to keep and bear arms, and clarified that means-ends tiered scrutiny analysis has no place in Second Amendment challenges.

**Response to Paragraph 5**

Paragraph 5 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement.  *See EEOC v. Green Lantern Inn, Inc,*, No. 19 Civ. 6704, 2022 WL 1507944, at *28 (W.D.N.Y. Mar. 8, 2022) (rejecting assertion in Local Civil Rule 56 statement that "is argument more than it is an assertion of fact.").  The State Defendants do not dispute that the Supreme Court released the *Bruen* decision on June 23, 2022.

6.     In response, AG James vowed:

In the days to come, **my office will be taking action** to address the potential harm that this ruling may cause, and we will continue to defend the constitutionality of our state's laws, as we've always done. **We will work with the Governor and Legislature** to amend our licensing statute that will continue to protect New Yorkers. I want to reassure all New Yorkers that our robust gun protection laws remain intact and **we will be working with our partners in government to further strengthen them**.

Pl.'s App'x **Exhibit B** is New York State Attorney General Letitia James' ("AG James") June 23, 2022 press release, "Attorney General James Vows to Protect New Yorkers in Wake of Supreme Court Ruling" (emphasis added). Also available at: https://ag.ny.gov/press-release/2022/attorney-general-james-vows-protect-new-yorkers-wake-supreme-court-ruling.

**Response to Paragraph 6**

Undisputed for purposes of this motion.

7.     Over the course of the following week, Governor Hochul called lawmakers back to Albany for a special session, and on July 1, 2022, passed the second of that summer's "landmark" packages of gun restrictions, known as the Concealed Carry Improvement Act ("CCIA").

**Response to Paragraph 7**

Undisputed for purposes of this motion.

8.     The CCIA amended the Body Armor Ban as enacted a few weeks earlier, to greatly expand the definition of "body armor" from soft body-vests to "any product that is a personal protective body covering intended to protect against gunfire, regardless of whether such product is to be worn alone or is sold as a complement to another product or garment." Penal Law § 270.20.

**Response to Paragraph 8**

Paragraph 8 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. *See EEOC v. Green Lantern Inn, Inc.*, No. 19 Civ. 6704, 2022 WL 1507944, at *28 (W.D.N.Y. Mar. 8, 2022) (rejecting assertion in Local Civil Rule 56 statement that "is argument more than it is an assertion of fact."). The State Defendants do not dispute that the CCIA amended the Body Armor Law and contained the quoted language. The State Defendants do dispute unsupported descriptors like "greatly expanded."

9.     In the words of AG James, the CCIA "expand[ed] the scope of bullet-resistant protective equipment prohibited in New York [to encompass], for example, the steel-plated vest worn by the shooter in the [sic] Buffalo, New York." Pl.'s App'x **Exhibit C** is AG James' January 26, 2023 press release, "Understanding Recent Changes to New York's Gun Laws." (emphasis added). Also available at: https://ag.ny.gov/new-york-gun-laws.

**Response to Paragraph 9**

Undisputed for purposes of this motion.

10.     AG James applauded the amended Body Armor Ban. Pl.'s App'x **Exhibit D** is AG James' July 2, 2022 press release, "Attorney General James' Statement on New Efforts to Protect Abortion and Strengthen Gun Control." Also available at: https://ag.ny.gov/press-release/2022/attorney-general-james-statement-new-efforts-protect-abortion-and-strengthen-gun.

**Response to Paragraph 10**

Disputed. The cited document does not discuss the amendments to the Body Armor Law.

11.     Defendant AG James and Governor Hochul enthusiastically touted New York State's first-in-the-nation (and only) Body Armor Ban as a key part of their 2022 "landmark legislation" restricting firearms.  Pl.'s App'x **Exhibit E** is Governor Hochul's June 1, 2022 press release, "Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision."  Also available at: https://www.governor.ny.gov/news/governor-hochul-signs-landmark-legislation-strengthen-gun-laws-and-bolster-restrictions.

**Response to Paragraph 11**

Disputed.  The cited document contains no statement by Attorney General James, nor any basis to characterize the law as "their . . . legislation."  The Attorney General is not a legislator.

12.     Neither have distanced themselves from the law, nor treated it as obsolete.  A State website links AG James to enforcement of the "marketplace prohibition" in GBL § 396-eee.  Pl.'s App'x **Exhibit F** is a screenshot of the New York Secretary of State's website "FAQ's" concerning the Body Armor Ban (*see* Q2).  Also available at: https://dos.ny.gov/body armor#:~:text=Effective%20July%206%2C%202022%2C%20when,of%20body%20armor%20is%20prohibited.

**Response to Paragraph 12**

Disputed.  The State Defendants note that the link in Paragraph 12 is broken, and that the document at Exhibit F is not authenticated under Fed. R. Evid. 901 and is hearsay under Fed. R. Evid. 802, as it is not the statement of any opposing party in this case and not subject to any hearsay exception.

13.     The State Police warned shortly after enactment that they have "zero tolerance" for violations of the CCIA, which encompasses the Body Armor Ban. If "you violate this law, you will be arrested. Simple as that." The State Police's warnings regarding zero tolerance for violations of the CCIA are available on Youtube: "Governor Hochul Delivers a Press Conference on Gun Violence Prevention," August 31, 2022, beginning at 37:40. https://www.youtube.com/watch?v=gC1L2rrztQs.

**Response to Paragraph 13**

Undisputed for purposes of this motion.

