UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

---

BENJAMIN HEETER, JOSEPH WURTENBERG, and

FIREARMS POLICY COALITION, INC.,

Plaintiffs,

vs.

Case No. 24-CV-00623-JLS-HKS

LETITIA JAMES, in her official capacity as Attorney

General of the State of New York; STEVEN G.

JAMES, in his official capacity as Superintendent of

the New York State Police; MICHAEL J. KEANE, in

his official capacity as Acting District Attorney for Erie

County, New York, and SANDRA DOORLEY, in her

official capacity as District Attorney for Monroe

County, New York,

Defendants.

## DECLARATION OF PROFESSOR DENNIS BARON

I, Dennis Baron, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I have been retained by the State of New York to provide expert opinion and testimony regarding Corpus Linguistics research. I am being compensated at a rate of $475 per hour.

2. I have examined the historical use of the terms *arms* and *armour* in order to determine whether arms included armor during the Founding Era (1750–1820) and the period surrounding Reconstruction and the ratification of the Fourteenth Amendment (1868–1890).

## Conclusions

3. Looking at the data from the Corpus of Founding Era American English (COFEA), supplemented by data from the Corpus on Early Modern English (COEME), the Corpus on Reconstruction Era American English (COREA), the Corpus on Historical American English (COHA), and several newspaper databases, I can conclude

    a. That "arms" as a general term that includes "armour" along with other military equipment is very rare in the Founding Era.

    b. That "armor" referring to arms as well as defensive or protective garments refers specifically to the context of war, not to personal self defence, and that this sense of "armor" had become rare, or even obsolete, by the Founding Era.

    c. That "armor" does not typically refer to what we call "body armor" today. Instead it typically refers either to the protective gear worn by soldiers or royalty in the past, the periods *before* the Founding Era; or it is used

metaphorically, often in a religious context (one common example: "the armor of God," referring to the spiritual armor that believers use in the fight against satan and sin), but also sometimes in a secular sense (for example, politicians put on a rhetorical or emotional armor as they prepare to debate their opponents). There is one additional metaphorical sense of armor applied to animals who use certain physical characteristics to protect themselves from predators, such as the armor of the hedgehog. I have found no examples in the corpora of "armor" used by the American military or militias; or by British soldiers during the American Revolution; or by civilians in the Founding Era.

4. During the period of the 14th Amendment, corpus data from the Corpus of Reconstruction Era American English, or COREA, a new BYU corpus, along with data from newspapers, confirms that "armor" either refers historically to defensive suits of armor worn by knights of old, or to the protective iron-cladding being used in later nineteenth century warships and field artillery.

5. Considering the evidence from corpus data, which extends and clarifies the definitions found in the dictionaries used in the Founding Era and in the later nineteenth century, it is clear that the word "arms" in the Second Amendment does *not* include "armor." Soldiers in the Founding Era did not use the suits of armor made of metal or chain mail of the kinds associated with soldiers of earlier eras (the knights of old), and protective leather gear, if worn at all, was notoriously ineffective against bullets in that pre-Kevlar era. Civilians did not typically wear such body protection either. In the 14th Amendment period, "armor" referred to metal cladding on warships and field artillery, not to personal protective gear, except of course in reference to the

days of yore. It is clear that "arms" would not include "armor" in the later 19th century.

**Background and Qualifications**

6.  I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the Department of English and the Department of Linguistics since 1975. I served as Head of the Department of English for six years and before that as Director of Rhetoric at the University for 11 years. I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, in addition to topics related to language and law. I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, and a former long-time member of the National Council of Teachers of English. I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship for work on a book on language and law, and, most recently, a Guggenheim Fellowship for work on my latest book on language and law. I have also published books on language reform, on usage, and on gender in language.

7.  Most relevant for this report, I published two books on language and law: *The English-Only Question: An Official Language for Americans?* (Yale Univ. Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free Speech* (Cambridge Univ. Press, 2023). My current book project, with the working title "Shibboleth: Language and Political Purity," traces the history and general

ineffectiveness of language tests from the first shibboleth, in biblical times to the present, tests that use passwords, pronunciations, or other aspects of language to distinguish friend from foe, patriot from traitor, citizen from spy.

