UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BENJAMIN HEETER, JOSEPH WURTENBERG, and the
FIREARMS POLICY COALITION, INC,

Plaintiffs,

v.

LETITIA JAMES, in her official capacity as Attorney General
of the State of New York, STEVEN G. JAMES, in his official
capacity as Superintendent of the New York State Police, and
MICHAEL J. KEANE, in his official capacity as District
Attorney for the County of Erie, and SANDRA DOORLEY,
in her official capacity as District Attorney for the County of
Monroe,

Defendants.

No. 24-cv-00623 (JLS)

**DECLARATION OF RYAN L. BELKA**

RYAN L. BELKA, declares under penalty of perjury that the following is true and correct:

1. I am an Assistant Attorney General, of counsel to Letitia James, New York State Attorney General, and with my co-counsel James Thompson, I represent Defendants Letitia James, in her official capacity as Attorney General of the State of New York ("Attorney General James"), and Steven G. James, in his official capacity as Superintendent of the New York State Police ("Superintendent James")(collectively the "State Defendants"), in this action.

2. I make this declaration in support of the State's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of its Cross-Motion for Summary Judgment.

***Individual Plaintiffs Lack Standing and Their Claims are not Ripe***

3.      Attached as **Exhibit A** is a true and accurate copy of relevant excerpts from the April 25, 2025 Deposition of individual Plaintiff Benjamin Heeter.  Heeter Dep., 19:11-21:22; 39:3-40:20; 47:5-8.

4.      Attached as **Exhibit B** is a true and accurate copy of the relevant excerpts from the Deposition of individual Plaintiff Joseph Wurtenberg. Wurtenberg Dep., 37:3-15; 42:7-44:7; 44:17-45:16; 60:18-61:16.

5.      Benjamin Heeter owns both steel and Kevlar body armor.  *See Exhibit A.*

6.       However, he testifies that he may want more Kevlar body armor, at some time in the future, even though he has never worn the Kevlar body armor he owns.  *Id*.

7.      Joseph Wurtenberg owns body armor sufficient for himself and his family. *See Exhibit B*.

8.      However, he testifies that he may want to purchase more at some time in the future. *See Exhibit B*.

9.      New York's Body Armor Law allows qualified professionals to purchase body armor.  New York State Executive Law § 144-a.

10.     Plaintiff Heeter failed to verify if his employment rendered him a qualified professional under the law. *See Exhibit A.*

11.     Further, Plaintiff Heeter failed to have his employment added to the qualifying professionals list as allowed under the law. *See Exhibit A.*

12.     Plaintiff Wurtenberg failed to verify if his employment rendered him a qualified professional under the law. *See Exhibit B.*

13.     Further, Plaintiff Wurtenberg failed to have his employment added to the qualifying professionals list as allowed under the law. *See Exhibit B*.

***"Arms" did not Include personal [body] "Armor"***
***in Either the Founding or Reconstruction Eras***

14.     If the Founding Fathers had intended the term "Arms" to cover body armor, they would surely have included it when using the term, or included body armor in the arms that they viewed as necessary to the young nation's survival.

15.     This Court has previously emphasized the importance of corpus linguistics as important to conducting the textual-historical analysis at the heart of this case.  *See* Hearing Transcript, *Christian v. James*, No. 22 Civ. 695 (W.D.N.Y.), at 30:24-31:25 (Sept. 12, 2024), attached as **Exhibit C** (explaining that corpus linguistics "can be helpful.  It can be something that maybe I'll ask the lawyers to look at in the right case.  But, you know, when you are talking about what a word like gun means in 1791, perhaps, that could be something useful. . . . In the right case, I might be prompted to ask the lawyers to take a look at that.").

16.     Corpus linguistics is a scientific method that utilizes large bodies of digitized historical text to determine the meaning of usage of words in context.  *See* Baron Dec. ¶ 12 *et seq.*; *cf. Fulkerson v. Unum Life Ins. Co. of Am.*, 36 F.4th 678, 682 (6th Cir. 2022) (finding that "corpus linguistics is a helpful tool in assessing common usage" and surveying its use by judges and scholars).

17.     State Defendants' corpus linguistics expert is Dr. Dennis Barron.

18.     Plaintiffs do not have a corpus linguistics expert.

19.     Attached as **Exhibit D** is an Act of Congress passed on May 22, 1794 stating: "An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same."  Ch. 33, 1 Stat. 369 (1794).

20.     The law explained what was covered by the term "Arms" at that time (1794), namely "any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenados [sic], gunpowder, sulphur, or saltpetre." *Id.* § 1.

21.     Attached as **Exhibit E** is an Act of Congress from 1797 where Arms were described in terms of weapons and ammunition, in other words, not armor.  Ch. 2, 1 Stat. 520 (1797).

22.     The Fifth Congress re-enacted the law in 1797 with minor changes, again covering the same enumerated list of "Arms."  Ch. 2, 1 Stat. 520 (1797).  *See Exhibit E.*

23.     Attached as **Exhibit F** is an act passed by the Fifth Congress in 1795 stating: "An Act to enable the President of the United States to Procure Cannon, Arms and Ammunition, and for other purposes."  Ch. 38, 2 Stat. 555 (1798).

*24.*     That understanding of arms as weapons continued as the Republic grew.  *See Exhibits D-F, et seq.*

25.     Attached as **Exhibit G** is a Bill considered in 1809 by the Tenth Congress stating: "A Bill prohibiting for a limited time the exportation of arms, ammunition, canvas, cordage, and hemp, and for encouraging the importation thereof."

26.     The bill followed the structure of the earlier Arms import/export bills, and would have covered "any cannon, muskets, pistols, bayonets, swords, cutlasses, musket-balls, lead, bombs, grenadoes [sic], gun-power [sic], sulphur or salt-petre, canvas or sailduck of any description, commonly used for ships or vessels, cordage, cables, tarred or untarred yarns made of hemp, seine, sail or sewing twine, and sheet copper."  *See Exhibit G and Exhibits D-F*.

27.     In all the potential materials contemplated for war, from cannons all the way down to "sewing twine," Congress did not include body armor.  *Id.*

*__History and Tradition Support the Regulation of Body Armor__*

28.    Indeed, the tradition traces from the very foundation of Western Civilization, as Sir William Blackstone, who Plaintiffs acknowledge as "the preeminent authority on English law for the founding generation," [ECF No. 71] at 12 (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)), traces "[t]he offence of riding or going armed" all the way back to "the laws of Solon, [when] every Athenian was finable who walked about the city in armour." IV William Blackstone, *Commentaries on the Laws of England* 148-49 (Clarendon Press 1770), attached here as **Exhibit H**; *see also* I John Potter, *Achaeologia Graeca: or the Antiquities of Greece* ch. 26 at 182 (Sam Palmer, Printer 1722), attached here as **Exhibit I** (reprinting the ancient law's text: "He shall be fin'd who is seen to walk the City-streets with a Sword by his Side, or having about him other Armour, unless in case of exigency.")

29.    Attached as **Exhibit J**: In 1353 Edward III issued a "Proclamation for keeping the peace within the City" of London, ordering among other things "that every hosteler and herbergeour, within the franchise of the City, shall cause his guests to be warned that they must leave their arms and armour in their hostels where they are lodging." Henry Thomas Riley, *Memorials of London and London Life in the XIIth , XIVth, and XVth Centuries* at 272 (Longmans, Green & Co. 1868).

30.    The same law required "that no alien shall go in armour, or shall carry sword, knife with point, or other arms, in the City, or in the suburb thereof, on pain of imprisonment, and of losing such arms and armour." *Id.*; *see also* Carp Decl. ¶ 7.

31.    Attached as **Exhibit K** is John Collyer's *Criminal Statutes of England* where Edward III issued the Statute of Northampton, which prohibited anyone to "go, nor ride armed by night, nor by day, in fairs markets, nor in the presence of the justices or other ministers, nor in no

part elsewhere, upon pain to forfeit their armour to the King and their bodies to prison, at the king's pleasure." John Collyer, *The Criminal Statutes of England* at 4 (S. Sweet 1832), 2 Ed. 3, c. 3; *see* Carp. Dec. ¶ 7.

32.     Richard II later updated the Statute, adding a provision stating that "no lord, knight, nor other, little nor great, shall go, nor ride by night nor by day armed, nor bear sallet nor skull of iron, nor of other armour, . . . save and except the King's officers and minsters in doing their office." *Id.* at 5, 20 Ric. 2, c.1.

33.     Attached as **Exhibit L** Henry IV, in 1400, issued a law prohibiting all Welshmen from "bear[ing] any manner of armour" within cities, boroughs, and merchant towns near the English border.  II Danbey Pickering, *The Statutes at Large, from the Fiftheenth Year of King Edward III to the Thirteenth Year of King Henry IV, Inclusive* at 413 (Joseph Bentham, printer 1762).

34.     Attached as **Exhibit M** Henry VIII in 1534 issued a law forbidding anyone in Wales from bearing any "weapon, privy coat, or armour defensive" near court, or "to any town, church , fair, market or other congregation.  IV Danby Pickering, *The Statutes at Large, from the First Year of King Richard III to the Thirty-first year of King Henry VIII, Inclusive*, at 330 (Joseph Bentham, printer 1763).

35.     Attached as **Exhibit N** in 1597 (shortly before the first English settlement in America) issued "A Proclamation against the common use of Dagges, Handgunnes, Harqubuzes, Calliners, and Cotes of Defense."

36.     Concerned that diverse persons had worn "privie Cotes and Doublets of Defense . . . and presume audaciously to apparel themselves with the said privie Armour, not only in Cities, Townes, and publicke assemblie, but within her Majesties Court wheresover, . . to the great offence

and contempt of her Highnes[s] and of her Laws, and to the hurt of divers her Majestie[']s good subjects," Queen Elizbeth's order "doth explicitly prohibit[] and forbid all and every of her subjects whatsoever, the wearing of any such Privie or secret kind of Cote, or Doublet of Defence," on pain of imprisonment.  *Id.*

37.     Attached as **Exhibit O** shows that this tradition of prohibiting the wearing of armor made its way into the common law, such that by 1715 a guide for justices of the peace included a section on "Armour," containing not only the Statute of Northampton provision allowing for the arrest of persons who "go armed offensively," but also paragraph stating that persons who "shall go apparelled with privy Coats or Doublets" can have sureties imposed against them.  Michael Dalton, *The Country Justice: Containing the Practice of the Justices of the Peace* at 37 (John Walton, printer 1715). *See* Carp. Decl. ¶ 10.

### *Michael Foreman*

38.     State Defendants timely disclosed four experts in this case, including Michael Foreman.  Attached as **Exhibit P** is a true and accurate copy of the Declaration of Michael S. Foreman.

39.     On or about, November 5, 2025, Plaintiff's counsel reached out to schedule Mr. Foreman's deposition.

40.     Shortly thereafter, on November 17, 2025, Plaintiffs served a Notice of Deposition for Michael Foreman and his deposition was scheduled for December 18, 2025.  Attached as **Exhibit Q** is a true and accurate copy of the Notice of Deposition for Michael S. Foreman.

41.     On December 18, 2025, Plaintiffs did not depose Mr. Foreman as scheduled and instead contacted counsel to reschedule Mr. Foreman's deposition to late January 2026.

42.     Unfortunately, Mr. Foreman unexpectedly passed away on January 16, 2026 and he was not deposed in this case.  https://www.dobbsfuneralhome.com/obituary/Michael-Foreman

***Body Armor is Unusually Dangerous***

43.     Body armor companies are well aware of the unprecedented threat to law enforcement officers, which is why market leaders in the armor industry do not sell to persons outside the military, law enforcement, and certain allied professions.  *See Exhibit P* at 6-13; Schildkraut Decl., ¶¶ 20-24. Exhibit D.

44.     The Buffalo shooter noted this multiple times in his manifesto, complaining that "many of the S+ tier IIIA armor like the Safariland Hardwire are only available to certain credentials because of [expletive] companies" Schildkraut Decl., ¶¶ 20-24. Exhibit D at 8 and 12 and that "Avon Protection, Gentex, BAE systems, United Shield, ArmorSource, Safariland PROTECH, and Point Blank PARACLETE all make great helmets but the mass majority of them are only available to the government and police." *Id*.

45.     This policy was explained by the State Defendants' fourth expert, Michael Foreman, a retired Chief with 40 years of law enforcement experience who was Executive Vice President at Point Blank Enterprises until his untimely death in January 2026. *See Exhibit P* at 6-7.

46.     Mr, Foreman wrote that body armor exists to "protect the protectors," and that "[r]estrictions on the sale and possession of body armor are an essential element in the steps necessary to protect those who serve." *See Exhibit P* at 8, 11.

47.     "Law enforcement today faces far too many threats to their safety without making it easier to obtain body armor for non-qualifying individuals," which is why the "top [body armor]

companies have chosen to make it their practice to only sell to qualifying professionals." *Id* at 6-8, 11-12.

48.    At common law "[t]he wearing of armor in public by people other than peacekeepers was understood to be terrifying to the people and therefore subject to prohibition." Carp Dec. ¶ 9; *see Id. generally*.

49.    As it was in medieval England, as the wearing of modern ballistic body armor in public justifiably causes people to anticipate mass violence. *See, e.g.,* Jeff Murray, *Weapons charges follow concerning Facebook live: Why Broome County Schools locked down*, Binghamton Press & Sun-Bulletin (Dec. 13, 2022) (discussing lockdowns in medical facilities and nine school districts after video "showing a man wearing what appeared to be ballistic body armor and displaying a handgun while operating a vehicle"); WEVVV, *Fairfield schools placed on lockdown Wednesday after armed man arrested nearby* (Feb. 26, 2026), https://tinyurl.com/yueknjjz (lockdown due to a man "found walking through a neighborhood armed with a loaded rifle and wearing body armor"); Bethany Fowler, *Lockdown lifted for SCC Jackson Campus following felon wearing body armor on the loose*, WSPA (June 7, 2022), https://tinyurl.com/mr38m6sw; *see also* Eric Scott, *Man Training for Marathon Triggers School Lockdown in Wildwood Crest, NJ*, New Jersey 101.5 (Sept. 20, 2022), https://tinyurl.com/y7ayh9rz (lockdown after weighted running vest mistaken for ballistic armor).

## *Plaintiffs' Motion Relies on Inadmissible Hearsay that was not Disclosed in Discovery*

50.    Plaintiffs market research reports and the Greenlee article are provided to the court for the truth of the matter asserted without any viable hearsay exception.

51.    Plaintiffs commissioned market research reports, circumventing discovery safeguards outlined in the Federal Rules of Evidence. [ECF No. 69-5], Exs. 1, 3, 5 & 6 (at least

two of which they appear to have commissioned. *See id.* Exs. 2 & 4; *cf. id.* Ex. 1 at 10 (indicating that the report was made "in response to requests/orders received).

52.     These sources are not offered by any witness with personal knowledge, as required by F. R. Evid. 602, but simply attached to the declaration of Plaintiffs' attorney. *Cf. FTC v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) ("An attorney's affidavit or declaration not based on personal knowledge carries no weight.").

53.     Plaintiffs did not disclose these documents to the State Defendants prior to their appearance in connection with this motion, did not disclose the identities of the persons who compiled these documents in their initial disclosures. *supra*, depriving State Defendants any opportunity to cross-examine any witness in connection with these documents.  Attached hereto as **Exhibit R** is Plaintiffs' Rule 26 Disclosure (*Attached Documents Removed*).

54.     Joseph Greenlee is not a historian; he is former the Director of the NRA's Office of Litigation.  *See* https://fedsoc.org/bio/joseph-greenlee.

55.     At the time he wrote the article, Greenlee was Director of Constitutional Studies at the FPC Action Foundation, a nonprofit affiliated with Plaintiff Firearms Policy Coalition and headquartered at the same address.  *See* 23 Geo. J.L. & Pub. Pol'y at 1 n.a1.

56.     Plaintiffs do not disclose this affiliation in any of the five times they cite to Mr. Greenlee in their brief. *See generally*, [ECF No. 71] at 12, 15, 20.

57.     Plaintiffs did not disclose to counsel or the Court that they paid for its creation. *See* Plaintiff FPC's July 2024 press release announcing the instant lawsuit, the organization states that "FPC commissioned research on the history and tradition of defensive armor use and regulation" leading to "a forthcoming law review article," namely the Greenlee piece.  *See*

https://www.firearmspolicy.org/fpc-sues-new-york-to-strike-down-body-armor-ban        (last

accessed April 18, 2026).

58.    Mr. Greenlee's article does not disclose that it was "commissioned" by Plaintiff

FPC, nor that it was prepared for the purpose of litigation, nor that the litigation it was prepared

for was this lawsuit.

Dated: Buffalo, New York
         April 27, 2026                              /s/ Ryan L. Belka
                                                     RYAN L. BELKA



A

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

----------------------------------------------------

**BENJAMIN HEETER,**
**MARK BRAIMAN,**
**JOSEPH WURTENBERG,**
**FIREARMS POLICY COALITION, INC.,**

                                    Plaintiffs,

     -vs-                          1:24-cv-00623-JLS

**LETITIA JAMES,** in her official
capacity as Attorney General of
the State of New York,
**STEVEN G. JAMES,** in his official
Capacity as Superintendent of
the New York State Police,
**MICHAEL J. KEANE,** in his official
Capacity as Acting District
Attorney for Erie County, New York,
**WILLIAM G. GABOR,** in his official
Capacity as District Attorney for
Madison County, New York
**SANDRA DOORLEY,** in her official
capacity as District Attorney for
Monroe County, New York

                                    Defendants.

----------------------------------------------------

          Examination Before Trial of **BENJAMIN**

**HEETER,** held before Carrie A. Fisher, Notary

Public, at the New York State Attorney General's

Office, Main Place Tower, 350 Main Street, Suite

300A, Buffalo, New York, on April 25, 2025, at

1:00 p.m., ending at 2:58 p.m., pursuant to the

Federal Rules of Civil Procedure.

A P P E A R A N C E S:

ATTORNEYS FOR THE PLAINTIFFS:

**FLUET**
**BY: NICOLAS J. ROTSKO, ESQ.**
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
(703) 590-1234

ATTORNEYS FOR DEFENDANTS LETITIA JAMES AND STEVEN G. JAMES:

**STATE OF NEW YORK**
**OFFICE OF THE ATTORNEY GENERAL**
**LETITIA JAMES**
**BY: RYAN L. BELKA,**
**ASSISTANT ATTORNEY GENERAL**
Main Place Tower
350 Main Street, Suite 300A
Buffalo, New York 14202
(716) 853-8400

ATTORNEYS FOR DEFENDANT WILLIAM G. GABOR:

**HANCOCK ESTABROOK, LLP**
**BY: ERICA L. MASLER, ESQ.**
(appearing via Webex)
1800 AXA Tower I
100 Madison Street
Syracuse, NY 13202
(315) 565-4558

ATTORNEYS FOR DEFENDANT SANDRA DOORLEY:

**JOHN P. BRINGEWATT, ESQ.,**
**MONROE COUNTY ATTORNEY**
**BY: ROBERT J. SHOEMAKER, ESQ.**
(appearing via Webex)
307 County Office Building
39 West Main Street
Rochester, New York 14614
(585) 753-1380

(Cont.)

3

A P P E A R A N C E S:

ATTORNEYS FOR DEFENDANT MICHAEL J. KEANE:

**ERIE COUNTY DEPARTMENT OF LAW**
**BY: CHRIS SASIADEK, ESQ.**
(appearing via Webex)
Edward A. Rath County Office Building
95 Franklin Street, Room 1634
Buffalo, New York 14202
(716) 858-2208

4

**I N D E X**

WITNESS                  EXAMINATION                      PAGE

Benjamin Heeter      By Mr. Belka                         5

                     By Mr. Shoemaker                    61

                     By Ms. Masler                       63

                     By Mr. Sasdiadek                    65

**E X H I B I T S**

DEFENDANT'S              DESCRIPTION                      PAGE

Exhibit A      First Amended Complaint                   45

DEPAOLO CROSBY REPORTING SERVICES, INC.

135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

the idea that you wanted to purchase body armor?

