# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| BENJAMIN HEETER, et al.,<br><br>         *Plaintiffs*,<br><br>   v.<br><br>LETITIA JAMES, et al.,<br><br>         *Defendants*. | **BRIEF OF AMICI CURIAE BRADY CENTER TO PREVENT GUN VIOLENCE, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, AND EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>Civil Action No.: 1:24-cv-00623-JLS |

Anna G. Bobrow
Rebecca C. Wilton
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
anna.bobrow@hoganlovells.com
rebecca.wilton@hoganlovells.com

Francis C. Healy, NY Bar No. 4187068
Matthew Sullivan, NY Bar No. 5738653
Stanley J. Brown, NY Bar No. 4422846
Rachel Bayer, NY Bar No. 5885017
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, N.Y. 10017
(212) 918-3000
francis.healy@hoganlovells.com
matthew.sullivan@hoganlovells.com
stanley.brown@hoganlovells.com
rachel.bayer@hoganlovells.com

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

CORPORATE DISCLOSURE STATEMENT ......................................................................1

INTERESTS OF AMICI CURIAE....................................................................................1

BACKGROUND ...........................................................................................................2

ARGUMENT ...............................................................................................................3

    I.      BODY ARMOR IS NOT PROTECTED BY THE PLAIN TEXT OF
           THE SECOND AMENDMENT.......................................................................3

          A.      Body Armor Is Not A Form of "Bearable Arms." .............................4

          B.      Body Armor Is Not In Common Use By Civilians For Lawful
               Purposes ...........................................................................................6

          C.      Body Armor Manufacturers Recognize That Their Products
               Are Designed Primarily For Military And Law Enforcement
               Use ...................................................................................................9

    II.     MASS SHOOTERS FREQUENTLY USE BODY ARMOR DURING
           ACTS OF VIOLENCE ................................................................................11

    III.    NEW YORK'S LAW IS CONSISTENT WITH THIS NATION'S
           HISTORY OF REGULATION .....................................................................14

          A.      New York's Body Armor Law Addresses Unprecedented
               Societal and Technological Concerns................................................14

          B.      Body Armor Is Unusually Dangerous And Thus, Not Protected
               By The Second Amendment ............................................................17

CONCLUSION...........................................................................................................20

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) .......................................................................................2, 6, 16

*Bell v. United States*,
No. 13-5533, 2013 WL 5763219 (E.D. Pa. Oct. 24, 2013) ......................................................5

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) (en banc) ..............................................................................9. 18

*Calce v. Tisch*,
No. 25-861-cv, 2026 WL 980092 (2d Cir. Apr. 13, 2026)................................................4, 7, 8

*Dist. of Columbia v. Heller*,
554 U.S. 570 (2008)...................................................................................................... *passim*

*Frey v. Nigrelli*,
661 F. Supp. 3d 176 (S.D.N.Y. 2023).......................................................................................7

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024)..........................................................................................1, 16

*Lane v. Cacace*,
No. 22-CV-10989 (KMK), 2025 WL 903766 (S.D.N.Y. Mar. 25, 2025) ...........................6, 7

*McDonald v. City of Chicago*,
561 U.S. 742 (2010).................................................................................................................1

*Nat'l Ass'n for Gun Rts. v. Lamont*,
153 F.4th 213 (2d Cir. 2025) ....................................................................................... *passim*

*New York State Firearms Ass'n v. James*,
157 F.4th 232 (2d Cir. 2025) ...................................................................................................3

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022)......................................................................................................... *passim*

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024)........................................................................................................5

*Second Amendment Arms v. City of Chicago*,
No. 10-C-4257, 2024 WL 3495010 (N.D. Ill. July 22, 2024) ..................................................6

*United States v. Alsenat*,
  734 F. Supp. 3d 1295 (S.D. Fla. 2024) ...............................................................5, 6

*United States v. Davis*,
  906 F. Supp. 2d 545 (S.D.W. Va. 2012) ...................................................................4

*United States v. Gomez*,
  159 F.4th 172 (2d Cir. 2025) .........................................................................3, 4, 6

*United States v. Rahimi*,
  602 U.S. 680 (2024) .............................................................................1, 3, 14, 15

**STATUTES:**

N.Y. Exec. Law § 144-a ...................................................................................................2

N.Y. Gen. Bus. Law § 396-eee ......................................................................................2

N.Y. Penal Law § 270.21 ................................................................................................2

N.Y. Penal Law § 270.22 ................................................................................................2

**OTHER AUTHORITIES:**

Arclin, https://www.arclin.com/tensylon/military-protective-gear (last visited
  April 21, 2026) ............................................................................................................10

Angel Armor, *About Us*, https://angelarmor.com/about-us (last visited Apr. 28,
  2026) ...............................................................................................................................9

Armor Express, https://www.armorexpress.com (last visited Apr. 28, 2026) ...............................10

Maki Becker, *Lawmakers Reintroduce Body Armor Bill in Honor of Aaron Salter*,
  WKBW (May 14, 2025), https://www.wkbw.com/news/local-
  news/buffalo/lawmakers-reintroduce-body-armor-bill-in-honor-of-aaron-
  salter-security-guard-killed-in-mass-shooting ........................................................19

Beez Combat Systems, *Terms & Conditions*,
  https://www.beezcombatsystems.com/pages/terms-conditions (last visited
  Apr. 28, 2026) ..........................................................................................................9, 10

Bonnie Berkowitz & Chris Alcantara, *The Terrible Numbers That Grow with
  Each Mass Shooting*, Wash. Post,
  https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-
  america (updated Nov. 3, 2023) ...............................................................................15

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the
  Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings
  Const. L.Q. 145 (2022) ...............................................................................................17

Caitlin Dewey, *Company That Sold Tops Gunman Body Armor Left Controversial Digital Trail*, The Buffalo News (updated July 5, 2024)..........................................................12

