UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BENJAMIN HEETER, et al.,

Plaintiffs,

v.

LETITIA JAMES, et al.,

Defendants.

Civil Action No.:

1:24-cv-00623-JLS

---

### PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' LOCAL CIVIL RULE 56(a)(1) STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56(a)(2) of the Local Rules of Civil procedure for the United States District Court for the Western District of New York, the Plaintiffs hereby file their response to the State Defendants' Local Civil Rule 56(a)(1) Statement of Undisputed Material Facts, denying that Superintendent Stephen G. James and Attorney General Letitia James are entitled to summary judgment.[1]

1.     The Firearms Policy Coalition lacks standing to bring suit in this case. The Declaration of Brandon Combes, hereinafter Combes Decl. at [ECF No. 69-4], ¶ 1-7.

**Response to Paragraph 1:** Disputed. Paragraph 1 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. Plaintiffs assert and maintain that FPC has standing for the reasons stated in the accompanying Memorandum.

---

[1] The Plaintiffs do not respond to the State Defendants' section headings, as they are not a proper part of the Rule 56 Statement and no response is required under the Local Rules of Civil Procedure. *See* Local Rule 56(a)(2). To the extent a response is required, the Plaintiffs object to the section headings as unsupported by "citation[] to admissible evidence." Local Civil Rule 56(a).

2.      Brandon Combes is the President of FPC. Combes Decl., ¶ 1.

**Response to Paragraph 2:** Undisputed.

3.      "Through this lawsuit, FPC seeks to defend the… rights of its members to purchase and possess body armor and bulletproof garments…" Combes Decl. at ¶ 6.

**Response to Paragraph 3:** The Combs Declaration speaks for itself, but FPC does not dispute that this lawsuit seeks to defend the rights of FPC members to purchase and possess body armor and bulletproof garments.

4.      FPC brings this lawsuit vicariously on behalf of its members and cannot demonstrate any injury in their own right. Combes Decl., ¶¶ 1-7.

**Response to Paragraph 4:** Paragraph 4 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. Plaintiffs assert and maintain that FPC has standing for the reasons stated in the accompanying Memorandum.

5.      The individual Plaintiffs, Benjamin Heeter and Joseph Wurtenberg, also lack standing because they already possess body armor and have suffered no actual injury from the challenged statute. Belka Decl., ¶¶ 3-13, Ex. A-B, the Deposition of Benjamin Heeter, hereinafter Heeter Dep., 19:11-21:22, 39:1-42:22, 47:5-8 and the Deposition of Joseph Wurtenberg, hereinafter Wurtenberg Dep., 37:3-15, 42:7-44:7, 44:17-45:16, 60:18-61:16.

**Response to Paragraph 5:** Paragraph 5 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. Plaintiffs dispute that they lack standing for the reasons stated in the accompanying Memorandum but do not dispute that Mr. Heeter and Mr. Wurtenberg both possess body armor.

6.      Benjamin Heeter owns both steel and Kevlar body armor. Belka Decl., ¶¶ 3, 5, Ex. A.

2

**Response to Paragraph 6:** Undisputed for purposes of this motion.

7.    However, he testifies that he may want more Kevlar body armor, at some time in the future, even though he has never worn the Kevlar body armor he owns. Belka Decl., ¶¶ 3, 6, Ex. A.

**Response to Paragraph 7**: Disputed as stated. Mr. Heeter has averred that he previously sought to purchase body armor around the time this lawsuit commenced, continues to desire to purchase body armor, and would do so at present, but for the Body Armor Ban. *See* Decl. of B. Heeter, ¶¶ 3, 4, Ex. M (ECF No. 69-4).  Whether Mr. Heeter has worn the Kevlar armor he owns is immaterial to any issue presented by the Motions for Summary Judgment, including Mr. Heeter's standing.

8.    Joseph Wurtenberg owns body armor sufficient for himself and his family. Belka Decl., ¶¶ 4, 7, Ex. B.

**Response to Paragraph 8:** Disputed as stated, although immaterial to any issue presented by the Motions for Summary Judgment, including Mr. Wurtenberg's standing.  Mr. Wurtenberg testified as of April 25, 2025, that "should the need arise," he owns "sufficient body armor for [him]self and [his] family," in that he had "three to four small ballistic carriers with plates in storage," but did not disavow an intent to purchase additional body armor or a right to do so. Belka Decl. Ex. B. at 42:7–44:7

9.    However, he testifies that he may want to purchase more at some time in the future. Belka Decl., ¶¶ 4, 8, Ex. B.

**Response to Paragraph 9:** Disputed as stated, although immaterial to any issue presented by the Motions for Summary Judgment, including Mr. Wurtenberg's standing.  Mr. Wurtenberg averred that he previously sought to purchase additional body armor around the time this

lawsuit commenced, and would do so, but for the Body Armor Ban. *See* Decl. of J. Wurtenberg, ¶¶ 3, 4, Ex. N (ECF No. 69-4). Additionally, Mr. Wurtenberg also testified to an intent "to replace" the body armor he had purchased for himself and his family when it expired, which would be no later than the next couple of years. Belka Decl. Ex. B, 6:1–13 (ECF 77-6)

10.     New York's Body Armor Law allows qualified professionals to purchase body armor. New York State Executive Law § 144-a.

**Response to Paragraph 10:** New York State Executive Law § 144-a speaks for itself.

11.     Plaintiff Heeter failed to verify if his employment rendered him a qualified professional under the law. Belka Decl., ¶¶ 3, 10, Ex. A.

**Response to Paragraph 11:** Disputed as stated, and immaterial to any issue presented by the Motions for Summary Judgment, including Mr. Heeter's standing.  Mr. Heeter is aware that his profession is ineligible. Belka Decl. Ex. A. at 39:3–9. Regardless, this fact is not material to any issue presented by the Motions for Summary Judgment, including Mr. Heeter's standing.

12.     Further, Plaintiff Heeter failed to have his employment added to the qualifying professionals list as allowed under the law. Belka Decl., ¶¶ 3, 11, Ex. A.

**Response to Paragraph 12:** Disputed as stated, and immaterial to any issue presented by the Motions for Summary Judgment, including Mr. Heeter's standing.  Mr. Heeter did not apply to have his profession deemed eligible to purchase body armor. Belka Decl., Ex. A. at 39:21–25.

13.     Plaintiff Wurtenberg failed to verify if his employment rendered him a qualified professional under the law. Belka Decl., ¶¶ 4, 12, Ex. B.

**Response to Paragraph 13:** Disputed as stated, and immaterial to any issue presented by the Motions for Summary Judgment, including Mr. Wurtenberg's standing. Mr. Wurtenberg is aware that his profession is ineligible. Belka Decl., Ex. B. at 45:1–2.

14.    Further, Plaintiff Wurtenberg failed to have his employment added to the qualifying professionals list as allowed under the law. Belka Decl., ¶¶ 4, 13, Ex. B.

**Response to Paragraph 14:** Disputed as stated, and immaterial to any issue presented by the Motions for Summary Judgment, including Mr. Wurtenberg's standing.  Mr. Wurtenberg did not apply to have his profession deemed eligible to purchase body armor. Belka Decl., Ex. A. at 39:21–25.

15.    On May 14, 2022, Payton Gendron committed a racially motivated massacre at the Tops on Jefferson Street in Buffalo New York. The Declaration of Jaclyn Schildkraut, hereinafter Schildkraut Decl., ¶¶ 20-24.

**Response to Paragraph 15:** Undisputed for purposes of this Motion, but immaterial to any issue presented by the Motions for Summary Judgment. The Body Armor Ban applies to all law-abiding citizens, including Plaintiffs, not just mass shooters.

16.    In planning the massacre, Mr. Gendron took pains to select body armor that would allow him to prolong the attack so he could kill as many African-Americans as possible. Schildkraut Decl., ¶¶ 20-24.

**Response to Paragraph 16:** Plaintiffs are without knowledge or information sufficient to form a belief about the truth of the statements contained in Paragraph 16, which are not material to any issue presented by the Motions for Summary Judgment. Before and since adoption of the Body Armor Ban, the wearing of body armor in connection with the commission of any violent felony offense has been a Class E Felony under New York Law. *See* New York Penal

Law § 270.20. The Body Armor Ban applies to all law-abiding citizens, including Plaintiffs, not just mass shooters.