14.     The Ban has been consistently enforced by the State Police, including multiple arrests after enactment. Pl.'s App'x **Exhibits G, H, and I** are State Police press releases discussing arrests for violation of the Body Armor Ban. Also available at: https://troopers.ny.gov/news/state-police-arrest-virginia-man-illegally-possessing-multiple-firearms (Ex. G, August 2024); https://troopers.ny.gov/news/new-york-state-police-arrest-hastings-man-illegally-possessed-firearms (Ex. H, August 2024); https://troopers.ny.gov/news/niagara-falls-man-arrested-multiple-ghost-guns (Ex. I, June 2024).

**Response to Paragraph 14**

Undisputed for purposes of this motion.

15.     The new crimes of selling and purchasing body armor are included in the state's pattern jury instructions. Pl.'s App'x **Exhibit J** contains the pattern jury instructions for Penal Law § 270.21 (unlawful possession of body armor). Also available at: https://nycourts.gov/judges/cji/2-PenalLaw/270/270.21.pdf. Pl.'s App'x **Exhibit K** contains the

pattern jury instructions for Penal Law § 270.22 (unlawful sale of body armor). Also available at: https://nycourts.gov/judges/cji/2-PenalLaw/270/270.22.pdf.

**Response to Paragraph 15**

Undisputed for purposes of this motion.

16.    FPC is a 501(c)(4) nonprofit membership organization with members residing in New York State, including Plaintiffs Heeter and Wurtenberg.  FPC's members throughout the state, who have plans to purchase and/or acquire body armor for lawful purposes, but who are not in a profession deemed "eligible" by the state, have been prohibited from doing so since July 6, 2022, when the amended Body Armor Ban took effect.  These FPC members are and will continue to be injured by the Body Armor Ban unless and until enforcement is enjoined.  The individual Plaintiffs in this case are but two examples of FPC's members who have a continuing desire to purchase and/or acquire body armor and are injured by the Ban.  Pl.'s App'x **Exhibit L** is the Declaration of Brandon Combs, dated September 27, 2024.

**Response to Paragraph 16**

Disputed.  Mr. Combs' statement about the existence, intentions, desires, and injuries of unidentified members is hearsay (in fact, hearsay-within-hearsay), and inadmissible under Fed. R. Evid. 802.  The statements regarding what the Body Armor Law prohibits and the alleged injury-in-fact are legal conclusions, not factual statements, and accordingly improper in a Rule 56(a) statement.  *See EEOC v. Green Lantern Inn, Inc.*, No. 19 Civ. 6704, 2022 WL 1507944, at *28 (W.D.N.Y. Mar. 8, 2022) (rejecting assertion in Local Civil Rule 56 statement that "is argument more than it is an assertion of fact.").  The State Defendants do not dispute that the Firearms Policy Coalition is a 501(c)(4) organization and that Plaintiffs Heeter and Wurtenberg are members.  The

State Defendants dispute that Plaintiffs Heeter and Wurtenberg are injured by the ban as they both own body armor.  Neither Plaintiff has attempted to fit within the list of qualified professionals nor asked that their profession be considered to be added to the list of qualified professionals, as allowable under state law.  Belka Decl., ¶¶ 3-13, Exs. A-B, Heeter Dep., 19:11-21:22, 39:3-40:20, 47:5-8; Wurtenberg Dep., 37:3-15, 42:7-44:7, 44:17-45:16, 60:18-61:16.

17.     Plaintiff Heeter is a resident of Erie County, and wishes to purchase body armor for lawful purposes, including to protect himself in the event of civil unrest similar to the riots of 2020. He is a medical device salesman, which is not an eligible profession.  Pl.'s App'x **Exhibit M** is the Declaration of Benjamin Heeter, dated September 27, 2024.

**Response to Paragraph 17**

Disputed.  Plaintiff Heeter never attempted to fit within the list of existing qualified professionals nor asked that his profession be considered to be added to the list of qualified professionals, as allowable under state law.  Belka Decl., ¶¶ 3, 5-6, 9-11, Ex. A.  State Defendants do not dispute that Plaintiff Heeter is a medical device salesman who is a resident of Erie County.

18.     Plaintiff Wurtenberg is a resident of Monroe County, and wishes to purchase body armor for lawful purposes, including to have it available for his "graveyard shift" commute during late night hours in downtown Rochester, and to incorporate into his range training equipment to prevent accidental injury.  Plaintiff Wurtenberg is a 911 dispatcher, which is not an eligible profession. Pl.'s App'x **Exhibit N** is the Declaration of Joseph Wurtenberg, dated September 27, 2024.

**Response to Paragraph 18**

Disputed.  Plaintiff Wurtenberg never attempted to fit within the existing list of qualified

professionals nor asked that his profession be considered to be added to the list of qualified professionals, as allowable under state law. Belka Decl., ¶¶ 4, 7-9, 12-13, Ex. B. Moreover, Plaintiff Wurtenberg testified that he has sufficient body armor for his needs and the needs of his family, at this time. State Defendants do not dispute that Plaintiff Wurtenberg is a 9-1-1 operator who is a resident of Monroe County.

19. Body armor is legal in all states other than New York, creating a robust market for civilian body armor. There are at least 70 manufacturers that sell body armor to the civilian marketplace, demonstrating strong consumer demand. Pl.'s App'x **Exhibit O** is a list of such manufacturers.

**Response to Paragraph 19**

Disputed. The document at Exhibit O is not authenticated under Fed. R. Evid. 901, is not offered by a witness with personal knowledge as required by Fed. R. Evid. 602, and is hearsay under Fed. R. Evid. 802 as it is not the statement of any opposing party in this case and not subject to any hearsay exception. Moreover, the document at Exhibit O, even if admissible, does not contain any statement regarding the legality of body armor under any state's law, any statement about the sales practice of any specific company, or any statement regarding the "robust[ness]" of any "market for civilian body armor."