8. Also relevant is my recent essay, "Look It Up in Your Funk and Wagnalls: How Courts Define the Words of the Law," an analysis of how judges incorporate information from dictionaries and digitized corpora as they ascertain legal meaning, which appeared in *Dictionaries: Journal of the Dictionary Society of North America,* vol. 43.2 (2022): 95–144.

9. In addition, I served as lead author on what came to be called "the Linguists' Brief" in *District of Columbia v. Heller*, 554 U.S. 570 (2008), a brief cited both by Justice Scalia in the majority opinion, and by Justice Stevens in his dissent. I was a co-author on another brief by professors of linguistics and corpus linguistics, cited in *New York State Rifle and Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022), which Justice Breyer cited in his dissent. In that dissent, Justice Breyer also quoted directly from my essay "Corpus Evidence Illuminates the Meaning of 'Bear Arms'" (*Hastings Constitutional Law Quarterly*, 46.3: 2019). I have spoken about historical meaning and the Second Amendment at the Federalist Society at the University of Chicago Law School, at the Neubauer Symposium on Historical Semantics at the University of Chicago, at Brigham Young University Law School, at Stanford University, and at the conference "*Heller* after Ten Years" at Hastings College of Law (now UC College of Law, San Francisco). I have also written opinion essays on historical meaning and the Second Amendment for the *Washington Post* and the *Los Angeles Times*.

10. I have submitted declarations or reports in a number of cases, including *Ocean State Tactical, LLC, et al. v. State of Rhode Island* (Case No. 1:22-cv-00246-JJM-PAS) (D. R.I.); *Hanson, et al, v. District of Columbia, et al.* (Civil Action No. 1:22-cv-02256-RC); *Delaware State Sportsmen's Association, Inc., et al., v. Delaware Department of Safety and Homeland Security; Nathanial McQueen, Jr.* (C.A. No. 1:22-cv-00951-RGA, Consolidated); *National Association for Gun Rights and Capen v. Baker* (Massachusetts, C.A. No. 22-cv-11431-FDS); *NAGR and Flanigan v. Lamont, et al.* (Connecticut: C.A. No. 3:22 CV 1118); *National Association for Gun Rights, et al., v. Lopez* (Hawai'i, C.A. No. 1:22-cv-404-DKW-RT); *Oregon Firearms Federation, et al, v. Kotek, et al.,* (lead case with three additional, consolidated, Oregon, Case No. 2:22-cv-01815-IM); and declarations on behalf of the State of California in *Rupp, et al. v. Bonta* (Case No. 8:17-cv-00746-JLS-JDE), *Duncan, et al. v. Bonta* (Case No. 3:17-cv-01017-BEN-JLB), *Fouts, et al.v. Bonta* (Case No. 3:19-cv-01662-BEN-JLB), and *Lane and Sears v. James* (Case No. 22 Civ. 10989 KMK). In the past twenty years I have also served as an expert in fourteen cases involving document interpretation.

11. This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of one or more large, digitized corpora consisting of many millions of words.

**Opinions: Theory and Methodology**

12.    Corpus linguistics as a field developed in the late 1960s, when scholars began using computer programs to analyze large bodies of digitized text. Initial work in corpus linguistics did not typically involve legal issues. Literary scholars, taking advantage of the ability of computers to search large digitized databases, facilitated their analysis of print materials by developing computerized concordances to the works of Shakespeare, Milton, and other major English writers. They plotted the frequency of words and phrases in order to develop a picture of an author's style, and to determine authorship of a particular work when the provenance was in doubt. Soon, in addition to solving literary mysteries, linguists successfully applied computerized textual analysis in a number of criminal cases in the United States and in England involving, for example, the authorship of a ransom note or an email. Lexicographers, who began compiling analog databases of text in the late nineteenth century, began to digitize their earlier data and to add to that material, assembling computerized databases of historical and contemporary text and, more recently, of spoken language as well, in order to arrive at more precise definitions of the multiple senses of words and phrases.