A. I've always been intrigued by it. Probably in the mid-2010s, somewhere in that range.

Q. And was there any catalystic event that caused you to become interested in body armor in the mid-2010s?

A. I can't think of anything.

Q. Did you purchase body armor at that time?

A. Maybe not at that time but shortly after, yes.

Q. When did you purchase body armor?

A. I'd say approximately 2017, 2018.

Q. What type of body armor did you purchase?

A. I purchased AR500 steel body armor.

Q. Does the AR stand for Armor Line?

A. No, it's a type -- it's a steel, a rating of steel.

Q. Is there a brand associated with the body armor that you purchased in 2017 or 2018?

A. If there is, I don't.

Q. Do you know the level rating of the body armor that you purchased in 2017 or 2018?

A. I could only speculate.

Q. Okay.

A. I believe it's a Level III.

Q.  Even though it's steel body armor?

A.  I'm not -- I don't know.  There's subcategories that I'm not familiar -- that I'm not all that well-versed on.

Q.  Can you describe the body armor that you own?

A.  Yeah, sure.  It is a small metal plate, covers part of my chest.

Q.  Is there a carrying device for the small metal plate?

A.  There is.

Q.  Like a vest?

A.  It's -- you could classify it as a vest in some sense but not in the common sense of a vest because it slides over your head, not buckles in front like a vest would.  When I think of a vest, I think of something that buttons like a shirt.

Q.  And this -- presumably you purchased these two things together?

A.  Yes.

Q.  Okay.  You don't want to call it a vest.  What do you want to call the --

A.  No, I am not opposed to a vest.  I'm just --

Q.  Okay.  I am going to refer to it as a vest.

A.  Sure.

Q. Okay. So the vest has a carrying device where you put in plated body armor?

A. Yes.

Q. Is that the kind of body armor that you have?

A. It is.

Q. And you bought that in 2017 or 2018 and you currently possess it?

A. I do.

Q. Do you have any other kind of body armor?

A. I do.

Q. What other types of body armor do you have?

A. I have a soft body armor, a Kevlar-woven fiber panel.

Q. And about what date did you buy the soft Kevlar-woven panel body armor?

A. The same time frame.

Q. Meaning you bought the soft Kevlar-woven panel body armor in 2017 or 2018?

A. Yes.

Q. And you continue to have that body armor as well?

A. Yes.

Q. Do you own any other types of body armor?

A. No.

Q. Do you own any firearms?

(A recess was taken.)

BY MR. BELKA:

Q. Mr. Heeter, do you understand that there is a carve out in New York's body armor prohibition for those in eligible professions?

A. Yes.

Q. And what do you understand about that?

A. I understand if you're a first responder or a police officer you can buy body armor.

Q. Are you aware of which portion of the state keeps the list of eligible professions?

A. No.

Q. Okay. I will represent to you that it is the Department of State which is a separate state agency keeps the list of eligible professions as it relates to body armor prohibition. Are you aware that you can apply to have your profession deemed an eligible profession under the law?

A. No.

Q. I already know the answer to this one, but it's safe to say then that you did not apply to have your profession deemed eligible to purchase body armor under the law?

A. Correct.

Q.  If you had known that you could apply to have your profession deemed eligible, would you have done so?

MR. ROTSKO:  Objection to form.

A.  Yes.

Q.  Has -- without delving into attorney-client -- sorry, strike that.

Since the commencement of this lawsuit and your various discussions with your attorneys -- strike that.  I don't want to get into attorney-client privilege.

Have you ever been made aware prior to this very instant that you could apply to have your profession deemed eligible under the law?

A.  I've never spoken with my attorney about it. Now that we're talking about it, I may have been aware that you could do -- that you could apply for a waiver.

Q.  And have you done that?

A.  I have not.

Q.  How long ago did you become aware that you could apply to have your profession considered eligible under the law?

A.  I don't -- it's a very fuzzy recollection of the whole thing so I don't know how long it

47

used to so I need a bigger size.  And thirdly, some of the body armor that I have is expiring and I would like to have the ability to buy non-expired body armor.

Q. Your AR500 steel body armor is expiring?

A. My Kevlar body armor is expiring.

Q. The one that you've never worn?

A. Correct.

Q. And why approximately at the time that this lawsuit was commenced -- strike that.

At what period of time did you come to desire -- strike that.

What period of time did you seek to purchase BulletSafe Level IV body armor?

A. Early 2024.

Q. And what was the reasoning behind your desire to purchase BulletSafe Level IV body armor?

A. I just went over that.  Do you want me to go over it again?

Q. No.  If it's the same reasoning you wanted to purchase the Safe Life Defense body armor, that's fine.

A. That's the same.

Q. Okay.  And the reasons as I understand it that you would like to purchase BulletSafe body

B

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

------------------------------------------------

**BENJAMIN HEETER,**
**MARK BRAIMAN,**
**JOSEPH WURTENBERG,**
**FIREARMS POLICY COALITION, INC.,**

                         Plaintiffs,

     -vs-                      1:24-cv-00623-JLS

**LETITIA JAMES,** in her official capacity as Attorney General of the State of New York,
**STEVEN G. JAMES,** in his official Capacity as Superintendent of the New York State Police,
**MICHAEL J. KEANE,** in his official Capacity as Acting District Attorney for Erie County, New York,
**WILLIAM G. GABOR,** in his official Capacity as District Attorney for Madison County, New York
**SANDRA DOORLEY,** in her official capacity as District Attorney for Monroe County, New York

                         Defendants.

------------------------------------------------

        Examination Before Trial of **JOSEPH JAMES WURTENBERG**, held before Carrie A. Fisher, Notary Public, at the New York State Attorney General's Office, Main Place Tower, 350 Main Street, Suite 300A, Buffalo, New York, on April 25, 2025, at 9:34 a.m., ending at 11:47 a.m., pursuant to the Federal Rules of Civil Procedure.

2

A P P E A R A N C E S:

ATTORNEYS FOR THE PLAINTIFFS:

**FLUET**
**BY: NICOLAS J. ROTSKO, ESQ.**
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
(703) 590-1234

ATTORNEYS FOR DEFENDANTS LETITIA JAMES AND STEVEN G. JAMES:

**STATE OF NEW YORK**
**OFFICE OF THE ATTORNEY GENERAL**
**LETITIA JAMES**
**BY: RYAN L. BELKA,**
**ASSISTANT ATTORNEY GENERAL**
Main Place Tower
350 Main Street, Suite 300A
Buffalo, New York 14202
(716) 853-8400

ATTORNEYS FOR DEFENDANT WILLIAM G. GABOR:

**HANCOCK ESTABROOK, LLP**
**BY: JAMES YOUNGS, ESQ.**
(appearing via Webex)
1800 AXA Tower I
100 Madison Street
Syracuse, NY 13202
(315) 565-4558

ATTORNEYS FOR DEFENDANT SANDRA DOORLEY:

**JOHN P. BRINGEWATT, ESQ.,**
**MONROE COUNTY ATTORNEY**
**BY: ROBERT J. SHOEMAKER, ESQ.**
(appearing via Webex)
307 County Office Building
39 West Main Street
Rochester, New York 14614
(585) 753-1380

(Cont.)

A P P E A R A N C E S:

ATTORNEYS FOR DEFENDANT MICHAEL J. KEANE:

**ERIE COUNTY DEPARTMENT OF LAW**
**BY: CHRIS SASIADEK, ESQ.**
(appearing via Webex)
Edward A. Rath County Office Building
95 Franklin Street, Room 1634
Buffalo, New York 14202
(716) 858-2208

4

<u>I N D E X</u>

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Joseph Wurtenberg | By Mr. Belka | 5, 61 |
| | By Mr. Shoemaker | 53 |
| | By Mr. Youngs | 56 |
| | By Mr. Sasdiadek | 58 |
| | By Mr. Rotsko | 60 |

<u>E X H I B I T S</u>

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | First Amended Complaint | 46 |

DEPAOLO CROSBY REPORTING SERVICES, INC.

135 Delaware Avenue, Suite 301, Buffalo, New York  14202
716-853-5544

found that it would be a worthwhile investment
into my safety in -- generally in my safety.

Q. Did you acquire body armor in and around the
year 2020?

A. Yes.

Q. And what body armor did you acquire in and
around the year 2020?

A. I don't specifically recall the make or model.

Q. Okay.  Can you describe the body armor that
you acquired in and around the year 2020?

A. I acquired a ballistic plate carrier and two
steel body armor plates.

Q. Okay.  And do you still have the ballistic
plate carrier and plates?

A. I do.

Q. And do you know the make and model of those?

A. I do not.

Q. Under what circumstances between 2020 and the
present do you use your ballistic plate
carrier and plates?

A. I use them for training and for range visits
for my safety.

Q. Are there any other circumstances other than
training and range visits in which you use
your ballistic plate carrier and plates from

range visits?

A. Not specifically that I'm using.

Q. You're training at the range?

A. Yes.

Q. Other than the ballistic plate carrier and plates do you have -- strike that.

Other than the ballistic plate carrier and plates, do you own any other forms of body armor?

A. Yes.

Q. What other forms of body armor do you own?

A. I -- I purchased and own for not my -- for not my personal use three or four other small ballistic carriers with plates.

Q. For what -- strike that.

For what purpose did you purchase three to four small ballistic carriers with plates?

A. For my family's use.

Q. Are you aware of what use your family makes of the three to four small ballistic carriers and plates?

A. Yes.

Q. What use do they make of it?

A. Currently none.

Q. The three to four small ballistic plate

carriers and plates are collecting dust somewhere in your house?

A. They are in storage.

Q. Why are they in storage?

A. Because at the moment there is no need for them to be used.

Q. Would the body armor that you own provide the body armor necessary should a moment of need arise?

A. I don't understand your question.

Q. Okay.  Currently there are three to four small ballistic carriers with plates in storage, correct?

A. Correct.

Q. Presumably this is for family other than yourself, right?

A. Correct.

Q. And you have a set of ballistic plate carriers and plates for yourself, correct?

A. Correct.

Q. And you use that ballistic plate carrier and plates from time to time as we've discussed?

A. Yes.

Q. But the reason the three to four plate carriers for your family are in storage is

because at the moment no need has arisen for them, correct?

A. Correct.

Q. Should the need arise, would you have sufficient body armor for yourself and your family?

A. Yes.

Q. Other than the home at 76 Matthew Drive in Fairport, do you own any other property?

A. No.

Q. And approximately when did you purchase the home on 76 Matthew Drive?

A. I believe it was August of 2019.

Q. Shortly after you became a public safety dispatcher 2?

A. Yes.

Q. Do you have an understanding that there are exceptions to the body armor prohibition as it relates to eligible professions?

A. Yes.

Q. What is your understanding as it relates to that exception to the body armor prohibition?

A. I believe it was enumerated for law enforcement, for security personnel.  I am not sure of any other specific groups that were

enumerated, but I do know that 911 professionals were not included.

Q. How do you have that understanding?

A. When I read the law in 2022, we were not included.

Q. When you read the law in 2022, were you aware of the provision that the Department of State can add eligible professions by application?

A. I don't recall that.

Q. I am going to represent to you that the Department of State can add eligible professions upon application.

Did you ever apply to the Department of State to have 911 professionals like yourself added to the list of eligible professions?

A. No, I did not.

MR. BELKA: I'm going to switch topics so it might be a good time for a quick break. We're close to an hour.

MR. ROTSKO: Okay.

MR. BELKA: Five minutes?

MR. ROTSKO: That's good.

MR. BELKA: Joe, five work for you?

THE WITNESS: Yes.

MR. BELKA: Okay.

office ever communicated to you that you'd be subject to prosecution for bringing body armor into Erie County?

A. No.

Q. Are you aware of any prosecutions in Erie County for possession of body armor?

A. I am not personally aware of any, no.

Q. Are you aware of any prosecutions in Erie County for someone buying or selling body armor?

A. Not specifically, no.

Q. No more questions.  I hope you have a great day.

A. Thank you.

EXAMINATION BY MR. ROTSKO:

Q. Mr. Wurtenberg, I have just a few questions.

Earlier today did you testify that you purchased three to four plate carriers and plates for your family?

A. Yes.

Q. About what year did you purchase -- and month did you purchase those items?

A. It was the same time that I purchased my body armor in 2020.

Q. Okay.  Are you familiar with a manufacturer's recommended shelf life for the plate carriers and plates that you have purchased for yourself and your family?

A. I know manufacturers do have them.  I don't specifically know what they are for each manufacturer, but I believe generally speaking it's in the five- to seven-year range.

Q. Okay.  When the body armor that you've purchased for yourself and your family reaches five to seven years, what would you do -- what would you intend to do?

A. I would intend to replace it.

MR. ROTSKO:  I have no further questions.

FURTHER EXAMINATION BY MR. BELKA:

Q. Mr. Wurtenberg, are you familiar with a child's car seat?

A. Yes.

Q. Are you familiar with child car seats having expiration dates or manufacturer-recommended shelf lives?

A. Yes.

Q. Aside from getting you to buy more car seats,

C

```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF NEW YORK


  BRETT CHRISTIAN,                         Docket Number:
  FIREARMS POLICY COALITION,      1:22-CV-00695-JLS
  INC.,
  SECOND AMENDMENT
  FOUNDATION,                  *
                               *
  Plaintiffs,                  *
                               *
                               *           Buffalo, New York
              v.               *           September 12, 2024

                               *           9:33 a.m.
                               *
  STEVEN G. JAMES, in his                  ORAL ARGUMENT
  official capacity as
  Superintendent of the New
  York State Police,
  MICHAEL J. KEANE, in his
  official capacity as District
  Attorney for the County of
  Erie, New York,             *
                              *
  Defendants.                 *

  EVERYTOWN FOR GUN SAFETY,    *
                               *
  Amicus.                      *
  * * * * * * * * * * * * * * * *
```

                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE JOHN L. SINATRA, JR.
                   UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:        COOPER & KIRK, PLLC.,
                           By WILLIAM V. BERGSTROM, ESQ.,
                           1523 New Hampshire Avenue, NW,
                           Washington, DC  20036.

For Defendant
Steven G. James:                OFFICE OF THE NEW YORK STATE
                                ATTORNEY GENERAL, NYC
                                By JAMES M. THOMPSON, ESQ.,
                                28 Liberty Street,
                                14th Floor,
                                New York, New York  10005
                                And
                                OFFICE OF THE NEW YORK STATE
                                ATTORNEY GENERAL,
                                By RYAN L. BELKA, ESQ.,
                                Main Place Tower,
                                350 Main Street,
                                Suite 300A,
                                Buffalo, New York  14202.


For Defendant
Michael J. Keane:               COUNTY OF ERIE,
                                DEPARTMENT OF LAW,
                                By ERIN E. MOLISANI, ESQ.,
                                95 Franklin Street,
                                Suite 1634,
                                Buffalo, New York  14202.


The Courtroom Deputy:           KIRSTIE L. HENRY


The Court Reporter:             BONNIE S. WEBER, RPR,
                                Notary Public,
                                Robert H. Jackson Courthouse,
                                2 Niagara Square,
                                Buffalo, New York  14202,
                                Bonnie_Weber@nywd.uscourts.gov.




            Proceedings recorded by mechanical stenography,
                 transcript produced by computer.

we're talking about gun carriage, I think that -- you know, counsel just said that's a broad term.

I think we point out in our response brief that gun actually in these statutes is a technical term that never referred to pistols.

**THE COURT:**  Right.  What about that?

That's was a question that I've got later, but let's talk about it now.  There's this notion that perhaps gun means only long guns.

**MR. THOMPSON:**  I don't think there's any basis for that in the text or the statute, but one way or another, I think it's a distinction without a difference.

If the legislature had the power and the ability to regulate the carriage of long guns onto people's property, there's no reason to think that it would not have the ability to regulate the carriage of pistols or handguns as well.

So, even if we were to credit Mr. Bergstrom's assertion that the term is so limited, it still speaks to the ability of the legislature to allow private property owners to make their own decisions about what sorts of guns people carried.

**THE COURT:**  And I know that it's not this case, but maybe it could be or it could have been or maybe in the next case we'll talk more about it, but isn't -- have either of you heard about the database called corpus linguistics?

MR. THOMPSON:  Yes.  We've --

THE COURT:  Consulted it?

MR. THOMPSON:  We have used experts in it in other cases.

THE COURT:  It's out there.  It can be helpful.  It can be something that maybe I'll ask the lawyers to look at in the right case.

But, you know, when you are talking about what a word like gun means in 1791, perhaps, that could be something useful.

MR. THOMPSON:  But, again, not part of the record here.

THE COURT:  No.  I know that.  I know that.  In the right case, I might be prompted to ask the lawyers to take a look at that.

MR. BERGSTROM:  I will say though that, in the record here is Noah Webster's dictionary from 1828, where he said gun was never used this way.

And I think it's odd, given the way the State otherwise relies on dictionary definitions to define these terms, that it's reticent to do the same for this term, in the statute, which seems much easier to take it out of context.

THE COURT:  Yeah.  Yeah.  And don't anyone worry, I'm not planning to embark on any corpus linguistics in the future. I've done some of it in training, it's not easy.

MR. THOMPSON:  It's fascinating.

MR. BELKA:   Thank you.

THE COURT:   All right.


(Proceedings concluded at 10:56 a.m.)

*   *   *

In accordance with 28, U.S.C., 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Western District of New York before the Honorable John L. Sinatra, Jr.

_s/ Bonnie S. Weber_     September 28, 2024
Signature        Date

BONNIE S. WEBER, RPR

Official Court Reporter
United States District Court
Western District of New York

D

shall be the duty of the Secretary of the Treasury to provide, by contract, which shall be approved by the President of the United States, for building a lighthouse on the island of Seguin, near the entrance of the river Kennebeck, in the district of Maine, (the commonwealth of Massachusetts having ceded to the United States ten acres of the said island, for that purpose) and to furnish the same with all necessary supplies, and also to agree for the salaries or wages of the person or persons, who may be appointed by the President, for the superintendence and care of the same: And the President is hereby authorized to make the said appointments: That the number or disposition of the light or lights in the said lighthouse, be such as may tend to distinguish it from others, as far as is practicable.

*contract for building lighthouse on the island of Seguin with approbation of the President.*

*President to appoint superintendent.*

SEC. 2. *And be it further enacted,* That a sum not exceeding five thousand dollars be appropriated for the same, out of any monies heretofore appropriated, which may remain unexpended, after satisfying the purpose for which they were appropriated, or out of any other monies which may be in the treasury, not subject to any prior appropriations.

*Appropriation therefor.*

SEC. 3. *And be it further enacted,* That it shall be the duty of the Secretary of the Treasury, to cause a beacon to be erected, and three buoys to be placed at the entrance of Saint Mary's river in the state of Georgia, and that a sum, not exceeding three hundred dollars, be appropriated in like manner, as the sum for defraying the expenses for erecting a lighthouse on the island of Seguin, is appropriated by this act, for the purpose of defraying the charges of erecting and placing the same.

APPROVED, May 10, 1794.

*Secretary of Treasury to cause beacon, &c. to be placed at St. Mary's river, &c.*

*Appropriation therefor.*

---

STATUTE I.

CHAP. XXXII.—*An Act further to authorize the Adjournment of Circuit Courts.*

May 10, 1794.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That a circuit court in any district, when it shall happen that no justice of the supreme court attends within four days after the time appointed by law for the commencement of the session, may be adjourned to the next stated term by the judge of the district, or in case of his absence also, by the marshal of the district.

APPROVED, May 10, 1794.

*Act of Sept. 24, 1789, ch. 20.
When circuit court may be adjourned by district judge or marshal.*

---

STATUTE I.

CHAP. XXXIII.—*An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same.*

May 22, 1794.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That it shall not be lawful to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenados, gunpowder, sulphur or saltpetre, but the exportation of all the aforesaid articles are hereby prohibited for and during the term of one year.

[Obsolete.]
*Exportation of arms and ammunition prohibited for one year.
1795, ch. 63.
1797, ch. 2.*

SEC. 2. *And be it further enacted,* That any of the aforesaid articles, excepting such of them as may constitute a part of the equipment of any vessel, which during the continuance of this prohibition shall be found on board of any vessel in any river, port, bay or harbor within the territory of the United States, with an intent to be exported from the United States to any foreign country, shall be forfeited, and in case the value thereof shall amount to four hundred dollars, the vessel on board of which the same shall be seized, together with her tackle, apparel and furniture shall also be forfeited. *Provided nevertheless,* That nothing in this act shall be construed to prohibit the removal or transportation of any of the articles aforesaid from one port to another port within the

*Forfeiture on landing any of the said articles with intent to export them, &c.*

United States in any vessel having a license as a coasting vessel, the master, agent or owner of which shall have given bond with one or more sufficient sureties to the collector of the district from which such vessel is about to depart, in a sum double the value of such vessel and of such of the said articles as may be laden on board her, that the said articles shall be re-landed and delivered in some port of the United States.