DOJ, *Frequently Asked Questions: Patrick Leahy Bulletproof Vest Partnership Program Mandatory Wear Requirement* (2020), https://www.ojp.gov/bvp/mandatory-wear-faqs. .......................................................11

DOJ, *Patrick Leahy Bulletproof Vest Partnership*, https://www.ojp.gov/program/bulletproof-vest-partnership/overview (last visited Apr. 29, 2026) ...................................................................................................11

FBI, *Active Shooter Incidents: 20-Year Review, 2000–2019* (June 1, 2021), https://www.fbi.gov/file-repository/active-shooter-incidents-20-year-review-2000-2019-060121.pdf/view......................................................................................17

*Flak Jacket*, ScienceDirect Topics, https://www.sciencedirect.com/topics/engineering/flak-jacket (last visited Apr. 29, 2026)..................................................................................................16

Fraternal Order of Police, *Legislation Supported by the FOP in the 119th Congress*, http://fop.net/government-and-media-affairs/legislation-we-support (last visited Apr. 29, 2026) ..................................................................................19

Eddie Garcia, Chief, Dallas Police Dep't, President, Major Cities Chiefs Ass'n, Letter to U.S. House of Representatives (May 22, 2023), https://majorcitieschiefs.com/wp-content/uploads/2023/05/2023.05.22-H.R.-3247-Aaron-Salter-Jr.-Responsible-Body-Armor-Possession-Act-Support-Letter.pdf.................................................................................................................19

Testimony of Joseph A. Gramaglia, Police Commissioner Buffalo, New York, Testimony Before the Committee on Oversight and Reform, *The Urgent Need to Address the Gun Violence Epidemic* (June 8, 2022), https://oversightdemocrats.house.gov/imo/media/doc/Gramaglia%20Testimony.pdf.......................................................................................14

Integris, *Design Your Own Shield*, https://integriscomposites.com/personalprotection/ballistic-shields/design-your-own-shield (last visited April 28, 2026)............................................................10

Ben Kesling, *Civilian Access to Body Armor Stirs Debate*, Wall St. J. (June 17, 2016), https://www.wsj.com/articles/civilian-access-to-body-armor-stirs-debate-1466155806..................................................................................................10

LTC, *Body Armor Plates*, https://ltc-ltc.com/body-armor-plates (last visited Apr. 21, 2026) ..................................................................................................10

Office of the New York State Att'y Gen.,
*Investigative Report on the Role of Online Platforms in the
Tragic Mass Shooting in Buffalo on May 14, 2022* (Oct. 18, 2022)..................................12, 13

MaryAlice Parks et al., *Buffalo Shooting Renews Calls for Body Armor
Regulation*, ABC News (June 17, 2022), https://abcnews.com/US/buffalo-
shooting-renews-calls-body-armor-regulation/story?id=85437343 ........................................18

*Past Summary Ledgers*, Gun Violence Archive,
https://www.gunviolencearchive.org/past-tolls (last visited Apr. 29, 2026) ...........................15

Jillian Peterson & James Densley, *Mass Shooter Database*, The Violence Project
(Version 10) (updated Jan. 2026),
https://www.theviolenceproject.org/databases/mass-shooters.................................................12

Michael Sierra-Arevalo & Justin Nix, *Gun Victimization in the Line of Duty:
Fatal and Nonfatal Firearm Assaults on Police Officers in the United States*,
2014-2019 Criminology & Pub. Pol'y 1041 (2020) ..................................................................10

U.S. Armor, About, https://usarmor.com/about/#partners (last visited Mar. 31,
2026) .........................................................................................................................................9

*Weapon*, Black's Law Dictionary (12th ed. 2024) ........................................................................4

*Weapon*, Merriam-Webster, https://www.merriam-
webster.com/dictionary/weapon (last visited Apr. 29, 2026) ....................................................5

Lindsay Whitehurst, Gene Johnson & James Anderson, *Buffalo Is Latest Mass
Shooting by Gunman Wearing Body Armor*, U.S. News & World Rep. (May
26, 2022), https://www.usnews.com/news/politics/articles/2022-05-
18/buffalo-is-latest-mass-shooting-by-gunman-wearing-body-armor.....................................16

Michael Young, FBI, *The FBI's Legacy Body Armor Program* (Oct. 8, 2024),
https://leb.fbi.gov/articles/featured-articles/the-fbis-legacy-body-armor-
program ....................................................................................................................................11

## CORPORATE DISCLOSURE STATEMENT

Amicus curiae Brady Center to Prevent Gun Violence ("Brady") has no parent corporations.  It has no stock; hence, no publicly held company owns 10% or more of its stock.

Amicus curiae Giffords Law Center to Prevent Gun Violence ("Giffords") has no parent corporations.  It has no stock; hence, no publicly held company owns 10% or more of its stock.

Amicus curiae Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations.  It has no stock; hence, no publicly held company owns 10% or more of its stock.

## INTERESTS OF AMICI CURIAE

Amici are three of the country's leading gun violence prevention organizations.  Brady is the nation's longest-standing nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and advocacy.  Giffords is a survivor-led, nonprofit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to reduce gun violence and save lives.  Everytown for Gun Safety is the nation's largest gun-violence-prevention organization, with nearly eleven million supporters across the country.

These organizations have a shared commitment to public safety and civil rights and a substantial interest in ensuring that when democratically elected officials act to reduce our Nation's gun violence epidemic, those efforts are not thwarted by deeply flawed legal theories.  Amici have filed numerous *amicus* briefs in cases involving the constitutionality of firearms regulations.  *E.g.*, *United States v. Rahimi*, 602 U.S. 680 (2024); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008).  Judges regularly cite the organizations' research and expertise.  *E.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 85 (D. Conn. 2023), *aff'd*, 153 F.4th 213 (2d Cir. 2025), *petition for cert. filed* No. 25-421 (U.S. Oct. 3, 2025); *Hanson v. Dist. of Columbia*,

1

120 F.4th 223, 249 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2778 (2025); *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 403-05 (D. Md. 2018); *Antonyuk v. James*, 120 F.4th 941, 1022 n.89, 1023 n.90 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025).