17. Body armor was central to that plan. Schildkraut Decl., ¶¶ 20-24.

**Response to Paragraph 17:** Plaintiffs dispute unsupported descriptors like "central to that plan" and otherwise dispute the statements in Paragraph 17 on the ground that, notwithstanding the effort to launder Mr. Gendron's statements through Ms. Schildkraut, the statements in Paragraph 19 remain hearsay under Fed. R. Evid. 802, as it is not the statement of any opposing party in this case and not subject to any hearsay exception. *United States v. Lombardozzi*, 491 F.3d 61, 73 (2d Cir. 2007) (explaining that "an expert may not simply repeat 'hearsay evidence without applying any expertise whatsoever' because it enables the government to put before the jury an 'out-of-court declaration of another, not subject to cross-examination ... for the truth of the matter asserted'" (citation omitted)). Thus, Plaintiffs are without knowledge or information sufficient to form a belief about the truth of the statements contained in Paragraph 19, which are not material to any issue presented by the Motions for Summary Judgment. Before and since adoption of the Body Armor Ban, the wearing of body armor in connection with the commission of any violent felony offense has been a Class E Felony under New York Law. *See* New York Penal Law § 270.20. The Body Armor Ban applies to all law-abiding citizens, including Plaintiffs, not just mass shooters.

18. The shooter thought it was "100% guaranteed" that he would face "[p]olice handgun threats with duty ammo," and he found his "Solution: NIJ certified II or IIIa armor for helmet and vest" along with "NIJ certified III armor plates." Schildkraut Decl., ¶¶ 20-24, Ex. D. at 8.

**Response to Paragraph 18:** Disputed because, notwithstanding the effort to launder Mr. Gendron's statements through Ms. Schildkraut, the statements in Paragraph 19 remain hearsay under Fed. R. Evid. 802, as it is not the statement of any opposing party in this case and not subject to any hearsay exception. *United States v. Lombardozzi*, 491 F.3d 61, 73 (2d Cir. 2007) (explaining that "an expert may not simply repeat 'hearsay evidence without applying any expertise whatsoever' because it enables the government to put before the jury an 'out-of-court declaration of another, not subject to cross-examination ... for the truth of the matter asserted'" (citation omitted)). That being so, Plaintiffs are without knowledge or information sufficient to form a belief about the truth of the statements contained in Paragraph 18, which are not material to any issue presented by the Motions for Summary Judgment. Before and since adoption of the Body Armor Ban, the wearing of body armor in connection with the commission of any violent felony offense has been a Class E Felony under New York Law. *See* New York Penal Law § 270.20. The Body Armor Ban applies to all law-abiding citizens, including Plaintiffs, not just mass shooters.

19.    Gendron's quest for a tactical edge over law enforcement was frustrated in part by the policies of several responsible body-armor manufacturers: as he discovered "Avon Protection, Gentex, BAE systems, United Shield, ArmorSource, Safariland PROTECH, and Point Blank PARACLETE all make great [armor], but the mass majority of them are only available to the government and police." *Id.* at 12.

**Response to Paragraph 19:** Disputed because, notwithstanding the effort to launder Mr. Gendron's statements through Ms. Schildkraut, the statements in Paragraph 19 remain hearsay under Fed. R. Evid. 802, as it is not the statement of any opposing party in this case and not subject to any hearsay exception. *United States v. Lombardozzi*, 491 F.3d 61, 73 (2d Cir.

2007) (explaining that "an expert may not simply repeat 'hearsay evidence without applying any expertise whatsoever' because it enables the government to put before the jury an 'out-of-court declaration of another, not subject to cross-examination ... for the truth of the matter asserted'" (citation omitted)). That being so, Plaintiffs are without knowledge or information sufficient to form a belief about the truth of the statements contained in Paragraph 19, which are not material to any issue presented by the Motions for Summary Judgment. Before and since adoption of the Body Armor Ban, the wearing of body armor in connection with the commission of any violent felony offense has been a Class E Felony under New York Law. *See* New York Penal Law § 270.20. The Body Armor Ban applies to all law-abiding citizens, including Plaintiffs, not just mass shooters.

20. In fact, he was frustrated that armor from certain major retailers was unavailable or "harder to find on the civilian market" as "many of the S+ tier IIIA armor . . . are only available to certain [military or law enforcement] credentials because of [expletive] companies." *Id*. at 38-39.

**Response to Paragraph 20:** Disputed. Plaintiffs note that, notwithstanding the effort to launder Mr. Gendron's statements through Ms. Schildkraut, they remain hearsay under Fed. R. Evid. 802, as it is not the statement of any opposing party in this case and not subject to any hearsay exception. *United States v. Lombardozzi*, 491 F.3d 61, 73 (2d Cir. 2007) (explaining that "an expert may not simply repeat 'hearsay evidence without applying any expertise whatsoever' because it enables the government to put before the jury an 'out-of-court declaration of another, not subject to cross-examination ... for the truth of the matter asserted'" (citation omitted)). That being so, Plaintiffs are without knowledge or information sufficient to form a belief about the truth of the statements contained in Paragraph 20, which

are not material to any issue presented by the Motions for Summary Judgment. Before and since adoption of the Body Armor Ban, the wearing of body armor in connection with the commission of any violent felony offense has been a Class E Felony under New York Law. *See* New York Penal Law § 270.20. The Body Armor Ban applies to all law-abiding citizens, including Plaintiffs, not just mass shooters.

21.    Ultimately, the company policies were not enough and he acquired body armor from another company with plates that he believed "would stop all pistol threats." *Id.* at 33.

**Response to Paragraph 21:** Disputed. Plaintiffs note that, notwithstanding the effort to launder Mr. Gendron's statements through Ms. Schildkraut, they remain hearsay under Fed. R. Evid. 802, as it is not the statement of any opposing party in this case and not subject to any hearsay exception. *United States v. Lombardozzi*, 491 F.3d 61, 73 (2d Cir. 2007) (explaining that "an expert may not simply repeat 'hearsay evidence without applying any expertise whatsoever' because it enables the government to put before the jury an 'out-of-court declaration of another, not subject to cross-examination ... for the truth of the matter asserted'" (citation omitted)). That being so, Plaintiffs also dispute unsupported descriptors like "not enough." Plaintiffs are without knowledge or information sufficient to form a belief about the truth of the statements contained in Paragraph 21, which are not material to any issue presented by the Motions for Summary Judgment. Before and since adoption of the Body Armor Ban, the wearing of body armor in connection with the commission of any violent felony offense has been a Class E Felony under New York Law. *See* New York Penal Law § 270.20. The Body Armor Ban applies to all law-abiding citizens, including Plaintiffs, not just mass shooters.

22. After murdering five innocent patrons and shooting another, Mr. Gendron was engaged by an archetypal good guy with a gun: retired Buffalo Police Officer Aaron Salter. Schildkraut Decl., ¶¶ 20-24. Exhibit D.

**Response to Paragraph 22:** Undisputed for purposes of this Motion, but not material to any issue presented by the Motions for Summary Judgment. Before and since adoption of the Body Armor Ban, the wearing of body armor in connection with the commission of any violent felony offense has been a Class E Felony under New York Law. *See* New York Penal Law § 270.20. The Body Armor Ban applies to all law-abiding citizens, including Plaintiffs, not just mass shooters.

23. But for the plated body armor, Salter would have ended the massacre. *Id.*

**Response to Paragraph 23:** Disputed, in that Defendants' own characterization of the events states that five patrons were murdered before Mr. Salter engaged the shooter. Disputed to the extent this statement is conjecture. Further, this statement is not material to any issue presented by the Motions for Summary Judgment. Before and since adoption of the Body Armor Ban, the wearing of body armor in connection with the commission of any violent felony offense has been a Class E Felony under New York Law. *See* New York Penal Law § 270.20. The Body Armor Ban applies to all law-abiding citizens, including Plaintiffs, not just mass shooters.