20. A recent analysis of the body armor market by Precedence Research ("Precedence") concluded that American civilians spent $41.9 million on body armor in 2022. Declaration of Nicolas Rotsko, dated March 27, 2026 ("Rotsko Decl.), **Exhibit 3**, at U.S. Body Armor Market tab. Precedence projected that U.S. civilian expenditures on body armor would increase to $69.2

million by 2034, as the materials to make body armor become more and more lightweight, thereby increasing its popularity. *Id.*

**Response to Paragraph 20**

Disputed. The State Defendants object to the Precedence report as hearsay, as it is an out-of-court statement offered for the truth of the matter asserted, and because it does not fall into any hearsay exception, including the exception for market reports, which requires "a showing that the compilation is 'generally relied on by the public or by persons in particular occupations' to demonstrate that the data is trustworthy and reliable." *Syracuse Mtns. Corp. v. Petroleos de Venezuela S.A.*, No. 21 Civ. 2684, 2024 WL 3637997, at *7 n.8 (S.D.N.Y. Aug. 1, 2024) (finding that a plaintiff's counsel's statement was "insufficient foundation" for a purportedly reliable market report). The State Defendants further object that Precedence Research was not identified as a witness in Plaintiffs' Rule 26 disclosures or included as part of expert testimony disclosed and introduced according to the requirements of Rule 26, and that the document was not produced in discovery. The State Defendants also object to the reliability of the Precedence document, as the company "does not make any warranty for the accuracy of the data" and "will accept no accountability for actions taken on the basis of any information that could consequently prove to be incorrect." Rotsko Decl. Ex. 3 at 1. The State Defendants further note that the term "civilian" as used in the report appears to include large numbers of persons who are eligible to buy armor in New York as peace officers or members of eligible professions. *See* Rotsko Decl. Ex. 6 at 10 (finding that "[i]n the Body Armor Parts market, the rapidly growing sector is the Law Enforcement & Security Personnel," and that armor products are "particularly appealing for civilians, including . . . security personnel.").

21.    Grand View Research ("Grand View") analyzed the North American body armor market using a detailed research methodology and data from 2021-2025. Rotsko Decl. **Exhibit 1**. Grand View estimated that civilians spent $61.9 million on body armor in 2023, $65.7 million in 2024, and $69.8 million in 2025. *Id.* (see data table after methodology).  Grand View projected that civilian expenditures on body armor would increase to $111.5 million by 2033. *Id.*

**Response to Paragraph 21**

Disputed.  The State Defendants object to the Grand View report as hearsay, as it is an out-of-court statement offered for the truth of the matter asserted, and because it does not fall into any hearsay exception, including the exception for market reports, which requires "a showing that the compilation is 'generally relied on by the public or by persons in particular occupations' to demonstrate that the data is trustworthy and reliable." *Syracuse Mtns. Corp. v. Petroleos de Venezuela S.A.*, No. 21 Civ. 2684, 2024 WL 3637997, at *7 n.8 (S.D.N.Y. Aug. 1, 2024) (finding that a plaintiff's counsel's statement was "insufficient foundation" for a purportedly reliable market report).  The State Defendants further object that Grand View Research was not identified as a witness in Plaintiffs' Rule 26 disclosures or included as part of expert testimony disclosed and introduced according to the requirements of Rule 26, and that the document was not produced in discovery.  The State Defendants also object to the reliability of the Grand View document, as the company "does not offer warranty for the accuracy of the data" and "takes no responsibility for any inaccurate information." (Rotsko Decl., Ex. 1 at 10).  The State Defendants further note that the term "civilian" as used in the report appears to include large numbers of persons who are eligible to buy armor in New York as peace officers or members of eligible professions.  See Rotsko Dec. Ex. 6 at 10 (finding that "[i]n the Body Armor Parts market, the rapidly growing

sector is the Law Enforcement & Security Personnel," and that armor products are "particularly appealing for civilians, including . . . security personnel.").

22.    Multiple additional market research firms consider civilian use to be a driver of industry growth. Fortune Business Insights identified the civilian market as a growth opportunity, because new "[m]odular body armor systems offer flexibility and versatility, . . . [and] are becoming increasingly popular among civilians seeking personal safety." Rotsko Decl. **Exhibit 5**. According to Fortune Business Insights, North America held the largest share of the global body armor market in 2024, in part because of "increasing civilian demand for personal protective gear amid rising security threats."

## Response to Paragraph 22

Disputed.  The State Defendants object to the Fortune Business Insights report as hearsay, as it is an out-of-court statement offered for the truth of the matter asserted, and because it does not fall into any hearsay exception, including the exception for market reports, which requires "a showing that the compilation is 'generally relied on by the public or by persons in particular occupations' to demonstrate that the data is trustworthy and reliable." *Syracuse Mtns. Corp. v. Petroleos de Venezuela S.A.*, No. 21 Civ. 2684, 2024 WL 3637997, at \*7 n.8 (S.D.N.Y. Aug. 1, 2024) (finding that a plaintiff's counsel's statement was "insufficient foundation" for a purportedly reliable market report).  The State Defendants further object that Fortune Business Insights was not identified as a witness in Plaintiffs' Rule 26 disclosures or included as part of expert testimony disclosed and introduced according to the requirements of Rule 26, and that the document was not produced in discovery.  The State Defendants note that the cited area of the report discusses the market "throughout the globe," rather than in the United States, and that term "civilian" as used in

the report appears to include large numbers of persons who are eligible to buy armor in New York as peace officers or members of eligible professions. *See* Rotsko Decl. Ex. 5 at 2 (including "private security personnel" in the discussion of "civilian" body armor).