13.    The Oxford English Dictionary (OED) is the standard dictionary of the English language compiled on historical principles. As a graduate student at the University of Michigan in 1970, I coded analog texts from the relevant OED files to help build the computerized database for the Dictionary of Early Modern English, the period from 1500–1800 that is particularly relevant to the language of the Founding Era. Today, major dictionaries like the OED and the Merriam-Webster suite of dictionaries rely on

public databases of oral and written language, as well as their own proprietary databases, in order to revise older definitions and to track the spread of new words and meanings. The major dictionary makers working on other languages use similar databases in their own work.

14. Over the past twenty years, legal corpus linguistics (LCL) has developed as a subset of corpus linguistics. LCL involves the analysis of digitized corpora of current and historical English to establish meaning—often referred to as "original public meaning"—in statutes and in the Constitution. LCL often provides more information about the meaning of words and phrases than can be gleaned from dictionary definitions. Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt. In Muscarello v. United States, 524 U.S. 125 (1998), we find an early computer search to help determine the meaning of a word in a statute. In Muscarello, the Supreme Court considered whether "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or trunk, can be deemed to be within the scope of the statutory phrase 'carries a firearm.'" To answer that question in the affirmative, Justice Breyer searched two computerized newspaper databases (Lexis/Nexis, for the New York Times, and Westlaw, for "U.S. News") to clarify the meaning of the words "carry," "vehicle," and "weapon." In 2012, Judge Richard Posner, of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute. Not satisfied with the dictionary definition that the government relied on in the case before him, Judge Posner ran a Google search to confirm that the word "harbor" in the Immigration Act

of 1917 does not mean 'shelter,' as the government claimed, but rather 'hide, conceal from view,' as he felt it must mean in the context of the statute. United States v. Costello, 666 F.3d 1040 (7th Cir. 2012).

15. More principled, scientific database searches soon followed, and in 2018 Justice Thomas Lee, of the Utah Supreme Court, a long-time champion of corpus linguistics, together with the legal scholar Stephen Mouritsen, summarized the latest research in corpus linguistics and LCL as a way to determine ordinary meaning, and more specifically, original public meaning, with more clarity (Thomas Lee and Stephen Mouritsen, "Judging Ordinary Meaning," Yale Law Journal 127 (2018): 788–879). Jurists over the past few years have found that in several cases, LCL proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning. LCL often supplements the historical interpretations found in older dictionaries and in the Oxford English Dictionary, as well, allowing a more precise interpretation of historical text data.

16. In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on legal corpus linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers. As a result, corpus linguistics has drawn increased attention from the courts, including recent mentions in decisions in the Sixth, Seventh, and Ninth Circuits, as well as a comment by Justice Alito in his concurrence in Facebook, Inc. v. Duguid, 141 S. Ct. 1163 (2021), where he suggested that LCL may one day provide a useful alternative to the canons of interpretation.

17. Several large databases have come online in the past few years that facilitate LCL research. Brigham Young University's Center for Law and Corpus Linguistics hosts the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words and covering the years 1760–1799. BYU's Corpus of Early Modern English (COEME), with data from 1475–1800, contains over 40,000 texts and 1.1 billion words. Recently, the BYU Center for Law and Corpus Linguistics added the Corpus of Reconstruction Era American English (COREA), with 209.4 million words taken from 121,000 legal and congressional texts.

18. The Corpus of Historical American English (COHA), initially developed at BYU but now independent of that institution, currently contains 475 million words of text from 1820–2020. The size of these databases continues to grow as more works are digitized, coded, and added to the corpora. In compiling this report, I reviewed each of these databases. Some of the corpora provided data for some lexical searches, but not for others. The examples cited below specify which corpus they are drawn from. I have modernized some typographical features in the examples (in particular, the long 's' that was common through the 18th century); but I have preserved original spellings—note that "armour" is the more common spelling in the 18th century, with "armor" becoming the more-common spelling in American texts from the 19th century to the present. I have underlined arms, armor, and armour in the citations to guide the reader.