<div style="float:left; width:20%;">Vessel exporting said articles liable to forfeiture, &c.</div>

SEC. 3. *And be it further enacted,* That if any of the articles aforesaid shall, contrary to the prohibitions of this act, be exported to any foreign country, the vessel in which the same shall have been exported together with her tackle, apparel and furniture, shall be liable to forfeiture, and the captain or master of such vessel shall forfeit and pay a sum not exceeding one thousand dollars.

<div style="float:left; width:20%;">Duty of custom-house officers herein.</div>

SEC. 4. *And be it further enacted,* That it shall be the duty of the custom-house officers, and of all persons employed in the collection of the revenue, to attend to the execution of this law, and all forfeitures and penalties incurred under it, shall be sued for, prosecuted, adjudged and distributed in like manner as is provided in the act, entitled "An act to provide more effectually for the collection of the duties imposed by law on goods, wares and merchandise imported into the United States, and on the tonnage of ships and vessels."

<div style="float:left; width:20%;">1790, ch. 35.</div>

<div style="float:left; width:20%;">Importation of brass cannon, muskets, &c. for two years free of duty.</div>

SEC. 5. *And be it further enacted,* That all brass cannon, muskets and firelocks with bayonets suited to the same, pistols, swords, cutlasses, musket ball, lead, and gunpowder which shall be imported into the United States from any foreign country within the term of one year, and all sulphur and saltpetre which shall be so imported within the term of two years from and after the passing of this act, shall be free of duty, any thing in any former law to the contrary notwithstanding.

APPROVED, May 22, 1794.

---

<div style="float:left; width:20%;">STATUTE I.

May 30, 1794.</div>

CHAP. XXXIV.—*An Act to continue in force the act for the relief of persons imprisoned for debt.*

<div style="float:left; width:20%;">[Expired.]
Act for relief of persons imprisoned for debt, continued for two years.
Act of May 5, 1792, ch. 29. Repealed 1796, ch. 38.</div>

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the act, entitled "An act for the relief of persons imprisoned for debt," be continued, and that the same be in force for the term of two years from the passing of this act, and from thence to the end of the next session of Congress and no longer.

APPROVED, May 30, 1794.

---

<div style="float:left; width:20%;">STATUTE I.

May 30, 1794.</div>

CHAP. XXXV.—*An Act to alter the time for the next annual meeting of Congress.*

<div style="float:left; width:20%;">[Obsolete.]
Congress to meet first Monday in Nov. next.</div>

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That after the adjournment of the present session, the next annual meeting of Congress shall be on the first Monday in November next.

APPROVED, May 30, 1794.

---

<div style="float:left; width:20%;">STATUTE I.

May 30, 1794.</div>

CHAP. XXXVI.—*An Act further extending the time for receiving on loan the Domestic Debt of the United States.*

<div style="float:left; width:20%;">[Obsolete.]
Domestic debt, term for subscribing extended to 31st Dec. 1794.
1793, ch. 26.
1795, ch. 13.</div>

SECTION 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the term for receiving on loan that part of the domestic debt of the United States which shall not have been subscribed in pursuance of the act, entituled "An act for extending the time for receiving on loan that part of the domestic debt of the United States which may not be subscribed

E

# ACTS OF THE FIFTH CONGRESS

OF THE

## UNITED STATES,

*Passed at the first session, which was begun and held at the City of Philadelphia, in the state of Pennsylvania, on Monday, the fifteenth day of May, 1797, and ended on the eighth of July, 1797.*

JOHN ADAMS, President; THOMAS JEFFERSON, Vice President of the United States, and President of the Senate; WILLIAM BRADFORD, President of the Senate pro tempore, from July 6th; JONATHAN DAYTON, Speaker of the House of Representatives.

## STATUTE I.

June 14, 1797.

Repealed by Act of April 20, 1818, ch. 83, sec. 12.

Citizens fitting out ships, or concerned therein, how punished and fined.

1794, ch. 50.

CHAPTER I.—*An Act to prevent citizens of the United States from Privateering against nations in amity with, or against citizens of the United States.*

SECTION 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That if any citizen or citizens of the United States shall, without the limits of the same, fit out and arm, or attempt to fit out and arm, or procure to be fitted out and armed, or shall knowingly aid or be concerned in the furnishing, fitting out or arming any private ship or vessel of war, with intent that such ship or vessel shall be employed to cruise or commit hostilities, upon the subjects, citizens or property of any prince or state with whom the United States are at peace, or upon the citizens of the United States, or their property, or shall take the command of, or enter on board of any such ship or vessel for the intent aforesaid, or shall purchase an interest in any vessel so fitted out and armed, with a view to share in the profits thereof, such person or persons so offending shall, on conviction thereof, be adjudged guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars, and imprisonment not exceeding ten years: And the trial for such offence, if committed without the limits of the United States, shall be in the district where the offender shall be apprehended or first brought.

Construction of this act.

SEC. 2. *And be it further enacted,* That nothing in the foregoing act shall be construed to prevent the prosecution or punishment of treason, or any piracy defined by a treaty or other law of the United States.

APPROVED, June 14, 1797.

STATUTE I.

June 14, 1797.

[Expired.]

Exportation of cannon, &c. unlawful until March 3, 1798.

Vessels.

CHAP. II.—*An Act prohibiting, for a limited time, the Exportation of Arms and Ammunition, and for encouraging the Importation thereof.*

SECTION 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That it shall not be lawful to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket-balls, lead, bombs, grenadoes, gunpowder, sulphur or saltpetre, but the exportation of all the aforesaid articles is hereby prohibited, until to the end of the next session of Congress, and no longer.

SEC. 2. *And be it further enacted,* That any of the aforesaid articles, excepting such of them as may constitute a part of the equipment of

520

any vessel, which during the continuance of this prohibition shall be found on board of any vessel in any river, port, bay or harbour within the territory of the United States, put on board with an intent to be exported from the United States, shall be forfeited, and in case the value thereof shall amount to one hundred dollars, the vessel on board of which the same shall be seized, together with her tackle, apparel and furniture, shall also be forfeited. *Provided nevertheless*, that nothing in this act shall be construed to prohibit the removal or transportation of any of the articles aforesaid from one port to another port within the United States, in any vessel having a license as a coasting vessel, the master, agent or owner of which shall have given bond, with one or more sufficient sureties, to the collector of the district from which such vessel is about to depart, in a sum double the value of such vessel and of such of the said articles as may be laden on board her, that the said articles shall be re-landed and delivered in some port of the United States. Or to prevent the exportation of any of the above articles on public account, under the direction of the President of the United States.

<div align="right"><em>Vessels exporting the same to be forfeited.</em></div>

<div align="right"><em>Prohibition not to extend to removal of such articles from one part of the United States to another.</em></div>

Sec. 3. *And be it further enacted*, That if any of the articles aforesaid shall, contrary to the prohibitions of this act, be exported from the United States, the vessel in which the same shall have been exported, together with her tackle, apparel and furniture, shall be forfeited, and the captain or master of such vessel, knowingly offending in the premises, shall be liable to indictment, and upon conviction shall forfeit and pay a sum not exceeding one thousand dollars; which shall be distributed in like manner as is herein after provided as to other forfeitures incurred under this act.

<div align="right"><em>Master of vessel shall be liable to indictment for violating this act.</em></div>

Sec. 4. *And be it further enacted*, That it shall be the duty of the custom-house officers, and of all persons employed in the collection of the revenue, to attend to the execution of this law, and all forfeitures and penalties incurred under it and not otherwise directed to be prosecuted and recovered, shall be sued for, prosecuted, adjudged and distributed in like manner as is provided in the act, entitled "An act to provide more effectually for the collection of the duties imposed by law on goods, wares and merchandise imported into the United States, and on the tonnage of ships and vessels."

<div align="right"><em>Duty of custom house officers herein.</em></div>

<div align="right"><em>Ante, p. 145.</em></div>

Sec. 5. *And be it further enacted*, That all brass cannon, muskets and firelocks with bayonets suited to the same, pistols, swords, cutlasses, musket-ball, lead, and gunpowder, which shall be imported into the United States from any foreign country, within the term of one year, and all sulphur and saltpetre which shall be so imported within the term of two years from and after the passing of this act, shall be free of duty; any thing in any former law to the contrary notwithstanding.

<div align="right"><em>Such articles may be imported free of duty.</em></div>

Approved, June 14, 1797.

———

<div align="right"><span style="font-variant:small-caps">Statute</span> I.</div>

<span style="font-variant:small-caps">Chap.</span> III.—*An Act to provide for the further Defence of the Ports and Harbors of the United States.*

<div align="right">June 23, 1797.</div>

Section 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That for fortifying certain ports and harbors of the United States, there be appropriated a sum not exceeding one hundred and fifteen thousand dollars.

<div align="right"><em>Appropriation of $115,000 for fortifying ports;</em></div>

<div align="right"><em>Post, p. 554.</em></div>

Sec. 2. *And be it further enacted*, That the said appropriation shall be paid and discharged out of the surplus of the revenue and income, beyond the appropriations heretofore charged thereon.

Sec. 3. *And be it further enacted*, That the President of the United States be, and he is hereby empowered to authorize any of the states which were found indebted to the United States in a settlement of the

2 x 2

F

FIFTH CONGRESS. Sess. II. Ch. 38. 1798.                   555

before appropriated, to make and complete, at the discretion of the President of the United States, the fortifications heretofore directed for certain ports and harbors, and to erect fortifications in any other place or places as the public safety shall require, in the opinion of the President of the United States; and which other fortifications he is hereby authorized to cause to be erected, under his direction from time to time as he shall judge necessary.

SEC. 2. *And be it further enacted,* That where any state, which was found indebted to the United States, by the report of the commissioners for settling the accounts between the United States, and the individual states, shall, with the approbation of the President of the United States, proceed to finish or complete any fortification heretofore commenced by such state, for the defence of any port or harbor within the same, or shall, under the direction of the President of the United States, make and erect any additional fortifications, pursuant to the act, intituled "An act to provide for the further defence of the ports and harbors within the United States," as well the previous expenditures made since the twentieth day of March, one thousand seven hundred and ninety-four, which shall be approved by the President of the United States, as the expenditures which have been, or which shall be directed by him, shall be allowed and credited to such state, on account of the balance found and reported, as aforesaid: *Provided,* that no expenditure exceeding the balance found and reported against the respective state, shall be allowed as aforesaid; and provided, that the fortifications for which the whole, or any part of the expenditure, shall be so allowed and credited as aforesaid, with their privileges and appurtenances, shall be, and shall be declared and established as the property of the United States, while maintained by them.

SEC. 3. *And be it further enacted,* That these words of the said act, intituled "An act for the further defence of the ports and harbors of the United States," that is to say, "Provided, the said states shall, and do cede to the United States, the lands or places on which such fortifications shall be so erected, in cases where the lands are the property of such states," shall be, and the same are hereby repealed.

APPROVED, May 3, 1798.

*margin notes:*
States erecting or completing fortifications to be credited on account of balances reported against them.

1797, ch. 3.

Proviso.

Part of former act repealed.
1797, ch. 3.

---

STATUTE II.

CHAP. XXXVIII.—*An Act to enable the President of the United States to procure Cannon, Arms and Ammunition, and for other purposes.*

SECTION 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That a sum not exceeding eight hundred thousand dollars, shall be, and hereby is appropriated, and shall and may be paid out of any monies not before appropriated, under the direction of the President of the United States, to purchase, as soon as may be, a sufficient number of cannon, also a supply of small arms, and of ammunition and military stores, to be deposited, and used, as will be most conducive to the public safety and defence, at the discretion of the President of the United States.

SEC. 2. *And be it further enacted,* That the President of the United States be, and he is hereby authorized, in case he shall find it impracticable, to procure by purchase, with certainty and dispatch proportionate to the necessities of the public service, the cannon and arms hereby required, and any considerable part thereof shall be likely to be deficient, to take, by lease, for a term of years, or by sale in fee, to the United States, one or more suitable place or places where cannon or small arms may be advantageously cast and manufactured, and shall and may there establish founderies and armouries for the manufacture of the same, respectively, and shall cause suitable artisans and laborers to be there

*margin notes:*
May 4, 1798.
[Obsolete.]
Appropriation to purchase cannon, small arms, &c.

President may establish founderies and armouries.

556                    FIFTH CONGRESS.  Sess. II. Ch. 39, 41, 42.  1798.

employed for account of the United States; and shall and may appoint one or more persons to superintend the said works, under the direction of the department of war. And an account of the expenditures which shall be incurred in forming and employing these establishments; and of the cannon and arms which shall be cast and manufactured therein respectively, shall be laid before the Congress of the United States at their next session, and annually thereafter, so long as the same shall be continued.

Accounts to be laid before Congress respecting the same.

Sec. 3. *And be it further enacted,* That the sum of one hundred thousand dollars shall be and hereby is appropriated, and shall be paid out of any monies not before appropriated, for the hire, purchase and employ of the said founderies and armouries, respectively, in case such establishments shall be found necessary, as hereinbefore provided.

Appropriation for the founderies and armouries.

Approved, May 4, 1798.

Statute II.

May 4, 1798.

[Obsolete.]

President may provide ten gallies.

Post, p. 561.

Chap. XXXIX.—*An Act to authorize the President of the United States to cause to be purchased, or built, a number of small vessels to be equipped as gallies, or otherwise.*

Section 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the President of the United States be, and he is hereby authorized, if the same shall appear to him necessary for the protection of the United States, to cause a number of small vessels, not exceeding ten to be built, or purchased, and to be fitted out, manned, armed and equipped as gallies, or otherwise, in the service of the United States, the officers and men to be on the same pay, and to receive the same subsistence, as officers of the same rank and men are entitled to, in the navy of the United States.

Officers may be appointed by the President in the recess—employment of the gallies.
Appropriation.

Sec. 2. *And be it further enacted,* That the said officers shall be appointed and commissioned by the President of the United States alone during the recess of the Senate; and the said gallies or vessels shall be stationed in such parts of the United States, as he may direct.

Sec. 3. *And be it further enacted,* That there be appropriated for the purpose aforesaid, the sum of eighty thousand dollars, out of any monies in the treasury not otherwise appropriated.

Approved, May 4, 1798.

Statute II.

May 8, 1798.

[Obsolete.]

Chap. XLI.—*An Act directing the payment of a detachment of Militia, for services performed in the year one thousand seven hundred and ninety-four, under Major James Ore.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the proper accounting officers be, and they are hereby authorized to settle the accounts of the militia who served on an expedition commanded by Major James Ore, against the lower Cherokee Indians, in the year one thousand seven hundred and ninety-four; and that the same be paid out of any monies in the treasury, not otherwise appropriated.

Approved, May 8, 1798.

Statute II.

May 8, 1798.

[Obsolete.]
Ante, p. 461.

Chap. XLII.—*An Act, to continue in force, a part of an act respecting the compensation to the Officers and Mariners of the Revenue Cutters.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the first section of an act passed the sixth day of May, one thousand seven hundred and ninety-six, intituled "An act making further provision relative to the revenue

G

# No. 72.

## FEBRUARY 27, 1809.

Read the first and second time, and committed to a committee of the whole House, to-morrow.

# A Bill

Prohibiting for a limited time the exportation of arms, ammunition, canvas, cordage and hemp, and for encouraging the importation thereof.



Sec. 1. *BE it enacted by the senate and house of representatives of the United States of America, in congress assembled,* That it shall not be lawful to export from the United States or from the territories thereof, any cannon, muskets, pistols, bayonets, swords, cutlasses, musket-balls, lead, bombs, grenadoes, gun-power, sulphur or salt-petre, canvas or sailduck of any description, commonly used for ships or vessels, cordage, cables, tarred or untarred yarns made of hemp, seine, sail or sewing twine, and sheet copper; but the exportation of the aforesaid articles is prohibited until to the end of the next session of congress, and no longer.

2

Sec. 2. *And be it further enacted*, That any of the aforesaid articles, excepting such of them as may constitute a part of the equipment of any vessel, which, during the continuance of this prohibition, shall be found on board of any vessel in any river, port, bay or harbor within the territory of the United States, put on board with an intent to be exported from the United States or the territories thereof, shall be forfeited, and in case the value thereof shall amount to one hundred dollars, the vessel on board of which the same shall be seized, together with her tackle, apparel and furniture, shall also be forfeited: *Provided nevertheless*, that nothing in this act shall be construed to prohibit the removal or transportation of any of the articles aforesaid, from one port to another port, within the United States, or the territories thereof, in any vessel having a license as a coasting vessel, (the master, agent or owner of which shall have given bond with one or more sufficient sureties to the collector of the district from which such vessel is about to depart, in a sum double the value of such vessel and of such the said articles as may be laden on board of her, that the said articles shall be re-landed and delivered in some port of the United States, or of the territories thereof.  Or to prevent the exportation of any of the above articles on public account under the direction of the president of the United States.)

Sec. 3. *And be it further enacted.* That if any of the articles aforesaid shall, contrary to the prohibitions of this act, be exported from the United States, or the territories thereof, the vessel in

3

which the same shall have been exported, together with her tackle, apparel and furniture, shall be forfeited, and the captain or master of such vessel knowingly offending in the premises, shall be liable to indictment, and upon conviction shall forfeit and pay a sum not exceeding one thousand dollars, which shall be distributed in like manner as is hereinafter provided as to other forfeitures incurred under this act.

Sec. 4. *And be it further enacted*, That it shall be the duty of the custom-house officers, and of all persons employed in the collection of the revenue, to attend to the execution of this law; and all forfeitures and penalties incurred under it, and not otherwise directed to be prosecuted and recovered, shall be sued for, prosecuted, adjudged and distributed in like manner as is provided in the act, intitled, " An act to provide more effectually for the collection of the duties imposed by law on goods, wares and merchandize imported into the United States, and on the tonnage of ships and vessels.

Sec. 5. *And be it further enacted*, That all brass cannon, muskets and firelocks with bayonets suited to the same, pistols, swords and cutlasses, which shall be imported into the United States, from any foreign country, within the term of one year from and after the passing of this act, shall be free of duty; any thing in any former law to the contrary notwithstanding.

H



John Adams Library,

IN THE CUSTODY OF THE
BOSTON PUBLIC LIBRARY.

SHELF N°
ADAMS
93.2

*John Adams*

# COMMENTARIES

## ON THE

# LAWS

### OF

# ENGLAND.

## BOOK THE FOURTH.

BY

WILLIAM BLACKSTONE, Esq.

SOLICITOR GENERAL TO HER MAJESTY.

THE FOURTH EDITION.

OXFORD,

PRINTED AT THE CLARENDON PRESS.

M. DCC. LXX.

*John Adams*

merly allowable to every perſon diſſeiſed, or turned out of poſ-
ſeſſion, unleſs his entry was taken away or barred by his own
neglect, or other circumſtances; which were explained more at
large in a former volume[1]. But this being found very prejudi-
cial to the public peace, it was thought neceſſary by ſeveral ſta-
tutes to reſtrain all perſons from the uſe of ſuch violent methods,
even of doing themſelves juſtice; and much more if they have
no juſtice in their claim[m]. So that the entry now allowed by
law is a peaceable one; that forbidden is ſuch as is carried on
and maintained with force, with violence, and unuſual weapons.
By the ſtatute 5 Ric. II. ſt. 1. c. 8. all forcible entries are puniſhed
with impriſonment and ranſom at the king's will. And by the
ſeveral ſtatutes of 15 Ric. II. c. 2. 8 Hen. VI. c. 9. 31 Eliz.
c. 11. and 21 Jac. I. c. 15. upon any forcible entry, or forcible
detainer after peaceable entry, into any lands, or benefices of the
church, one or more juſtices of the peace, taking ſufficient
power of the county, may go to the place, and there record the
force upon his own view, as in caſe of riots; and upon ſuch
conviction may commit the offender to gaol, till he makes fine
and ranſom to the king. And moreover the juſtice or juſtices
have power to ſummon a jury, to try the forcible entry or de-
tainer complained of: and, if the ſame be found by that jury,
then, beſides the fine on the offender, the juſtices ſhall make re-
ſtitution by the ſheriff of the poſſeſſion, without inquiring into
the merits of the title; for the force is the only thing to be
tried, puniſhed, and remedied by them: and the ſame may be
done by indictment at the general ſeſſions. But this proviſion
does not extend to ſuch as endeavour to maintain poſſeſſion by
force, where they themſelves, or their anceſtors, have been in
the peaceable enjoyment of the lands and tenements, for three
years immediately preceding.