## BACKGROUND

Plaintiffs challenge a New York law that prohibits sales of body armor to, and the purchase or possession of body armor by, individuals who are not in an "eligible profession," which includes police officers or individuals in military service, N.Y. Penal Law §§ 270.21, 270.22; N.Y. Gen. Bus. Law ("GBL") § 396-eee ("Body Armor law" or "the law"), as well as professions "in which the duties may expose the individual to serious physical injury that may be prevented or mitigated by the wearing of body armor," such as security guards. *See* N.Y. Exec. Law § 144-a. Plaintiffs argue that the law is unconstitutional because it regulates conduct within the plain text of the Second Amendment and is inconsistent with this Nation's history of firearm regulation. ECF No. 69-1 at 9-24.

Plaintiffs are incorrect on both counts. Body armor is not a form of "arms" covered by the Second Amendment's plain text because it is not a form of "bearable arms," nor is it in common use by civilians for lawful self-defense purposes. Rather, it is frequently used by mass shooters to extend and maximize the terror of their violent acts and insulate them from being stopped by law enforcement and others. Moreover, the law is consistent with this Nation's historical regulation of bearable arms because the law addresses unprecedented societal concerns, and because body armor is unusually dangerous. Indeed, when made available to the general public (as opposed to those with a specific demonstrated need for protection), modern day, wearable body armor amplifies violence in in early America.

2

**ARGUMENT**

As the Supreme Court has made clear, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. The Second Amendment's protections "extend[] prima facie, to all instruments that constitute bearable arms." *Id*. at 582. The Court recognized, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Second Amendment's protections only extend to weapons that are in common use for lawful self-defense. *Id.* at 627; *see also United States v. Gomez*, 159 F.4th 172, 176 (2d Cir. 2025), *cert. denied*, No. 25-6858, 2026 WL 795188 (U.S. Mar. 23, 2026). And, even if the weapon is covered by the Second Amendment's plain text, the regulation is still permissible if the government demonstrates that its regulation is consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 17.

The party challenging a law bears the initial burden of showing that the regulated conduct is covered by the Second Amendment's plain text. *Id.* at 34; *see also New York State Firearms Ass'n v. James*, 157 F.4th 232, 244 (2d Cir. 2025). If it does, the burden then shifts to the government to demonstrate that the regulation is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. Plaintiffs' challenge to New York's law fails at both steps of this analysis.

**I.      BODY ARMOR IS NOT PROTECTED BY THE PLAIN TEXT OF THE SECOND AMENDMENT.**

A threshold question in any Second Amendment analysis is whether the law at issue regulates conduct protected by the Second Amendment's plain text. The Second Circuit has directed that "the first step of the *Bruen* inquiry requires courts to consider three issues": "whether the conduct at issue is protected, whether the weapon concerned is in common use, and whether the affected individuals are ordinary, law-abiding, adult citizens and thus part of the people whom

3

the Second Amendment protects." *Gomez*, 159 F.4th at 176 (internal quotation marks and citation omitted). Consistent with this instruction,[1] body armor is not covered by the Second Amendment because it is not a form of bearable arms; it is not in civilian common use; and the individuals most affected by this law are not ordinary, law-abiding citizens whom the Second Amendment protects.

### A.      Body Armor Is Not A Form of "Bearable Arms."

Body armor, properly understood, does not qualify as a form of "bearable arms" within the meaning of the Second Amendment. In *Heller*, the Supreme Court interpreted the Second Amendment's use of the word "arms" to encompass a certain subset of "weapons," most notably, firearms. *See* 554 U.S. at 582 ("[T]he most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"); *id.* at 592 ("[The Second Amendment] guarantee[s] the individual right to possess and carry weapons in case of confrontation."); Weapon, Black's Law Dictionary (12th ed. 2024) (defining "weapon" as "[a]n instrument used or designed to be used to injure or kill someone").

Plaintiffs attempt to sidestep *Heller*'s repeated use of "arms" to mean "weapons" by pointing to historical dictionary definitions that reference "defensive arms," extrapolating that the Second Amendment's plain text must therefore cover body armor. ECF No. 69-1 at 9-14. But contrary to Plaintiffs' assertions, there is no consensus that body armor qualifies as "arms." As one federal district court explained, "the assertion that [the Second Amendment] right extends to body armor is, at best, a novel reach and, at worst, a potential diminution of the cherished right itself." *United States v. Davis*, 906 F. Supp. 2d 545, 557 n.6 (S.D.W. Va. 2012). There, the court found it "notable that in *Heller* the Supreme Court used the word 'weapon' as a substitute for

---

[1] Plaintiffs' suggestion that the Second Circuit's test in *Gomez* is "contrary to Supreme Court precedent," ECF No. 69-1 at 19, is unavailing. The Supreme Court recently declined to review the decision in *Gomez* and the Second Circuit has applied *Gomez* to other Second Amendment challenges. *See Calce v. Tisch*, No. 25-861-cv, 2026 WL 980092, at *2 (2d Cir. Apr. 13, 2026).

'Arms' repeatedly throughout the opinion," concluding that "arms" as used in the Second Amendment covers only "instruments used forcibly or affirmatively during a confrontation," or "instruments used forcibly on another person," and not "things that are merely a passive means of self-defense." *Id.* at 556 (alteration and citation omitted); *see also Bell v. United States*, No. 13-5533, 2013 WL 5763219, at *4 (E.D. Pa. Oct. 24, 2013) ("It is not clear whether body armor constitutes 'arms' as used in the Second Amendment.").