24. Instead, four more innocents, including Aaron Salter, were killed, and two more were shot. *Id.*

**Response to Paragraph 24:** Undisputed for purposes of this Motion, with respect to the continued shooting after Mr. Salter engaged the shooter, but disputed as to conjecture about alternative outcomes. Further, this statement is not material to any issue presented by the

10

Motions for Summary Judgment. Before and since adoption of the Body Armor Ban, the wearing of body armor in connection with the commission of any violent felony offense has been a Class E Felony under New York Law. *See* New York Penal Law § 270.20. The Body Armor Ban applies to all law-abiding citizens, including Plaintiffs, not just mass shooters.

25.    The pattern would repeat itself several years later at the other end of New York State, when a gunman, from out-of-state, wearing body armor entered a Park Avenue office building on July 28, 2025, killing Didarul Islam, an off-duty NYPD officer who was working security, before continuing on to murder others. Schildkraut Decl., ¶ 29.

**Response to Paragraph 25:** Plaintiffs dispute unsupported descriptors like "the pattern," which are apparently based on two isolated acts of violence involving the wearing of body armor, both of which involved independent Class E Felonies under New York Law, *see* New York Penal Law § 270.20, without regard for the Body Armor Ban, which applies to all law-abiding citizens, including Plaintiffs, not just mass shooters. Otherwise, Undisputed for purposes of this Motion, but not material to any issue presented by the Motions for Summary Judgment.

26.    On May 22, 1794, Congress passed "An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same." Ch. 33, 1 Stat. 369 (1794), Belka Decl., ¶19, Ex. D.

**Response to Paragraph 26:** The cited provision speaks for itself. It is not material to any issue presented by the Motions for Summary Judgment.

27.    The law explained what was covered by the term "Arms" at that time (1794), namely "any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenados [sic], gunpowder, sulphur, or saltpetre." *Id.* § 1.

**Response to Paragraph 27:** The cited provision speaks for itself. Plaintiffs dispute that the law purported to define the "arms" that the People had the right to keep and bear under the Second Amendment. As it did not, it is not material to any issue presented by the Motions for Summary Judgment.

28.    Arms were described in terms of weapons and ammunition, in other words, not armor. Ch. 2, 1 Stat. 520 (1797), Belka Decl., ¶ 21, Ex. E.

**Response to Paragraph 28:** The cited provision speaks for itself. That the law specified what arms it applied to suggests that the common and ordinary meaning of the term was broader. Regardless, Plaintiffs dispute that the law purported to define the scope of "arms" that the People had the right to keep and bear under the Second Amendment, and maintain that the law is not material to any issue presented by the Motions for Summary Judgment.

29.    The Fifth Congress re-enacted the law in 1797 with minor changes, again covering the same enumerated list of "Arms." Ch. 2, 1 Stat. 520 (1797), Belka Decl., ¶ 22, Ex. E.

**Response to Paragraph 29:** The cited provision speaks for itself. Plaintiffs dispute that the law purported to define the scope of "arms" that the People had the right to keep and bear under the Second Amendment, and maintain that the law is not material to any issue presented by the Motions for Summary Judgment.

30.    In 1795, the Fifth Congress passed "An Act to enable the President of the United States to Procure Cannon, Arms and Ammunition, and for other purposes." Ch. 38, 2 Stat. 555 (1798), Belka Decl., ¶ 23, Ex. F.

**Response to Paragraph 30:** The cited provision speaks for itself. It is not material to any issue presented by the Motions for Summary Judgment.

31.    That understanding of arms as weapons continued as the Republic grew. Belka Decl., ¶¶ 19-24, Exs. D-F, et seq.; Baron Decl., ¶¶ 3-5, 25-31; Carp Decl., ¶¶ 12-33.

**Response to Paragraph 31:** Denied.  Plaintiffs have submitted a range of textual sources demonstrating that "arms" continues to refer to "armour of defence" as well as "[w]eapons of offence," to the present day.  Rotsko Decl. ¶¶ 13-64 (and exhibits submitted therewith). Plaintiffs deny that frequency of usage either purported to or may be read to define the "arms" that the People had the right to keep and bear under the Second Amendment and is otherwise material to any issue presented by the Motions for Summary Judgment. *See D.C. v. Heller*, 554 U.S. 570, 588 (2008) (observing that "the fact that the phrase" bear arms "was commonly used in a particular context does not show that it is limited to that context").

32.    In 1809 the Tenth Congress considered "A Bill prohibiting for a limited time the exportation of arms, ammunition, canvas, cordage, and hemp, and for encouraging the importation thereof." Belka Decl., ¶ 25, Ex. G.

**Response to Paragraph 32:** The cited unenacted bill speaks for itself. Plaintiffs dispute that the proposal purported to define the "arms" that the People had the right to keep and bear under the Second Amendment, and so maintain that the law is not material to any issue presented by the Motions for Summary Judgment.

33.    The bill followed the structure of the earlier Arms import/export bills, and would have covered "any cannon, muskets, pistols, bayonets, swords, cutlasses, musket-balls, lead, bombs, grenadoes [sic], gun-power [sic], sulphur or salt-petre, canvas or sailduck of any description, commonly used for ships or vessels, cordage, cables, tarred or untarred yarns made of hemp, seine, sail or sewing twine, and sheet copper." Belka Decl., ¶ 26, Exs. D-G.

13

**Response to Paragraph 33:** The cited unenacted bill speaks for itself. Plaintiffs dispute that the proposal defined the "arms" that the People had the right to keep and bear under the Second Amendment.

34.    In all the potential materials contemplated for war, from cannons all the way down to "sewing twine," Congress did not include body armor. *Id.*

**Response to Paragraph 34:** The cited unenacted bill speaks for itself. Plaintiffs dispute that the proposal purported to define the "arms" that the People had the right to keep and bear under the Second Amendment.

35.    The corpus linguistics data supports the understanding that "arms" did not include body armor at the time of the founding. See the Declaration of Dennis Baron (hereinafter Baron Decl.), ¶¶ 3-5, 25-31.

**Response to Paragraph 35:** Paragraph 35 contains a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. And it is not supported by a citation. On the contrary, Professor Barron admits that the use of the term "arms" as a general term that includes 'armour'" while "very rare in the Founding Era," nonetheless occurred, and provided no evidence that such usage was improper. Baron Decl. ¶ 3(a). In fact, in his conclusion Professor Baron says nothing relevant of the Founding Era, but simply concludes "that 'arms' would not include 'armor' *in the later 19th century*." Baron Decl. ¶ 5 (emphasis added). The frequency of popular usage of terms to refer to particular items does not control the meaning of the term generally, nor does it specifically define the "arms" that the People had the right to keep and bear under the Second Amendment. *See District of Columbia v. Heller*, 554 U.S. 570, 583 (2008) (To suggest otherwise is "rather like saying that, since there are many statutes that authorize aggrieved employees to 'file complaints' with federal agencies,

14

the phrase 'file complaints' has an employment-related connotation."). As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

36.    Corpus linguistics is a scientific method that utilizes large bodies of digitized historical text to determine the meaning of usage of words in context. See Baron Decl., ¶ 12 et seq.

**Response to Paragraph 36:** Paragraph 36 is garbled ("meaning of usage of") and so is disputed. It is the meaning of words that matter; their usage is relevant only to the extent it may illumine their meaning in a relevant context. Plaintiffs do not dispute that large bodies of digitized historical texts can indicate the common usage of a term during a period of time, but deny that such usage, even if proven, define the "arms" that the People had the right to keep and bear under the Second Amendment. As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

37.    Prof. Baron examined the historical use of the terms "arms," "armor," and "armour" during the Founding Era and the period surrounding Reconstruction and the ratification of the Fourteenth Amendment. See Id.

**Response to Paragraph 37:** Undisputed for purposes of the Motion. Plaintiffs dispute, however, that corpus linguistics controls or should be given much weight. *District of Columbia v. Heller*, 554 U.S. 570, 576–81 (2008), made plain that the "normal and ordinary" meaning of "arms" is determined by reference to dictionaries of the time, which include armor, not its usage in non-legal texts.