23.     Cognitive Market Research observed "[r]ising crime rates and growing concerns about personal safety have driven increased demand for body armor among civilians, particularly in high-risk areas." Rotsko Decl. **Exhibit 6**. Discussing the mass shooting in Buffalo, New York in May 2022, and the Pittsburgh synagogue shooting in 2018, Cognitive Market Research observed that "[t]hese events, along with numerous civil protests and violent confrontations, have underscored the critical need for body armor for both law enforcement and civilians." *Id.* Cognitive Market Research observed that "the Covert segment dominates the market. Covert body armor is designed to be worn under clothing, providing discreet protection without drawing attention. This feature makes it particularly appealing for civilians, including high-net-worth individuals, executives, and security personnel, who require personal safety but do not want to reveal that they are wearing protective gear." *Id.*

**Response to Paragraph 23**

Disputed. The State Defendants object to the Cognitive Market Researh report as hearsay, as it is an out-of-court statement offered for the truth of the matter asserted, and because it does not fall into any hearsay exception, including the exception for market reports, which requires "a showing that the compilation is 'generally relied on by the public or by persons in particular occupations' to demonstrate that the data is trustworthy and reliable." *Syracuse Mtns. Corp. v. Petroleos de Venezuela S.A.*, No. 21 Civ. 2684, 2024 WL 3637997, at *7 n.8 (S.D.N.Y. Aug. 1, 2024) (finding that a plaintiff's counsel's statement was "insufficient foundation" for a purportedly

reliable market report).  The State Defendants further object that Cognitive Market Research and the report's author, Manjiri Kanhere, were not identified as witnesses in Plaintiffs' Rule 26 disclosures or included as part of expert testimony disclosed and introduced according to the requirements of Rule 26, and that the document was not produced in discovery.  The State Defendants note that the term "civilian" as used in the report appears to include large numbers of persons who are eligible to buy armor in New York as peace officers or members of eligible professions.  *See* Rotsko Decl. Ex. 6 at 10 (stating that "[i]n the Body Armor Parts market, the rapidly growing sector is the Law Enforcement & Security Personnel," and that armor products are "particularly appealing for civilians, including . . . security personnel.").

24.     This Court should grant judgment in Plaintiffs favor, declare the Body Armor Ban unconstitutional, and enjoin its enforcement.

**Response to Paragraph 24**

Disputed.    Paragraph 24 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement.  *See EEOC v. Green Lantern Inn, Inc.*, No. 19 Civ. 6704, 2022 WL 1507944, at *28 (W.D.N.Y. Mar. 8, 2022) (rejecting assertion in Local Civil Rule 56 statement that "is argument more than it is an assertion of fact.").  Paragraph 24 is also offered without "citation to admissible evidence."  Local Rule of Civil Procedure 56(a) (1); *see* Fed. R. Civ. P. 56(c)(2).  The State Defendants also note that available evidence does not support this assertion.

**STATE DEFENDANTS' LOCAL CIVIL RULE 56(a)(1) STATEMENT OF
UNDISPUTED MATERIAL FACTS**

In support of the Superintendent and Attorney General's contemporaneously filed motion for summary judgement, Superintendent Stephen G. James and Attorney General Letitia James, respectfully submit that the following facts are undisputed:

### *Organizational Plaintiffs Lack Standing*

1.      The Firearms Policy Coalition lacks standing to bring suit in this case.  The Declaration of Brandon Combes, hereinafter Combes Decl. at [ECF No. 69-4], ¶ 1-7.

2.      Brandon Combes is the President of FPC. Combes Decl., ¶ 1.

3.      "Through this lawsuit, FPC seeks to defend the… rights of its members to purchase and possess body armor and bulletproof garments…"  Combes Decl. at ¶ 6.

4.       FPC brings this lawsuit vicariously on behalf of its members and cannot demonstrate any injury in their own right. Combes Decl., ¶¶ 1-7.

### *Individual Plaintiffs Lack Standing and Their Claims are not Ripe*

5.      The individual Plaintiffs, Benjamin Heeter and Joseph Wurtenberg, also lack standing because they already possess body armor and have suffered no actual injury from the challenged statute.  Belka Decl., ¶¶ 3-13, Ex. A-B, the Deposition of Benjamin Heeter, hereinafter Heeter Dep., 19:11-21:22, 39:1-42:22, 47:5-8 and the Deposition of Joseph Wurtenberg, hereinafter Wurtenberg Dep., 37:3-15, 42:7-44:7, 44:17-45:16, 60:18-61:16.

6.      Benjamin Heeter owns both steel and Kevlar body armor.  Belka Decl., ¶¶ 3, 5, Ex. A.

7.       However, he testifies that he may want more Kevlar body armor, at some time in the future, even though he has never worn the Kevlar body armor he owns.  Belka Decl., ¶¶ 3, 6, Ex. A.

- 16

8.      Joseph Wurtenberg owns body armor sufficient for himself and his family.  Belka Decl., ¶¶ 4, 7, Ex. B.

9.      However, he testifies that he may want to purchase more at some time in the future. Belka Decl., ¶¶ 4, 8, Ex. B.

10.     New York's Body Armor Law allows qualified professionals to purchase body armor.  New York State Executive Law § 144-a.

11.     Plaintiff Heeter failed to verify if his employment rendered him a qualified professional under the law.  Belka Decl., ¶¶ 3, 10, Ex. A.

12.     Further, Plaintiff Heeter failed to have his employment added to the qualifying professionals list as allowed under the law. Belka Decl., ¶¶ 3, 11, Ex. A.

13.     Plaintiff Wurtenberg failed to verify if his employment rendered him a qualified professional under the law.  Belka Decl., ¶¶ 4, 12, Ex. B.

14.     Further, Plaintiff Wurtenberg failed to have his employment added to the qualifying professionals list as allowed under the law. Belka Decl., ¶¶ 4, 13, Ex. B.