19. Critics of LCL have objected that databases like COFEA and COEME contain only texts written by "elites," whose language may differ from that of "ordinary people"

who do not write at all, or who for various reasons do not write texts likely to be included in the available corpora. It is certainly the case that many printed books and periodicals, along with documents like the Constitution, its amendments, and state and federal statutes, tend to be written by educated specialists as well as lawyers and professional writers. Although "ordinary people" are expected to understand the language of the Constitution, the Declaration of Independence, and other founding documents, as well as the laws that govern the nation, such texts typically require specialized knowledge. A reading-difficulty formula like the commonly used Flesch-Kincaid scale suggests that the Declaration of Independence and the Constitution require a fifteenth-grade reading level, while according to one comprehensive study, Adult Literacy in America (National Center for Education Statistics, U.S. Department of Education, 1993; https://nces.ed.gov/pubs93/93275.pdf), the average American adult tends to have a seventh- or eighth-grade reading level. The National Center for Education Statistics no longer uses "grade level," instead rating literacy levels for Americans between ages 16 and 65 on a scale from 1 to 5; measurements conducted in 2003 showed no significant change from the 1993 NCES report; and the most recent data, from 2014, confirm that most adult Americans still test at or below level 2, with 4.1% testing below level 1 (https://nces.ed.gov/pubs2019/2019179/index.asp).

20. In order to counter any "elite" bias that may be found in databases like COFEA, COEME, COREA, and COHA, I rely as well on five digitized newspaper databases covering the period 1750–1900, focusing for this report on the Founding Era and on the period of Reconstruction after the passage of the Fourteenth Amendment. Newspapers of the eighteenth and nineteenth centuries were the principal means of

communicating news and information. As such, they embodied much of the language of the "ordinary people" who read them. These early newspapers also provide researchers with more data for the nineteenth century than a corpus like COHA, which covers the same period but tends to focus on literary and specialized texts rather than material for the general reader. Although COREA is a corpus that focuses on the Reconstruction period, it draws from a relatively limited number of specialized legal sources. It is therefore useful to consult newspaper databases to supplement the data.

21. Because of changes in print technology and the spread of literacy, Founding Era newspapers differed from the newspapers of the post-Civil War era. Print technology remained relatively static between the 1450s, when printing presses first appeared in Europe, and the early nineteenth century, when the Industrial Revolution drastically changed printing methods. The first printing press was adapted by Gutenberg from the design of the traditional wine press, and for centuries, printing, like making wine, was a slow and labor-intensive process. As a result, newspapers in the founding era were small by today's standards, averaging four to eight pages. Publication was less frequent as well. Papers tended to appear weekly or semi-weekly, rather than daily. Even so, newspapers in the Founding Era and later, during Reconstruction, provided average Americans with their principal access to all the critical events and documents of their time, along with coverage of local and international news. Although newspaper subscribers tended to be "elites," newspaper content was widely shared by word of mouth: ultimately, most Americans in the Founding Era, including those who

would be classified as illiterate or poorly educated by today's standards, got their news from newspapers.

22. Since the 1960s, database compilers have been able to track contemporary spoken English more successfully, though none of the databases for the Founding Era and for the post-Civil War period cover the spoken language of Americans. Although scholars can reconstruct some of that early oral language, we are always doing so through the lens of print versions purporting to represent or comment on ordinary speech.

23. The newspaper databases that I have examined are Readex Historical American Newspapers; Chronicling America (newspapers digitized by the Library of Congress); the British Newspaper Archive (compiled by the British Library); and two private subscription services, newspapers.com and newspaperarchive.com. For this report, both Readex and newspapers.com provide the most-complete picture of the language of the Founding Era newspapers as well as the ordinary language of the later nineteenth century.