9. T H E offence of *riding* or *going armed*, with dangerous or
unuſual weapons, is a crime againſt the public peace, by terri-
fying the good people of the land; and is particularly prohibited

[1] See Vol. III. pag. 174, &c.          [m] 1 Hawk. P. C. 141.

by

by the ftatute of Northampton, 2 Edw. III. c. 3. upon pain of forfeiture of the arms, and imprifonment during the king's pleafure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour [n].

10. SPREADING *falfe news*, to make difcord between the king and nobility, or concerning any great man of the realm, is punifhed by common law [o] with fine and imprifonment; which is confirmed by ftatutes Weftm. 1. 3 Edw. I. c. 34. 2 Ric. II. ft. 1. c. 5. and 12 Ric. II. c. 11.

11. FALSE and *pretended prophecies*, with intent to difturb the peace, are equally unlawful, and more penal; as they raife enthufiaftic jealoufies in the people, and terrify them with imaginary fears. They are therefore punifhed by our law, upon the fame principle that fpreading of public news of any kind, without communicating it firft to the magiftrate, was prohibited by the antient Gauls [p]. Such falfe and pretended prophecies were punifhed capitally by ftatute 1 Edw. VI. c. 12. which was repealed in the reign of queen Mary. And now by the ftatute 5 Eliz. c. 15. the penalty for the firft offence is a fine of 100*l*, and one year's imprifonment; for the fecond, forfeiture of all goods and chattels, and imprifonment during life.

12. BESIDES actual breaches of the peace, any thing that tends to provoke or excite others to break it, is an offence of the fame denomination. Therefore *challenges to fight*, either by word or letter, or to be the bearer of fuch challenge, are punifhable by fine and imprifonment, according to the circumftances of the offence [q]. If this challenge arifes on account of any mo-

[n] Pott. Antiqu. b. 1. c. 26.

[o] 2 Inft. 226.    3 Inft. 198.

[p] " Habent legibus fanctum, fi quis quid de " republica a finitimis rumore aut fama acceperit, " uti ad magiftratum deferat, neve cum alio " communicet: quod faepe homines temerarios " atque imperitos falfis rumoribus terreri, et " ad facinus impelli, et de fummis rebus confi- " lium capere, cognitum eft." Caef. de bell. Gall. lib. 6. cap. 19.

[q] 1 Hawk. P. C. 135. 138.

ney

Case 1:24-cv-00623-JLS-HKS     Document 77-6     Filed 04/27/26     Page 61 of 122



*John Adams*

# ARCHÆOLOGIA GRÆCA:

## OR, THE

# ANTIQUITIES

### OF

# GREECE.

---

### The FOURTH EDITION.

---

## By *JOHN POTTER*, D. D.
### now Lord Bishop of OXFORD.

---

## VOLUME the FIRST.

#### CONTAINING,

I. The CIVIL GOVERN- } II. The RELIGION of
MENT of *ATHENS.* } GREECE.

---

——— *Antiquam exquirite Matrem.* Virgil.
——— *Vos exemplaria Græca*
*Nocturna versate manu, versate diurna.* Horat.

---

## LONDON:

Printed by SAM. PALMER, for J. KNAPTON, R. KNAPLOCK,
J. and B. SPRINT, D. MIDWINTER, R. ROBINSON, W. TAY-
LOR, W. and J. INNYS, J. OSBORN, W. MEARS, A. WARD,
and J. BATEMAN.

MDCCXXII.

182 *Of the Civil Government of* Athens.

Calling, and honour'd with firſt Seats in all publick Places [h]. *One of So-* lon's *Laws.*

## Miſcellany Laws.

THEY ſhall be proſecuted for Ingratitude, who do not retaliate Kindneſſes [i].

The *Borough*, and Name of every one's Father ſhall be written down in all Deeds, Compacts, Suits, and other Concerns [k].

A Diſcoverer, who alledges Truth, ſhall be ſecure; but if Falſhood, ſhall ſuffer Death [l].

He ſhall be Ατιμℭ, who ſtands *Neuter* in any publick Sedition [m]. *This Law was enacted by* Solon, *to oblige every* Athenian *to promote the Wel- fare of the Commonwealth to his utmoſt.*

He ſhall die, who leaves the City for Reſidence in the *Piraeus* [n]. *This Law was enacted by* Solon *to prevent Diſcord amongſt the* Athenians.

He ſhall be fin'd who is ſeen to walk the City-ſtreets with a Sword by his Side, or having about him other Armour, unleſs in caſe of Exigen- cy [o]. *One of* Solon's *Laws. See* Book III. Chap. iv.

He ſhall be denied Burial within *Attica*, and his Goods expos'd to Sale, who hath been convicted of perfidious Behaviour towards the State, or of Sacrilege [p]. *See* Book I. Chap. iv.

He that hath betray'd his Country, ſhall not enter into *Attica's* Bor- ders; if he do, he ſhall expiate his Crime by the ſame Law, as they who, tho' condemn'd by the *Areopagites* to Baniſhment, return [q].

Thoſe Compacts ſhall ſtand good, which have been approv'd of by the *Judges* [r].

Let there be an *Amneſty* of all former Diſſenſions, and no one be lia- ble to be call'd in Queſtion, or reproach'd for any thing done formerly [s].

*This Law was made after the* thirty Tyrant's *Expulſion, to reconcile all former Quarrels, and was ſworn to by the* Archons, Senate of five hundred, *and all the* Commonalty *of* Athens.

When any Perſon is accus'd contrary to this Oath, uſe may be made of the Plea call'd πꝃαϟραϕη; the *Archons* ſhall have Cognizance of this Mat- ter, and he that makes the Plea, ſhall make his Defence firſt; the Party that is caſt, ſhall have the Fine call'd Επωϲελια impos'd upon him [t]. *This Law was enacted by* Archinus, *as a Security to the former.*

No Stranger ſhall be wrong'd or injur'd [u].

Put the bewildred Traveller in his Way, and be hoſpitable to Strangers [w].

No Seller of Rings ſhall keep by him the Signature of a Ring, when ſold [x]. *One of* Solon's *Laws.*

---

[h] *Lucianus Abdicato, Valerius Maximus,* lib. V. cap. 3.    [i] *Demoſth.* in *Bœotum.* [k] *Andocides de Myſteriis.*    [l] *Plutarchus Solone.*    [m] *Suidas.*    [n] *Lucian Ana- charſide.*    [o] *Xenophon* Ελληνικων, lib. I.    [p] *Dinarchus* in *Demoſiken.*    [q] *De- moſthenes Halones.*    [r] *Cicero, Philip.* I.    [s] *Lyſias* in *Cteſiphontem.*    [t] *Ando- cides* de *Myſteriis.*    [u] *Xenophon* Απομνημ, lib. II.    [w] *Cicero* de *Offic.* lib. III. [x] *Laertius Solone.*

J

# 𝕸emorials

OF

# LONDON AND LONDON LIFE,

IN THE

## XIIITH, XIVTH, AND XVTH CENTURIES,

BEING

## A SERIES OF EXTRACTS,

LOCAL, SOCIAL, AND POLITICAL,

### from the Early Archives of the City of London.

### A.D. 1276 — 1419;

London Corporation.

SELECTED, TRANSLATED, AND EDITED BY

## HENRY THOMAS RILEY, M.A.

OF CORPUS CHRISTI COLLEGE, CAMBRIDGE; AND OF THE INNER TEMPLE, BARRISTER-AT-LAW.

---

*PUBLISHED BY ORDER OF THE CORPORATION OF LONDON, UNDER THE SUPERINTENDENCE OF THE LIBRARY COMMITTEE.*

---

LONDON

## LONGMANS, GREEN, AND CO.

MDCCCLXVIII.

Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

" no way to omit.   Witness myself, at Westminster, the 28th day
" of July, in the 27th year of our reign in England, and in France
" the 14th."

———◆———

### Proclamation for keeping the peace within the City.

27 Edward III. A.D. 1353.   Letter-Book G. fol. x.   (Norman French.)

THIS proclamation was made on Thursday, the Feast of St. Peter's Chains [1 August], in the 27th year of the reign of King Edward the Third etc.—

" It is ordered that every hosteler and herbergeour, within the
" franchise of the City, shall cause his guests to be warned that
" they must leave their arms and armour in their hostels where they
" are lodging, in the keeping there of their hosts ; and if such hosts
" do not give such warning, and any one shall be found bearing
" arms or in armour, for default of such warning, the host of such
" person shall be punished by imprisonment and other penalty, at
" the discretion of the Mayor and Aldermen.

" Also,—that no alien shall go in armour, or shall carry sword,
" knife with point, or other arms, in the City, or in the suburb
" thereof; on pain of imprisonment, and of losing such arms and
" armour.

" Also,—that every person of the peace shall come in aid of the
" officers of the City, if need be, to arrest felons and other mis-
" doers, and such as shall be found contravening the cry aforesaid.
" And in the absence of the officers, every man of the peace shall
" have power to arrest such persons, and to bring them to the
" houses of the Sheriffs, that so due punishment may be inflicted
" upon them.

" Also,—that no one shall give maintenance, succour, prayer, or
" aid, to any person who is of bad covin or alliance, or accused of
" evil, on pain of forfeiting as much as he may forfeit, unto our
" Lord the King, and to the City.

" Also,—that no one shall hold an assemblage, within the City
" or without, for making covin, confederacy, or alliance ; nor yet
" shall make any collection of money in boxes, or in other manner,
" for the maintenance of his quarrels, or for exciting evil riots, on
" pain of imprisonment and of forfeiture, as before stated.

" Also,—that no one, on pain of imprisonment, shall be so
" daring as to go wandering about the City, or the suburb thereof,
" after the hour of curfew rung out at St. Martin's le Grand ; un-
" less he be a man of the City of good repute, or the servant of
" such, for some real cause, and that, with light.


Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

. " Also,—that no taverner or brewer shall keep the door of his
" tavern open after curfew rung out at St. Martin's le Grand afore-
" said, under the penalty thereon of old ordained."

————◇————

*Letter Testimonial from the Mayor, Aldermen, and Commonalty, to
the Pope, in behalf of Cesario, Bishop of Sancta Maria de Rosis.*

28 Edward III. A.D. 1354.   Letter-Book G. fol. xvii.   (Latin.)

LETTER sent to our Lord the [1]Pope, by Adam Fraunceys, Mayor,
the Aldermen, Sheriffs, and all the Commonalty, of the City of
London, in behalf of Cesario, Bishop of Sancta Maria de Rosis,
under Seal of the Mayoralty.—

" Most holy and most excellent Father and Lord.  Be it known
" unto your Holiness, that whereas the Reverend Father in Christ,
" and Lord, the Lord Cesario, by the grace of God, Bishop of
" Sancta Maria de Rosis, is a prelate sufficiently well learned in the
" pursuits of letters, descended of noble blood, devout, humble,
" virtuous, and exemplary in words and in manners, as unto all of
" us is truthfully known, and as from long experience we have
" learned : hence it is that, most devoutly recommending him to
" your most excellent Holiness, we do most humbly implore and
" entreat your Highness, that of your especial favour you will
" translate him to some other bishopric, and a more wealthy, seeing
" that from his own he cannot now obtain a sufficient maintenance,
" by reason of the poverty thereof ; or else that, for God's pity, it
" will please you to provide him with some benefice from which
" he may have a competent subsistence, and to grant, of your es-
" pecial favour, that if any persons, moved by piety, for the love
" of God, shall wish to confer the same upon him, he may accept
" of benefice and duties, both with cure and without cure, to the
" amount of 200 pounds sterling.  Most holy and most excellent
" Father and Lord, may Almighty God, of His most excelling pity,
" give you gracious and long life, and may He preserve you for the
" rule of His Holy Church, and of all people in Christendom.
" Amen."  *

————◇————

*Inquisition by Surgeons as to the treatment of a wound.*

28 Edward III. A.D. 1354.   Letter-Book G. fol. xviii.   (Latin.)

BE it remembered, that on the Monday next after the Feast of St.
Matthias the Apostle [24 February], in the 28th year etc., the

———
[1] Innocent the Sixth.

T

K

THE

# CRIMINAL STATUTES

OF

# ENGLAND;

ANALYSED, AND ARRANGED ALPHABETICALLY,

## With Notes.

———◆———

### By JOHN COLLYER, Esq.,

OF LINCOLN'S INN, BARRISTER AT LAW.

———◆———

*" Hoc spectant leges, hoc volunt; incolumem esse civium con-
junctionem: quam qui dirimunt, eos morte, exilio, vinclis,
damno coërcent."*—Cic.

══════════

*LONDON:*

PRINTED FOR S. SWEET, 3, CHANCERY LANE,
Law Bookseller & Publisher;
AND W. WRIGHTSON, BIRMINGHAM.

———

1832.

Digitized by Google

THE

# CRIMINAL STATUTES

OF

# ENGLAND;

ANALYSED, AND ARRANGED ALPHABETICALLY,

## With Notes.

BY JOHN COLLYER, ESQ.

OF LINCOLN'S INN, BARRISTER AT LAW.

" *Hoc spectant leges, hoc volunt; incolumem esse civium con-*
*junctionem: quam qui dirimunt, eos morte, exilio, vinclis,*
*damno cöercent.*"—Cic.

LONDON:

PRINTED FOR S. SWEET, 3, CHANCERY LANE,

Law Bookseller & Publisher;

AND R. MILLIKEN, GRAFTON STREET, DUBLIN

1828.

Digitized by Google

4          ACCESSORIES.—*Geo. 4, c. 64.*

specting the principal standing mute, &c. which are not now necessary. (See 7 & 8 *Geo.* 4, *c.* 28, *ss.* 2 & 3.) It may here be remarked, that if an act of Parliament enact an offence to be felony, though it mention nothing of accessories before or after, yet virtually and consequentially they that counsel or command the offence, are accessories before the fact, and they who knowingly receive the offender are accessories after. 1 *H. P. C.* 613. Receivers of stolen goods may be tried either as accessories, or for a substantive felony. (See *post,* tit. "*Receiving Stolen Goods.*")

## AFFRAY.

### 2 *Ed.* 3, *c.* 3.

Statute of Northampton.

Item, it is enacted, that no man, great nor small, of what condition soever he be, except the King's servants, in his presence, and his ministers, in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same, in such places where such acts happen, be so hardy to come before the King's justices, or other of the King's ministers, doing their office with force and arms, nor bring no force in affray of the peace, nor to go, nor ride armed at night, nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison, at the king's pleasure. And that the King's justices, in their presence, sheriffs, and other ministers, in their bailiwicks, lords of franchises, and their bailiffs in the same, and mayors, and bailiffs of cities and boroughs, within the same cities and boroughs, and borough-holders, constables, and wardens of the peace within their wards, shall have power to execute this act, And that the justices assigned, at their coming down into the country, shall have power to inquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertained to their office.

*Note.*—An affray is a public offence, to the terror of the king's subjects: 3 *Inst.* 158. It cometh of the French word *affrayer,* to affright; and therefore may be without word or *blow* given, and so is the word used in the statute of Northampton: *Cowell.* But it seems that, before that statute, a blow was necessary to constitute an affray. Lord Coke says, " albeit upon the single combat no death ensue nor blood drawn, yet the very combat for revenge is an affray, and is to be punished by fine and imprisonment," &c. 3 *Inst.* 158, which words would imply, that any thing less than a combat is not an affray for which a man can be indicted at common law.

### 7 *Ric.* 2, *c.* 13.

No man shall ride in harness within the realm, nor with launcegays.

Digitized by Google

### 20 *Ric.* 2, *c.* 1.

First, whereas, in a statute made the seventh year of the reign of the King that now is, it is ordained and assented, that no man shall ride armed within the realm, against the form of the statute of Northampton thereupon made, nor with launcegays within the same realm ; and that the said launcegays shall be utterly put out within the said realm, as a thing prohibited by the King, upon pain of forfeiture of the same launcegays, armours, or any other harness, in the hands and possession of them that bear them from henceforth, within the same realm, against the same statutes and ordinances, without the King's special license. Our Lord the King, considering the great clamour made to him in this present Parliament, because that the said statute is not holden, hath ordained and established in the said Parliament, that the said statutes shall be fully holden and kept, and duly executed, and that the said launcegays shall be clear put out, upon the pain contained in the said statute of Northampton, and also to make fine and ransom to the King. And, moreover, that no lord, knight, nor other, little nor great, shall go, nor ride by night nor by day armed, nor bear sallet nor skull of iron, nor of other armour, upon the pain aforesaid, save and except the King's officers and ministers in doing their office.

---

## ARSON.

### (See, also, tit. " Burning.")

### 7 & 8 *Geo.* 4, *c.* 30.

II. Be it enacted, that if any person shall unlawfully and maliciously set fire to any church or chapel, or to any chapel for the religious worship of persons dissenting from the united church of England and Ireland, duly registered or recorded ; or shall unlawfully and maliciously set fire to any house, stable, coach-house, outhouse, warehouse, office, shop, mill, malthouse, hop-oast, barn, or granary, or to any building or erection used in carrying on any trade or manufacture, or any branch thereof, whether the same, or any of them respectively, shall then be in the possession of the offender, or in the possession of any other person, with intent thereby to injure or defraud any person, every such offender shall be guilty of felony, and, being convicted thereof, shall suffer death as a felon.

*Setting fire to a church, chapel, house, or certain buildings.*

*Note.*—This enactment is founded chiefly on the 43 *Geo.* 3, *c.* 58, *s.* 1, which is repealed. The clause relating to churches and chapels is said to be new. Upon an indictment for arson at common law, it was necessary to prove, in addition to the actual burning, that the property in question came under the description of *domus*, and that it belonged to another person. The word *domus*, however, necessarily

Digitized by Google

L

THE

# Statutes at Large,

FROM THE

## Fifteenth Year of King EDWARD III.

TO THE

*0291*

## Thirteenth Year of King HEN. IV. incluſive.

To which is prefixed,

**A** TABLE containing the TITLES of all the STATUTES during that Period.

---

## VOL. II.

---

**By** DANBY PICKERING, of Gray's-Inn, Eſq;

Reader of the Law Lecture to that Honourable Society.

---

*CAMBRIDGE,*

Printed by JOSEPH BENTHAM, Printer to the UNIVERSITY; for CHARLES BATHURST, at the Crofs-Keys, oppoſite St.Dunſtan's Church in Fleet-Street, London.  1762.

*CUM PRIVILEGIO.*

464                    Anno fecundo Henrici IV.            [1400

## CAP. XIX.

*During three years, for no cloth whereof the dozen exceedeth
not 13 s. 4 d. any subsidy shall be paid, or shall be sealed.*

Ex edit. Raft.   ITEM, in eafe and relief of the poor common people of the
realm, our faid fovereign lord the King by the advice and af-
fent aforefaid, hath ordained and eftablifhed, That from the
feaft of Saint *Michael* laft paft, during three years then next fol-
Cloth.          lowing, no cloth of kerfey, *Kendal* cloth, frife of *Coventry, Cog-
ware*, nor none other cloth ftreit, nor remnant of *England*, nor
cloth of *Wales*, whereof the dozen exceed not the value of xiii.s.
9 H. 4. c. 2.   iiii.d. be in any wife fealed of no feal, little nor great, nor no fub-
7 Jac. 1. c. 16. fidy payed of the faid cloths during the time aforefaid.