Moreover, it is surely indisputable that in common speech, people would not refer to body armor as a "weapon," as the Supreme Court and the Second Circuit have used that word. The Merriam-Webster Dictionary defines "weapon" to mean "something (such as a club, knife, or gun) used to injure, defeat, or destroy." Weapon, Merriam-Webster, https://www.merriam-webster.com/dictionary/weapon (last visited Apr. 29, 2026).

The robust body of case law around establishing that firearm "accessories" fall outside the scope of the Second Amendment further supports the proposition that body armor, too, is not protected by the Second Amendment. Although accessories like machine gun conversion devices that convert semi-automatic pistols into an automatic weapon, large capacity magazines, and laser sights enhance the danger of a firearm, because they "have no use independent of their attachment to a gun and cannot be used to hurt anybody with [them] unless you hit them over the head," they are not "bearable arms" protected by the Second Amendment. *United States v. Alsenat*, 734 F. Supp. 3d 1295, 1309 (S.D. Fla. 2024), *aff'd*, 2026 WL 1078057 (11th Cir. Apr. 21, 2026) (internal quotations marks and citation omitted) (holding that a machine gun conversion device is an accessory not protected by the Second Amendment); *see also Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 386-87 (D.R.I. 2022), *aff'd*, 95 F.4th 38 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2771 (2025) (finding that the plaintiffs did not establish that large capacity magazines

5

are "arms" under the Second Amendment because they are merely accessories to firearms and "are not used in a way that 'cast[s] at or strike[s] another.'") (citation omitted); *Second Amendment Arms v. City of Chicago*, No. 10-C-4257, 2024 WL 3495010, at \*10 (N.D. Ill. July 22, 2024) ("[A] firearm remains an effective weapon without a [laser sight] attached," and thus a laser sight "is not a weapon protected by the Second Amendment.") (citation omitted).

Body armor is even further outside the meaning of "arms" than accessories.  Like an accessory, body armor significantly increases the danger to the public and law enforcement when a shooter uses it alongside a firearm.  But unlike an accessory, body armor does not "derive [its] entire purpose from [its] *attachment* to a firearm."  *Alsenat*, 734 F. Supp. 3d at 1309 (emphasis added).  If accessories are not within the ambit of the Second Amendment, then body armor must surely be outside the Second Amendment's protections, as well.

### B.      Body Armor Is Not In Common Use By Civilians For Lawful Purposes.

Moreover, the plain text of the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes[.]"  *Gomez*, 159 F.4th at 177 (quoting *Heller*, 554 U.S. at 625); *see also Antonyuk*, 120 F.4th at 960.  This limitation is "supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Antonyuk*, 120 F.4th at 960 (internal quotation marks and citation omitted).  Plaintiffs bear the burden of demonstrating that body armor is in common use by law-abiding citizens for lawful self-defense purposes. *See Gomez*, 159 F.4th at 177-78; *Lane v. Cacace*, No. 22-CV-10989 (KMK), 2025 WL 903766, at \*8 (S.D.N.Y. Mar. 25, 2025) ("*Bruen* and *Heller* make clear that Plaintiffs have the burden of making the initial showing that they are seeking to possess or carry firearms that are in common use today for self-defense and are typically possessed by law-abiding

6

citizens for that purpose.") (citation omitted).[2]  For example, in *Lane*, the district court found that plaintiffs had not carried their burden when they offered links to "inadmissible" "consumer surveys, firearm dealer surveys, and firearm production data" as evidence that "millions of law-abiding citizens choose to possess" the firearm at issue.  2025 WL 903766, at *8 (citation omitted).  And the Court found that even if the references were admissible, they "faile[d] to demonstrate common use *for self-defense*, which is a necessary showing."  *Id.*  In a recent decision regarding a challenge to New York City's stun gun ban, the Second Circuit affirmed a district court's grant of summary judgment because the challengers failed to supply admissible evidence to carry their burden to show that stun guns are in common use for lawful self-defense.  *Calce v. Tisch*, No. 25-861-cv, 2026 WL 980092, at *2 (2d Cir. Apr. 13, 2026).  The Second Circuit cautioned that "plaintiffs cannot 'rely on conclusory allegations or unsubstantiated speculation' in opposition to summary judgment."  *Id.* (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

Here, Plaintiffs perform back-of-the-envelope math and ask this Court to use the estimated $41.9 million spent in total by civilians on body armor in 2022, "assum[ing] conservatively that each unit of body armor purchased" in any given year costs $750, to determine that 55,000 "units" were sold to civilians in 2022.  ECF No. 69-1 at 16.  From that number, Plaintiffs argue that body armor is common in the civilian population.  *Id.*  As in *Lane*, Plaintiffs do not offer any witness declarations or materials that would confirm their assumption, which renders their assumptions about whether body armor is in common civilian use inadmissible.  *See* 2025 WL 903766, at *8; *see also* ECF No. 69-2 ¶¶ 19-23 (offering only estimates about how much money American

---

[2] *See also Frey v. Nigrelli*, 661 F. Supp. 3d 176, 200 (S.D.N.Y. 2023) (denying plaintiff's motion for a preliminary injunction and finding that plaintiffs "met their burden of showing that the prohibition against carrying arms . . . implicates the text of the Second Amendment"); *Ocean State Tactical, LLC*, 646 F. Supp. 3d at 388 ("[P]laintiffs have failed to meet their burden of establishing that [large capacity magazines] are 'Arms' within the textual meaning of the Second Amendment.").

civilians spent, not the value of each unit sold).  Plaintiffs also do not offer any facts about who the so-called civilian purchasers of body armor are (for example, whether "civilian purchasers" include individuals in eligible occupations exempted by the law, such as security guards), how many people are purchasing it, or how that compares to the American population at large.  *See* ECF No. 69-2 ¶¶ 19-23.  Without this necessary context, it is impossible to ascertain whether the purchase of body armor is by a few individuals or whether it is widespread throughout the population, and for what purpose body armor is being purchased and/or used (i.e., for purposes of lawful self-defense or for other conduct).  *See Calce*, 2026 WL 980092, at *2.