38.    Prof. Baron evaluated hundreds of millions of words to capture the everyday language of the American public, circumventing any potential "elite" bias in statutory texts. Baron Decl., ¶¶ 12-24.

15

**Response to Paragraph 38:** Disputed, on the grounds that "evaluated hundreds of millions of words" is vague and conclusory, lacking foundation, and that "circumventing any potential "elite" bias in statutory texts" is an opinion rather than a factual assertion. Moreover, Plaintiffs dispute that corpus linguistics controls or should be given much weight. *District of Columbia v. Heller*, 554 U.S. 570, 576–81 (2008), made plain that the "normal and ordinary" meaning of "arms" is determined by reference to dictionaries of the time, which include armor, not its usage in non-legal texts.

39.    In his comprehensive review of the corpora, Prof. Baron found zero examples of "armor" being used by the American military, militias, British soldiers, or civilians during the Founding Era. Baron Decl., ¶¶ 3-5, 25-31.

**Response to Paragraph 39:** Disputed. Several states even mandated that citizens keep armor for use in the militia as late as 1798. Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 25-26 (2025). Plaintiffs further dispute that whether chain mail or suits of armor were worn during the Founding Era is relevant to or dispositive of what the term "arms" means, or that corpus linguistics controls. *District of Columbia v. Heller*, 554 U.S. 570, 576–81 (2008), made plain that the "normal and ordinary" meaning of "arms" is determined by reference to dictionaries of the time, which include armor. Plaintiffs also dispute that the Second Amendment's protections extend only to "arms" that existed during the Founding Era.

40.    Soldiers in the founding did not wear metal suits or chain mail, and the protective leather gear of that pre-Kevlar era was notoriously ineffective against bullets, meaning civilians did not typically wear such body protection either. Baron Decl., ¶ 3; Carp Decl., ¶¶ 12-25.

**Response to Paragraph 40:** Undisputed as to "metal suits or chain mail" being worn by footsoldiers in the Continental Army, but there is evidence that armor was used during the Founding Era, and that "bucklers, helmets, breast plates, coats of mail," were considered the "kinds of arms, proper for arming soldiers" at the time. Rotsko Decl. ¶ 44 & Ex. 39 (Treaty of Amity and Commerce Between the United States of America and His Most Christian Majesty, 8 Stat. 12, art XXIV (Feb. 6, 1778)); *see also* Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 25-26 (2025) (militia equipment mandates). Plaintiffs further dispute that corpus linguistics controls. *District of Columbia v. Heller*, 554 U.S. 570, 576–81 (2008), made plain that the "normal and ordinary" meaning of "arms" is determined by reference to dictionaries of the time, which include armor. Plaintiffs also dispute that such non-usage of types of armor during the Founding era defines the "arms" that the People had the right to keep and bear under the Second Amendment. As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

41.     Alternatively, the term was used metaphorically. For instance, Founding-era texts frequently reference the religious "armor of God" used by believers to fight sin and Satan, the secular emotional "armor" politicians adopt to debate opponents, or the physical characteristics animals use to protect themselves from predators, such as the "armor" of a hedgehog. Baron Decl., ¶¶ 3-5, 25-31.

**Response to Paragraph 41:** Undisputed for purposes of this Motion. Plaintiffs further point out that ample literary usage shows that "arms" included "armor." Rotsko Decl. ¶¶ 45-64 (and exhibits provided therewith). Moreover, Plaintiffs dispute that corpus linguistics controls. *District of Columbia v. Heller*, 554 U.S. 570, 576–81 (2008), made plain that the

"normal and ordinary" meaning of "arms" is determined by reference to dictionaries of the time, which include armor.

42.    Data from COREA and late-nineteenth-century newspapers confirms that during the Reconstruction Era, the term "armor" still did not refer to personal protective equipment. *Id.*

**Response to Paragraph 42:** Disputed. By the 1860s, bulletproof vests were widely available to the general public and were used by both Union and Confederate soldiers during the American Civil War. Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 30-35 (2025); Bashford Dean, *Helmets and Body Armor in Modern Warfare* (1920), at 56-58. Plaintiffs further dispute that corpus linguistics controls. *District of Columbia v. Heller*, 554 U.S. 570, 576–81 (2008), made plain that the "normal and ordinary" meaning of "arms" is determined by reference to dictionaries of the time, which include armor.

43.    Rather, it referred historically to the defensive suits worn by knights of old, or, in a contemporary sense, to the protective iron-cladding utilized on nineteenth-century warships and field artillery. *Id.*

**Response to Paragraph 43:** Undisputed that "arms" and "armor" can refer to Medieval technology and iron-cladding on military equipment, but Plaintiffs dispute that "arms" and "armor" did not encompass the bullet proof vests available during this era. Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 30-35 (2025); Bashford Dean, *Helmets and Body Armor in Modern Warfare* (1920), at 56-58. Plaintiffs dispute that corpus linguistics controls. *District of Columbia v. Heller*, 554 U.S. 570,

576–81 (2008), made plain that the "normal and ordinary" meaning of "arms" is determined by reference to dictionaries of the time, which include armor.

44.     Just as in the Founding Era, the normal and ordinary meaning of "arms" in the later nineteenth century plainly did not include personal "armor." *Id.*

**Response to Paragraph 44:** Disputed. Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 30-35 (2025); Bashford Dean*, Helmets and Body Armor in Modern Warfare* (1920), at 56-58. And Plaintiffs dispute that corpus linguistics controls. *District of Columbia v. Heller*, 554 U.S. 570, 576–81 (2008), made plain that the "normal and ordinary" meaning of "arms" is determined by reference to dictionaries of the time, which define arms to include armor.

45.     Indeed, the tradition traces from the very foundation of Western Civilization, as Sir William Blackstone, who Plaintiffs acknowledge as "the preeminent authority on English law for the founding generation," [ECF No. 71] at 12 (quoting Alden v. Maine, 527 U.S. 706, 715 (1999)), traces "[t]he offence of riding or going armed" all the way back to "the laws of Solon, [when] every Athenian was finable who walked about the city in armour." IV William Blackstone, Commentaries on the Laws of England 148-49 (Clarendon Press 1770), Belka Decl., ¶ 28, Ex. H; *see also* I John Potter, Achaeologia Graeca: or the Antiquities of Greece ch. 26 at 182 (Sam Palmer, Printer 1722), Belka Decl., ¶ 28, Ex. I (reprinting the ancient law's text: "He shall be fin'd who is seen to walk the City-streets with a Sword by his Side, or having about him other Armour, unless in case of exigency.")

**Response to Paragraph 45:** The cited texts speak for themselves. Plaintiffs dispute that such laws define the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban,

which applies everywhere and even to persons who are not dangerous, is constitutional.  As they do not, they are not material to any issue presented by the Motions for Summary Judgment.

46.    In keeping with this tradition, English monarchs and parliaments regularly issued laws forbidding or restricting the wearing of armor, to prevent dangerous persons being better-equipped than legitimate authority. Carp Decl., ¶¶ 6-11.

**Response to Paragraph 46:** Undisputed for purposes of this motion.  Plaintiffs dispute that English monarch's efforts to disarm citizenry define the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban, which applies everywhere and even to persons who are not dangerous, is constitutional.  As they do not, they are not material to any issue presented by the Motions for Summary Judgment.

47.    These laws began in an outgrowth of what we would now call sensitive places laws, including a law from the late 13th century stating that "they who shall come to see [a] Tournament, shall not be armed with any Manner of Armour," and a 1313 law requiring that "every man shall come" to parliaments and assemblies "without all Force and Armour, well and peaceably." Carp. Dec. ¶ 6.

**Response to Paragraph 47:** The cited laws speak for themselves.  Plaintiffs dispute that such English acts define the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban, which applies to all places, is constitutional.  As they do not, they are not material to any issue presented by the Motions for Summary Judgment.

20

48.    In 1353 Edward III issued a "Proclamation for keeping the peace within the City" of London, ordering among other things "that every hosteler and herbergeour, within the franchise of the City, shall cause his guests to be warned that they must leave their arms and armour in their hostels where they are lodging." Henry Thomas Riley, Memorials of London and London Life in the XIIth, XIVth, and XVth Centuries at 272 (Longmans, Green & Co. 1868), Belka Decl., ¶¶ 29, Ex. J.