### *The Buffalo Massacre and the Midtown Shooting*

15.     On May 14, 2022, Payton Gendron committed a racially motivated massacre at the Tops on Jefferson Street in Buffalo New York.  The Declaration of Jaclyn Schildkraut, hereinafter Schildkraut Decl., ¶¶ 20-24.

16.     In planning the massacre, Mr. Gendron took pains to select body armor that would allow him to prolong the attack so he could kill as many African-Americans as possible. Schildkraut Decl., ¶¶ 20-24.

17.     Body armor was central to that plan.  Schildkraut Decl., ¶¶ 20-24.

18.     The shooter thought it was "100% guaranteed" that he would face "[p]olice

handgun threats with duty ammo," and he found his "Solution: NIJ certified II or IIIa armor for helmet and vest," along with "NIJ certified III armor plates."  Schildkraut Decl., ¶¶ 20-24, Ex. D. at 8.

19.    Gendron's quest for a tactical edge over law enforcement was frustrated in part by the policies of several responsible body-armor manufacturers: as he discovered "Avon Protection, Gentex, BAE systems, United Shield, ArmorSource, Safariland PROTECH, and Point Blank PARACLETE all make great [armor], but the mass majority of them are only available to the government and police." *Id.* at 12.

20.    In fact, he was frustrated that armor from certain major retailers was unavailable or "harder to find on the civilian market" as "many of the S+ tier IIIA armor . . . are only available to certain [military or law enforcement] credentials because of [expletive] companies." *Id*. at 38-39.

21.    Ultimately, the company policies were not enough and he acquired body armor from another company with plates that he believed "would stop all pistol threats." *Id.* at 33.

22.    After murdering five innocent patrons and shooting another, Mr. Gendron was engaged by an archetypal good guy with a gun: retired Buffalo Police Officer Aaron Salter. Schildkraut Decl., ¶¶ 20-24. Exhibit D.

23.    But for the plated body armor, Salter would have ended the massacre.  *Id.*

24.    Instead, four more innocents, including Aaron Salter, were killed, and two more were shot. *Id.*

25.    The pattern would repeat itself several years later at the other end of New York State, when a gunman, from out-of-state, wearing body armor entered a Park Avenue office building on July 28, 2025, killing Didarul Islam, an off-duty NYPD officer who was working security, before continuing on to murder others.  Schildkraut Decl., ¶ 29.

***"Arms" did not Include personal [body] "Armor"***
***in Either the Founding or Reconstruction Eras***

26.     On May 22, 1794, Congress passed "An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same."  Ch. 33, 1 Stat. 369 (1794), Belka Decl., ¶19, Ex. D.

27.     The law explained what was covered by the term "Arms" at that time (1794), namely "any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenados [sic], gunpowder, sulphur, or saltpetre."  *Id.* § 1.

28.     Arms were described in terms of weapons and ammunition, in other words, not armor.  Ch. 2, 1 Stat. 520 (1797), Belka Decl., ¶ 21, Ex. E.

29.     The Fifth Congress re-enacted the law in 1797 with minor changes, again covering the same enumerated list of "Arms."  Ch. 2, 1 Stat. 520 (1797), Belka Decl., ¶ 22, Ex. E.

30.     In 1795, the Fifth Congress passed "An Act to enable the President of the United States to Procure Cannon, Arms and Ammunition, and for other purposes."  Ch. 38, 2 Stat. 555 (1798), Belka Decl., ¶ 23, Ex. F.

31.     That understanding of arms as weapons continued as the Republic grew.  Belka Decl., ¶¶ 19-24, Exs. D-F, *et seq.*; Baron Decl., ¶¶ 3-5, 25-31; Carp Decl., ¶¶ 12-33.

32.     In 1809 the Tenth Congress considered "A Bill prohibiting for a limited time the exportation of arms, ammunition, canvas, cordage, and hemp, and for encouraging the importation thereof." Belka Decl., ¶ 25, Ex. G.

33.     The bill followed the structure of the earlier Arms import/export bills, and would have covered "any cannon, muskets, pistols, bayonets, swords, cutlasses, musket-balls, lead, bombs, grenadoes [sic], gun-power [sic], sulphur or salt-petre, canvas or sailduck of any

- 19 -

description, commonly used for ships or vessels, cordage, cables, tarred or untarred yarns made of hemp, seine, sail or sewing twine, and sheet copper."  Belka Decl., ¶ 26, Exs. D-G.

34.   In all the potential materials contemplated for war, from cannons all the way down to "sewing twine," Congress did not include body armor.  *Id.*

35.   The corpus linguistics data supports the understanding that "arms" did not include body armor at the time of the founding.  *See* the Declaration of Dennis Baron (hereinafter Baron Decl.), ¶¶ 3-5, 25-31.

36.    Corpus linguistics is a scientific method that utilizes large bodies of digitized historical text to determine the meaning of usage of words in context.  *See* Baron Decl., ¶ 12 *et seq.*

37.   Prof. Baron examined the historical use of the terms "arms," "armor," and "armour" during the Founding Era and the period surrounding Reconstruction and the ratification of the Fourteenth Amendment. *See Id.*

38.   Prof. Baron evaluated hundreds of millions of words to capture the everyday language of the American public, circumventing any potential "elite" bias in statutory texts. Baron Decl., ¶¶ 12-24.

39.   In his comprehensive review of the corpora, Prof. Baron found zero examples of "armor" being used by the American military, militias, British soldiers, or civilians during the Founding Era. Baron Decl., ¶¶ 3-5, 25-31.

40.   Soldiers in the founding did not wear metal suits or chain mail, and the protective leather gear of that pre-Kevlar era was notoriously ineffective against bullets, meaning civilians did not typically wear such body protection either.  Baron Decl., ¶ 3; Carp Decl., ¶¶ 12-25.