24. All the databases contain some duplicates. COFEA, COEME, and COREA digitize multiple editions of the same work; and the newspaper databases not only duplicate some, though not all, of one another's content, but they also contain a number of duplicate stories because, particularly in the period of newspaper growth during the nineteenth century—in an age before the wire services and syndication appeared, and before the larger papers began to set up news bureaus in key areas around the country and around the world—newspapers routinely printed each other's stories, sometimes acknowledging their source and sometimes not (I exclude duplicate citations from all my corpus searches). The databases often offer more insight into the meaning of

words and phrases than simply going to a dictionary. Jurists from Learned Hand and Felix Frankfurter to Frank Easterbrook and Richard Posner have warned their colleagues not to make a fortress of the dictionary. Like dictionaries, corpora are by necessity incomplete. LCL does not replace dictionaries, but it does provide an important supplement to them. Typical LCL analyses are conducted using a keyword and a few words surrounding it, to supply context. Sometimes a limited specific citation is ambiguous. And sometimes, a search of the data set returns only small number of citations, perhaps ten or twenty rather than a few hundred. In such cases, I supplement my use of LCL with a reading of the full context of the citations in order better to determine the keyword's meaning and the relevance of the citation to the search question.

**The Meaning of "arms" and "armor" in the Databases**

25. "Arms" as a stand-alone term refers to weapons. "Arms" almost never includes "armor." A search of "arms" in COFEA returns 26,358 citations. "Arms" appears both as a general term for war, as in (a), or as a reference to specific weapons, as in (b) and (c).

    a.  1764 "For Mars is rouz 'd by Wars alarms, And calls the Britons forth to <u>Arms</u>." The American mock-bird, or Songster's delight: being a choice collection of entire new songs, as they are now sung by the best singers at all the publick places of diversion in England.

       <u>https://quod.lib.umich.edu/cgi/t/text/text-idx?c=evans;cc=evans;q1=N31317;rgn=main;view=text;idno=N31317.0001.001</u>

    b.  1769. "[T]hese <u>Arms</u> were deposited in Chests, and laid upon the Floor of the Town Hall to remind the People of the Use of them." An appeal to the world; or A vindication of the town of Boston.

https://quod.lib.umich.edu/cgi/t/text/text-idx?c=evans;cc=evans;q1=N08707;rgn=main;view=text;idno=N08707.0001.001

    c.  1776 "The General [George Washington] also desires, that the Officers will be particularly attentive to the men's <u>Arms</u> & Ammunition, that there may be no deficiency, or application for Cartridges, when we are called into the field." General Orders, 15 October.

https://founders.archives.gov/documents/Washington/03-06-02-0429

26. A COFEA search for "armour" (the more-common spelling at the time) and "armor" returns 690 hits, or citations. Typically they refer to the armor worn by knights or royals in the past (c); to the metaphorical armor of religious faith (b); and, occasionally, to military equipment, as in (a), though this citation, too, refers to the past, not the present. Example (d) describes a patriotic ceremonial display in which the qualities of Liberty, Justice, and so on are personified as ancient Greek or Roman deities wearing armor. Examples (e) and (f—a citation from the Corpus of Early Modern English, or COEME) offer a non-religious metaphorical use of armor to refer to the defensive strength provided by the governmental separation of powers (e), and to the defensive tools available to the writer (f). Example (g) shows "armor" as the equivalent of "courage" or "mettle," and (h) shows "armour" as a generalized term

referring to war, the equivalent of "to take arms" or "to go to war" —in neither of these last two cases is "armor" used to mean personal protective gear:

a. 1765. "[T]o erect, raise and build within the said province [of New Jersey] . . . such and so many forts, fortresses, castles, cities, corporations, boroughs, towns, villages, and other places of strength and defence; and . . . to fortify and furnish with such provisions and proportions of ordnance, powder, shot, armour, and all other weapons, ammunition and habiliments of war, both offensive and defensive; as shall be thought necessary and convenient for the safety and welfare of the said province." The history of the colony of Nova-Caesaria, or New-Jersey: containing, an account of its first settlement, progressive improvements, the original and present constitution, and other events, to the year 1721. https://quod.lib.umich.edu/cgi/t/text/text-idx?c=evans;cc=evans;q1=N07965;rgn=main;view=text;idno=N07965.0001.0 01

b. 1763. "Let us cast off the works of darkness, and let us put on the armour of light. Let us walk honestly as in the day; not in rioting and drunkenness, not in chambering and wantonness, not in strife and envying. But put ye on the Lord." Jonathan Mayhew, "Christian sobriety: being eight sermons on Titus II. 6." https://quod.lib.umich.edu/cgi/t/text/text-idx?c=evans;cc=evans;q1=N07402;rgn=main;view=text;idno=N07402.0001.0 01

c. 1775. "Maximus Tyrius says, the Crotonians loved the Olympic games, the Spartans fine armour, the Cretans hunting, the Sybarites dressing, and the