## CAP. XX.

*The King's pardon of treafon, felony, outlawry, &c. to all
them that will purfue their charters before the feaft of
All Saints, with fome exceptions.*

Ex edit. Raft.   ITEM, at the inftance and prayer of the faid commons, by
their petition made in this prefent parliament: our faid fo-
vereign lord the King of his fpecial grace hath releafed and par-
Pardon.         doned generally to all his liege people of *England*, the fuit of
his peace that to him pertaineth for all manner of treafons and
felonies, by them done or committed before the xix. day of *No-
vember*, the firft year of his reign, except murder and rape of
women, whereof they be indited, arraigned or appealed: and alfo
the outlawries, if any in them be pronounced by the fame occa-
fion. And hath granted to them thereof his firm peace, fo that
none of his faid liege people be a common thief, before the faid
xix. day endited, nor that he be no pronour, nor appealed of
the death of any man at the fuit of the party, nor taken with the
manour, nor that he hath broken the King's prifon before the
faid xix. day, nor that he hath not been at the murder of *Thomas*,
late duke of *Gloucefter*, uncle to our fovereign lord the King, and
fo that he ftand to right in the King's court, if any will fpeak
againft him of the things aforefaid, or of any of them: fo that
always all they that will enjoy the benefit of this pardon, fhall
purfue their charters in fpecial betwixt this and feaft of All-
Saints next following.

---

## Statutes made at *Weftminfter, Anno* 2 HEN. IV. and *Anno Dom.* 1400.

AT *the parliament holden at
Weftminfter in the* Utas
*of St. Hillary, the fecond year of
the reign of King* HENRY *the
Fourth, the fame our lord the
King,*

AU parlement tenuz a
Weftm' en les octaves
de Seint Hiller lan du regne le
Roy HENRY le Quart puis le
conqueft fecond mefme noftre
feignur

le Roy del affent des ducs conts & barons & fpecialx inftance & re- es communes affemblez refent parlement ad fait ier & eftablir certeins : & ordinances en la qenfeut.

*King, by the affent of the prelates, dukes, earls, and barons, ánd at the fpecial inftance and requeft of the commons affembled at this prefent parliament, hath caufed to be ordained and ftablifhed certain ftatutes and ordinances in form following.*

## CAP. I.

*rmation of liberties. Each perfon may purfue the law, or defend it.*

nerement qe feinte ef- fe eit fes droitures & s & qe touz les feignurs elx & temporelx & toutz es burghs & villes en- fes eient & enjoient toutz ibertees & franchifes ils ont duement ufez ueux ils ont du grante nobles progenitours & :ffours Roys dEngleterre a Grande Chartre & la : de la Forefte & touz res bons ordinances & : faitz en fon temps & ps de fes nobles proge- nient repellez foient ient tenuz & gardez en )ointz & qe toutz fes ꝣ fubgitz purront fran- it & pefiblement & en : fauf proteſtion du luy venir a fes courtes a les loyes ou les defen- ز deftourbance ou im- nt de nully & qe pleine ꝣ droit foient faitz fibien eres come as riches en rtes avauntdites.

FIRST, That holy church have her rights and liberties; (2) and that all the lords fpiritual and temporal, and all the cities, boroughs, and towns enfranchifed, have and enjoy all their liberties and franchifes, which they have lawfully ufed, and which they have of the grant of his noble progenitors and predeceffors Kings of *England*; (3) and that the Great Charter, and the Charter of the Foreft, and all other good ordinances and ftatutes ma e in his time, and in the time of his noble progenitors, not repealed, be firmly holden and kept in all points: (4) and that all his liege people and fubjects may freely and peaceably in his fure and quiet protection go and come to his courts, to purfue the laws, or defend the fame, without difturbance or impediment of any: (5) and that full juftice and right be done, as well to the poor as to the rich, in his courts aforefaid.

The rights of the church, and of all other perfons, cities and boroughs confirmed, and all laws in force ratified.

Every perfon fhall be in peace, and juftice fhall be done.

1 Hi 4. c. 1.
7 H. 4. c. 1.

## CAP. II.

*ofition of part of the ftatute of 1 HEN. IV. c. 6. bing the mentioning of other gifts which a petitioner received of the King or his predeceffors.*

M, whereas in the laft parliament of our fovereign lord King that now is, amongft other things it was ordained. blifhed, That all they which from henceforth fhall de-

Ex edit. Raft.

Dd3                    mand

mais foulement de chofe thing done within the realm, but
fur la meer folonc ce qad only of a thing done upon the fea,
uement ufez en temps de according as it hath been duly ufed
Roy EDWARD Aiel le in the time of the noble King ED-
oi RICHARD noftre dit WARD, grandfather to the faid
ir le Roy voet & grante King RICHARD; (2) our faid
dit eftatut foit fermement lord the King will and grant-
& gardez & mys en due eth, That the faid ftatute be
tion. Et outre ce mefme firmly holden and kept, and
feignur le Roy de ladvis put in due execution. (3) And A remedy for
nt des feignurs efpirituelx moreover, the fame our lord him who is
mporelx & al prier des the King, by the advice and wrongfully
communes ad ordeignez affent of the lords fpiritual and purfued in the
abliz qe quant a peine temporal, and at the prayer of court of the
e fur ladmirall ou fon the faid commons, hath or- admiralty.
nant qe leftatut & la com- dained and ftablifhed, That as
loye foient tenuz devers touching a pain to be fet upon
k qe celuy qi foy fent the admiral, or his lieutenant,
encontre la fourme du that the ftatute and the com-
atut ait faction par brief mon law be holden againft
u fur le cas envers celuy them; (4) and that he that 5 Co. 106.
purfue en la courte de feeleth himfelf grieved againft Dyer, 159.
raltee & recoevre fes da- the form of the faid ftatute, Cro. Car.296,
s devers mefme le pur- fhall have his action by writ 603.
au double & encourge grounded upon the cafe againft 4 Mod. 176.
e le purfuant la peine de him that doth fo purfue in the 1 Salk. 31.
nvers le Roy pur la pur- admiral's court; (5) and re-
nfi faite fil foit atteint. cover his double damages a-
gainft the purfuant; (6) and
me purfuant fhall incur the pain of ten pounds to the
for the purfuit fo made, if he be attainted. Raft.23.

## CAP. XII.

*Certain reftraints laid on wholly born* Welfhmen.

M, it is ordained and eftablifhed, That from henceforth Ex edit.Raft.
Welfhman whole born in *Wales*, and having father and Welfhmen
r born in *Wales*, fhall purchafe lands and tenements born.
the town of *Chefter, Salop, Bridgenorth, Ludlow, Leominfter,*
rd, *Gloucefter, Worcefter,* nor other merchant towns join-
the marches of *Wales*, nor in the fuburbs of the fame,
pain of forfeiture of the fame lands, and tenements to the
of whom fuch lands or tenements be holden in chief. And
at no fuch *Welfhman* be from henceforth chofen or re-
to be citizen or burgefs in any city, borough or merchant
and that fuch *Welfhmen*, which now be in any fuch city,
gh, or franchifed town, being citizens or burgeffes, fhall
fficient furety, and put a good caution of their good bear-
s well towards our fovereign lord the King and his heirs
realm of *England*, as for to hold their loyalty to the go-
s of fuch cities, boroughs, or towns for the time being, in
on of the fame cities, boroughs, or towns; if the fame
Welfhmen

414        Anno fecundo HENRICI IV.      [1401.

*Welfhmen* will dwell therein, fo that none of them from henceforth be received nor accepted to no office of mayor, bailiff, chamberlain, conftable, or warden of the ports of the gaol, nor to the common council of fuch cities, boroughs or towns, nor that he be in no wife made other occupier or officer in the fame, nor that none of the faid *Welfhmen* from henceforth hear any manner of armour within fuch city, borough, or merchant town,

Repealed by   upon pain of forfeiture of the fame armour, and imprifonment
21 Jac. 1. c.28.   till they have made fine in his behalf.

## CAP. XIII.

*The effect of the pardon granted by ftat. 21 R. II. c. 15. rebearfed and confirmed, notwithftanding the refidue of the faid parliament is repealed.*

ITEM, whereas the faid *Richard* late King of *England*, at his parliament holden at *Weftminfter*, and adjourned towards *Salop*, the xxi. year of his reign, by a ftatute did pardon and releafe to all his liege people of *England*, of whatfoever eftate or condition they were, and to every of them all manner efcapes of felons, chattels of fugitives and of felons, trefpaffes, negligences, mifprifions, ignorances, and all other articles of the eyre, and all other things fallen or chanced within the realm of *England*, the punifhment whereof fhould lie in fine or in ranfom, or in other pecuniar pains, or otherwife imprifonment or amerciaments of the commons of towns or of fingular perfons, or in charge of their freehold, that never offended as heirs or landtenants, of efcheators, fheriffs, or coroners, or other fuch officers, and alfo hath pardoned and releafed to them all manner of gifts, alienations or purchafes made by them, or by any of them, of lands, tenements, or other poffeffions holden of him in chief without the King's licence, and all manner of entries made into their inheritances, purchafes, or otherwife in part or in all, after the death of their anceftors, or of any other, without fuit or due procefs thereof made, till the Thurfday the laft day of the faid parliament, except thofe lands, tenements, and poffeffions, which be aliened into Mortmain without the licence royal. And alfo hath wholly pardoned and releafed to them all manner of fines, amerciaments, iffues, forfeits not adjudged nor determined, made, fallen or chanced within the fame realm before the faid Thurfday: our faid fovereign lord the King, by the advice and affent of all the lords fpiritual and temporal, and at the fpecial requeft and prayer of the faid commons, will and

Pardon.   granteth, That all his liege people, and every of them, may have, ufe, and enjoy the privilege and benefit, of the faid pardon and ftatute, notwithftanding that the faid parliament, made the faid xxi. year, and all the ftatutes made in the fame, and all the circumftances and dependences of the fame parliament be utterly adnulled, revoked, and repealed in the parliament of our fovereign lord the King that now is, holden at *Weftminfter* the firft year of his reign.

CAP.

M

# THE

# Statutes at Large,

From the Firft Year of K. RICHARD III.

T O

The 31ft Year of K. HENRY VIII. inclufive.

B Y

DANBY PICKERING, of GRAY's INN, Efq;

Digitized by Google

# THE
# Statutes at Large,

### FROM THE

## First Year of King RICHARD III.

### TO THE

## Thirty-firft Year of King HENRY VIII. incluſive.

To which is prefixed,

A TABLE containing the TITLES of all the STATUTES
during that Period.

---

## VOL. IV.

---

## By DANBY PICKERING, of Gray's-Inn, Eſq;

Reader of the Law Lecture to that Honourable Society.

---

Printed by JOSEPH BENTHAM, Printer to the UNIVERSITY;
for CHARLES BATHURST, at the Crofs-Keys, oppoſite St. Dunſtan's
Church in Fleet-Street, London.  1763.

*CUM PRIVILEGIO.*

Digitized by Google

The penalty for transporting offenders into or forth of Wales at unlawful times.

upon *Severn* aforesaid, from henceforth do not convey, neither carry with any manner barge, boat or other vessel, any person or persons with horses, mares, oxen, kine or any other cattle, nor no other person or persons, before the time of the sun rising in the morning, and after the time of the sun being gone down at night, (5) upon pain of imprisonment and fine to be set on him that shall so convey or carry over any of the said passages over the said river of *Severn* out of *England* into *Wales* or the forest of *Dean*, or out of *Wales*, or the said forest of *Dean*, into *England*, unless the said passengers and every of them, have good knowledge of such person and persons and of their dwelling-places ; (6) and upon request to them made by any person or persons, to disclose the name and the dwelling-place of every such person or persons so by them conveyed over the said water, to any such person or persons requiring the same, if suit be made for and after them upon any outcry, huy or fresh suit, of or for any felony, robbery, murder and manslaughter, committed and done from henceforth.

Keepers of ferries shall be bound to transport no offenders at unlawful times.

II. And that the King's justices of the peace within every of the said counties of *Glocester* and *Somerset*, at their quarter-sessions, shall have full power and authority to call before them all such persons which hereafter shall keep any of the said passages, or any other ferry or passage over the said water into *Wales* or the said forest, or out of *Wales* or the said forest into *England*, and to bind them with sufficient sureties with them in recognizance in such sums of money as it shall seem to the discretion of the said justices of peace, that they and every of them, being passengers and keepers of ferries and passages as is aforesaid, from henceforth shall not, after the said times before limited and appointed, convey or carry, or cause to be conveyed or carried, any manner of person or persons or any kind of cattle, but such persons as they do know and will answer for, and know where their abidings, dwellings and habitations be, and upon request made to them, or any of them, as is abovesaid, shall from time to time disclose, as well the same person or persons, as the goods and chattels so passing the said passages, upon fresh suit made or hereafter to be made upon any felony, murder or robbery committed and done in the borders of the counties aforesaid, or in any other place within this realm or South-*Wales*.

## CAP. VI.
### *The bill concerning councils in* Wales.

Murders, felonies, &c. in Wales to be inquired of in the shires next adjoining, &c. Cro. Car. 331. Mod. cases in law 136. The long perseverance in wickedness of

*F*ORASMUCH *as the people of* Wales *and marches of the same, not dreading the good and wholsom laws and statutes of this realm, have of long time continued and persevered in perpetration and commission of divers and manifold thefts, murders, rebellions, wilful burnings of houses and other scelerous deeds and abominable malefacts, to the high displeasure of God, inquietation of the King's well-disposed subjects, and disturbance of the publick weal, which malefacts and scelerous deeds be so rooted and fixed in the same people, that they be not like to cease, unless some sharp correction and punishment for redress and amputa-*

*tion*

tion of the premisses be provided, according to the demerits of the offenders: (2) be it therefore enacted by the King our sovereign lord, and the lords spiritual and temporal, and the commons, in this parliament assembled, and by authority of the same, That all and singular person and persons dwelling or resiant within *Wales*, or in the lordships marchers of the same, from time to time, and at all times hereafter, upon such monition or warning given for the court to be kept in *Wales*, or in any of the lordships marchers aforesaid, as before this time hath been used, shall personally repair, resort and appear before the justice, steward, lieutenant or other officer, at all and every sessions, court and courts, to be holden before the same justice, steward or other officer, in any whatsoever castle, fortress or other place within *Wales*, or within the precincts, limits and jurisdictions of every the lordships marchers or seigniories aforesaid, or the marches of the same, as by the said justice, steward or other officer shall be appointed; (3) and then and there shall give his or their personal attendance, to do, execute and accomplish all and every thing and things which to him or them shall affere and appertain, upon pain of such fines, forfeitures and amerciaments as shall be affered, assessed and taxed by the justice, steward or other officer, to the King's use, if it be within any of the King's lordship's marchers; (4) and if it be within any other lordships marchers, then to the use of the lord of the said lordship marcher for the time being; (5) the said forfeitures and amerciaments to be levied, perceived and taken by way of distress of the goods and chattels of every person not appearing at the said court or courts, or not doing, executing or accomplishing his duty as is abovesaid.

*some lewd people in Wales, and the marches thereof. All persons shall appear, upon lawful summons given, before the justices in the courts in Wales.*

II. *And forasmuch as the officers in the lordships marchers in Wales have often and sundry times heretofore unlawfully exacted of the King's subjects within such lordships where they have had rule or authority, by many and sundry ways and means, and also committed them to strait duress and imprisonment for small and light feigned causes, and extorciously compelled them thereby to pay unto them fines for their redemptions, contrary to the law:* (2) therefore be it further enacted, That if any steward, lieutenant or any other officer of any lordship marcher, do feign, procure or imagine any untrue surmise against any person or persons that shall so give their personal attendance before them at such court or courts, and upon the same untrue surmise commit them to any duress or imprisonment, contrary to the law, or contrary to the true and laudable custom of that lordship, that then upon suit made unto the King's commissioners, or council of the marches for the time being, by any such person or persons so imprisoned, or by any of their friends, that then the same commissioners or council shall have full power and authority to send for such steward, lieutenant or officer, and also for the person or persons so imprisoned; (3) and if the same person or persons so imprisoned, can evidently prove before the said council, by good and substantial witness or otherwise, that his imprisonment was upon any feigned surmise, without cause reasonable or lawful, that

*Wrongs done by officers in lordships marchers.*

*Untrue surmises feigned against them which appear, to imprison them.*

then

**330**  Anno vicefimo fexto HENRICI VIII.  [1534.

then the fame commiffioners fhall have full power and authority to affefs the faid officer, to pay to the faid perfon or perfons wrongfully imprifoned, vi. s. viij. d. for every day of their imprifonment or more, by the difcretions of the faid commiffioners, according to the hurts and behaviour of the perfon or perfons imprifoned.

*The party's remedy a-gainft the officer which doth imprifon him upon feigned furmifes.*

III. And that the fame commiffioners fhall fet further fine upon the faid officer, to be paid to the King's ufe, as by their difcretions fhall be thought convenient; (2) and in cafe the fame officer do refufe to appear before the fame commiffioners incontinent after any commandment to them directed and delivered after any fuch complaint made to the fame commiffioners, that then the fame commiffioners fhall have full power and authority, upon every default made by any officer or officers, to affefs and fet upon every fuch officer or officers making default, fuch fine or fines to be levied to the King's ufe, as by their difcretions fhall be thought convenient; (3) and that the fame commiffioners fhall have full power and authority to compel the faid officer or officers by way of imprifonment, as well to pay fuch fines as fhall be fet and taxed upon them to the King's ufe, as to pay unto every perfon or perfons fo imprifoned, fuch fums of money as they fhall be feffed to pay for their wrong imprifonment.

*No weapon fhall be brought to courts, fairs or churches in Wales.*
*4 H. 4. c. 27 & 29.*

IV. And be it alfo enacted by authority aforefaid, That no perfon or perfons dwelling or refiant within *Wales* or the lordfhips marchers of the fame, of what eftate, degree or condition foever he or they be of, coming, reforting or repairing unto any feffions or court to be holden within *Wales*, or any lordfhips marchers of the fame, fhall bring or bear, or caufe to be brought or borne to the fame feffions or court, or to any place within the diftance of two miles from the fame feffions or court, nor to any town, church, fair, market or other congregation, except it be upon a hute or outcry made of any felony or robbery done or perpetrated, nor in the highways, in affray of the King's peace, or the King's liege people, any bill, long-bow, crofs-bow, hand-gun, fword, ftaff, dagger, halbert, morefpike, fpear or any other manner of weapon, privy coat or armour defenfive, (2) upon pain of forfeiture of the fame weapon, privy coat or armour, and to fuffer imprifonment and make fine and ranfom to the King's highnefs by the difcretion of the King's commiffioners of his marches for the time being, except it be by the commandment, licence or affent of the faid juftices, fteward or other officer, or of the commiffioners or council of the marches for the time being.

*None fhall levy any exactions, or commorths, or collections, or make games in Wales.*

V. And that no perfon or perfons from henceforth, without licence of the faid commiffioners in writing, fhall within *Wales*, or the marches of the fame, or in any fhires adjoining to the fame, require, procure, gather or levy any commorth, bydale, tenants ale, or other collection or exaction of goods, chattels, money, or any other thing, under colour of marrying, or fuffering of their children faying or finging their firft maffes or gofpels,

Digitized by Google

Case 1:24-cv-00623-JLS-HKS Document 77-6 Filed 04/27/26 Page 85 of 122

pels, of any priests or clerks, or for redemption of any murder, or any other felony, or for any other manner of cause, by what name or names soever they shall be called; (2) nor shall make or procure to be made any games of running, wrestling, leaping, or any other games, (the game of shooting only excepted and foreprised,) (3) upon pain of one whole year's imprisonment of every person or persons as shall gather, or procure to be gathered, any such collection or exaction, or shall make or procure to be made any games as is aforesaid; (4) and further, they and every of them shall make such fine as by the discretion of the King's commissioners of his marches shall be thought convenient: (5) and further, the said commissioners by this present act shall have power and authority to hear and determine the said offences by their examination; (6) and that no person or persons shall hereafter at any time cast any thing into any court within *Wales*, or in the lordships marchers of the same, by the mean or name of an arthel, by reason whereof the court may be letted, disturbed or discontinued for that time, upon pain of one whole year's imprisonment of any such person or persons as shall cast or cause to be cast any such arthel into any court or courts hereafter to be holden within *Wales* or the lordships marchers of the same; any custom before this time used to the contrary notwithstanding.

> No *arthel* shall be cast into any court.