In fact, Plaintiffs' own sources indicate that body armor is not in common use by civilians, but instead remains primarily in use by law enforcement and military personnel.  As an initial matter, even assuming 55,000 units were sold to civilians in 2022, *see* ECF No. 69-1 at 16, with a population of at least 330 million people, that would mean that at most 0.016% of individuals in the United States purchased these units in 2022—hardly commonplace.

Moreover, one of the studies Plaintiffs cite, by Precedence, defines body armor as "protective clothing worn by soldiers to protect them from all the threats that they face while they are involved in battle."  ECF No. 69-6 at 28.  This same study notes that body armor is becoming "increasingly popular among civilians," which include "private security professionals," but it does not state that it is in common civilian *use*, let alone in common *use for lawful self-defense*.  *Id.* at 29.  The paltry $41.9 million that American civilians are estimated to have spent on body armor in 2022, ECF No. 69-1 at 16, is only 6% of the total market for body armor in that year and far exceeded by the law enforcement and defense market, which was estimated as $658.9 million in 2022.  *See* ECF No. 69-6 at 23.  Even if Precedence's analysis for demand in 2033 is correct, civilian demand for body armor will still only be 6.2% of the total U.S. market.  *See id.*

Nor would a sudden flood of body armor on the market change this analysis.  As the Fourth Circuit has noted, the Supreme Court in *Heller* and *Bruen* "did not posit that a weapon's common use is conclusive evidence that it cannot be banned," but rather "*Bruen*'s admonition that the right to keep and bear arms extends only to those weapons 'in common use today for self-defense' reflects the fact that the Second Amendment protects only those weapons that are typically possessed by average Americans for the purpose of self-preservation and are not ill-suited and disproportionate to achieving that end." *Bianchi v. Brown*, 111 F.4th 438, 460-61 (4th Cir. 2024) (en banc), *cert denied sub nom. Snope v. Brown*, 145 S. Ct. 1534 (2025) (citing *Bruen*, 597 U.S. at 32); *see also Lamont*, 153 F.4th at 232-33 (holding that *Heller* and *Bruen* "do not hold that the Second Amendment *necessarily* protects *all* weapons in common use" as "they do not shield popular weapons from review of their potentially unusually dangerous character.").  Because Plaintiffs have not carried their burden to show that body armor is in common use *for lawful self-defense* by civilians, they have failed to demonstrate that body armor is protected by the Second Amendment.

**C.    Body Armor Manufacturers Recognize That Their Products Are Designed Primarily For Military And Law Enforcement Use.**

The common, law-abiding application for body armor is its use by law enforcement officers and the military.  Many body armor manufacturers focus on serving the military, law enforcement, and others whose line of work places them at heightened risk of gunfire.  *See, e.g.*, U.S. Armor, About, https://usarmor.com/about/#partners (last visited Mar. 31, 2026) (listing military and federal and state law enforcement clients).  Indeed, major body armor manufacturers go further by refusing to sell their products to civilians.  *See, e.g.*, Angel Armor, *About Us*, https://angelarmor.com/about-us (last visited Apr. 28, 2026) ("Our goal is to serve first responders by offering market-leading proactive solutions that protect officers in every situation."); Beez

9

Combat Systems, *Terms & Conditions*, https://www.beezcombatsystems.com/pages/terms-conditions (last visited Apr. 28, 2026) ("We sell body armor ONLY to Law Enforcement, Military and authorized agencies."); LTC, *Body Armor Plates*, https://ltc-ltc.com/body-armor-plates (last visited Apr. 21, 2026) ("Do you sell body armor plates to individuals? No. We sell only to military, law enforcement and approved distributors."); *see also* Armor Express, https://www.armorexpress.com (last visited Apr. 28, 2026) (products only available through government contracts, and for four categories of profession: law enforcement, fire/EMS, corrections, and federal/military); Integris, *Design Your Own Shield*, https://integriscomposites.com/personalprotection/ballistic-shields/design-your-own-shield (last visited April 28, 2026) (explaining that the company "offers a tailored solution for law enforcement and military units seeking ballistic protection customi[z]ed to their specific operational requirements"); Arclin, https://www.arclin.com/tensylon/military-protective-gear (last visited April 21, 2026) ("Arclin offers a range of armor solutions for complete head-to-toe protection for law enforcement officers."). Companies like Point Blank Enterprises, Inc. have chosen not to sell to civilians because they feel "a deeper obligation" to ensure their body armor is not used in crimes. Ben Kesling, *Civilian Access to Body Armor Stirs Debate*, WALL ST. J. (June 17, 2016), https://www.wsj.com/articles/civilian-access-to-body-armor-stirs-debate-1466155806.

Even among law enforcement agencies, body armor is a specialty product that is not uniformly available to all officers, in part due to resource constraints. Michael Sierra-Arevalo & Justin Nix, *Gun Victimization in the Line of Duty: Fatal and Nonfatal Firearm Assaults on Police Officers in the United States*, 2014-2019, 19 Criminology & Pub. Pol'y 1041, 1052 (2020) (citation omitted). Some agencies may not make body armor mandatory, *id.*, and even if mandatory, funding challenges persist. In fact, multiple federal programs exist to attempt to address this

shortfall: the Federal Bureau of Investigation (FBI) has a Legacy Body Armor program to "help alleviate some of the financial burden on departments that do not possess the requisite funding to purchase appropriate body armor for their officers," *see* Michael Young, FBI, *The FBI's Legacy Body Armor Program* (Oct. 8, 2024), https://leb.fbi.gov/articles/featured-articles/the-fbis-legacy-body-armor-program, and the Department of Justice's Office of Justice Programs offers the Patrick Leahy Bulletproof Vest Partnership to reimburse up to 50% of the cost of body armor vests purchased for law enforcement officers, DOJ, *Patrick Leahy Bulletproof Vest Partnership*, https://www.ojp.gov/program/bulletproof-vest-partnership/overview (last visited Apr. 29, 2026). But this assistance is limited; indeed, the Department of Justice notes that it has been "unable to reimburse the maximum . . . for all requested vests." DOJ, *Frequently Asked Questions: Patrick Leahy Bulletproof Vest Partnership Program Mandatory Wear Requirement* (2020), https://www.ojp.gov/bvp/mandatory-wear-faqs.