**Response to Paragraph 48:** The cited laws speak for themselves.  Plaintiffs dispute that such royal acts define the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban, which applies to all places, is constitutional.  As they do not, they are not material to any issue presented by the Motions for Summary Judgment.

49.    The same law required "that no alien shall go in armour, or shall carry sword, knife with point, or other arms, in the City, or in the suburb thereof, on pain of imprisonment, and of losing such arms and armour." *Id*.; *see also* Carp Decl. ¶ 7.

**Response to Paragraph 49:** The cited law speaks for itself.  Plaintiffs dispute that such royal acts define the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban, which applies to all persons and all places, is constitutional.  As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

50.    Edward III also issued the Statute of Northampton, which prohibited anyone to "go, nor ride armed by night, nor by day, in fairs markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King and

21

their bodies to prison, at the king's pleasure." John Collyer, The Criminal Statutes of England at 4 (S. Sweet 1832), 2 Ed. 3, c. 3, Belka Decl., ¶¶ 31-32, Ex. K; *see* Carp. Dec. ¶ 7.

**Response to Paragraph 50:** The cited law speaks for itself.  Plaintiffs dispute that such royal acts define the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban, which applies to all persons and all places, is constitutional.  As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

51.    Richard II later updated the Statute, adding a provision stating that "no lord, knight, nor other, little nor great, shall go, nor ride by night nor by day armed, nor bear sallet nor skull of iron, nor of other armour, . . . save and except the King's officers and minsters in doing their office." *Id.* at 5, 20 Ric. 2, c.1.

**Response to Paragraph 51:** The cited law speaks for itself.  Plaintiffs dispute that such law defines the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban, which applies to all persons and all places, is constitutional.  As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

52.    In 1400, Henry IV issued a law prohibiting all Welshmen from "bear[ing] any manner of armour" within cities, boroughs, and merchant towns near the English border. II Danbey Pickering, The Statutes at Large, from the Fifteenth Year of King Edward III to the Thirteenth Year of King Henry IV, Inclusive at 413 (Joseph Bentham, printer 1762), Belka Decl., ¶ 33, Ex. L.

**Response to Paragraph 52:** The cited law speaks for itself.  Plaintiffs dispute that such law defines the "arms" that the People had the right to keep and bear under the Second

Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban, which applies to all persons and all places, is constitutional. As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

53.    Over a century later, Henry VIII in 1534 issued a law forbidding anyone in Wales from bearing any "weapon, privy coat, or armour defensive" near court, or "to any town, church, fair, market or other congregation." IV Danby Pickering, *The Statutes at Large, from the First Year of King Richard III to the Thirty-first year of King Henry VIII*, Inclusive, at 330 (Joseph Bentham, printer 1763), Belka Decl., ¶ 34, Ex. M.

**Response to Paragraph 53:** The cited law speaks for itself. Plaintiffs dispute that such law defines the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban, which applies to all persons and all places, is constitutional. As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

54.    His daughter Queen Elizabeth in 1597 (shortly before the first English settlement in America) issued "A Proclamation against the common use of Dagges, Handgunnes, Harqubuzes, Calliners, and Cotes of Defense." Belka Decl., ¶¶ 35-36, Ex. N.

**Response to Paragraph 54:** The cited law speaks for itself. Plaintiffs dispute that such law defines the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban is constitutional. As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

55.    Concerned that diverse persons had worn "privie Cotes and Doublets of Defense . . . and presume audaciously to apparel themselves with the said privie Armour, not

23

only in Cities, Townes, and publicke assemblie, but within her Majesties Court wheresover, . . to the great offence and contempt of her Highnes[s] and of her Laws, and to the hurt of divers her Majestie[']s good subjects," Queen Elizabeth's order "doth explicitly prohibit[] and forbid all and every of her subjects whatsoever, the wearing of any such Privie or secret kind of Cote, or Doublet of Defence," on pain of imprisonment. *Id.*

**Response to Paragraph 55:** The cited law speaks for itself.  Plaintiffs dispute that such law defines the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban, which applies to all persons and all places, is constitutional.  As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

56.    This tradition of prohibiting the wearing of armor made its way into the common law, such that by 1715 a guide for justices of the peace included a section on "Armour," containing not only the Statute of Northampton provision allowing for the arrest of persons who "go armed offensively," but also paragraph stating that persons who "shall go apparelled with privy Coats or Doublets" can have sureties imposed against them. Michael Dalton, *The Country Justice: Containing the Practice of the Justices of the Peace* at 37 (John Walton, printer 1715), Belka Decl., ¶ 37, Ex. O; see Carp. Decl. ¶ 10.

**Response to Paragraph 56:** The cited law speaks for itself.  Plaintiffs dispute that such law defines the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban, which applies to all persons and all places, is constitutional.  As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

24

57.    In his discussion of "Affrays," William Hawkins wrote that "a Man cannot excuse the wearing of such Armour in Publick, by alledging that such a one threatened him, and that he wears it for the Safety of his Person from Assault." Carp. Decl. ¶ 9 (quoting William Hawkins, A Treatise of the Pleas of the Crown, vol. 1 (London, 1716), p. 136, chap. 63, §8).

**Response to Paragraph 57:** The cited law speaks for itself.  Plaintiffs dispute that such law defines the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban, which applies to all persons and all places, is constitutional.  As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

58.    And this common-law tradition made its way across the Atlantic, as "[b]ooks about the common law and legislation deriving from the common law in early America still invoked the Statute of Northampton when defining an 'affray,' including the now arcane passage about 'armour,' as well as Hawkins's commentary on wearing armor in public." Carp. Decl. ¶ 11.

**Response to Paragraph 58:** The cited law speaks for itself.  Plaintiffs dispute that such law defines the "arms" that the People had the right to keep and bear under the Second Amendment, otherwise control the scope of that right, or suggest that the Body Armor Ban, which applies to all persons and all places, is constitutional.  As it does not, it is not material to any issue presented by the Motions for Summary Judgment.

59.    While the new laws prohibiting or restricting armor diminished or disappeared prior to the founding of the United States, the explanation for the lack of such laws is

straightforward: at the time of the Founding, personal body armor designed to defend against firearms was not in use. Carp Decl., ¶¶ 12-25.

**Response to Paragraph 59:** Disputed. Paragraph 59 contains a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. Plaintiffs do not dispute that there were no laws prohibiting or restricting armor prior to the founding of the United States, but dispute the legal conclusion that the lack of such laws was not evidence of a pre-existing right to keep and bear arms, including armor.

60.    It was a functionally obsolete technology that had been entirely eclipsed by the advent of gunpowder. Carp Decl., ¶ 14.

**Response to Paragraph 60:** Undisputed for purposes of this Motion that chain mail and suits of metal armor were dated technology at the time of the Founding, but dispute that all armor was obsolete. Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 25-26 (2025) (militia equipment mandates during the Founding Era). Plaintiffs further state that whether the arms were "in existence in the 18th century" is an argument that has been rejected by the Supreme Court as "bordering on the frivolous." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).

61.    At the time of the Founding, the development of firearms had "far outpaced armorers' ability to provide soldiers with bodily defense of their persons." Carp Decl., ¶ 14.

**Response to Paragraph 61:** Undisputed for purposes of this Motion, but not material to any issue presented by the Motions for Summary Judgment. Whether the arms were "in existence in the 18th century" is an argument that has been rejected by the Supreme Court as "bordering on the frivolous." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).

26

62.    By the eighteenth century, armor was not only wholly ineffective against musketry and artillery, but it was also dangerously impractical. The heavy metal suits of earlier eras robbed infantry of essential mobility and subjected soldiers to extreme health risks, including heat exhaustion during summer campaigns and the lethal threat of metal fragments being driven into the body by penetrating bullets. Carp Decl., ¶¶ 15–16.