41.     Alternatively, the term was used metaphorically. For instance, Founding-era texts frequently reference the religious "armor of God" used by believers to fight sin and Satan, the secular emotional "armor" politicians adopt to debate opponents, or the physical characteristics animals use to protect themselves from predators, such as the "armor" of a hedgehog. Baron Decl., ¶¶ 3-5, 25-31.

42.     Data from COREA and late-nineteenth-century newspapers confirms that during the Reconstruction Era, the term "armor" still did not refer to personal protective equipment.  *Id.*

43.     Rather, it referred historically to the defensive suits worn by knights of old, or, in a contemporary sense, to the protective iron-cladding utilized on nineteenth-century warships and field artillery.  *Id.*

44.     Just as in the Founding Era, the normal and ordinary meaning of "arms" in the later nineteenth century plainly did not include personal "armor." *Id.*

### *History and Tradition Support the Regulation of Body Armor*

45.     Indeed, the tradition traces from the very foundation of Western Civilization, as Sir William Blackstone, who Plaintiffs acknowledge as "the preeminent authority on English law for the founding generation," [ECF No. 71] at 12 (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)), traces "[t]he offence of riding or going armed" all the way back to "the laws of Solon, [when] every Athenian was finable who walked about the city in armour."  IV William Blackstone, *Commentaries on the Laws of England* 148-49 (Clarendon Press 1770), Belka Decl., ¶ 28, Ex. H; *see also* I John Potter, *Achaeologia Graeca: or the Antiquities of Greece* ch. 26 at 182 (Sam Palmer, Printer 1722), Belka Decl., ¶ 28, Ex. I (reprinting the ancient law's text: "He shall be fin'd who is seen to walk the City-streets with a Sword by his Side, or having about him other Armour, unless in case of exigency.")

46.     In keeping with this tradition, English monarchs and parliaments regularly issued laws forbidding or restricting the wearing of armor, to prevent dangerous persons being better-equipped than legitimate authority.  Carp Decl., ¶¶ 6-11.

47.     These laws began in an outgrowth of what we would now call sensitive places laws, including a law from the late 13th century stating that "they who shall come to see [a] Tournament, shall not be armed with any Manner of Armour," and a 1313 law requiring that "every man shall come" to parliaments and assemblies "without all Force and Armour, well and peaceably."  Carp. Dec. ¶ 6.

48.     In 1353 Edward III issued a "Proclamation for keeping the peace within the City" of London, ordering among other things "that every hosteler and herbergeour, within the franchise of the City, shall cause his guests to be warned that they must leave their arms and armour in their hostels where they are lodging."  Henry Thomas Riley, *Memorials of London and London Life in the XIIth , XIVth, and XVth Centuries* at 272 (Longmans, Green & Co. 1868), Belka Decl., ¶¶ 29, Ex. J.

49.     The same law required "that no alien shall go in armour, or shall carry sword, knife with point, or other arms, in the City, or in the suburb thereof, on pain of imprisonment, and of losing such arms and armour."  *Id.*; *see also* Carp Decl. ¶ 7.

50.     Edward III also issued the Statute of Northampton, which prohibited anyone to "go, nor ride armed by night, nor by day, in fairs markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King and their bodies to prison, at the king's pleasure."  John Collyer, *The Criminal Statutes of England* at 4 (S. Sweet 1832), 2 Ed. 3, c. 3, Belka Decl., ¶¶ 31-32, Ex. K; *see* Carp. Dec. ¶ 7.

51.     Richard II later updated the Statute, adding a provision stating that "no lord, knight, nor other, little nor great, shall go, nor ride by night nor by day armed, nor bear sallet nor skull of iron, nor of other armour, . . . save and except the King's officers and minsters in doing their office." *Id.* at 5, 20 Ric. 2, c.1.

52.     In 1400, Henry IV issued a law prohibiting all Welshmen from "bear[ing] any manner of armour" within cities, boroughs, and merchant towns near the English border.  II Danbey Pickering, *The Statutes at Large, from the Fiftheenth Year of King Edward III to the Thirteenth Year of King Henry IV, Inclusive* at 413 (Joseph Bentham, printer 1762), Belka Decl., ¶ 33, Ex. L.

53.     Over a century later, Henry VIII in 1534 issued a law forbidding anyone in Wales from bearing any "weapon, privy coat, or armour defensive" near court, or "to any town, church , fair, market or other congregation.  IV Danby Pickering, *The Statutes at Large, from the First Year of King Richard III to the Thirty-first year of King Henry VIII, Inclusive*, at 330 (Joseph Bentham, printer 1763), Belka Decl., ¶ 34, Ex. M.

54.     His daughter Queen Elizabeth in 1597 (shortly before the first English settlement in America) issued "A Proclamation against the common use of Dagges, Handgunnes, Harqubuzes, Calliners, and Cotes of Defense."  Belka Decl., ¶¶ 35-36, Ex. N.

55.     Concerned that diverse persons had worn "privie Cotes and Doublets of Defense . . . and presume audaciously to apparel themselves with the said privie Armour, not only in Cities, Townes, and publicke assemblie, but within her Majesties Court wheresover, . . to the great offence and contempt of her Highnes[s] and of her Laws, and to the hurt of divers her Majestie[']s good subjects," Queen Elizbeth's order "doth explicitly prohibit[] and forbid all and every of her

subjects whatsoever, the wearing of any such Privie or secret kind of Cote, or Doublet of Defence," on pain of imprisonment. *Id.*

56.    This tradition of prohibiting the wearing of armor made its way into the common law, such that by 1715 a guide for justices of the peace included a section on "Armour," containing not only the Statute of Northampton provision allowing for the arrest of persons who "go armed offensively," but also paragraph stating that persons who "shall go apparelled with privy Coats or Doublets" can have sureties imposed against them.    Michael Dalton, *The Country Justice: Containing the Practice of the Justices of the Peace* at 37 (John Walton, printer 1715), Belka Decl., ¶ 37, Ex. O; *see* Carp. Decl. ¶ 10.