Ionians lascivious dances." J. Burgh, "Political disquisitions; or, An enquiry into public errors, defects, and abuses. Illustrated by, and established upon facts and remarks, extracted from a variety of authors, ancient and modern." https://quod.lib.umich.edu/cgi/t/text/text-idx?c=evans;cc=evans;q1=N10941;rgn=main;view=text;idno=N10941.0001.001

d. 1776. "[D]exter the Goddess Liberty in a corselet of <u>armour</u> alluding to the present Times, holding in her right Hand the Spear and Cap, and with her left supporting the Shield of the States; sinister, the Goddess Justice bearing a Sword in her right hand, and in her left a Balance." Journals of the Continental Congress. https://heinonline.org/HOL/P?h=hein.congrec/jcc0005&i=1

e. 1792. "As in a single Govt. the Legislative Ex. & Judicy. ought to be kept separate by defensive <u>armour</u> for each. So ought the two Govts. federal & State." Notes for the National Gazette Essays, [ca. 19 December 1791–3 March 1792]. https://founders.archives.gov/documents/Madison/01-14-02-0144.

f. 1780. "I am prepared better than Moor, of Moor-hall, for the dragon—I have <u>armour</u> of iambics, a shield of raillery, and a sword of satire." Thomas Holcroft, Alwyn: or the gentleman comedian. [from COEME] In two volumes: [pt.1]; eebo.K024818.001.

g. 1783. "Every patriot trembled till we had proved our <u>armour</u>, till it could be seen, whether this hasty concourse was susceptible of exercitual arrangement, and could face the enemy with firmness." Ezra Stiles, President of Yale

College. A sermon: The United States elevated to glory and honor.

https://quod.lib.umich.edu/cgi/t/text/text-

idx?c=evans;cc=evans;q1=N14363;rgn=main;view=text;idno=N14363.0001.0

01.

h.  1799. "Citizens, . . . inspired with genuine love of your country, you, in

conjunction with your patriotic brethren, assumed the armour of war; and

under GOD, and WASHINGTON, vanquished the foe." Thomas Beed, An

oration, delivered at Roxbury, July 4, 1799, in commemoration of American

independence. https://quod.lib.umich.edu/cgi/t/text/text-

idx?c=evans;cc=evans;q1=N26443;rgn=main;view=text;idno=N26443.0001.0

01

27. A COFEA search for "arms" together with "armor" or "armour" returns only 6 hits,

one being a duplicate. Each one distinguishes weaponry (arms) from defensive body

coverings (armor, armour). Note that (a) clearly echoes ancient armor; (b) is modeled

directly on the English Statute of Northampton (1328); (c) shows Abigail Adams

using "armor" metaphorically; (d) references the ceremonial armor of the French

king; (e) refers to 16th-century armor; and (f) cites Milton's "Paradise Lost" (1667).

a.  1776 "[W]hen they enter the lists in form, make a display of their armour, and

their arms, and boldly challenge all opponents, what are we to think?"

American independence the interest and glory of Great Britain.

https://quod.lib.umich.edu/cgi/t/text/text-

idx?c=evans;cc=evans;q1=N11611;rgn=main;view=text;idno=N11611.0001.0

01

b.  1779 "Be it enacted by the General Assembly, that no man great nor small, of

what condition soever he be . . . be so hardy to come before the Justices of any

court, or other of their ministers of justice doing their office, with force and

<u>arms</u> on pain to forfeit their <u>armour</u> to the commonwealth and their bodies to

prison at the pleasure of a court, nor go nor ride armed by night nor by day, in

fairs or markets or in other places in terror of the country . . . shall direct, and

in like manner to forfeit his <u>armour</u> to the commonwealth." 72. A Bill

Forbidding and Punishing Affrays, 18 June 1779.