VI. And that all sessions and courts hereafter to be holden within *Wales*, or the lordships marchers of the same, shall be kept within the most sure and peaceable place within the same lordship marcher, where the said justice, steward, or other officer shall appoint; (2) and for the punishment and speedy trials, as well of the counterfeiters of any coin current within this realm, washing, clipping or minishing of the same, as of all and singular felonies, murders, wilful burning of houses, manslaughters, robberies, burglaries, rapes and accessaries of the same, and other offences feloniously done, perpetrated and committed, or hereafter to be done, perpetrated and committed, within any lordship marcher of *Wales*: (3) be it enacted by the authority aforesaid, That the justices of the gaol-delivery and of the peace, and every of them for the time being, in the shire or shires of *England* where the King's writ runneth, next adjoining to the same lordship, marcher, or other places in *Wales*, where such counterfeiting, washing, clipping or minishing of any coin current within this realm, or murder hath been, or hereafter shall be committed or done, or where any other felonies or accessaries shall be hereafter committed, perpetrated or done, shall have from henceforth full power and authority at their sessions and gaol-delivery, to enquire by verdict of twelve men of the same shire or shires next adjoining within *England* where the King's writ runneth, there to cause all such counterfeiters, washers, clippers of money, felons, murderers and accessaries to the same, to be indicted according to the laws of this land, in like manner and form as if the same petit treasons, murders, felonies and accessaries to the same had been done, committed or perpetrated within any of the said shires

> All courts shall be kept within most sure places.

> Indictment in the next county for a felony committed within any lordship marcher. 27 H.8.c.26. 34 & 35H.8. c.26. Rex v. Athoe, Trin. 9 Geo.1. in B.R.

within

Digitized by Google

within the said realm, and also to hear, determine and judge the same, according to the laws of this realm.

**Acquittal in lordships marchers no bar.**

VII. And that all foreign pleas pleaded by any of the said malefactors and offenders, shall be tried and determined in the said shire or shires; (2) and that the acquittal or fine making for any of the causes aforesaid in any of the lordships marchers, shall be no bar for any person or persons, being indicted in the said shire or shires, within two years next after any such murder or felony done.

**Justices may award process unto lordships marchers.**

VIII. And further it is enacted, That the said justices of peace and gaol-delivery, and every of them, shall have full power and authority to award all manner of process as well of outlawry as otherwise, against all and every such offender and offenders so indicted in manner and form, and according to the customs and laws used and accustomed within this realm of

**A certificate of an outlawry to a lordship marcher, &c.**

*England*; (2) and that the said justices or two of them, afore whom any such offender shall happen to be outlawed, or attainted by outlagary, shall immediately upon the same outlagary or attainder, direct and send unto the King's officers of his lordships marchers or to their deputies, or unto the lord or lords marchers of the same lordship marcher or to his or their officer or officers or to their deputies, wherein such offence, murder or felony shall happen to be done, or where any such offender, murderer or felon shall happen to be resiant, a certificate under the seals of them or two of them, of any such outlagary or attainder; (3) commanding them and every of them by the same, under pain of forfeiture of a hundred pounds to the King, to be levied and perceived as well of the goods, chattels, lands and tenements of the same lord or lords marchers, as of the goods and chattels, lands and tenements of the King's officer there to apprehend and attach, or cause to be apprehended and attached, the body or bodies of the same offender or offenders so outlawed or attainted, and safely to keep, or cause to be kept, the same offender or offenders, till such convenient time before the next sessions of the King's justices of the gaol-delivery of the shire where such offender or offenders shall happen to be outlawed or attainted, as to the King's officers of his lordships marchers, or to their deputies, or unto the lord marcher or lords marchers of the same lordship marcher, or his or their officer or officers, or their deputies, where such offender or offenders shall be apprehended, attached, detained and kept, shall be thought expedient for the conveyance

**By what means an offender shall be conveyed from one lordship marcher to another.**

and conducting of the same offender or offenders, (4) in manner and form following, to be delivered from the King's officers or their deputies, or the lord marcher or the lords marchers, or his or their officer or officers, to other persons assigned by this act to receive and convey such offender or offenders, by indenture to be made between the deliverer or deliverers, and the receiver or receivers, that is to say, that the King's officers of his lordship marcher, or their deputies, or the lord or lords marchers of the lordship marcher, or his or their officer

or

Digitized by Google

or officers, or their deputies, where such offender or offenders shall be apprehended, attached, detained and kept, shall safely and surely conduct and convey, or cause to be conducted and conveyed, the same offender or offenders, to the next lordship marcher toward the shire where the same offender or offenders shall happen to be outlawed or attainted; (5) and that the King's officers of the same lordship marcher, or their deputies, or the lord or lords marchers of the same lordship marcher, or his or their officer or officers, or their deputies, shall receive, and safely and surely conduct and convey the same offender or offenders to the next lordship marcher; (6) and so the King's officers of every lordship marcher, or their deputies, or the lord or lords marchers of the same lordship, or his or their officer or officers, or their deputies, to receive, conduct and convey safely and surely, every such offender or offenders from one lordship marcher to another lordship marcher, by indenture, as is aforesaid, unto the time that such offender or offenders shall be safely delivered before the said justices of the gaol-delivery; (7) upon pain of forfeiture by every of the King's officer or lord marcher, by whose default the same offender or offenders shall ne may not appear before the same justices at their said sessions, there to stand and abide the order of the King's laws, C. li. to be levied and perceived of the goods and chattels, lands and tenements of the same officer or lord, to the King's use.

IX. And that all and every officer and officers, lord and lords, or other persons to whom any certificate shall be directed as is abovesaid, shall at the next sessions and gaol-delivery to be holden after the apprehension or attachment of such offender or offenders, return the same certificate in due form, and what he or they have done in that behalf, upon the pain aforesaid; (2) saving alway to all and every offender and offenders, all and singular traverses, challenges, exceptions, advantages, and all other pleas, to, of, and upon the outlawry pronounced or promulged against the same offender or offenders, in manner and form as is and hath been used and accustomed by the laws of this realm for any the King's subjects dwelling within the same realm.

*The officer shall return his precept.*

*All advantages saved to the offenders.*

X. Provided always, and be it enacted by the authority aforesaid, That if any person or persons which shall happen hereafter to be indicted, outlawed, arraigned, convicted or attainted by force of this act, do find such sufficient sureties before the King's justices of the gaol-delivery as by their discretions shall be thought convenient, that the same person or persons shall not from thenceforth commit nor do any felony, murder or felonious offence, nor be accessary to any felony, murder or felonious offence, but at all times from thenceforth shall be of good behaviour against the King our sovereign lord, his heirs and successors, his and their laws and subjects, that then the same justices of gaol-delivery for the time being, with and by the assent, consent and agreement of the lord president,

*An offender attainted of any felony, upon surety found of his good behaviour, may be discharged. See 34 & 35 H.8.c.26. f. 100.*

and

and two of the King's commissioners, or council of the marches for the time being, or three of them at the least, whereof the lord president, or one of the said council, to be one, shall and may by their discretions, for one time only, admit any such offender to a certain fine or sum of money on him by them to be assessed and taxed, to be surely paid to the King's use; (2) and shall have full power and authority, by this present act, to discharge any such offender or offenders, so arraigned, outlawed, convicted and attainted of all and every such felony, murder or felonious offence and accessaries of the same, and of all executions and punishments of death, which the same offender or offenders should suffer by the common laws of this realm, so that the same offender or offenders stand not appealed of the said felony, murder or felonious offence, or as accessaries of the same offences, at the time of his said discharge; (3) and that every such offender so discharged, as is abovesaid, shall be for the said offence or offences done within any of the King's lordships marchers, or any other lordships marchers, discharged as well against the King's highness, his heirs and successors, as against all other lords marchers, for one time only.

**No liberties of lord marcher shall be abridged.**
XI. Provided alway, and be it enacted by the authority aforesaid, That this present act, or any thing therein contained, shall not extend ne take place to abridge, deprive, or minorate any liberties, privilege or authority of any lords marchers heretofore granted to the same lord, or lawfully used or accustomed by the said lord or any of his ancestors, unless the foresaid offenders happen to be indicted, outlawed, arraigned, convicted or attainted by force of this act, as is abovesaid, within two years next after such murder or other felonious offence perpetrated, done, or committed within the said lordships marchers, or any of them; any thing in this present act before rehearsed to the contrary notwithstanding.

**Where felonies committed in Merioneth in Wales shall be enquired of, heard and determined. Repealed by 8 El. c. 20.**
XII. And furthermore be it enacted by the authority aforesaid, That all murders, robberies, felonies and accessaries of the same, which shall happen hereafter to be done, perpetrated or committed, within the shire of Merioneth in Wales, shall and may be from henceforth enquired, heard and determined in the counties of Carnarvon or Anglesey, before the King's justice of North Wales, or his deputy for the time being, by verdict or inquest to be taken by the inhabitants of the same shires of Carnarvon or Anglesey, or otherwise, if by the discretion of the justice there, or his deputy, it shall be thought convenient: (2) and that the same justice, or his deputy for the time being, shall have full power and authority by his discretion, by force of this present act, to hear and determine all and every the aforesaid murders, felonies, robberies and accessaries, in form aforesaid.

XIII. *And where heretofore upon divers murders, robberies and felonies perpetrated and done, as well within the lordships marchers of Wales, as in other places of Wales without the same lordships, the offenders divers times flee and escape from the same lordship or other place*

place where such offence was committed, and have repaired and re-sorted into another lordship marcher, and there by the aid, comfort and favour of the said lord of the same lordship, or his officer or officers, have been abiding and resiant, into the which lordships the same lords marchers have and do pretend a custom and privilege, that none of the King's ministers or subjects may enter to pursue, apprehend and attach any such offender thereunto repaired, as is aforesaid, by reason whereof the same offenders went unpunished, to the animation and encouraging of other evil-disposed people: (2) it is therefore enacted by the authority abovesaid, That every officer and officers, and their deputies, upon commandment given by the commissioners or council of the marches for the time being, shall bring, send or deliver every such offender to the officer of the lordship marcher, or other place, where any such offence is or shall be committed or done, upon the metes and bounds of the said lordships, or to the said commissioners or council, according as to the said officers by them shall be commanded under pain of xl. li. the said commandment or commission to be directed to any such officer, to be sent, conveyed and delivered by a serjeant at arms, or a pursuivant, attendant on the said council in the marches for the time being.

*Where and to whom any offender taken in Wales shall be delivered.*

## C A P. VII.

### The bill for the highways in the county of Sussex.

WHERE it is ordained and enacted by authority of this present parliament heretofore holden at London the fifteenth day of April in the fourteenth year of the King's most noble reign, and from thence adjourned to Westminster the last day of July the fifteenth year of his reign, and there holden; in consideration that many common ways in the Weld of Kent be so deep and noyous by wearing and course of water, and other occasions, that people cannot have their passages and carriages by horses upon or by the same, but to their great pains, perils and jeopardy; (2) that if any person or persons from that time, in any place within the said Weld of the said county, of his good mind and disposition, without any value of good by him or by them to be received for the same, will, for the common weal of the King's people, assign and lay out a more commodious way in and over the lands thereunto adjoining, whereof the person or persons, or other to his use, shall be seised of fee in estate of inheritance, that the same new way, so to be assigned and laid out, by oversight and assent of two justices of the peace of the said county, and twelve other discreet men within the same hundred inhabiting, where any such new way shall be limited and laid out, or inhabiting within the same hundred, and other hundreds to the said hundred next adjoining, shall be from thenceforth holden, occupied and used in like manner as the said old way there now is, or before hath been; (3) and that also the same person or persons so disposed, willing and accomplishing, shall and may, for the same new way, so assigned and used, receive and hold, in way of recompense for the same new way so to be given, the soil and ground of the old way in severalty to them their heirs and assigns,

*Highways in Sussex shall be amended. 14 & 15 H. 8. c.6.*

*Any person may lay out a new way in his own ground in the Weld of Kent by the consent of two justices of peace, &c. and keep several the old.*

N

# By the Queene.

  

*A Proclamation against the common vſe of Dagges, Handgunnes, Harquebuzes, Calliuers, and Cotes of Defence.*

He Queenes Maieſtie, being informed credibly from ſundrie partes of the Realme, that her former commaundements, contained in her Proclamations heretofore publiſhed for the prohibiting of the common carying of Dagges, Piſtolles, and ſuch other ſhort pieces of ſhot accoꝛ ding to the Actes of Parliament remaining of force, haue not bene by ſuch publike Officers in Shires, Townes, and other publike places duely executed, as by the ſaide proclamations was oꝛdꝛed, but haue in a generalitie bene neglected, and ſo the diſoꝛder growne ſo great in common carying of Dagges, Piſtolles, and ſuch like, not onely in Cities and Townes, and in all partes of the Realme in common high waies, whereby her Maieſties good quyet people, deſirous to liue in peaceable maner, are in feare and daunger of their liues to trauel abꝛoade for their neceſſarie buſineſſe, by meanes of the multitude of the euil diſpoſed, who contrary to the Lawes and her Maieſties proclamations do ſo commonly cary ſuch offenſiue weapons, being in time of peace onely meete for theeues, robbers & murderers: Whereupon her Maieſtie by the aduice of her Counſel, and vpon the general complaint made of the multitude of her peaceable people, doeth giue ſtreight charge to all maner officers, to whom the execution of the former proclamations did apperteine, that immediatly vpon the publication hereof, they do with ſpeede take oꝛdꝛ how the contents of the foreſaid proclamations may be ſpeedily put in due execution. And to that end her Maieſtie chargeth all Maioꝛs, Shiriues, Bailiffes, and other head Officers of Cities and townes coꝛpoꝛate, and all Juſtices of Peace within all Counties and other places hauing any ſpeciall liberties, that they do aſſemble them ſelues in ſome accuſtomꝛd places, and there to ſet downe certaine oꝛder, and appoynt ſpeciall miniſters, not onely to enquire of the default of the execution of the foreſaide Proclamations, but alſo to proceede duely to the execution thereof.

And furthermoꝛe, where her Maieſtie vnderſtandeth that beſides the enoꝛmities growne by lacke of execution of the ſayd Proclamations againſt the common vſage of Dagges and Piſtolles, there is an other greater diſoꝛder growne of common carying abꝛoade both in Townes and Fields, of great Pieces, as Harquebuſes, Calliuers and ſuch like, vnder colour of learning oꝛ exerciſing to ſhoote therein, to the ſeruice at Muſters appoynted in ſundꝛie Counties for the common ſeruice of the Realme, (a matter to be in good ſoꝛte fauoured, but not to be miſuſed) by which meanes, thꝛough the generall carying of them in places not appoynted for ſuch muſters, and by the frequent ſhooting with them in and neere Cities, Townes coꝛpoꝛate, oꝛ the Suburbes thereof where great multitude of people do liue, reſide, and trauaile vp and downe for their neceſſarie buſineſſe, many harmes do enſue, and occaſions like to encreaſe of great danger, by ſuch libertie permitted for the vſe of ſuche offenſiue weapons in places not conuenient. For theſe conſiderations, and foꝛ the conſequences of ſundꝛie miſchieues that may enſue, her Maieſtie by like aduice of her Counſell, doth commaunde and charge all maner her ſubiects of what eſtate ſo euer they be, from hencefoꝛth to foꝛbeare frō ſhooting in any maner of Handgunnes, Harquebuzes, Calliuers, oꝛ ſuch like, of what name ſo euer they be,

214

...in any place, but onely at and in the places that are, or shalbe appointed for common Musters, by the direction of the Commissioners for generall Musters, or els at and in such places as are, or shall be appointed to be meete places, either within great Cities or the Suburbes of the same, or in places farre of from Townes of habitation, for the exercise of Shooting in such pieces as is aforesayde, and for the learning to shoote in the same places. And that no such Piece be charged with Shot or Powder, but at, or in the same place so limited for Musters, or for exercise of Shooting. And if any persons being Artificers, makers of such Pieces in any place, shall haue cause to trie such pieces, either for the satisfaction of them selues, or of any that shall desire to buy the same, the triall thereof shall also be at the sayde places so limited, and at none other. And if any person shall hereafter attempt the contrary to the breache of these her Highnesses commaundementes, that the same shalbe committed to prison, by any Officer hauing charge to see the keeping of the Peace, or being any principall or chiefe Officer within any of the sayde Cities or Townes corporate, there to remaine by the space of two Monethes at the least. And the Piece and Shot so misused, to be seased and kept, and sent to any of her Maiesties Officers of Ordinance or Castels where any Ordinance is kept, that shalbe next to the same place, there to remaine. And vpon any seconde Offence to be committed to close prison, and there to remaine vntill the same shalbe expressely bailed by commaundement of her Maiestie, or of sixe of her priuie Counsell.

Furthermore, her Maiestie in like sort commaundeth, that no maner of Person shall vse any Shooting in any such small Pieces, within two myles of any house where her Maiestie shall reside, during the time of her Maiesties residing, vpon like paine as before is expressed. And to that ende her Maiestie chargeth her Purseuchal of her house, to be carefull by him selfe and his Ministers, to see the due obseruation thereof. And if he shall finde any to offende therein, not onely to commit the same to prison, but also to aduertise her Maiestie, or her priuie Counsell thereof, that some furder extraordinarie punishment may be extended vpon such audacious persons, as shall aduenture to offend so neere to the place, where her Maiesties person shalbe.

And where as diuers of late yeres haue vsed to weare priuie Cotes, and Doublets of defence, therby intending to quarrell, and make frayes vpon other vnarmed, and presume audaciously to apparell them selues with the said priuie Armour, not onely in Cities, Townes, and publike assemblie, but within her Maiesties Court wheresoeuer, to the great offence & contempt of her Highnes, and of her Lawes, and to the hurt of diuers her Maiesties good subiects. Therfore her Maiestie doth expressely prohibite & forbid all and euery of her subiects whatsoeuer, the wearing of any such priuie or secret kinde of Cote, or Doublet of Defence. And further her Maiesties expresse pleasure is, that all her Justices of peace, Maiors, Sheriffes, Bailiffes, Constables, and other her Maiesties Officers whatsoeuer, shall and may lawfully apprehend and arrest all such persons, as shall offend contrary to the Tenour of this Proclamation in that behalfe. And the said persons so apprehended, shall, and may lawfully commit to the next prison and gaole, where they shalbe so arrested, there to remaine without baile or mainprise, vntill there shalbe direction giuen from her Maiesties priuie Counsel. And the same priuie Cotes or Doublets to be taken from them, and sent to the Sheriffe of the shire for the time being, to be by him kept vntill her Maiestie shall otherwise dispose of the same. And the partie so offending to be fined at her Highnesse will and pleasure.

Finally, also her Maiestie farther chargeth all maner Officers in Cities, Townes and other places, to make searche for all maner small Dagges, called pocket Dagges, as well in any mans house to be suspected for the same, as in the Shoppes and Houses of Artificers that do vse to make the same: And all them shall sease and take into their custodie, deliuering a Bil of their handes, testifying the receipt thereof, to the intent the owners may haue such recompence for the same, as hereafter vpon Certificate to her Maiesties priuie Counsel, or to the Presidents and Counsels in Wales and in the North partes, shalbe thought requisite. And herewith her Maiestie commaundeth, that no maner of person shall hereafter either make or amende, or shall bring into this Realme any such Dagges, commonly called pocket Dagges, or such like, vpon paine of imprisonment, as next aboue is expressed. And wheresoeuer there are any persons that haue made any small Shot, the same shalbe bounde in reasonable summes to her Maiesties vse, by the discretion of the principall Officers of the Towne, not to make nor put to Sale, or otherwise to vtter any such smal Pieces as are commonly called pocket Dagges, or that may be hid in any Pocket, or like place about a mans body, to be hid or caried couertly.

And for execution of all the contentes of this Proclamation, her Maiestie chargeth all her Officers, that either in Liberties or without, haue any authoritie to enquire of the breache of her Maiesties peace, to assemble them selues presently, and so monethly betwene this and Christmas next. And there by a Jurie of sufficient persons to be sworne, or by other ministers to be by them deputed, to enquire of the obseruation of all the poyntes herein contained.

Giuen at our Manour of Greenewich, the xxvi. day of July in the xxi. yeere of our reigne.

God saue the Queene.

## Imprinted in London at Bacon house by Christopher Barker,

### Printer to the Queenes Maiestie.

Anno 1579.



# The Country Justice:

CONTAINING THE

# PRACTICE

OF THE

## Justices of the Peace,

As well I N, as O U T of the

# SESSIONS.

GATHERED

For the better help of Such JUSTICES of Peace,
as have not been much conversant in the Study of the
L A W S of this R E A L M.