This lack of uniformity among law enforcement belies Plaintiffs' suggestions that body armor is common, or so readily available to civilians. And indeed, given this lack of resources, if New York's body armor law is nullified, that decision would particularly endanger the police officers who would typically be the first responders on a shooting scene—officers who will often not have the weapons needed to pierce a perpetrator's armor and, given these resource challenges, also will not have body armor protection to stop a bullet from a shooter who has protected himself by purchasing body armor. Law enforcement faces enough risks without adding other dangers as officers risk their lives to protect the public.

## II. MASS SHOOTERS FREQUENTLY USE BODY ARMOR DURING ACTS OF VIOLENCE.

Body armor is not in common use for lawful self-defense by law-abiding citizens. Rather, it has become a practice of mass shooters to wear it during their planned acts of violence. Plaintiffs

11

characterize the prevalence of body armor as limited to a "handful of tragic mass-shooting incidents," ECF No. 69-1 at 18, but this ignores studies showing that body armor is frequently used in mass violence events. For example, according to the Violence Project, a nonpartisan research center that has created the most comprehensive databases available on mass violence, at least 17 body armor-assisted mass shootings have taken place after 2009, including the 2022 mass shooting at Tops Friendly Market in Buffalo, New York that killed ten people. Jillian Peterson & James Densley, *Mass Shooter Database*, The Violence Project (Version 10) (updated Jan. 2026), https://www.theviolenceproject.org/databases/mass-shooters; *see also* Caitlin Dewey, *Company That Sold Tops Gunman Body Armor Left Controversial Digital Trail*, The Buffalo News (updated July 5, 2024). Overall, 28 mass shooters in the past 45 years have worn body armor. Jillian Peterson & James Densley, *Mass Shooter Database*, The Violence Project (Version 10) (updated Jan. 2026), https://www.theviolenceproject.org/databases/mass-shooters.

The Tops shooting in Buffalo exemplifies the central role that body armor plays for those planning mass violence. The shooter meticulously devised the attack, detailing his preparations extensively in a private Discord channel and culminating in a manifesto. The shooter conducted months of research and wrote dozens of pages about the type of body armor he would acquire in order to "'kill as many blacks as possible' and 'avoid dying.'" *See* Office of the New York State Att'y Gen., *Investigative Report on the Role of Online Platforms in the Tragic Mass Shooting in Buffalo on May 14, 2022* 28 (Oct. 18, 2022) (hereinafter "OAG Investigative Report"). He discussed the advantages and disadvantages of various body armor brands, ultimately settling on certain body armor because it was "relatively light but would stop most bullets, especially from handguns that police were likely to use." Cameron McWhirter & Sadie Gurman, *Accused Buffalo Gunman Described Why He Chose His Firearms, Body Armor*, Wall St. J. (May 15, 2022). In

12

fact, the shooter derived the "confidence" to execute his plans from the fact that he would be "protected by [his body] armor." Compl. (hereinafter "*Patterson* Compl.") ¶ 478, *Patterson et al. v. Meta et al.*, No. 805896/2023 (N.Y. Sup. May 12, 2023), https://files.giffords.org/wp-content/uploads/2024/11/805896_2023_Diona_Patterson_et_al_v_Diona_Patterson_et_al_SUM MONS___COMPLAINT_1.pdf (citing shooter's manifesto).[3]

Beyond his own attack, the Tops shooter hoped that his writings could serve as a practical instruction manual to help future perpetrators collect the best materials, including body armor, for committing mass violence. OAG Investigative Report at 15, 21. Thirty-four pages of the shooter's manifesto are devoted to recommending the best body armor for future mass shooters. Dewey, *Company That Sold Tops Gunman Body Armor Left Controversial Digital Trail*.

The shooter's body armor served its deadly purpose on the day of the attack. On a previous surveillance visit to the market, he had noted the presence of a security guard, retired Buffalo Police Lieutenant Aaron Salter, Jr., and the fact that he possessed a firearm. OAG Investigative Report at 10. The shooter wrote that he would have to "kill [security] first" and his "[s]olution" was "NIJ certified II or IIIa armor for helmet and vest." *Patterson* Compl. ¶ 471 (citing shooter's manifesto). His sinister prediction proved true. After the shooter entered the market, Salter confronted and shot him—but the shooter's body armor ensured that he was not harmed. OAG Investigative Report at 10. The shooter then shot and killed Lieutenant Salter. *Id.* Protected by his body armor, he went on to murder four more individuals and injure another before he was disarmed, roughly two minutes after the shooting began.[4] *Id.* In short, if the shooter had been

---

[3] The shooter's manifesto and Discord writings have been removed from the Internet and are not available via search engines.

[4] Salter's murder is a tragic demonstration of the critical disadvantage that responding law enforcement may face when confronting active shooters who are equipped with body armor. As Buffalo Police Commissioner Joseph Gramaglia put it to Congress: "[Salter's] service weapon was no match for the military-style weapons and armor the perpetrator was equipped with." Testimony

prevented from possessing body armor, as he would have been today under the law, the shooter would have been stopped by Lieutenant Salter and four other murdered individuals would be alive today.