**Response to Paragraph 62:** Disputed. Evidence supports that body armor remained in use throughout the Eighteenth Century. *E.g.*, Rotsko Decl. ¶ 44 & Ex. 39 (Treaty of Amity and Commerce Between the United States of America and His Most Christian Majesty, 8 Stat. 12, art XXIV (Feb. 6, 1778)); *Id.* ¶¶ 40-42 (and exhibits submitted therewith); *see also* Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 25-26 (2025).  Whether the arms at issue here were "in existence in the 18th century" is an argument that has been rejected by the Supreme Court as "bordering on the frivolous." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).

63.    Consequently, eighteenth-century militia statutes and Continental Army regulations never prescribed the wearing of body armor. Carp Decl., ¶ 26.

**Response to Paragraph 63:** Disputed.  Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 25-26 (2025) (discussing militia equipment mandates in the Eighteenth Century).

64.    The only vestigial remnants of armor present during the Founding Era, such as the "gorgets" worn by officers like George Washington, were strictly ornamental symbols of rank and diplomacy that "served no protective function whatsoever." Carp Decl., ¶¶ 19–20.

**Response to Paragraph 64:** Disputed. Not only is the purported "fact" mere rhetoric and hyperbole, but even as late as the 1770s, "bucklers, helmets, breast plates, coats of mail," were

27

considered the "kinds of arms, proper for arming soldiers." Rotsko Decl. ¶ 44 & Ex. 39 (Treaty of Amity and Commerce Between the United States of America and His Most Christian Majesty, 8 Stat. 12, art XXIV (Feb. 6, 1778).

65.     Because defensive armor was a defunct, abandoned technology that possessed no utility for civilian self-defense, the lack of any specific armor regulations from the Founding (or Reconstruction) eras reflects "a lack of political demand rather than constitutional limitations." Carp Decl., generally.

**Response to Paragraph 65:** Disputed. Paragraph 65 contains a legal conclusion, not a factual statement, and accordingly is improper in a Rule 56(a) statement. Plaintiffs do not dispute that there were no specific armor regulations from the Founding (or Reconstruction) eras, but maintain that the lack of such laws is a legislative fact providing evidence of a pre-existing right to keep and bear arms, including armor. To the extent this statement contains factual assertions, they are disputed. In the Eighteenth Century, "bucklers, helmets, breast plates, coats of mail," were considered the "kinds of arms, proper for arming soldiers." Rotsko Decl. ¶ 44 & Ex. 39 (Treaty of Amity and Commerce Between the United States of America and His Most Christian Majesty, 8 Stat. 12, art XXIV (Feb. 6, 1778). And bullet proof vests were used during the Civil War. Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 30-35 (2025); Bashford Dean*, Helmets and Body Armor in Modern Warfare* (1920), at 56-58.

66.     The body armor at issue here, engineered from advanced synthetic materials like Kevlar to stop high-velocity ammunition, did not begin to emerge until the late 19th and 20th centuries. Carp Decl., ¶¶ 28–29.

**Response to Paragraph 66:** Undisputed for purposes of this Motion, but not material to any issue presented by the Motions for Summary Judgment. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," and which are "modern forms" of arms. *D.C. v. Heller*, 554 U.S. 570, 582 (2008).

67.    Earlier 19th-century experiments, such as steel breastplates sold to soldiers during the Civil War, were widely mocked as heavy, hot, ineffective, and "little more than technological curiosities." Carp Decl., ¶ 27.

**Response to Paragraph 67:** Disputed. Bullet proof vests were used during the Civil War, although often secretly, since some considered them unmanly. Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1, 30-35 (2025); Bashford Dean*, Helmets and Body Armor in Modern Warfare* (1920), at 56-58. Further, this statement is not material to any issue presented by the Motions for Summary Judgment. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," including "modern forms" of arms. *D.C. v. Heller*, 554 U.S. 570, 582 (2008).

68.    The modern incarnation of body armor was never contemplated by the Founders, was not possessed by early Americans, and descends from a historical lineage of tactical gear strictly regulated and restricted to the government's peaceable forces. Carp Decl., *generally.*

**Response to Paragraph 68:** Disputed, but not material to any issue presented by the Motions for Summary Judgment. Whether the arms were "in existence in the 18th century" is an

argument that has been rejected by the Supreme Court as "bordering on the frivolous." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).

69.     The unusually dangerous nature of modern ballistic body armor is demonstrated by the way it has become a key part of the modern mass shooter's toolkit. Schildkraut Decl., ¶¶ 16-17; Figures 1 and 2.

**Response to Paragraph 69:** Paragraph 69 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. Plaintiffs dispute unsupported descriptors like "a key part of the modern mass shooter's toolkit," and note that in a mere 7.5% out of 375 mass public shooting incidents, as claimed by Ms. Schildkraut, was "some form of tactical gear . . . utilized by the perpetrators." Plaintiffs also note that "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," including "modern forms" of arms. *D.C. v. Heller*, 554 U.S. 570, 582 (2008). "The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 783 (2010). That being so, Paragraph 69 is not material to any issue presented by the Motions for Summary Judgment.

70.     As detailed by Dr. Jaclyn Schildkraut, a leading expert on mass shootings, the use of tactical gear by mass shooters has steadily and alarmingly increased over the last two decades. *Id.*

**Response to Paragraph 70:** Plaintiffs dispute unsupported descriptors like "steadily and alarmingly increased," and note that this claim is not supported by the figure referenced. Regardless, Paragraph 70 is not material to any issue presented by the Motions for Summary Judgment. "The right to keep and bear arms . . . is not the only constitutional right that has

controversial public safety implications." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 783 (2010).

71.    The primary impetus for perpetrators utilizing body armor is chillingly pragmatic: the most common ballistic vests "can withstand fire from standard police-issued handguns," ensuring that a shooter "would likely be able to continue their killing until they are met with greater force." Schildkraut Decl., ¶ 10.

**Response to Paragraph 71:** Disputed. Plaintiffs dispute unsupported descriptors like "primary impetus" and "chillingly pragmatic." Regardless, the statements contained in Paragraph 71 are not material to any issue presented by the Motions for Summary Judgment.

72.    The trend of armor use in mass shootings "began around 2008, reflecting that the use of body armor by mass shooting perpetrators is a newer development," and "the proportion of mass shooting incidents in which body armor was used continues to increase over time." *Id.* ¶ 17.

**Response to Paragraph 72:** Disputed. Plaintiffs dispute unsupported descriptors like "trend" and also dispute that this claim is supported by the material referenced. Regardless, the statements contained in Paragraph 72 are not material to any issue presented by the Motions for Summary Judgment.

73.    Because mass shooters study and learn from the tactical successes of their predecessors, "it is expected that the rise in the use of body armor among mass shooters w[ill] continue to increase in the future." *Id.* ¶ 10.

**Response to Paragraph 73:** Disputed. Paragraph 73 is not supported by a citation to admissible evidence, and the opinion offered does not meet the *Daubert* standard for admissibility. *Buckley v. Deloitte & Touche USA LLP*, 541 F. App'x 62, 63 (2d Cir. 2013).

Additionally, Plaintiffs dispute that this claim is supported by the material referenced or capable of being the subject of admissible expert testimony. Regardless, the Statements contained Paragraph 73 are not material to any issue presented by the Motions for Summary Judgment.

74.    Modern ballistic body armor involves societal concerns and dramatic technological changes (see *Bruen* at 27) – the military-grade Level III armor and accessories chosen by the Buffalo shooter – involves both. Schildkraut Decl. ¶¶ 22-23.

**Response to Paragraph 74:** Paragraph 74 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement  or an expert report. To the extent a response is required, Plaintiffs note that the "societal problem" is the same recognized in *Heller* and *Bruen*, gun violence in densely populated areas, and that under *Bruen*, and without regard to technological change, "the Second Amendment's definition of "arms" . . . covers modern instruments that facilitate armed self-defense," *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 28 (2022).

75.    The "dramatic technological change" is the advent of armor that can stop a bullet, something that would have been unthinkable to the Founding or Reconstruction generations. Carp Decl., ¶¶ 14-16.