57.    In his discussion of "Affrays," William Hawkins wrote that "a Man cannot excuse the wearing of such Armour in Publick, by alledging that such a one threatened him, and that he wears it for the Safety of his Person from Assault."    Carp. Decl. ¶ 9 (quoting William Hawkins, *A Treatise of the Pleas of the Crown*, vol. 1 (London, 1716), p. 136, chap. 63, §8).

58.    And this common-law tradition made its way across the Atlantic, as "[b]ooks about the common law and legislation deriving from the common law in early America still invoked the Statute of Northampton when defining an "affray," including the now arcane passage about "armour," as well as Hawkins's commentary on wearing armor in public."    Carp. Decl. ¶ 11.

59.    While the new laws prohibiting or restricting armor diminished or disappeared prior to the founding of the United States, the explanation for the lack of such laws is straightforward: at the time of the Founding, personal body armor designed to defend against firearms was not in use. Carp Decl., ¶¶ 12-25.

60.    It was a functionally obsolete technology that had been entirely eclipsed by the advent of gunpowder. Carp Decl., ¶ 14.

61.    At the time of the Founding, the development of firearms had "far outpaced armorers' ability to provide soldiers with bodily defense of their persons." Carp Decl., ¶ 14.

62.    By the eighteenth century, armor was not only wholly ineffective against musketry and artillery, but it was also dangerously impractical. The heavy metal suits of earlier eras robbed infantry of essential mobility and subjected soldiers to extreme health risks, including heat exhaustion during summer campaigns and the lethal threat of metal fragments being driven into the body by penetrating bullets. Carp Decl., ¶¶ 15–16.

63.    Consequently, eighteenth-century militia statutes and Continental Army regulations never prescribed the wearing of body armor. Carp Decl., ¶ 26.

64.    The only vestigial remnants of armor present during the Founding Era, such as the "gorgets" worn by officers like George Washington, were strictly ornamental symbols of rank and diplomacy that "served no protective function whatsoever." Carp Decl., ¶¶ 19–20.

65.    Because defensive armor was a defunct, abandoned technology that possessed no utility for civilian self-defense, the lack of any specific armor regulations from the Founding (or Reconstruction) eras reflects "a lack of political demand rather than constitutional limitations." Carp Decl., *generally*.

66.    The body armor at issue here, engineered from advanced synthetic materials like Kevlar to stop high-velocity ammunition, did not begin to emerge until the late 19th and 20th centuries. Carp Decl., ¶¶ 28–29.

67.    Earlier 19th-century experiments, such as steel breastplates sold to soldiers during the Civil War, were widely mocked as heavy, hot, ineffective, and "little more than technological curiosities." Carp Decl., ¶ 27.

*68.*     The modern incarnation of body armor was never contemplated by the Founders, was not possessed by early Americans, and descends from a historical lineage of tactical gear strictly regulated and restricted to the government's peaceable forces. Carp Decl., *generally.*

### *Body Armor is Unusually Dangerous*

69.     The unusually dangerous nature of modern ballistic body armor is demonstrated by the way it has become a key part of the modern mass shooter's toolkit. Schildkraut Decl., ¶¶ 16-17; Figures 1 and 2.

70.     As detailed by Dr. Jaclyn Schildkraut, a leading expert on mass shootings, the use of tactical gear by mass shooters has steadily and alarmingly increased over the last two decades. *Id.*

71.     The primary impetus for perpetrators utilizing body armor is chillingly pragmatic: the most common ballistic vests "can withstand fire from standard police-issued handguns," ensuring that a shooter "would likely be able to continue their killing until they are met with greater force." Schildkraut Decl., ¶ 10.

72.     The trend of armor use in mass shootings "began around 2008, reflecting that the use of body armor by mass shooting perpetrators is a newer development," and "the proportion of mass shooting incidents in which body armor was used continues to increase over time." *Id.* ¶ 17.

73.     Because mass shooters study and learn from the tactical successes of their predecessors, "it is expected that the rise in the use of body armor among mass shooters w[ill] continue to increase in the future. *Id.* ¶ 10.

74.     Modern ballistic body armor involves societal concerns and dramatic technological changes (see *Bruen* at 27) – the military-grade Level III armor and accessories chosen by the Buffalo shooter – involves both. Schildkraut Decl. ¶¶ 22-23.

75.     The "dramatic technological change" is the advent of armor that can stop a bullet, something that would have been unthinkable to the Founding or Reconstruction generations. Carp Decl., ¶¶ 14-16.

76.     The armor of the 18th century was "functionally obsolete," totally ineffective against musketry, and incredibly hazardous to the wearer's health. Carp Decl., ¶¶ 14-16.

77.     Body armor companies are well aware of the unprecedented threat to law enforcement officers, which is why market leaders in the armor industry do not sell to persons outside the military, law enforcement, and certain allied professions.  Belka Decl., Ex. P at 6-13; Schildkraut Decl., ¶¶ 20-24, Exhibit D.

78.     The Buffalo shooter noted this multiple times in his manifesto, complaining that "many of the S+ tier IIIA armor like the Safariland Hardwire are only available to certain credentials because of [expletive] companies" Schildkraut Decl., ¶¶ 20-24, Exhibit D at 8 and 12 and that "Avon Protection, Gentex, BAE systems, United Shield, ArmorSource, Safariland PROTECH, and Point Blank PARACLETE all make great helmets but the mass majority of them are only available to the government and police." *Id*.