https://founders.archives.gov/documents/Jefferson/01-02-02-0132-0004-0072

c.  1781. "The Spring is advanceing and our Soldiers will have less occasion for

cloathing — patience, perseverance and intrepidity have been their <u>Armour</u>

and their cloathing through an inclemnant Winter." Abigail Adams to John

Adams, 23 April 1781 https://founders.archives.gov/documents/Adams/04-04-

02-0071.

d.  1786. "Royal possessions, including <u>arms</u> and <u>armor</u>, furniture, tapestries, and

jewels, were housed in what is now the Ministère de la Marine on the Place de

la Concorde." Jefferson Papers, Memorandum Books, 1786.

https://founders.archives.gov/documents/Jefferson/02-01-02-0020.

e.  1794. Referring to the court's sentence of the French admiral, Gasper Coligni,

in 1572. "AFTER which a gibbet shall be set upon Mount–Faucon, and he

there to be hanged in the most eminent place. HIS <u>arms</u> and <u>armour</u> to be

drawn at a horse's tail through the streets of the said city, and other cities

where they shall be found, and there to be broken in pieces, as a sign of his

perpetual ignominy." The new and complete book of martyrs; or, An universal history of martyrdom: being Fox's Book of martyrs, revised and corrected, vol. 1. https://quod.lib.umich.edu/cgi/t/text/text-idx?c=evans;cc=evans;q1=N20568;rgn=main;view=text;idno=N20568.0001.001.

f.  1795 "Chariot making is more ancient than the earth itself; for, according to the opinion of Milton . . . the trade was carried on in heaven, long before the earth was made. — 'Now storming fury rose, and clamor, such as heard in heaven till now was never; arms on armor, clash'd horrible discord; and the madding wheels of brazen chariots raged: dire was the noise of conflict; all heaven resounded, and had earth been then, all earth had to her centre shook." A lecture; containing a short history of mechanics, and of useful arts and manufactures, reverently dedicated to the respectable supporters of liberty and property, the mechanics of the United States. https://quod.lib.umich.edu/cgi/t/text/text-idx?c=evans;cc=evans;q1=N21432;rgn=main;view=text;idno=N21432.0001.001.

28. Turning to the nineteenth century, in particular the period surrounding the adoption of the Fourteenth Amendment, a search for "arms" in COHA returns 4,666 examples of its use. These are five citations from COHA, showing arms and armor as separate, with (a), (b), and (d) referring to armor as old or ancient. In (c) armor is used metaphorically to refer to general military defenses; and (e) shows that "arms," when

it appears in a list, is a term treated separately from categories like "ammunition," "accoutrements," and other war-related materials:

    a.  1846. "Whose other <u>armor</u> and <u>arms</u> are these? They are Moorish?" J. H. Ingraham, "The Slave King; or, The Triumph of Liberty." V. 1.

    b.  1861. "[H]e collected within his own palace a good library, a fine set of medals, and the best collection of <u>arms</u> and ancient <u>armor</u> to be found in Italy." Charles Albert, North American Review, October: 301-330.

    c.  1863. "[I]f the South could find a like vulnerable point in the openings of our <u>armor</u>, she would make, with no hesitation, the most fearful and tremendous use of her advantage" Stephen Pearl Andrews, "The Great American Crisis." Continental Monthly, December 1863: 658–670.

    d.  1871. "The hall was hung with <u>arms</u> and <u>armor</u> of past generations." James De Mille, The Cryptogram (a novel).

    e.  1949. "It will be necessary that <u>arms</u>, ammunition, accoutrements, tents and camp equipage be deposited there for them the troops." (Francis F. Beirne, "War of 1812").