## By MICHAEL DALTON of Lincolns-Inn, *Esq*; *And One of the Masters in* Chancery.

To which is now added,

An Abridgment (under proper Titles) of all S T A T U T E S
relating thereunto, to the Dissolution of the Parliament 5 *Jan*. 1715.

A Large TABLE of the Principal Matters herein contain'd;

W I T H

Two other TABLES, one of the CHAPTERS in this Book;
And the other of such ACTS of Parliament, as concern the Office of a
J U S T I C E of P E A C E.

With Variety of Useful PRECEDENTS relating thereunto.

*Justice is the Staff of Peace, and the Maintenance of Honour.* Cic.

*L O N D O N,*
Printed for JOHN WALTHOE in the *Middle-Temple* Cloisters, and at
his Shop in *Stafford.* 1715.

S
UK
997.7
DAL

Every Justice of Peace (in his own discretion, and *ex officio*) may bind all such to the Peace as in his presence shall strike another, or shall threaten to hurt another, or shall contend only in hot words. *Vide tit. Sureties for the Peace.*

P. Just. 173
10 H. 7. 20
Cromp.
154.

If any person be dangerously hurt in any Affray (or otherwise,) every Justice of Peace, within the year and day after such hurt, may commit to the Gaol such Offender, there to remain until the day and year be expired, or that the said Offenders shall find Sureties to appear at the next General Gaol Delivery, to answer to the Felony, if the party hurt, happen to die within a year after the hurt. *Vide Stat.* 3 *H.7. c.1. And by God's Law, Exod. 21.* 18, 19. *If the party happen to recover, the Offender shall pay to the party hurt for losing his time, and also for his healing.*

§. 7.
*Dangerous hurt.*

But where the hurt shall be dangerous, or wound mortal, although the Justice may bail the offender, living the party so hurt; yet it shall be better discretion for the Justice to commit the offender to the Gaol, there to remain, until there shall appear some good hope of recovery in the other: And so Sir *Nicholas Hyde* advised at *Cam.* Lent Assizes, *An.* 5 *Car. Regis.*

*And by the Stat.* de officio Coronatoris 3 *or* 4 *E.* 1. *upon Appeal of Wounds, and such like, especially if the Wounds be mortal, the parties appealed shall be taken immediately, and kept till it be known perfectly whether the party hurt shall recover or not; and if he die, the Offender shall be kept; and if he recover, he shall be attached by four or six Pledges, as the wound is great or small: And if it be for a maim, the Offender shall find no less than four Pledges; if it be for a small wound or maim, two Pledges shall suffice.*

5 H. 7. 6.
Br. Faux.
imp. 41.

If an Affray or Assault shall be made upon a Justice of Peace or a Constable, they may not only defend themselves, but may also apprehend and commit the Offenders, until they have found Sureties for the Peace: The Justice of Peace may presently cause them to be arrested, and carried before another Justice, who may send them to the Gaol: And the Constable must commit them to the Stocks for the present, and after carry them before a Justice of Peace, or to the Gaol. *Vide hic postea.*

## CHAP. IX.
### *Armour.*

2 E. 3 c. 3.
P. 1.
7 R. 2. 13.
20 R. 2.
c. 1.

IF any person shall ride or go armed offensively before the King's Justices, or any other the King's Officers or Ministers doing their Office, or in Fairs, Markets or elsewhere, (by night or by day) in Affray of the King's People, (Sheriff, and other the King's Officers) and every Justice of Peace (upon his own view, or upon complaint thereof) may cause them to be staid and arrested, and may bind all such to the Peace or Good Behaviour, (or, for want of Sureties may commit them to the Gaol:) And the said Justice of Peace (as also every Constable) may seize and take away their Armour and other Weapons, and shall cause them to be apprised, and answered to the King as aforesaid. And this the Justice of Peace may do by the first *Assignavimus* in the Commission. See hereof *antea.*

§. 1.

*One Justice.*

Lam. Offic.
of a Const.
13.

So of such as shall carry any Guns, Daggs or Pistols that be charged, or that shall go apparelled with privy Coats or Doublets, the Justice may cause them to find Sureties for the Peace, and may take away such Weapons, &c. *Vide tit. Surety for the Peace.*

2 E. 3 c. 3.
Co. 5. 72.
20 R 2. 1.

And yet the King's Servants in his presence, and Sheriffs, and their Officers, and other the King's Ministers, and such as be in their company assisting them in executing the King's Process, or otherwise in executing of

§. 2.

E                                                                     their

their Office, and all others in pursuing Hue and Cry, where any Felony or other Offences against the Peace be done, may lawfully bear Armour or Weapons.

Also it seemeth that any Justice of Peace may command that Weapons be taken from such Prisoners as at any time shall be brought before him. [12 R. 2. 2.]

Also if any Servant to Husbandry, or to any Artificer, or Victualler, or any Labourer, shall bear any Buckler, Sword or Dagger, except they be travelling with their Master, or in their Masters message) it seemeth every Justice of Peace may imprison them till they have found Sureties for the Peace, and may seize and take away their said Weapons, (or may cause the Constable to seize the same as forfeit) and present the said Weapons at the next Sessions of the Peace. But this Statute seemeth now to be repealed by the Statute made 21 *Jac.* 28.

*And yet, by the first* Assignavimus *in the Commission, the Justice of Peace may do it, especially if he suspect any breach of the Peace to be intended by them.* Vide Addenda. [12 R. 2. 6. P. 2.]

## CHAP. X.
### *Barrator.*

§. 1.

BArrator *cometh from the French* Barrat, id est, astutia, *and in that Tongue betokeneth a Deceiver. In our Law a Barrator is a common Wrangler that setteth Men at odds, and is himself never quiet, but at Braul with one or other. Dr.* Cow *&* Minsh.

Every Justice of Peace (upon his discretion) may bind to the Peace or Good Behaviour, such as are common Barrators. [9 E. 4. 5. Lamb. 79.]

Also a common Barrator is he who is either a common Mover and Stirrer up (or Maintainer) of Suits in Law in any Court, or else of Quarrels or parties in the Country. *Co. L.* 368. [Co. 8. 36. 9 E. 4. 3. a.]

§. 2.
*In Courts.*

As if in any Court of Record, County Court, Hundred, or other inferior Courts, any person by fraud or malice under colour of Law, shall themselves maintain (or stir up others unto) multiplicity of unjust and feigned Suits or Informations (upon penal Laws,) or shall maliciously purchase a special *Supplicavit* of the Peace, to force the other party to yield him Composition; all such are Barrators.

§. 3.
*In the Country.*

In the Country; and these are of three sorts.

1. Disturbers of the Peace, *viz.* such as are either common Quarrellers or Fighters in their own cause; or common Movers or Maintainers of Quarrels and Affrays between others.

2. Common Takers or Detainers (by force or subtily) of the possessions of houses, lands or goods, which have been in question or controversies.

3. Inventers and Sowers of false Reports, whereby discord ariseth, or may arise between Neighbours. All these are Barrators. [Co. 8. 36.]

*Tea, if one be* Communis Seminator litium, *he is a Barrator.* West Indict. 75, 76.

*Or if any Man of himself be* Communis oppressor vicinorum, *(a common Oppressor of, or Wrangler with, his Neighbour or others) either by unjust or wrangling Suits, or other oppressions or deceits, he is a Barrator.*

*Or if one be* Communis Pacis perturbator, Calumniator, & Malefactor *he is a Barrator.* Crom. 257.

§. 4.

But all such persons must be common Barrators, *sc.* not in one or two, but in many causes. [Co. 8. 32.]

*A Feme covert cannot be indicted of Common Barretry, and an Indictment against one for that offence was quasht.* T. 16 Jac. Rolls, Rep. part. 2. p. 39.

1. *A*

P

| | |
|---|---|
| **From:** | Belka, Ryan |
| **To:** | Nicolas Rotsko |
| **Cc:** | Sasiadek, Christopher; Shoemaker, Bo; zacharynelson@monroecounty.gov |
| **Subject:** | Expert Disclosure; 24-cv-00623-JLS-HKS Heeter et al v. James et a |
| **Date:** | Sunday, August 31, 2025 10:56:00 AM |
| **Attachments:** | Dr. Dennis Baron.pdf |
| | Dr. Benjamin L. Carp.pdf |
| | Michael S. Foreman.pdf |
| | Dr. Jaclyn Schildkraut.pdf |

Nick,

Pursuant to the Civil Procedure Rule 26(a)(E)(2), State Defendants disclose the following experts: Dr. Dennis Baron, Dr. Benjamin Carp, Michael Foreman and Dr. Jacklyn Schildkraut. Copies of all reports are attached. Note that certain pages have been intentionally omitted from two exhibits attached to the report of Jacklyn Schildkraut – those portions are available for review and inclusion should you deem them necessary. However, as you will see, they were simply omitted to avoid publicly proliferating the irrelevant portions of the gross and racist musing of the Buffalo mass shooter.

Due to the holiday on September 1, 2025, these reports will be mailed to all parties the following day, September 2, 2025.

Ryan

Ryan L. Belka
Assistant Attorney General
Office of the Attorney General
Buffalo Regional Office
Main Place Tower, Suite 300A
350 Main Street
Buffalo, New York 14202
T: 716.853.8440
F: 716.853.8571

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BENJAMIN HEETER, JOSEPH WURTENBERG,
and FIREARMS POLICY COALITION, INC.,

Plaintiffs,

vs.

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York;
STEVEN G. JAMES, in his official capacity as
Superintendent of the New York State Police;
MICHAEL J. KEANE, in his official capacity as
Acting District Attorney for Erie County, New
York, and SANDRA DOORLEY, in her official
capacity as District Attorney for Monroe County,
New York,

Defendants.

Case No. 24-CV-00623-JLS-HKS

---

## DECLARATION OF MICHAEL S. FOREMAN

Expert;       Chief Michael Foreman, (Retired)
              3684 Watercrest Drive
              Longwood, Florida 32779

1

## EXPERT'S BACKGROUND AND EXPERIENCE

My name is Michael S. Foreman, and I am a retired Chief from the Orange County Sheriff's Office, Orlando, Florida. I am currently employed by Point Blank Enterprises Inc.

I have an associate's degree in criminal justice, a graduate of Florida Senior Leadership Program and have received over 5,000 hours of law enforcement training.

I have over 40 years' experience in the field of law enforcement, as a police officer, deputy sheriff, supervisor, manager and command staff member. During my law enforcement career I worked in uniform patrol, K-9, vice and narcotics, criminal investigations, gang investigations, drug interdiction, and SWAT. My law enforcement management experience includes uniform patrol, specialized patrol, narcotics, gang investigations, training, accreditation, and support services. I have been involved in the field of special weapons and tactics for 24 years as an operator, sniper, team leader, commander and trainer. My expertise includes practical experience where I have supervised and commanded over 1,200 tactical operations. I have been involved in law enforcement education and training, as an instructor, and as Training Commander for an agency with over 2,200 employees. I have served on a number of committees both locally and nationally representing law enforcement training needs in tactical operations, currently serving as a Director Emeritus for the National Tactical Officers Association and past President of the Florida SWAT Association. My duties at the Orange County Sheriff's office included that of chairman of the tactical event review committee, which purpose is to review all shootings and significant law enforcement tactical events. I also served as policy review chairman for an agency that is accredited both internationally and at the State level. I also served as Chairman of Special Operations, Region 5 Florida Regional Domestic Security. My effective date of retirement from the Orange County Sheriff's Office was January 4th, 2004.

I have been a consultant, lecturer and trainer at various colleges, police academies, and law enforcement agencies throughout the United States, Canada, South America, Caribbean, and Europe. I have trained over 3,000 officers in law enforcement related subjects and law enforcement tactics. I have been qualified to testify as an expert in State and Federal Courts based upon my education, training, and employment experiences.

2

**Expert Testimony**

- United States vs. Kenneth Barrett, Muskogee, OK, 2005

    - United States *v.* Barrett (6:04-cr-00115) District Court, E.D. Oklahoma
    - Two counts felony murder Kenneth Barrett
    - Retained by the United States Attorney's Office

- McCray vs. City of Ft. Lauderdale, 2006

    - United States District Court Southern District of Florida, case No.: 05-60315-Civ-Ungaro-Benages/Brown, Sheila McCray, Plaintiff vs. City of Fort Lauderdale, Officers of Fort Lauderdale Police Department
    - Retained by; Billing, Cochran, Heath, Lyles, Mauro and Anderson, P.A. (Ft. Lauderdale)

- Otero vs. Broward County Sheriff's Office, 2007

    - Aldo Otero v. City of Cooper City, Broward County and Broward County Sheriff's Office Case Number 07-61151 CIV-COHN/Seltzer
    - Retained by; Billing, Cochran, Heath, Lyles, Mauro and Anderson, P.A. (Ft. Lauderdale)

- Whittier vs. City of Sunrise Police Department, 2008

    - Whittier v. City of Sunrise, Florida, Case Number 07-60476 CIV-DIMITROULEAS/ROSENBAUM
    - Retained by; Johnson, Anselmo, Murdoch, Burke, Piper & McDuff, P.A. (Ft. Lauderdale)

- Estate of Seraphin vs. Broward County Sheriff's Office, 2011

    - Estate of Kirby Seraphin v. Broward County Sheriff's Office et, al., Circuit Court of the 17th Judicial Circuit, Broward County case no. 06-14799(09)
    - Retained by: Haliczer, Pettis, and Schwamm Attorney at Law

- Michael Brayshaw vs. Broward County Sheriff's Office, 2012

    - Michael Brayshaw v. Broward County Sheriff's Office, et al. United States District Court Southern Division of Florida Case Number 11-cv-62128-ZLOCH/ROSENBAUM
    - Retained by: Haliczer, Pettis, and Schwamm Attorney at Law

- Javier Pita vs. North Miami Beach Police, 2014
    - Javier Pita and Vida Pita v. City of North Miami Beach, Florida et.al., United States District Court Southern Division of Florida Case Number 13-23682-Civil-Moore
    - Retained by: : Haliczer, Pettis, and Schwamm Attorney at Law

3

I have not been retained as expert witness during the past 4 years. I have not published any articles in the past ten years.

I have been requested to review materials, documents and circumstances involving tactical operations, the use of force, and deadly force for law enforcement agencies during my career.

### Independent Reviews Conducted

- Independent Review of the World Trade Organization Conference November 29 – December 3, 1999
  - Date of Report: July 2000

- Independent Review of the Hamilton County Sheriff's Office, Chattanooga, TN
  - Date of Report: November 2001

- Independent Review of the United States Capitol Police, Washington, D.C.
  - Date of Report: November 2003

- Independent Review of the West Monroe Police Department Tactical Unit, West Monroe, LA
  - Date of Report: November 2004

- Department of Justice Office of the Inspector General, Review of the FBI HRT Shooting in Puerto Rico, September 2005. Expert consultant to the Department of Justice.
  - Date of Report: June 2006

**I, Michael S. Foreman, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct.**

Since December 3rd, 2003, I have been employed by Point Blank Enterprises, the parent company of Point Blank Body Armor, Paraclete, Productive Products, and The Protective Group manufacturers of personal protective equipment including soft and hard armor products. Point Blank Enterprises is the world's largest manufacturer of body amor and the primary provider of body armor to American law enforcement. We also provide body armor to the U.S. military, corrections, security personnel, and other qualified persons. I am currently Executive Vice President of Global Business Development.

I am being compensated by the New York State Attorney General's Office in the amount of $300 per hour for the review of materials and written report. Should depositions be required or courtroom testimony the rate of pay is $500 per hour.

4

I have reviewed the following materials for preparation of this report:

1.  First Amended Complaint; Civil Action No.: 1:24-cv-00623-JLS
    James Heeter and Firearms Policy Coalition v New York State Attorney General's
    Office, et al.

**Evolution of Modern Day Body Armor**

Modern day use of soft body armor has evolved from early experiments with silk to the advanced, lightweight materials used today.  The discovery of Kevlar in the 1960s revolutionized soft body armor, leading to the modern, concealable vests used by law enforcement and the military today. The 1960s saw the start of research into lightweight, effective body armor materials, leading to the development of Kevlar in the 1970s. This DuPont invention significantly advanced soft body armor, enabling the production of concealable vests with improved ballistic protection.

Today, soft body armor is made from materials like Kevlar, Twaron, Dyneema, and Spectra and other high-performance fibers, providing a range of protection levels for law enforcement, military personnel, and other qualifying persons. Advancements in ultra-high-molecular-weight polyethylene materials such as Dyneema and Spectra over the past decade has resulted in ultra-light weight high performing body armor being used by law enforcement and military today.

The development of body armor is driven by the ongoing need to provide personal protection from increasingly sophisticated ballistic threats while balancing factors like weight, comfort, and mobility. Modern body armor development focuses on creating lightweight, durable, and flexible materials that offer high levels of protection without hindering the wearer's movement. Research continues to improve the ballistic performance, weight, and comfort of these materials.

5

**American Law Enforcement and Body Armor**

Law enforcement today is comprised of more than 750,000 state and local law enforcement officers from approximately 18,000 law enforcement agencies, 137,000 Federal law enforcement officers, and 400,000 correctional officers. Generally, all law enforcement officers are issued body armor today and most law enforcement agencies have a mandatory wear policy. In many jurisdictions, body armor mandatory wear policies exist for law enforcement and security personnel, often requiring officers to wear approved body armor during specific duties. These policies aim to enhance officer safety and are often linked to funding programs like the Body Armor Program (BVP). The specifics of these policies, including the type of armor required, when it must be worn, and maintenance procedures, are detailed in the policy itself. Unfortunately, not all corrections officers are issued body armor, and it is difficult to estimate the number of body armor vests provided to correctional officers.

According to the Bureau of Labor Statistics, there were approximately 1.2 million security guards employed in 2023. Not all security guards carry guns. In fact, most security guards are unarmed and rely on observation, communication, and non-lethal methods to deter crime and maintain order. Armed security guards, on the other hand, are specifically trained and authorized to carry firearms, typically in situations requiring a higher level of security. While there are some security guards that are issued body armor, many others acquire body armor through personal purchases. It is difficult to estimate the number of security guards that possess body armor for the performance of their duties.

Body armor is not universally restricted from civilian purchase, but certain restrictions  and regulations exist due to concerns about public safety and potential misuse. Federal law prohibits convicted felons from owning body armor, and some states have additional restrictions on who can purchase or possess it. Most states

6

prohibit the wearing of body armor while committing certain crimes and provide enhanced sentencing, potentially leading to longer sentences upon conviction. Additionally, many manufacturers and retailers choose not to sell to the public, prioritizing sales to law enforcement and other eligible professions.

**New York Law**

New York currently has enhanced laws for using body armor during a crime. As June 6th, 2022 New York State Executive Law Section 144-a state that only people acting under eligible professions may purchase, own, or possess body armor which defined in New York Penal Code 270.20 as "any product that is a personal protective body covering intended to protect against gunfire, regardless of whether such product is to be worn alone or is sold as a complement to another product or garment. People attempting to order body armor will need to provide proof that they qualify as an eligible professional by submitting a professional license issue by a federal, state, or local government, employment card or other credential issued by an employer, or in absence of the foregoing, submission to the seller of a form approved by the Department of State that is notarized, verifying that the purchaser is engaged in an eligible profession.

**The Past Decade and the Body Armor Industry**

Modern day body armor was developed to protect the protectors, military personnel and law enforcement officers. Body armor can be made to stop several types of threats, such as bullets, fragmentation, knives and needles, or a combination of different threats. The U.S. body armor market generated a revenue of approximately $790 million in 2023.

The leaders in body armor development and body armor sold in the United States over the past decade include the following companies.

- Point Blank Body Armor
- Safariland Group
- Armor Express
- Slate Solutions

7

- Hardwire

The overwhelming majority of the revenue generated from U.S. body armor sales is done so by these top five companies. This revenue is generated from both soft armor and hard armor sales to law enforcement and the military. These companies represent the leaders in the U.S. body armor market today. It is not the practice of the leading body armor manufacturers to sell to non-qualifying professionals. Their market share and revenue are based on their commitment to protecting the protectors, which are the law enforcement officers and military personnel who protect our freedom, quality of life, and ensure the safety of our communities.