### III.    NEW YORK'S LAW IS CONSISTENT WITH THIS NATION'S HISTORY OF REGULATION.

Even if this Court were to find that body armor is covered by the Second Amendment's plain text, New York's Body Armor law is lawful because it "is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.  The Supreme Court has held that the Second Amendment does not bestow a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 21 (citing *Heller*, 554 U.S. at 626-27).  As the State explains, "American law and history strongly support the ability of governments to regulate body armor." ECF No. 77-1 at 24.  And, in particular, binding Second Circuit precedent recognizes the long historical tradition of regulations on unusually dangerous weapons. *Lamont*, 153 F.4th at 236.  Like historical bans on unusually dangerous weapons, the law here represents a proper democratic response to a tragedy, a "targeted restriction" enacted to respond to a tragedy where body armor was "used by a single perpetrator to kill multiple people at one time" and "to inflict terror in communities." *Id.*

#### A.    New York's Body Armor Law Addresses Unprecedented Societal and Technological Concerns.

In assessing Second Amendment challenges, courts compare the motivations (the "whys") and the mechanisms (the "hows") of modern and historical laws, taking into account relevant empirical research on prevailing conditions in modern and historical American society. *See Bruen*,

---

of Joseph A. Gramaglia, Police Commissioner Buffalo, New York, Testimony Before the Committee on Oversight and Reform, *The Urgent Need to Address the Gun Violence Epidemic* 2 (June 8, 2022), https://oversightdemocrats.house.gov/imo/media/doc/Gramaglia%20Testimony.pdf.

597 U.S. at 29-34; *see also Rahimi*, 602 U.S. at 1904 (Sotomayor, J., concurring) ("[T]he Court's interpretation [of *Bruen*] permits a historical inquiry calibrated to reveal something useful and transferable to the present day."). As further explained in *Rahimi*, the Second Amendment does not create "a law trapped in amber." 602 U.S. at 691. Instead, it allows for regulations "consistent with the principles that underpin our regulatory tradition." *Id.* at 692; *see also id.* at 739 (Barrett, J., concurring) ("[I]mposing a test that demands overly specific analogues has serious problems . . . . It forces 21st-century regulations to follow late-18th-century policy choices."). And the Supreme Court has recognized that "cases implicating unprecedented societal concerns or dramatic technological changes . . . may require a more nuanced approach" because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 597 U.S. at 27.

As Plaintiffs acknowledge, New York enacted the law to promote public safety in response to mass shootings, including the Tops shooting in Buffalo. ECF No. 69-1 at 3. The Tops shooting is part of a recent, exponential increase in the frequency of public mass shootings. Whereas a total of 25 mass shootings occurred between 1900 and 1965, *see* Bonnie Berkowitz & Chris Alcantara, *The Terrible Numbers That Grow with Each Mass Shooting*, Wash. Post, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america (updated Nov. 3, 2023), more than 3,500 mass shootings have occurred in the United States since just 2020, *see Past Summary Ledgers*, Gun Violence Archive, https://www.gunviolencearchive.org/past-tolls (last visited Apr. 29, 2026).

The Second Circuit has recognized that mass shootings are a purely modern phenomenon that warrants a "more nuanced" approach." *Lamont*, 145 F.4th at 240 ("*Bruen* thus had in mind the very situation we face here when it counseled that where direct analogues are absent because

15

of unprecedented societal concerns and dramatic technological changes, our analysis may adopt a 'more nuanced' approach."); *see also Hanson*, 120 F.4th at 241 ("There can be little doubt that mass shootings are an unprecedented societal concern.").

Faced with this modern concern, body armor presents precisely the type of "dramatic technological change[]" that the Supreme Court acknowledged may require "a more nuanced approach." *Bruen*, 597 U.S. at 27. Just as the Second Circuit has held that the modern development of semiautomatic assault weapons and large-capacity magazines has led to the unprecedented danger of mass shootings, *Lamont*, 153 F.4th at 236-37, the development of advanced lightweight body armor in recent years has created an unprecedented danger when used by a shooter to maximize the infliction of harm. Modern materials that allow body armor to be both lightweight and effective are the result of technological advancements that postdate the Founding by nearly two centuries. Kevlar, the revolutionary para-aramid fiber that made modern soft body armor feasible, was not invented until the 1970s. *See Flak Jacket*, ScienceDirect Topics, https://www.sciencedirect.com/topics/engineering/flak-jacket (last visited Apr. 29, 2026). Ultra-high-molecular-weight polyethylene fibers such as Dyneema and Spectra emerged from late 1970s gel-spinning breakthroughs. *Id.* The hybrid soft armor plus ceramic plate wearable systems that define modern tactical body armor were not integrated until the late 1990s. *Id.* Prior to these innovations, body armor consisted of heavy, cumbersome metal materials that bore no resemblance to the lightweight, concealable vests available today. *See id.*

Body armor in the hands of active shooters magnifies the unprecedented social concern posed by mass shootings. When armor is present, it impedes law enforcement's ability to immediately disarm and arrest attackers, prolonging attacks. *See, e.g.*, Lindsay Whitehurst, Gene Johnson & James Anderson, *Buffalo Is Latest Mass Shooting by Gunman Wearing Body Armor*,

16

U.S. News & World Rep. (May 26, 2022), https://www.usnews.com/news/politics/articles/2022-05-18/buffalo-is-latest-mass-shooting-by-gunman-wearing-body-armor.  FBI data from a 20-Year review covering 333 active shooter incidents found that approximately 4-5% of shooters wore body armor.  FBI, *Active Shooter Incidents: 20-Year Review, 2000–2019* 30 (June 1, 2021), https://www.fbi.gov/file-repository/active-shooter-incidents-20-year-review-2000-2019-060121.pdf/view.  While this percentage may appear modest, the consequences when body armor is worn are significant.  The recent Buffalo Tops shooting, for example, demonstrates that armored assailants can sustain prolonged firefights with law enforcement, dramatically increasing the danger to the public and the law enforcement officers who risk their own lives to protect the public.