**Response to Paragraph 75:** Paragraph 75 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. To the extent a response is required, the dramatic technological change is overstated (body armor does not render its wearer invincible). All the same, and despite any "dramatic technological change," *Bruen* established that "the Second Amendment's definition of 'arms' . . . covers modern instruments that facilitate armed self-defense," *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 28

(2022). "[T]he Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

76.    The armor of the 18th century was "functionally obsolete," totally ineffective against musketry, and incredibly hazardous to the wearer's health. Carp Decl., ¶¶ 14-16.

**Response to Paragraph 76:** Disputed.  See Response to Paragraphs 62, 64-65, and 67 above, which this Paragraph summarizes.  Whether the arms were "in existence in the 18th century" is an argument that has been rejected by the Supreme Court as "bordering on the frivolous." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).

77.    Body armor companies are well aware of the unprecedented threat to law enforcement officers, which is why market leaders in the armor industry do not sell to persons outside the military, law enforcement, and certain allied professions. Belka Decl., Ex. P at 6-13; Schildkraut Decl., ¶¶ 20-24, Exhibit D.

**Response to Paragraph 77:** Disputed. Plaintiffs dispute the unsupported descriptors of "well aware," "unprecedented threat," and "market leaders," note that the statement is not generally supported by admissible evidence, as Mr. Foreman can no longer testify and is not being proffered as an expert. Mr. Gendron's statements, though laundered through Ms. Schildkraut, remain hearsay under Fed. R. Evid. 802, as it is not the statement of any opposing party in this case and not subject to any hearsay exception." Regardless, the contemporary, voluntary choices of body armor companies, whatever they may be, do not define the "arms" that the People had the right to keep and bear under the Second Amendment. Accordingly, Paragraph 77 is not material to any issue presented by the Motions for Summary Judgment. Further, a review of the websites of approximately 70 body armor manufacturers indicate that they sell to the consumer market. Pls. App'x Exhibit O.

33

78.    The Buffalo shooter noted this multiple times in his manifesto, complaining that "many of the S+ tier IIIA armor like the Safariland Hardwire are only available to certain credentials because of [expletive] companies" Schildkraut Decl., ¶¶ 20-24, Exhibit D at 8 and 12 and that "Avon Protection, Gentex, BAE systems, United Shield, ArmorSource, Safariland PROTECH, and Point Blank PARACLETE all make great helmets but the mass majority of them are only available to the government and police." *Id.*

**Response to Paragraph 78:** The cited "manifesto" speaks for itself, but remains hearsay under Fed. R. Evid. 802, as it is not the statement of any opposing party in this case and not subject to any hearsay exception. Nor is it material to any issue presented by the Motions for Summary Judgment. Before adoption of the Body Armor Ban, the wearing of body armor in connection with the commission of any violent felony offense was a Class E Felony under New York Law. *See* New York Penal Law § 270.20.

79.    This policy was explained by the State Defendants' fourth expert, Michael Foreman, a retired Chief with 40 years of law enforcement experience who was Executive Vice President at Point Blank Enterprises until his untimely death in January 2026. *See* Belka Decl., Ex. P at 6-7.

**Response to Paragraph 79:** Undisputed for purposes of this Motion, however Plaintiffs dispute that the Court may consider the declaration containing inadmissible hearsay from a person who is deceased.

80.    Mr. Foreman wrote that body armor exists to "protect the protectors," and that "[r]estrictions on the sale and possession of body armor are an essential element in the steps necessary to protect those who serve." Belka Decl., Ex. P at 8, 11.

34

**Response to Paragraph 80:** Disputed. This is an opinion, not a factual assertion. Plaintiffs dispute the unsupported descriptor of "essential element" and note that the statement is not generally supported by admissible evidence, including by the testimony of Mr. Foreman, who can no longer testify, and maintain that law-abiding citizens are among the protectors who enjoy the right to keep and bear arms, including body armor, for their defense and the defense of others.

81.    "Law enforcement today faces far too many threats to their safety without making it easier to obtain body armor for non-qualifying individuals," which is why the "top [body armor] companies have chosen to make it their practice to only sell to qualifying professionals." Belka Decl., Ex. P at 6-8, 11-12.

**Response to Paragraph 81:** Disputed. This is an opinion, not a factual assertion. Plaintiffs dispute the unclear descriptor of "far too many threats," "non-qualifying individuals," "top [body armor] companies," and "qualifying professionals," and note that the statement is not generally supported by admissible evidence, including by the testimony of Mr. Foreman, who can no longer testify. Regardless, the contemporary, voluntary choices of body armor companies, whatever they may be, do not define the "arms" that the People had the right to keep and bear under the Second Amendment. Accordingly, Paragraph 81 is not material to any issue presented by the Motions for Summary Judgment.

82.    At common law "[t]he wearing of armor in public by people other than peacekeepers was understood to be terrifying to the people and therefore subject to prohibition." Carp Dec. ¶ 9; *see Id. generally.*

**Response to Paragraph 82:** Paragraph 82 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. To the extent a response is required,

paragraph 82 is disputed on the ground that it is not supported by admissible evidence, as it constitutes an inadmissible legal opinion. *See In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("The rule prohibiting experts from providing their legal opinions or conclusions is "so well-established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle."). Regardless, Plaintiffs dispute that the common law recognizes any such principle, even if it did, that it delimits the right of the People to keep and bear arms under the Second Amendment and, even if it did, would suggest that the Body Armor Ban, which applies to the purchase of body armor by all persons for all uses and in and all places, is constitutional.

83.    As it was in medieval England, as the wearing of modern ballistic body armor in public justifiably causes people to anticipate mass violence. *See, e.g., Jeff Murray, Weapons charges follow concerning Facebook live: Why Broome County Schools locked down*, Binghamton Press & Sun-Bulletin (Dec. 13, 2022) (discussing lockdowns in medical facilities and nine school districts after video "showing a man wearing what appeared to be ballistic body armor and displaying a handgun while operating a vehicle"); WEVVV, *Fairfield schools placed on lockdown Wednesday after armed man arrested nearby* (Feb. 26, 2026), https://tinyurl.com/yueknjjz (lockdown due to a man "found walking through a neighborhood armed with a loaded rifle and wearing body armor"); Bethany Fowler, *Lockdown lifted for SCC Jackson Campus following felon wearing body armor on the loose*, WSPA (June 7, 2022), https://tinyurl.com/mr38m6sw; see also Eric Scott, *Man Training for Marathon Triggers School Lockdown in Wildwood Crest, NJ*, New Jersey 101.5 (Sept. 20, 2022), https://tinyurl.com/y7ayh9rz (lockdown after weighted running vest mistaken for ballistic armor). Belka Decl., ¶ 49.

**Response to Paragraph 83:** Disputed. Paragraph 83 is disputed on the ground that the statement is not supported by admissible evidence, as the websites cited are hearsay not subject to any hearsay exception. Regardless, Plaintiffs dispute that American law recognizes any such principle, even if it did, that it delimits the right of the People to keep and bear arms under the Second Amendment and, even if it did, would suggest that the Body Armor Ban, which applies to the purchase of body armor by all persons for all uses and in and all places, is constitutional.

84.    Plaintiffs market research reports and the Greenlee article are provided to the court for the truth of the matter asserted without any viable hearsay exception. Belka Decl., ¶ 50.

**Response to Paragraph 84:** Paragraph 84 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. To the extent a response is required, the market research reports fit within the definition of the hearsay rule, Fed. R. Evid. 803:17. With respect to the statements in the article entitled *The Tradition of Armor Use and Regulation in America*, by Mr. Joseph G.S. Greenlee, that was published in the 23rd volume of the Georgetown Journal of Law & Public Policy in 2025, they are either legislative facts or subject to judicial notice, but in any case not subject to the rules against hearsay.