79.     This policy was explained by the State Defendants' fourth expert, Michael Foreman, a retired Chief with 40 years of law enforcement experience who was Executive Vice President at Point Blank Enterprises until his untimely death in January 2026.  *See* Belka Decl., Ex. P at 6-7.[2]

80.     Mr, Foreman wrote that body armor exists to "protect the protectors," and that "[r]estrictions on the sale and possession of body armor are an essential element in the steps necessary to protect those who serve."  Belka Decl., Ex. P at 8, 11.

---

[2]     https://www.dobbsfuneralhome.com/obituary/Michael-Foreman.

- 27

81.     "Law enforcement today faces far too many threats to their safety without making it easier to obtain body armor for non-qualifying individuals," which is why the "top [body armor] companies have chosen to make it their practice to only sell to qualifying professionals."[3]  Belka Decl., Ex. P at 6-8, 11-12.

82.     At common law "[t]he wearing of armor in public by people other than peacekeepers was understood to be terrifying to the people and therefore subject to prohibition." Carp Dec. ¶ 9; *see Id. generally.*

83.     As it was in medieval England, as the wearing of modern ballistic body armor in public justifiably causes people to anticipate mass violence.  *See, e.g.,* Jeff Murray, *Weapons charges follow concerning Facebook live: Why Broome County Schools locked down*, Binghamton Press & Sun-Bulletin (Dec. 13, 2022) (discussing lockdowns in medical facilities and nine school districts after video "showing a man wearing what appeared to be ballistic body armor and displaying a handgun while operating a vehicle"); WEVVV, *Fairfield schools placed on lockdown Wednesday after armed man arrested nearby* (Feb. 26, 2026), https://tinyurl.com/yueknjjz (lockdown due to a man "found walking through a neighborhood armed with a loaded rifle and wearing body armor"); Bethany Fowler, *Lockdown lifted for SCC Jackson Campus following felon wearing body armor on the loose*, WSPA (June 7, 2022), https://tinyurl.com/mr38m6sw; *see also* Eric Scott, *Man Training for Marathon Triggers School Lockdown in Wildwood Crest, NJ*, New Jersey 101.5 (Sept. 20, 2022), https://tinyurl.com/y7ayh9rz (lockdown after weighted running vest mistaken for ballistic armor). Belka Decl., ¶ 49.

---

[3]     Even without the Foreman Declaration, the existence and breadth of the corporate policy is documented in the manifesto excerpts in Exhibit D to the Schildkraut Declaration.

***Plaintiffs' Motion Relies on Inadmissible Hearsay***
***that was not Disclosed in Discovery***

84.     Plaintiffs market research reports and the Greenlee article are provided to the court for the truth of the matter asserted without any viable hearsay exception.  Belka Decl., ¶ 50.

85.     Plaintiffs commissioned market research reports, circumventing discovery safeguards outlined in the Federal Rules of Evidence. [ECF No. 69-5], Exs. 1, 3, 5 & 6 (at least two of which they appear to have commissioned.  *See id.* Exs. 2 & 4; *cf. id.* Ex. 1 at 10 (indicating that the report was made "in response to requests/orders received).  Belka Decl., ¶ 51.

86.     These sources are not offered by any witness with personal knowledge, as required by F. R. Evid. 602, but simply attached to the declaration of Plaintiffs' attorney.  *Cf. FTC v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) ("An attorney's affidavit or declaration not based on personal knowledge carries no weight.").  Belka Decl., ¶ 52.

87.     Plaintiffs did not disclose these documents to the State Defendants prior to their appearance in connection with this motion, did not disclose the identities of the persons who compiled these documents in their initial disclosures. Depriving State Defendants any opportunity to cross-examine any witness in connection with these documents.  Belka Decl., ¶ 53, Ex. R.

88.     Joseph Greenlee is not a historian; he is former the Director of the NRA's Office of Litigation.  Belka Decl., ¶ 54.  *See* https://fedsoc.org/bio/joseph-greenlee.

89.     At the time he wrote the article, Greenlee was Director of Constitutional Studies at the FPC Action Foundation, a nonprofit affiliated with Plaintiff Firearms Policy Coalition and headquartered at the same address.  *See* Belka Decl., ¶ 55; 23 Geo. J.L. & Pub. Pol'y at 1 n.a1.

90.     Plaintiffs do not disclose this affiliation in any of the five times they cite to Mr. Greenlee in their brief.  *See generally*, [ECF No. 71] at 12, 15, 20.

91.     Plaintiffs did not disclose to counsel or the Court that they paid for its creation. Belka Decl., ¶ 57.  *See* Plaintiff FPC's July 2024 press release announcing the instant lawsuit, the organization states that "FPC commissioned research on the history and tradition of defensive armor use and regulation" leading to "a forthcoming law review article," namely the Greenlee piece.  *See*  https://www.firearmspolicy.org/fpc-sues-new-york-to-strike-down-body-armor-ban (last accessed April 18, 2026).

92.     Mr. Greenlee's article does not disclose that it was "commissioned" by Plaintiff FPC, nor that it was prepared for the purpose of litigation, nor that the litigation it was prepared for was this lawsuit.  Belka Decl., ¶ 58.

Dated: Buffalo, New York
        April 27, 2026

LETITIA JAMES
Attorney General
State of New York


By: /s/ Ryan L. Belka
RYAN L. BELKA
Assistant Attorney General
350 Main Place, Suite 300A
Buffalo, NY 14202
(716) 853-8440
Ryan.Belka@ag.ny.gov

JAMES M. THOMPSON
Special Counsel
28 Liberty Street, 18th Floor
New York, NY 10005
(212) 416-6556
James.Thompson@ag.ny.gov

- 30 -