29. The new Corpus of Reconstruction Era American English, COREA, has 9,418 citations for "arms"; 371 citations for "armor" or "armour." But in only one case, example (a), in 1870, do we find arms and armor as separate categories, and armor appears as "armor plate," cladding for field pieces or ships, rather than personal protection for soldiers. Note, too, that the context is military, not civilian. Example (b) represents the common use of "armor" in this period to refer to defensive wood or iron plating on naval vessels. And (c) offers yet another example of "armor" used

metaphorically, this time in a political rather than a religious context. Example (d) refers to ancient armor. And example (e) refers metaphorically to Jefferson Davis's supposed ability to respond to news of military defeats as if they were expected hiccups rather than outright disasters.

a. 1870 "[H]e entered into copartnership in some of his business with one of the revolted States and with the government of the Confederate States, and shipped through the blockaded ports munitions of war, arms, gunpowder, armor-plates, cannon, shot, and other like articles; he made presents of three guns for field-service to that government, and otherwise aided, abetted, and encouraged the rebellion." U.S. Court of Claims, for the Twelfth Circuit, John Young, assignee of Alexander Collie, v. The United States. 12 Ct. Cl. 648, cocap.us.7650382b 1870. https://cite.case.law/ct-cl/12/648/

b. 1850. "it is contended, for the plaintiffs, that Heaton completed in 1850 – the invention of putting wood outside of iron for armor, and that he completed in the fall of 185? the invention of the wood outside of the iron, and the thin iron outside of the wood." Webb et al. v. Quintard, United States Circuit Court for the Southern District of New York, 29 F. Cas. 521.

c. 1870. "[B]ehind every weak joint in the constitutional armor of the American Union is masked and ambushed the batteries of war and the serried ranks of millions of men, and over it all is the sleepless eye of the jealous affections of the people. . . . There, as the great Douglas

said, each man must be either a patriot or a traitor." Congressional

Record, Volume 9, Part 1 (March 18, 1879 to May 13, 1879);

https://www.govinfo.gov/app/details/GPO-CRECB-1879-pt1-v9

d.  1870. "the armor of Homeric heroes." Congressional Record, Volume

2, Part 1 (December 1, 1873 to January 29, 1874).

https://www.govinfo.gov/app/details/GPO-CRECB-1874-pt1-v2

e.  1867. "This important defensive armor is habitually worn by Mr.

Davis. . . . As chief of the Confederate States he could listen to the

announcement of defeat while expecting victory, or to a foreign

dispatch destructive to hopes long cherished, or to whispers that old

friends were becoming cold or hostile, without exhibiting the slightest

evidence of feeling beyond a change of color . . . . Under such

circumstances, his language temperate and bland, his voice calm and

gentle, and his whole person at rest, he presented rather the appearance

of a man wearied and worn by care and labor, listening to something

he knew all about than of one receiving ruinous disclosures." The

Daily Dispatch (Richmond, VA), December 30, p. 1.

https://chroniclingamerica.loc.gov/lccn/sn84024738/1867-12-30/ed-
1/seq-1/ocr/

30. The newspaper data supplements findings from the BYU corpora. For example, a

search of the digitized corpus, America's Historical Newspapers (READEX),  returns

833 news articles for the single year 1868 containing the word "armor." In addition to

the expected references to old-time armor and armor used metaphorically as some

kind of defense, whether religious or political, we now find references to armored vessels, also called "iron-clads," along with one reference to a diver's armor (b). In this period, military armor has moved from the person to the equipment, particularly naval vessels.

    a. 1868 "[D]raws 25 feet of water, and carries 8-inch <u>armor</u>." "A formidable Prussian Iron-clad." *San Francisco Bulletin,* Feb. 29, 1868.

    b. 1868 "The diver wears a water tight <u>armor</u> over his entire person, except the head, which is covered by an inverted metallic pot, in which the head can turn and move at ease." *Boston Recorder,* Apr. 23, 1868.

## Conclusions

31. Corpus evidence from the Founding Era and from the Reconstruction Era clearly show that "arms" and "armor" are separate categories, and that "armor" typically refers, not to personal protective gear in contemporary use either by the military or by civilians ("body armor," as we would term it today), but to ancient armor, or to the ceremonial armor worn by some European royalty, or to the metaphorical armor that protects the believer and the politician, among others. In addition, during the Reconstruction Era, military armor refers to the protective cladding being added to naval vessels, a cladding that was starting to be used to reinforce field pieces. It does not refer to the personal armor of soldiers or civilians.

Dated: Champaign, Illinois. August 20, 2025.

Dennis Baron