Point Blank Enterprises and the Safariland Group dominate the law enforcement sales in soft armor with the traditional concealable vests or outer-carrier systems which have become popular in the U.S. today. Slate Solutions and Hardwire have been successful winning awards with the U.S. military, but lesser success with law enforcement. Point Blank Enterprises is one of the few companies which has enjoyed success in both the law enforcement and military markets with soft and hard armor products. Leading Technology Corporation (LTC) is one of the leaders in the hard armor market but does not offer soft armor solutions.

If revenue was the only factor that drove the decision making process when determining to whom body armor was sold to then the results could be very different. The body armor industry and the manufacturers listed previously should be recognized for their dedicated commitment to officer safety. I have spoken to team members and executives from these leading armor companies, and it is not their practice to sell to civilians or non-qualifying people.

**"Aaron Salter, Jr. Responsible Body Armor Possession Act" and the F.O.P**

May 14th, 2025, the U.S. House of Representatives introduced H.R. 3398, the "Aaron Salter, Jr. Responsible Body Armor Possession Act." This bill shall make it unlawful for a person to purchase, own, or possess enhanced body armor except for qualifying

8

individuals as defined in the bill. The safety of law enforcement and our communities is the objective.

On May 29th, 2025, Patrick Yoes the National President of the National Fraternal Order of Police wrote a letter to the House of Representatives Timothy M Kennedy and Henry C. Johnson on the behalf of the 377,000 members of the Fraternal Order of Police supporting the objectives of H.R. bill 3398. The letter stated the following.

"In mass casualty incidents involving active shooters motivated by ideology, assailants often use anti-ballistic armor to protect themselves from law enforcement's armed response, enabling them to inflict more death and injury on the public at large. This was the case at a mass shooting in Buffalo in 2022, when a gunman in body armor attacked Black patrons at a local supermarket.  Aaron Salter, Jr., the retired law enforcement officer for whom this legislation  is named, shot the attacker but his shots did not penetrate the body armor and Salter was killed. His heroism that day will not be forgotten.

Under current law, felons are prohibited from possessing, purchasing, or owning body armor and Federal sentencing guidelines provide for a sentencing enhancement if body armor is used in the commission of a felony. However, those without violent felony convictions like the shooter in Buffalo, and the cop-killer who targeted and killed five police officers in Dallas in 2016, were able to access anti-ballistic armor.

The legislation you have introduced would bar civilians from purchasing, owning, or possessing enhanced body armor with ballistic resistance that meets or exceeds the RF1 standard, per the National Institute of Justice (NIJ). We support the policy objective, but we are concerned that that bona fide, non-governmental law enforcement agencies like the CSX Transportation Police Department and other railroad police officers who protect our railroads, as well as private universities with fully sworn law enforcement officers, may be prohibited from obtaining this equipment.

9

On behalf of the more than 377,000 members of the Fraternal Order of Police, thank you both for your leadership on this legislation. If I can provide any additional information or support for this effort, please do not hesitate to contact me or Executive Director Jim Pasco in our Washington, D.C. office."

This letter identifies a non-governmental law enforcement agency like the  CSX Transportation Police Department and other railroad police officers, as well as private universities with fully sworn law enforcement officers. This is an example where qualified professionals can be added to the list of exceptions of qualifying professionals. The New York State law allows for the addition of qualifying professionals in the future as required.

**Law Enforcement Safety and Trends**

Law enforcement safety and the safety of our communities should be the priority for everyone. In 2023, the FBI designated 48 shootings as active shooter incidents. Although incidents decreased by 4% from 2022 (50 incidents), the number of active shooter incidents increased by 60% since 2019 (30 incidents).

Key findings in the 49 active shooter incidents reviewed included.
- There were 244 casualties (105 killed and 139 wounded).
- Two law enforcement officers were killed and 12 were wounded.
- In the incident with the highest number of casualties (31), 18 were killed and 13 wounded.
- In the 48 incidents, 60 firearms were used by shooters, 43 handguns, 16 rifles, and one shotgun.
- There were 49 shooters in the 48 incidents.
- Of the 49 shooters, five wore body armor (10%).

The number of law enforcement professionals nationwide who died in the line of duty in 2024 increased 25% compared to the previous year, according to preliminary data provided by the National Law Enforcement Officers Memorial Fund (NLEOMF), the

10

leading authority on officer fatalities. As reported in their official 2024 End-of-Year Preliminary Law Enforcement Officers Fatalities Report, the NLEOMF data shows that 147 federal, state, county, municipal, military, tribal, and campus officers have died in the line of duty in 2024, representing a 25% increase compared to the 118 officers who died in the line of duty in 2023.

The leading cause of these line-of-duty deaths for police officers in 2024 was gunfire, and the largest increase over 2023 resulted from traffic-related incidents, both underscoring the growing risks faced by law enforcement officers in the line of duty. Using and reporting on this data allows us to highlight the continuing dangers faced by our law enforcement professionals, particularly the number of officers who are shot and killed each year.

The National Fraternal Order of Police reports there have been 166 officers shot in the line of duty during the first six months of 2025. The total number of officers shot year to date is down 14% from 2024. Of the 166 officers shot by end of June 30, 2025, 21 were killed. That figure is down 22% from 2024 year to date. A total of 36 of the 2025 year-to-date shootings were characterized as "ambush" attacks by FOP. During these ambushes 45 officers were shot. Out of the 45, eight officers were killed.

## Conclusion; Find More Ways to Protect Law Enforcement

Whenever possible the objectives of our laws should focus on the safety of our communities and the safety of the law enforcement professionals. Restrictions on the sale and possession of body armor are an essential element in the steps necessary to protect those who serve. My experience in law enforcement has shown me that the criminals who possess body armor have done so in a planned manner that would give them hope that they might survive a shootout and/or incite them to refuse to surrender. This mindset of the criminal enhances the threat to law enforcement. Law enforcement today faces far too many threats to their safety without making it easier to obtain body armor for non-qualifying individuals.

11

Most body armor sales by the top body armor companies in America are generated from the sales to law enforcement, the military, and other qualified professionals. These top companies have chosen to make it their practice to only sell to qualifying professionals. These top body armor companies sell armor that is certified by the National Institute of Justice which guarantees the quality and standard that the body armor is manufactured too.

Online sales and marketing efforts targeting civilian or non-qualified people are not done so by the top body armor companies in America today. The top body armor companies like Point Blank Enterprises, Safariland Group, Armor Express, Slate Solutions, and Hardwire in America are all committed to officer safety. The companies that are targeting civilian body armor are not focused on the safety of our law enforcement community. A significant amount of body armor being sold to non-qualifying persons is body armor that is not certified to any standard, in many cases not made in America, made overseas with the content of the ballistic panel being unknown. This sub-standard body armor offered could place the end user in danger when faced with imminent threat from a firearm or other weapon.

The top body armor companies in America voluntarily produce body armor that comply with the National Institute of Justice Standards for Body Armor. The current NIJ standard is the Ballistic Resistance of Body Armor, standard 0101.06. An updated standard from the NIJ has been published, 0101.07. It is anticipated that body armor manufactured and certified to the new standard will be released in the second half of 2026. Law enforcement in America today purchases body armor that is certified to the NIJ standard to provide the finest lifesaving products available. The leading body armor companies are investing millions of dollars to meet the latest standard, while striving to reduce weight and increase performance.

The leading body armor companies in America today make it their practice of selling their armor to qualified professionals voluntarily. While they could sell to most anyone legally in most states, and they choose not to. This decision is one positive step forward in our efforts to protect U.S. law enforcement.

These findings and opinions are based on my 30 years of law enforcement experience and 21 years of experience in the body armor industry. I regularly interact with law enforcement officers in the United States, attend law enforcement conferences, and trade shows for the body armor industry. I interact on a regular basis with our competitors in the body amor armor industry who produce  90%  of the body armor worn in the United States today. These interactions include discussion regarding body armor standards, end-user requirements, and efforts to enhance law enforcement safety. We share a common goal, which is to "Save Lives." Since the introduction of body armor thousands of law enforcement officers have been saved by their body armor and it is our mission to save even more.

Date:         August 14, 2025

Location:     3684 Watercrest Dr.
              Longwood, FL 32779

Michael Foreman

13

Q

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BENJAMIN HEETER, et al.

               Plaintiffs,

      v.

LETITIA JAMES, et al.

               Defendants.

_____

**NOTICE OF DEPOSITION**

Civil Action No.:

1:24-cv-00623-JLS

PLEASE TAKE NOTICE that, in accordance with Fed. R. Civ. P. 30 and Loc. R. Civ. P. 30, testimony upon oral deposition will be taken of Michael S. Foreman, before a court reporter duly authorized to administer oaths.  The deposition will take place remotely via videoconference at Fluet & Associates, PLLC, 1751 Pinnacle Drive, Suite 1000, Tysons, VA 22102 and be recorded by stenographic, audio, video, and/or real-time transcription means, beginning at 10:00 a.m., EST on Thursday, December 18, 2025, and continuing from day to day thereafter until the examination is completed.

Dated:  McLean, Virginia
        November 17, 2025

                         FLUET

                         By: */s/ Nicolas J. Rotsko*
                            Nicolas J. Rotsko, Esq.

                         *Attorneys for Plaintiffs*
                         1751 Pinnacle Drive
                         Suite 1000
                         Tysons, VA 22102
                         T: (703) 590-1234
                         F: (703) 590-0366
                         nrotsko@fluet.law

R



(703) 590-1234 Tel
(703) 590-0366 Fax

1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
www.fluet.law

**VIA ELECTRONIC MAIL AND USPS FIRST CLASS MAIL**        January 31, 2025

Ryan L. Belka
Assistant Attorney General, of Counsel
350 Main Street
Main Place Tower, Suite 300A
Buffalo, New York 14202
(716) 853-8440
Ryan.Belka@ag.ny.gov

James P. Youngs
Erica L. Masler
100 Madison Street
1800 AXA Tower I
Syracuse, New York 13202
Tel.: (315) 565-4500
jyoungs@hancocklaw.com
emasler@hancocklaw.com

Christopher J. Sasiadek
Assistant County Attorney, of Counsel
95 Franklin Street, Room 1634
Buffalo, New York 14202
(716) 858-2200
christopher.sasiadek@erie.gov

Robert J. Shoemaker
Deputy County Attorney
307 County Office Building
39 West Main Street, Rochester, New York 1
Telephone: 585-753-1472
boshoemaker@monroecounty.gov

> Re:    *Heeter et al. v. James et al.* | **Case No. 1:24-cv-623-JLS:  Plaintiffs' Initial Disclosures**

Counsel:

On behalf of Plaintiffs Benjamin Heeter, Mark Braiman, Joseph Wurtenberg, and Firearms Policy Coalition, Inc., in the above-referenced matter, I have enclosed copies of Plaintiffs' Initial Disclosures.

Respectfully submitted,

Nicolas J. Rotsko, Esq.
**Fluet**
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
nrotsko@fluet.law

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BENJAMIN HEETER, et al.,

                                   Plaintiffs,

          v.

LETITIA JAMES, et al.,

                                   Defendants.

_____

**PLAINTIFFS' INITIAL DISCLOSURES**

Civil Action No.:

1:24-cv-00623-JLS-HKS

## PLAINTIFFS' F.R.C.P. 26(a)(1) INITIAL DISCLOSURES

Pursuant to Fed. R. Civ. P 26(a)(1), Plaintiffs Benjamin Heeter, Mark Braiman, Joseph Wurtenberg, and Firearms Policy Coalition, Inc. ("FPC"), (collectively, "Plaintiffs"), make the following initial disclosures based on the information reasonably available to them at this time.

Plaintiffs are continuing their investigation of relevant historical materials regarding the issues in dispute in this litigation. Plaintiffs will, as necessary, disclose further documents and witnesses in a timely manner. Plaintiffs reserve the right to supplement, revise, correct, clarify, or otherwise amend the information disclosed, consistent with the rules and any applicable orders of the Court, including after the Plaintiffs receive and review any discovery materials or other information from Defendants or third parties.

By making these disclosures, Plaintiffs do not intend to waive, and do not waive, any applicable privilege or work product protection, and expressly reserve the right to object to the production of information identified herein on those grounds. Plaintiffs also reserve the

right to object to the admissibility of any of the information disclosed below, and to any discovery proposed by a party in the future, as permitted by applicable rules of this Court, the Federal Rules of Evidence, and/or Court Orders.  Subject to these reservations, Plaintiffs provide the following information:

**I.**     **F.R. Civ. P. 26(a)(1)(A)(i):  The name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

Based on Plaintiffs' ongoing investigation, below are the presently identified individuals who may have discoverable information, and the subjects of that information, all of whom may be contacted through Plaintiffs' counsel:

(1.)    Plaintiff Benjamin Heeter, Lake View, New York 14085.  Subject of Information:  facts concerning his standing to bring this lawsuit.

(2.)    Plaintiff Mark Braiman, Cazenovia, New York 13035.  Subject of Information:  facts concerning his standing to bring this lawsuit.

(3.)    Plaintiff Joseph Wurtenberg, Fairport, New York, 14450.  Subject of Information:  facts concerning his standing to bring this lawsuit.

(4.)    Brandon Combs, President of Plaintiff Firearms Policy Coalition, Inc. ("FPC"), 5550 Painted Mirage Road, Suite 320, Las Vegas, Nevada.  Subject of Information: facts about FPC's standing to bring this lawsuit, including knowledge about the purposes and membership of Firearms Policy Coalition.

(5.)    All information regarding any expert witnesses, including copies of any expert reports, will be timely disclosed pursuant to the Scheduling Order (Dkt. No. 54).

2

**II.**     **F.R. Civ. P. 26(a)(1)(A)(ii):  A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party had in its possession, custody, or control and may use to support its claims or defense, unless the use would be solely for impeachment.**

Plaintiffs may use the following categories of documents, electronically stored information, and tangible things to support their claims:

(1.)     Historical lexicological materials, literary and religious texts, historical records, statutes, treatises, legal commentaries and materials, periodicals, and case law, including but not limited to the materials listed below, relating to the historical meaning of "arms," the absence of a tradition of armor prohibitions in the United States, and the commonality of body armor throughout American history.  Most of these materials can be found in electronic databases, libraries, and archives equally accessible to all parties and/or their counsel.  Copies of several historical documents that may be difficult for Defendants and their counsel to locate are produced with these disclosures.  Plaintiffs do not represent that this list includes every potentially relevant document that may exist, do not represent that all of these materials will be used, and reserve the right to use additional materials identified during the course of this litigation.

- Samuel Johnson, *Dictionary of the English Language* (4th ed. 1773)
- Timothy Cunningham, *A New and Complete Law Dictionary* (1771)
- N. Webster, *American Dictionary of the English Language* (1828)
- *A Pocket Dictionary or Complete English Expositor* (London, 1753)
- *A New and Complete Dictionary of Arts and Sciences: Comprehending All the Branches of Useful Knowledge* (London, 1754)
- Joseph Nicol Scott, *A New Universal Etymological English Dictionary* (London, 1755)
- Giles Jacob, *A New Law-Dictionary: Containing the Interpretation and Definition of Words and Terms Used in the Law; as Also the Whole Law and Practice Thereof* (9th ed. 1772)

3

- Thomas Sheridan, *A Complete Dictionary of the English Language* (1790)
- Joseph Worcester, *A Comprehensive Pronouncing and Explanatory Dictionary of the English* (1831)
- J.J.S. Wharton, *The Law Lexicon, on Dictionary of Jurisprudence* (1848)
- William G. Webster, *A Primary-School Pronouncing Dictionary of the English Language* (1848)
- Malachy Postlethwayt, *The Universal Dictionary of Trade and Commerce* (1851)
- John Bouvier, *A Law Dictionary Adapted to the Constitution and Laws of the United States of America* (12th ed. 1868)
- Malachy Postlethwayt, *The Universal Dictionary of Trade and Commerce* (1874)
- Henry Campbell Black, *A Dictionary of Law Containing Definitions of the Terms and Phrases of American and English Jurisprudence Ancient and Modern* (1st ed. 1891)
- *Oxford English Dictionary* (1st ed. 1884)
- *The Century Dictionary and Cyclopedia* (1901)
- *Oxford English Dictionary* (2d ed. 1989)
- *Black's Law Dictionary* (6th ed. 1990)
- *The Assize of Arms (1181), reprinted in Sources of English Constitutional History* 85–87 (Carl Stephenson & Frederick George Marcham, eds., 1937)
- *The Statute of Winchester*, 13 Edw. 1 St. 2 (1285), *reprinted in Sources of English Constitutional History* 174 (Carl Stephenson & Frederick George Marcham, eds., 1937)
- *For the Colony in Virginea Britannia: Laws Divine, Morall and Martiall, &c.* (London 1612)
- *The Records of the Virginia Company of London* (Kingsbury, ed. 1933)
- *Records of the Governor and Company of the Massachusetts Bay in New England* (Nathaniel B. Shurtleff ed., 1853)
- Michael Dalton, *The County of Justice: Containing the Practice of the Justices of the Peace, as well in, as out of the Sessions* (1715)
- William Hawkins, *A Treatise of the Pleas of the Crown: Or a System of the Principal Matters Relating to That Subject, Digested Under Their Proper Heads* (London 1716)
- Sir Matthew Hale, *The History of the Pleas of the Crown* (1736)
- William Blackstone, *Commentaries on the Laws of England* (1765–1769)

4

- *Treaty of Amity and Commerce Between the United States of America and His Most Christian Majesty* (Feb. 6, 1778)
- *Winthrop's Journal: "History of New England" 1630–1649* (Hosmer, ed., 1908)
- John Wilkins, *An Essay Towards a Real Character and a Philosophical Language* 278 (London 1668)
- Isaac Hunt, *The Birth, Parentage, and Education, of Praise—God Barebone* (1766)
- M. Thomas, *Essay on the Character, Manners, and Genius of Women in Different Ages* (1774)
- William Dunlap, *The Archers, or Mountaineers of Switzerland* 16 (1796)
- William Robertson, *The History of America* (1798)
- Thomas Pennant, *The View of Hindoostan* (1798)
- The Bible (King James, 1611)
- The Bible (English Standard Version, 2001)
- Alfred, Lord Tennyson, *The Marriage of Geraint* (1859)
- Alfred, Lord Tennyson, *Geraint and Enid* (1859)
- Sir Walter Scott, *Ivanhoe* (1819)

(2.)    Expert reports, if any, will be timely disclosed pursuant to the Scheduling Order (Dkt. No. 54).

## III.    Computation of damages.

Monetary Damages: None.  Plaintiffs seek only injunctive and declaratory relief. Should they prevail, Plaintiffs will seek attorney's fees under 42 U.S.C. § 1988.

## IV.    Insurance agreements.

None.

Dated:  McLean, Virginia
          January 31, 2025

                                        FLUET

                                        By: /s/ *Nicolas J. Rotsko*
                                                  Nicolas J. Rotsko, Esq.

                                        *Attorney for Plaintiffs*
                                        1751 Pinnacle Drive
                                        Suite 1000
                                        Tysons, VA 22102
                                        T: (703) 590-1234
                                        F: (703) 590-0366
                                        nrotsko@fluet.law

6

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 31, 2025, I sent the foregoing Plaintiffs' Initial Disclosures and copies of several historical documents to counsel record for Defendants via email and first-class mail.

Ryan L. Belka
Assistant Attorney General, of Counsel
350 Main Street
Main Place Tower, Suite 300A
Buffalo, New York 14202
(716) 853-8440
Ryan.Belka@ag.ny.gov
*Attorney for Defendant James*

Christopher J. Sasiadek
Assistant County Attorney, of Counsel
95 Franklin Street, Room 1634
Buffalo, New York 14202
(716) 858-2200
christopher.sasiadek@erie.gov
*Attorney for Defendant Keane*

James P. Youngs
Erica L. Masler
100 Madison Street
1800 AXA Tower I
Syracuse, New York 13202
Tel.: (315) 565-4500
jyoungs@hancocklaw.com
emasler@hancocklaw.com
*Attorneys for Defendant Gabor*

Robert J. Shoemaker
Deputy County Attorney
307 County Office Building
39 West Main Street, Rochester, New York 14614
Telephone: 585-753-1472
boshoemaker@monroecounty.gov
*Attorney for Defendant Doorley*

/s/ *Nicolas J. Rotsko*
Nicolas J. Rotsko, Esq.

7