### B.    Body Armor Is Unusually Dangerous And Thus, Not Protected By The Second Amendment.

At the Founding period and throughout American history, the motivation behind the regulation of "arms" was to protect the public from deadly harm.  *See* Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 Hastings Const. L.Q. 145, 158-60, 160 (2022), https://repository.uclawsf.edu/cgi/viewcontent.cgi?article=2155&context=hastings_constitutional_law_quaterly ("Dalton's exposition of the law—including his position that there existed no general right to carry firearms in public, even for anticipated self-defense—thus contributed to the general understanding of governmental authority to regulate public carry when the Second Amendment was drafted, as well as when the Fourteenth Amendment made it applicable to the States.").  There is a "longstanding tradition of restricting novel weapons that are particularly suited for criminal violence—a tradition that was 'liquidated and settled' by 'a regular course of practice' of regulating such weapons throughout our history."  *Lamont*, 153 F.4th at 242-43 (quoting *Bruen*, 597 U.S. at 35-36).  Like the technology for arms, the technology for armor has

17

changed.  *See* ECF No. 77-1 at 28.  But there remains a strong link between the past and present justification for the regulation: body armor is not something that an ordinary civilian needs for lawful self-defense.

First, as previously discussed, the wearing of body armor amplifies the violence committed by perpetrators of mass shootings.  *See* discussion *supra* pp. 14-17.  The protection it affords perpetrators of mass shootings makes it especially dangerous.

Moreover, far from being an object for use by civilians, body armor fits squarely within the category of items "most useful in military service."  *Heller*, 554 U.S. at 627.  The Fourth Circuit has reaffirmed that weapons "most useful in military service" fall outside the Second Amendment's protection and may be banned from civilian possession, even when available on the commercial market.  *Bianchi*, 111 F.4th at 452-53.  Tactical body armor—particularly the Level IV armor and similar high-protection products that Plaintiffs seek to acquire—is quintessentially military and law enforcement equipment.  Its primary design purpose and predominant use are within these professional contexts, not civilian self-defense.

For these reasons, many law enforcement groups support restrictions on civilian possession of body armor.  In the words of a representative of the California State Sheriffs' Association, which backed a bill to regulate body armor previously introduced in Congress: "It's not clear why civilians would need military-style body armor . . . We don't live in situations that require military-grade equipment."  Kesling, *Civilian Access to Body Armor Stirs Debate*; *see also* MaryAlice Parks et al., *Buffalo Shooting Renews Calls for Body Armor Regulation*, ABC News (June 17, 2022), https://abcnews.com/US/buffalo-shooting-renews-calls-body-armor-regulation/story?id=85437343 (former counterterrorism director at Department of Homeland

18

Security stating there is "very little reason why a member of the public should be allowed to go out and buy a bulletproof vest or a ballistic shield").

Similarly, the National Fraternal Order of Police—the world's largest organization of sworn law enforcement officers, with more than 377,000 members—has also expressed support for regulating the sale and possession of body armor by civilians. The group has supported the Aaron Salter, Jr. Responsible Body Armor Protection Act, H.R. 3398, 119th Cong. (2025), which would federally ban the civilian possession of body armor. *See* Fraternal Order of Police, *Legislation Supported by the FOP in the 119th Congress*, http://fop.net/government-and-media-affairs/legislation-we-support (last visited Apr. 29, 2026); *see also* Maki Becker, *Lawmakers Reintroduce Body Armor Bill in Honor of Aaron Salter*, WKBW (May 14, 2025), https://www.wkbw.com/news/local-news/buffalo/lawmakers-reintroduce-body-armor-bill-in-honor-of-aaron-salter-security-guard-killed-in-mass-shooting (Aaron Salter's former partner on the police force commenting "a national ban is necessary").

So does the Major Cities Chiefs Association, an organization of law enforcement executives from the largest cities in the United States and Canada, which recognized that the Tops shooter "was wearing military-grade body armor and, as a result, was able to continue his violent attack." Eddie Garcia, Chief, Dallas Police Dep't, President, Major Cities Chiefs Ass'n, Letter to U.S. House of Representatives (May 22, 2023), https://majorcitieschiefs.com/wp-content/uploads/2023/05/2023.05.22-H.R.-3247-Aaron-Salter-Jr.-Responsible-Body-Armor-Possession-Act-Support-Letter.pdf. New York's statute is aligned with law enforcement's support for restrictions on civilian possession of body armor as a common-sense restriction that will reduce the damage that can be done by perpetrators of mass violence.

19

New York's Body Armor law satisfies the Second Amendment's historical tradition analysis. Particularly viewed in light of relevant prevailing societal conditions, the law is consistent with historical regulations of arms that are dangerously unusual and suited for criminal violence. *See Bruen*, 597 U.S. at 35-36.

## CONCLUSION

New York's Body Armor law provides an important protection for the public. But just as important, the law reduces the risk for police officers sworn to protect the public. For the reasons set forth above and in the Defendants' motions, ECF Nos. 75, 76, 77, New York's Body Armor law is constitutional. This Court should deny Plaintiffs' Motion for Summary Judgment, ECF No. 69, and grant Defendants' Motions for Summary Judgment, ECF Nos. 75, 76, 77.

Dated: April 29, 2026

Respectfully submitted,

*/s/ Francis C. Healy*
Francis C. Healy, NY Bar No. 4187068
Matthew Sullivan, NY Bar No. 5738653
Stanley J. Brown, NY Bar No. 4422846
Rachel Bayer, NY Bar No. 5885017
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, N.Y. 10017
(212) 918-3000
francis.healy@hoganlovells.com
matthew.sullivan@hoganlovells.com
stanley.brown@hoganlovells.com
rachel.bayer@hoganlovells.com

Anna G. Bobrow
Rebecca C. Wilton
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5600
anna.bobrow@hoganlovells.com
rebecca.wilton@hoganlovells.com

20

**CERTIFICATE OF SERVICE**

I certify that on April 29, 2026, I filed the foregoing brief with the Clerk of the District

Court using its CM/ECF system, which electronically notified all participants in this case.

*/s/ Francis C. Healy*
Francis C. Healy