To the extent deemed an adjudicative fact, the authenticity of Mr. Greenlee's article and the fact of its publication is subject to judicial notice under Fed. R. Evid. 201; *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 299 (S.D.N.Y. 2012), as is the truth of the statements contained therein involving the historical legal acts of the various states. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("'The law of any State of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the

United States are bound to take judicial notice, without plea or proof.'" (quoting *Lamar v. Micou,* 114 U.S. 218, 223 (1885))). This rule has been applied by the Second Circuit in deciding challenges under the Second Amendment. *United States v. Vereen*, 152 F.4th 89, 101 n.3 (2d Cir. 2025), *cert. denied sub nom. Perez v. United States*, 223 L. Ed. 2d 536 (Jan. 12, 2026) (holding that "judicial notice of historical evidence is admissible when there is no dispute as to the authenticity of such materials and judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible" (citation marks omitted)). To the extent they are considered legislative facts, the federal rules of evidence do not apply at all. *See Langevin v. Chenango Ct., Inc.*, 447 F.2d 296, 300 (2d Cir. 1971) (Friendly, J.) (distinguishing between "'adjudicative facts,' that is, 'facts about the parties and their activities, businesses, and properties,'" ad those "'general facts which help the tribunal decide questions of law and policy and discretion.'" (citation omitted)).

85.     Plaintiffs commissioned market research reports, circumventing discovery safeguards outlined in the Federal Rules of Evidence. [ECF No. 69-5], Exs. 1, 3, 5 & 6 (at least two of which they appear to have commissioned. *See id.* Exs. 2 & 4; *cf. id.* Ex. 1 at 10 (indicating that the report was made "in response to requests/orders received"). Belka Decl., ¶ 51.

**Response to Paragraph 85:** Paragraph 85 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. Moreover, the publication of the market research reports, *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 299 (S.D.N.Y. 2012), as well as the facts they are offered to show—the general magnitude and trend of the consumer body armor market—are subject to judicial notice, *see Mech. Licensing Collective v. Spotify USA Inc.*, 763 F. Supp. 3d 608, 617 (S.D.N.Y. 2025) (taking "judicial notice of the fact that there

is a wide market for audiobooks in the United States" and "that audiobooks generally are products of value").

86.     These sources are not offered by any witness with personal knowledge, as required by F. R. Evid. 602, but simply attached to the declaration of Plaintiffs' attorney. *Cf. FTC v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) ("An attorney's affidavit or declaration not based on personal knowledge carries no weight."). Belka Decl., ¶ 52.

**Response to Paragraph 86:** Paragraph 86 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. To the extent a response is required, the declaration of Mr. Rotsko was made with personal knowledge of the authenticity of the market research reports, *United States v. Al Farekh*, 810 F. App'x 21, 25 (2d Cir. 2020) (noting that there is a "relatively low bar for authentication of evidence"), and does not go "beyond the introduction of documents." As such, there is no basis to strike any portion of the declaration. *See FTC v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) (refusing to strike the declaration, but declining to consider certain "legal arguments and factual allegations contained within" the declaration).

87.     Plaintiffs did not disclose these documents to the State Defendants prior to their appearance in connection with this motion, did not disclose the identities of the persons who compiled these documents in their initial disclosures. Depriving State Defendants any opportunity to cross-examine any witness in connection with these documents. Belka Decl., ¶ 53, Ex. R.

**Response to Paragraph 87:** Paragraph 87 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. To the extent a response is required, Plaintiffs

had no obligation to disclose legislative facts or adjudicative facts subject to judicial notice on a motion for summary judgment. *See* Fed. R. Evid. 201(c)(1), (d) (providing that the court "may take judicial notice on its own" and "at any stage in the proceeding"). That body armor is widely and lawfully sold is such a fact.

88.    Joseph Greenlee is not a historian; he is former the Director of the NRA's Office of Litigation. Belka Decl., ¶ 54. *See* https://fedsoc.org/bio/joseph-greenlee.

**Response to Paragraph 88:** Disputed, as the statement is not supported by the citation provided or any other evidence in the record. A person may both be a historian and the former director of the NRA's Office of Litigation. Over the past decade, Mr. Greenlee has published numerous law review articles examining the legal history and tradition of firearm regulation in the United States. *See* Joseph Greenlee, Publications (last visited May 28, 2026), https://www.josephgreenlee.org/publications. This work has been cited by nearly every United States Court of Appeals, including, for example, in *United States v. Cordova*, __ F.4th __ (5th Cir. May 20, 2026), *Christian v. James*, __ F.4th __ (2d Cir. May 18, 2026); *United States v. Watson*, 171 F.4th 1012 (7th Cir. 2026); *Knife Rights, Inc. v. Bonta*, 165 F.4th 1330 (9th Cir. 2026); *Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026); *United States v. Harrison*, 153 F.4th 998 (10th Cir. 2025); *United States v. Bridges*, 150 F.4th 517 (6th Cir. 2025); *United States v. Dubois*, 139 F.4th 887 (11th Cir. 2025); *Lara v. Comm'r Pa. State Police*, 125 F.4th 428 (3d Cir. 2025); *United States v. Jackson*, 110 F.4th 1120 (8th Cir. 2024).

89.    At the time he wrote the article, Greenlee was Director of Constitutional Studies at the FPC Action Foundation, a nonprofit affiliated with Plaintiff Firearms Policy Coalition and headquartered at the same address. *See* Belka Decl., ¶ 55; 23 Geo. J.L. & Pub. Pol'y at 1 n.a1.

40

**Response to Paragraph 89:** The cited law review article speaks for itself and discloses this affiliation. FPC Action Foundation is not a plaintiff in this case, nor is the statement contained in Paragraph 89 material to any issues presented by the Motions for Summary Judgment.

90.    Plaintiffs do not disclose this affiliation in any of the five times they cite to Mr. Greenlee in their brief. *See generally*, [ECF No. 71] at 12, 15, 20.

**Response to Paragraph 90:** The Plaintiffs' brief speaks for itself while the law review article discloses this affiliation. Mr. Greenlee's prior affiliations are not material to any issues presented by the Motions for Summary Judgment.

91.    Plaintiffs did not disclose to counsel or the Court that they paid for its creation. Belka Decl., ¶ 57. *See* Plaintiff FPC's July 2024 press release announcing the instant lawsuit, the organization states that "FPC commissioned research on the history and tradition of defensive armor use and regulation" leading to "a forthcoming law review article," namely the Greenlee piece. *See* https://www.firearmspolicy.org/fpc-sues-new-york-to-strike-down-body-armor-ban (last accessed April 18, 2026).

**Response to Paragraph 91:** Disputed, but not material to any issues presented by the Motions for Summary Judgment. As shown by their public press release, FPC publicly disclosed their commissioning of the research that resulted in the publication of the law review article entitled *The Tradition of Armor Use and Regulation in America*, by Mr. Joseph G.S. Greenlee, that was published in the 23rd volume of the Georgetown Journal of Law & Public Policy in 2025. This Court may take judicial notice of FPC's website. *See Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 247 (S.D.N.Y. 2025) ("[A] court may take judicial notice of information

41

publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" (citation omitted)).

92. Mr. Greenlee's article does not disclose that it was "commissioned" by Plaintiff FPC, nor that it was prepared for the purpose of litigation, nor that the litigation it was prepared for was this lawsuit. Belka Decl., ¶ 58.

**Response to Paragraph 92:** The cited law review article speaks for itself and discloses Mr. Greenlee's affiliation. 23 Geo. J.L. Pub. Pol'y 1 n. a1. Moreover, Paragraph 92 is a legal conclusion, not a factual statement, and accordingly improper in a Rule 56(a) statement. To the extent a response is required, the statement that Mr. Greenlee's article "was prepared for the purpose of litigation" or "for . . . this lawsuit" is disputed on the ground that the statements contained therein are not supported by admissible evidence, but instead "veer[] into legal argument and factual allegations for which Attorney [Belka] has no personal knowledge." *Fed. Trade Comm'n v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017). Further, that Mr. Greenlee's article was accepted for publication by a reputable law journal indicates that it is a serious contribution to legal scholarship.

Respectfully Submitted,                    FLUET

Dated:   McLean, Virginia                  By: /s/ *Nicolas J. Rotsko*
         May 29, 2026                              Nicolas J. Rotsko, Esq.

                                           1751 Pinnacle Drive
                                           Suite 1000
                                           Tysons, VA 22102
                                           T: (703) 590-1234
                                           F: (703) 590-0366
                                           nrotsko@fluet.law
                                           *Attorney for Plaintiffs*