UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BENJAMIN HEETER, JOSEPH WURTENBERG, and the
FIREARMS POLICY COALITION, INC,

Plaintiffs,

v.

LETITIA JAMES, in her official capacity as Attorney General
of the State of New York, STEVEN G. JAMES, in his official
capacity as Superintendent of the New York State Police,
MICHAEL J. KEANE, in his official capacity as District
Attorney for the County of Erie, and SANDRA DOORLEY,
in her official capacity as District Attorney for the County of
Monroe,

Defendants.

No. 1:24-cv-00623-JLS-HKS

## STATE DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR
## CROSS-MOTION FOR SUMMARY JUDGMENT

LETITIA JAMES
Attorney General
State of New York
350 Main Place, Suite 300A
Buffalo, New York 14202

Ryan L. Belka
James M. Thompson
Assistant Attorneys General
Of Counsel

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT .......................................................................................................... 1

    I.    PLAINTIFFS CANNOT RAISE AN UNPLED AS-APPLIED CHALLENGE FOR THE FIRST TIME ON REPLY ................................................................................1

    II.    PLAINTIFFS' CHALLENGE FAILS AT THE FIRST STEP OF THE *BRUEN/ RAHIMI* TEST ...................................................................................................2

        A.    Plaintiffs Have Not Shown That The Original Public Understanding of "Arms" Included Armor, And Dictionaries Alone Are Insufficient to Carry Their Burden ...................................................................................... 3

        B.    Plaintiffs Have Not Established That Body Armor Is In Common Use By Civilians For Self-Defense.................................................................... 6

    III.    THE HISTORICAL RECORD DEMONSTRATES AN ENDURING TRADITION OF GOVERNMENTS PROHIBITING THE WEARING OF BODY ARMOR, AND PLAINTIFFS HAVE ADDUCED NO CONTRARY HISTORICAL EVIDENCE .......10

CONCLUSION........................................................................................................ 12

## TABLE OF AUTHORITIES

**Cases**

*AFSCME Council 79 v. Scott*, 717 F.3d 851 (11th Cir. 2013)............................................................ 2

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)....................................................................... 3, 11

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ................................................................................... 9

*Calce v. Tisch*, No. 25-861, 2026 WL 980092 (2d Cir. Apr. 13, 2026) .................................... 6, 7

*Christian v. James*, 176 F.4th 189 (2d Cir. 2026)........................................................................ 2

*District of Columbia v. Heller*, 554 U.S. 570 (2008).......................................................... 3, 5, 6, 10

*Irish v. Tropical Emerald LLC*, No. 18 Civ. 82, 2021 WL 1827115 (E.D.N.Y. May 6, 2021).... 11

*Lane v. Cacace*, No. 22 Civ. 10989, 2025 WL 903766 (S.D.N.Y. Mar. 25, 2025)....................... 9

*Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213 (2d Cir. 2025)...................................... 6, 7

*Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63 (D. Conn. 2023) ............................... 7

*Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98 (2d Cir. 2025) .................................. 2

*NYSRPA v. Bruen*, 597 U.S. 1 (2022) ....................................................................................... 10

*Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368 (D.R.I. 2022).......................... 4

*Or. Firearms Fed. v. Kotek*, 682 F. Supp. 3d 874 (D. Or. 2023)................................................... 9

*Rocky Mtn. Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024)................................................. 4

*Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268 (4th Cir. 2025)............................................ 4

*Stupak-Thrall v. United States*, 89 F.3d 1269 (6th Cir. 1996) ..................................................... 2

*Syracuse Mtns. Corp. v. Petroleos de Venezuela S.A.*, No. 21 Civ. 2684, 2024 WL 3637997
   (S.D.N.Y. Aug. 1, 2024) ........................................................................................................ 8

*United States v. Arrington*, 634 F. Supp. 3d 57 (W.D.N.Y. 2022)................................................ 8

*United States v. Boler*, 115 F.4th 316 (4th Cir. 2024) ................................................................. 4

*United States v. Bridges*, 150 F.4th 517 (6th Cir. 2025)............................................................... 9

*United States v. Costello*, 666 F.3d 1040 (7th Cir. 2012)............................................................. 3

*United States v. Davis*, 906 F. Supp. 2d 545 (S.D.W. Va. 2012) ................................................. 6

*United States v. Fayton*, 704 F. Supp. 3d 449 (S.D.N.Y. 2023) ...................................................... 2

*United States v. Gomez*, 159 F.4th 172 (2d Cir. 2025) ................................................................ 6

*United States v. Rahimi*, 602 U.S. 680 (2024) .................................................................. 1, 5, 9

*United States v. Sprague*, 282 U.S. 716 (1931) ......................................................................... 3

*United States v. Wendt*, 168 F.4th 1068 (8th Cir. 2026)............................................................. 9

*Vt. Fed. of Sportsman's Clubs v. Birmingham*, No. 23 Civ. 710, 2024 WL 2150522
    (D.Vt. May 14, 2024)............................................................................................................ 4

*Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723 (U.S. June 25, 2026)............................ 3, 4, 6

## Rules

Fed. R. Civ. P. 37................................................................................................................... 7, 8

Fed. R. Evid. 602 .................................................................................................................... 7

Fed. R. Evid. 802 .................................................................................................................... 7

Local Rule of Civil Procedure 56 .......................................................................................... 10

## Other Authorities

An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and
    encouraging the Importation of the same, Ch. 33, § 1, 1 Stat. 369, 369 (1794) ........................ 3

Daniel Farr, *Body-armored gunman with frightening messages scrawled on rifle arrested after
firing shot near Trump's LA golf course*, N.Y. Post (Apr. 14, 2026) ...................................... 12

J.E. Worcester, *Comprehensive Pronouncing and Explanatory Dictionary of the English
Language* (Chauncey Goodrich 1831)...................................................................................... 5

Scott Flynn, *Georgia man opens fire on family reunion with AR-15 following racist tirade*,
    WSB-TV Atlanta (June 12, 2026) .......................................................................................... 12

Defendants Steven G. James, sued in his official capacity as Superintendent of the New York State Police, and Letitia James, sued in her official capacity as Attorney General of the State of New York (collectively, the "State Defendants"), respectfully submit this memorandum of law in further support of their cross-motion for summary judgment, ECF No. 77.

## PRELIMINARY STATEMENT

Plaintiffs ask this Court to become the first federal court ever to hold that body armor – including the military-grade armor increasingly used by mass shooters, including the Buffalo Tops shooter – is a constitutional right.  Against a centuries-long tradition of armor regulation that was integrated into the common law and brought over to the American colonies, Plaintiffs offer only a few secondary dictionary definitions, at odds with the public meaning of the term "Arms" in the Founding and Reconstruction eras, and no historical showing that any court or commentator, anywhere, viewed restrictions on body armor as unconstitutional.  Plaintiffs' challenge also requires the Court to find that "the Rules of Evidence do not apply," ECF No. 80 (the "P. Reply") at 29, to admit hearsay documents that expressly disclaim reliance, and to credit the substantive self-serving testimony of their own attorney, never disclosed as an expert or even a witness in this case.  The Court should decline the opportunity to reach such an ahistorical result premised on a circumvention of the Federal Rules.

## ARGUMENT

### I.   PLAINTIFFS CANNOT RAISE AN UNPLED AS-APPLIED CHALLENGE FOR THE FIRST TIME ON REPLY

Understanding that they cannot clear the high burden of proof required in a pre-enforcement facial challenge, Plaintiffs now seek to recast their claims as an "as-applied" challenge. P. Reply at 25-28; *cf. United States v. Rahimi*, 602 U.S. 680, 693 (2024) (a facial challenge is "the most difficult challenge to mount successfully, because it requires a [challenger]

1

to establish that no set of circumstances exists under which the Act would be valid." (citation modified)). There is no basis to allow Plainitffs to add a new constitutional theory in their summary judgment reply, particularly when they concede that "Plaintiffs did not expressly refer to an as-applied challenge in their First Amended Complaint." P. Reply at 16; *see Christian v. James*, 176 F.4th 189, 203 (2d Cir. 2026) (rejecting attempt by same institutional Plaintiff and counsel to recast a facial constitutional challenge into an as-applied challenge because "[t]heir complaint plainly does not raise such a challenge."). Moreover, although Plaintiffs now assert that they want an as-applied ruling, they do not point to any specific set of facts that they contend gives rise to such a challenge.[1] *See Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 107 (2d Cir. 2025) (emphasizing that as-applied challenges "must focus on specific conduct" and rejecting late-raised as-applied Second Amendment claim), *cert. denied* 2026 WL 1717981 (U.S. June 15, 2026); *United States v. Fayton*, 704 F. Supp. 3d 449, 453 (S.D.N.Y. 2023) (refusing to consider Second Amendment challenge raised on reply where challenger "offers no as-applied-specific arguments"). And in any event, "[a]rguments made for the first time in a reply brief need not be considered by a court." *Fayton*, 704 F. Supp. 3d at 453 (citation omitted).

## II. PLAINTIFFS' CHALLENGE FAILS AT THE FIRST STEP OF THE *BRUEN/RAHIMI* TEST

As an initial matter, Plaintiffs' challenge fails at the first, textual step of the *Bruen* analysis, under which courts consider whether a law "concern[s] any form of 'Arms,' *i.e.* any

---

[1] Plaintiffs' reliance on two out-of-circuit cases, *AFSCME Council 79 v. Scott*, 717 F.3d 851 (11th Cir. 2013) and *Stupak-Thrall v. United States*, 89 F.3d 1269 (6th Cir. 1996) is misplaced. In *Council 79*, before the text quoted by Plaintiff, the court explained that "[w]here 'an injunction . . . reach[es] beyond the particular circumstances of these plaintiffs,' it 'must therefore satisfy [the Supreme Court's] standards for a facial challenge to the extent of that reach." 717 F.3d at 863. Plaintiffs also rely on a dissent in *Stupak-Thrall* positing a guideline to construe regulatory challenges "as-applied" unless the challenge to a regulation is based purely on the authorizing statute. P. Reply at 18 (quoting 89 F.3d at 1288). Aside from the distinguishable nature of the facts of *Stupak-Thrall*, here Plaintiffs are challenging the equivalent of an authorizing statute and, thus, even by the logic of the cases cited by Plaintiff, can only bring a facial challenge.

2

weapon customarily used for offensive or defensive purposes." *Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723, at \*6 (U.S. June 25, 2026). The Body Armor Law, which does not concern any such "weapon," simply falls outside of that textual scope.

A.  Plaintiffs Have Not Shown That The Original Public Understanding of "Arms" Included Armor, And Dictionaries Alone Are Insufficient to Carry Their Burden

First, despite plaintiffs' assertions of "the primacy of dictionary-based ordinary meaning," P. Reply at 23, the Supreme Court is quite clear that "the Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)); *see also United States v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012) (Posner, J.) ("Dictionary definitions are acontextual, whereas the meaning of sentences depends critically on context, including all sorts of background understandings."). Plaintiffs have not carried their burden because "*Bruen* requires courts to . . . interpret[] the plain text of the Amendment as historically understood," *Antonyuk v. James*, 120 F.4th 941, 968 (2d Cir. 2024), not seek ahistorical definitions that vary from how our ancestors would have understood the Amendment's plain meaning.

The sources of Constitutional meaning in the record before the Court all support the understanding that the "most natural reading" of "Arms" is "weapons." *Heller*, 554 U.S. at 582. As the State Defendants demonstrated, ECF No. 77-1 at 11-12, when the early Congresses passed laws concerning the "Arms" necessary to secure a free nation, they enumerated lists of weapons only. *See, e.g.,* An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same, Ch. 33, § 1, 1 Stat. 369, 369 (1794) (defining "Arms" as "any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenados [sic], gunpowder, sulphur, or saltpetre," with no mention of armor). Plaintiffs do not respond to

3

this history, let alone dispute it.

The State Defendants introduced the expert report of Dr. Dennis Baron, who used the tools of corpus linguistics to analyze the way Americans in the Founding and Fourteenth Amendment eras actually used the terms "arms" and "armor," finding that the term "arms" did not include body armor as used by the American public in either era. *See* Baron Dec. ¶ 5. The use of corpus linguistics is particularly appropriate because the governing historical analysis is geared toward "the general understanding of that codified right at the relevant point in time," *Wolford*, 2026 WL 1825723 at *11, and the breadth of historical sources considered reflects that generalized understanding, rather than a narrower or more idiosyncratic one in a secondary dictionary definition. Plaintiffs do not meaningfully dispute Dr. Baron's conclusion, nor do they offer rebuttal expert testimony or move to exclude Dr. Baron's testimony under Federal Rule of Evidence 702. Instead, they simply suggest that the Court should ignore the data, despite the many courts that have endorsed corpus linguistics as a key tool of textual interpretation and relied on Professor Baron in specific.[2] *See Rocky Mtn. Gun Owners v. Polis*, 121 F.4th 96, 114 (10th Cir. 2024) ("To aid in interpreting the plain text [of the Second Amendment], the challenger may consult 18th century dictionaries and treatises, utilize corpus linguistics . . ."); *see, e.g., Vt. Fed. of Sportsman's Clubs v. Birmingham*, No. 23 Civ. 710, 2024 WL 2150522, at *3-4 (D.Vt. May 14, 2024) (looking to Professor Baron in understanding the historical scope of the term "Arms"); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 387 (D.R.I. 2022) ("The Court finds credible the state's expert, Prof. Dennis Baron, a professor of linguistics with an emphasis on 'historical language usage,' and accepts his opinion.").

---

[2] The major authority cited by Plaintiffs for rejecting corpus linguistics, a footnote from the Fourth Circuit's decision in *United States v. Boler*, 115 F.4th 316, 325 n.5 (4th Cir. 2024); *see* P. Reply at 23, appears to be an outlier even in that circuit, which has continued to utilize corpus linguistics as a tool of originalist interpretation in opinions issued after the *Boler* footnote. *See, e.g., Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 276 (4th Cir. 2025).

4

Even if the Court were to view dictionary definitions as governing over history, the text of Plaintiffs' dictionaries do not support the broad claims Plaintiffs are making. While several of the examples attached to the Rotsko Declaration include *some* definitions of "Arms" that could include armor, the bulk of them have *primary* definitions that refer specifically to weapons. *See, e.g.,* Rotsko Decl. Ex. 8 (first definition: "In general, all kinds of weapons"); *id.* Ex. 9 ("In *law*, any thing which a man takes in his hand in anger, to strike or assault another."); *id.* Ex. 10 (sole definition: "All portable weapons"); *id.* Ex. 11 (first definition: "in general, all kinds of weapons"); *id.* Ex. 12 (first definition "'All manner of weapons made use of by men"); *id.* Ex. 17 (first definition: "weapons"); *id.* Ex. 18 (first definition: "all weapons that serve to attack an enemy, or defend one's self.").[3] Even if the Court were to focus on dictionaries as opposed to "the stated intentions and understanding of the Framers and Ratifiers of the Constitution" or "the understandings of the American people from the pertinent ratification era," *Rahimi*, 602 U.S. at 719 (Kavanaugh, J., concurring), the dictionaries show that the primary understanding of "Arms" was "weapons."

With little more than secondary dictionary definitions to support their case, Plaintiffs ask the Court to beg the question for them, asserting that the Supreme Court has already *sub silentio* held that the term "Arms" covers body armor. *See* P. Reply at 21. It has not. Nothing in *Heller*, *Bruen*, *Rahimi*, or any other Supreme Court precedent put the textual status of body armor before the Court, nor has the Court opined on the question. *See Heller*, 554 U.S. at 592 ("Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry *weapons* in case of confrontation." (emphasis added)). And the Court's most recent opinion

---

[3] Plaintiffs' Exhibit 15 cuts off just before the definition of "arms," likely because the definition does not support their position. Joseph Worcester's 1831 dictionary defined "Arms" in pertinent part as "*weapons* of offence or defence." J.E. Worcester, *Comprehensive Pronouncing and Explanatory Dictionary of the English Language* 22 (Chauncey Goodrich 1831) (emphasis added), https://tinyurl.com/wtr6aetc/.

in *Wolford v. Lopez* explicitly defines Arms as "weapons customarily used for offensive or defensive purposes." 2026 WL 1825723 at *6; *see id.* at *15 (Barrett, J, joined by Thomas and Gorsuch, JJ., concurring) ("the pre-existing right of the people to have and carry weapons for their defense").

No court from the Founding to the present has ever adopted Plaintiffs' expansive interpretation of arms, and the relief they seek is divorced from the original public meaning of the Second Amendment. *See United States v. Davis*, 906 F. Supp. 2d 545, 552-58 (S.D. W.Va. 2012) (Finding that *Heller* does not equate an antiquated concept of "armour of defense" with constitutional "Arms").[4] The Court should hold, based on all the historical evidence before it, that the original public meaning of "keep and bear arms," consistent with "the most natural reading . . . is to 'have weapons.'" *Heller*, 554 U.S. at 582.

B.      Plaintiffs Have Not Established That Body Armor Is In Common Use By Civilians For Self-Defense

As the State Defendants explained in their moving brief, Plaintiffs' challenge fails at the first step of the *Bruen*/*Rahimi* test on a separate and sufficient ground: their failure to adduce admissible, non-hearsay evidence demonstrating that body armor is in common use by civilians for self-defense. ECF No. 77-1 at 16-23. Under binding precedent, the common use test is one in which "Plaintiffs bear the burden of proof."[5] *Calce v. Tisch*, No. 25-861, 2026 WL 980092, at *1 (2d Cir. Apr. 13, 2026) (summary order) (citing *United States v. Gomez*, 159 F.4th 172, 177 (2d Cir. 2025) and *Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 229 (2d Cir. 2025)).

_____

[4] *"Heller* did not hold that "amour of defense – whatever that may have been in the 18ᵗʰ century and whatever that may be now – equates with 'Arms' under the second amendment." *Davis*, 906 F. Supp. 2d at 556.

[5] The Supreme Court's recent decision in *Wolford* does nothing to undermine this precedent, explaining that the textual step of the *Bruen* test involves a determination that the items involved are "weapons customarily used for offensive or defensive purposes." 2026 WL 1825723 at *6. Only after this showing is made must "the government . . . show that its challenged law did not infringe the historical understanding of the codified right." *Id.*

6

Plaintiffs in their reply identify three ways they claim to have met their burden.  First, they claim that body armor is "jurisdictionally common" because it is legal in most states, P. Reply at 26, but this substitutes a lack of laws for their factual burden to "submit[] evidence establishing common use for lawful purposes."  *Calce*, 2026 WL 980092 at *2.  We are unaware of laws prohibiting lightsabers, sonic cannons, or battleaxes, for instance, but the lack of such laws does not establish that these weapons are "actually used for self-defense." *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 88 (D. Conn. 2023), *aff'd*, 153 F.4th 213 (2d Cir. 2025).  Next, they argue that the burden is carried by their compilation of a list of websites of companies that they claim sell to civilians, but this list is not supported by any witness testimony and consists only of hearsay links to the top-level pages of various websites, which do not support the matter asserted.  *See* ECF No. 69-4 Ex. O.  And even if the links were authenticated and admissible, they would not establish that these products are actually sold to civilians in significant numbers, nor actually in common use for self-defense.  *See Calce*, 2026 WL 980092 at *1 (rejecting "miscellaneous bits and pieces insufficient to establish that [the desired weapons] are in common use for lawful purposes").

Plaintiffs' third and primary common-use argument points to a handful of market reports they themselves commissioned—but did not disclose in their Rule 26 disclosures, *see* Belka Decl. Ex. R—that they now offer for the truth of their contents without the testimony of any witness with personal knowledge. *But see* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion"); Fed. R. Evid. 802; Fed. R. Evid. 602. Plaintiffs' reply includes no credible argument for these documents' admissibility, or for their

7

failure to disclose.[6]  They argue that their exhibits should be admitted under the hearsay exception for "market reports and similar commercial publications . . . that are generally relied on by the public or by persons in particular occupations," but they nowhere address the requirement, explained in the State Defendants' moving brief, that the exception "requires a showing that the compilation is 'generally relied on by the public or by persons in particular occupations' to demonstrate that the data is trustworthy and reliable."  ECF No. 77-1 at 18 (quoting *Syracuse Mtns. Corp. v. Petroleos de Venezuela S.A.*, No. 21 Civ. 2684, 2024 WL 3637997, at \*7 n.8 (S.D.N.Y. Aug. 1, 2024)).

The major case Plaintiffs cite for admissibility, *United States v. Arrington*, 634 F. Supp. 3d 57, 62 (W.D.N.Y. 2022), explains why Plaintiffs' reports do not meet the standard.  Judge Arcara explained in *Arrington* that the admissibility requires a showing of "general reliance by the public or by a particular segment of it, and the motivation of the compiler to foster reliance by being accurate," necessitating "evidence that the compilers stake their business or public reputations on the accuracy of a compilation."  *Id.* at 62 (quotations omitted).  That evidence is utterly absent here, and in fact Plaintiffs' reports explicitly declaim any reliance on their work and forbid their customers, including Plaintiffs, from sharing them publicly.  *See, e.g.,* ECF No. 69-6 at 11 (forbidding "disclosure to [a] third party" because company "does not offer warranty for the accuracy of the data" and "takes no responsibility for any incorrect information supplied").  Without a valid ground to admit these self-commissioned reports, Plaintiffs are left arguing that actually "the rules of evidence do not apply," P. Reply at 29, a repetition of the "legislative facts"

---

[6] Plaintiffs also argue that the Court should treat the proposed *amicus curiae* brief of Armored Republic Holdings LLC, ECF No. 73-1, as factual evidence.  To the extent Plaintiffs wished to introduce evidence from Armored Republic, they could have done so by including Armored Republic in their disclosures and identifying them as proper subjects for discovery; without having done so, they are "not allowed to use that information or witness to supply evidence on a motion."  Fed. R. Civ. P. 37(c)(1).  To the extent that Armored Republic wishes to offer factual evidence in challenging the Body Armor Law, it could have done so in its own lawsuit, *Armored Republic Holdings, LLC v. Mosley*, No. 24 Civ. 4261 (E.D.N.Y.).  Instead, it voluntarily dismissed that case.

gambit that federal courts have repeatedly rejected from this organizational plaintiff.  *See Lane v. Cacace*, No. 22 Civ. 10989, 2025 WL 903766, at *5 (S.D.N.Y. Mar. 25, 2025) ("the Court refuses to consider Plaintiffs' 'legislative facts,' as they are inadmissible and have not been subjected to the adversarial process"); *Or. Firearms Fed. v. Kotek*, 682 F. Supp. 3d 874, 885-86 (D. Or. 2023).

Even if the Plaintiffs' market reports were admissible, the data in them would not be sufficient to carry their burden.  As the State Defendants explained in their moving brief, ECF No. 77-1 at 19-21, Plaintiffs' data indicate that 93-94% of armor sales go to the military and law enforcement, and it appears likely that much of the remaining 6-7% goes to persons who would be excluded from the Body Armor Law as peace officers or members of designated eligible professions, such as security guards or EMTs.  Moreover, Plaintiffs' figures include no information about the type or level of armor sold to civilians, meaning that there is, for instance, no evidence that military grade Level III body armor is in common use by civilians, a fatal flaw in a facial challenge attacking the law "in all its applications."  *Rahimi*, 602 U.S. at 708 (Gorsuch, J., concurring) (quoting *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019)).  Plaintiffs argue that the fact that armor is used by law enforcement and members of related professions "should dispose of the issue," but American history and tradition recognizes that members of law enforcement have regularly had access to dangerous and unusual weapons that the Second Amendment did not cover for the public at large.  *See United States v. Bridges*, 150 F.4th 517, 526 (6th Cir. 2025) ("the relevant number [for common use] excludes law-enforcement equipment"); *see also United States v. Wendt*, 168 F.4th 1068, 1084 (8th Cir. 2026) (Stras., J., concurring).  Plaintiffs' case fails at *Bruen*/*Rahimi* step one due to their straightforward inability to adduce admissible evidence of common use by civilians for self-defense.

9

**III.    THE HISTORICAL RECORD DEMONSTRATES AN ENDURING TRADITION OF GOVERNMENTS PROHIBITING THE WEARING OF BODY ARMOR, AND PLAINTIFFS HAVE ADDUCED NO CONTRARY HISTORICAL EVIDENCE**

Even if the Court were to proceed to the second step of the *Bruen*/*Rahimi* analysis, the Body Armor Law would be upheld based on a centuries-long English and American tradition of regulating or prohibiting the wearing of armor in public.  As explained in the State Defendants' moving brief, ECF No. 77-1 at 24-28, and as detailed in the expert report of Professor Benjamin Carp, of Brooklyn College, City University of New York, "the traditions of English common law had given American governments the power to regulate the wearing of defensive armor for the purposes of keeping the public peace."  ECF No 77-4 ¶ 5.  Professor Carp explains how this tradition was integrated into the common law and carried over the Atlantic to early America, conclusions that Plaintiffs do not dispute in their Local Rule 56(a) response, and therefore admit. *See* ECF No. 80-1 ¶¶ 56, 58 (responding only that "[t]he cited law speaks for itself" and that the issue "is not material," without adducing any contrary evidence); *see also* Local Rule of Civil Procedure 56(a)(2) (opposing statement must provide "citation to admissible evidence").  And these laws include any number of "dead ringers" or "historical twins," *NYSRPA v. Bruen*, 597 U.S. 1, 30 (2022), such as Queen Elizabeth's "[p]roclamation against the common use of . . . Cotes of Defence," which prohibited "all and every of her subjects whatsoever, the wearing of any [] Privie or secret kind of Cote, or Doublet of Defence."  Belka Decl. Ex. N.

This historical Anglo-American tradition is dispositive because "it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right," and that the Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors."  *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 592) (emphasis in the original).  For century after century, that pre-existing right was never interpreted to prevent the People's elected representatives from banning the wearing of body armor.  Although few laws

10

prohibiting body armor were passed in the time near the founding of the American republic, the lack of such laws stems from the fact that by that time body armor was "functionally obsolete," Carp Decl. ¶ 5, indicating "a lack of political demand rather than constitutional limitations." *Antonyuk*, 120 F.4th at 970 (citation omitted).  Critically, the Plaintiffs have not adduced a single jot of historical evidence indicating that anyone in the Founding or Fourteenth Amendment Eras viewed armor regulations as unconstitutional.

What Plaintiffs do rely on is a law journal article from a litigator then in their employment, Joseph Greenlee, who was neither disclosed as a fact witness nor as an expert, and which they claim is "not subject to the rules against hearsay."  ECF No. 80-1 ¶¶ 84, 89; *see* Joseph Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 Geo. J.L. & Pub. Pol'y 1 (2025).  Plaintiffs now acknowledge "their commissioning of the research that resulted in the publication of the law review article," ECF No. 80-1 ¶ 91, and do not dispute that the article was created for the purpose of this lawsuit.[7]  *Id.* ¶ 92.  Plaintiffs have used this journal article as an end-around for the Federal Rules of Evidence.  As such, the Court should not consider the Greenlee article for the truth of the matters asserted.  *Cf. Irish v. Tropical Emerald LLC*, No. 18 Civ. 82, 2021 WL 1827115, at *7 (E.D.N.Y. May 6, 2021) (Courts "should be vigilant to preclude manipulative conduct designed to thwart the expert disclosure and discovery process." (citation omitted)).  But even if the Court were to consider the article, it contains significant errors that undermine any conclusion.  For instance, out of the 53 "eighteenth-century militia mandates" that Greenlee cites as examples, 23 J.L. & Pub. Pol'y at 25-26, 51 of them refer to either a "breastplate" or a "crupper," which—as Dr. Carp explains and Greenlee has previously acknowledged—are actually pieces of

---

[7] Instead, they merely argue that the State Defendants' counsel lacks personal knowledge of whether they prepared the Greenlee article and contend that the fact that it "was accepted for publication by a reputable law journal indicates that it is a serious contribution to legal scholarship."  ECF No. 80-1 ¶ 92.

horse tack.  Carp Decl. ¶ 18.

Lastly, history demonstrates that the Body Armor Law is separately and sufficiently supported by the historical tradition of prohibiting the carrying of weapons that terrify the public. *See* Carp Decl. ¶ 9 ("The wearing of armor in public by people other than peacekeepers was understood to be terrifying to the people and therefore subject to prohibition.").  Plaintiffs do not meaningfully dispute the historical proposition, instead only speculating that "terrifying circumstances" may lead people to buy armor and that some armor is concealable.  P. Reply at 32. And as to body armor's role as a dangerous and unusual article, Plaintiffs argue that "body armor is not itself lethal or dangerous," *id.* at 33, but do not meaningfully dispute that armor provides violent persons with a tactical advantage over law enforcement or that body armor is increasingly chosen by mass shooters and would-be mass shooters.[8]  *See* Schildkraut Decl. ¶¶ 10, 16-17, 22-23.  Subsequent events have underscored that connection, as body armor has figured in several shootings or attempted shootings even during the brief period between the filing of the State Defendants' moving brief and the filing of this one.[9]

## CONCLUSION

For the reasons set forth above, in their opposition and cross-motion papers, and upon all prior proceedings, the State Defendants respectfully request that the Court deny Plaintiffs' motion

---

[8] Due to an editing error, page 28 of the State Defendants' moving brief inaccurately paraphrases Professor Carp's declaration as indicating that "advanced synthetic materials like Kevlar" began being developed in the late 19th century.  As demonstrated in the underlying passage of Professor Carp's Declaration, such materials were only developed in the 1960s and only began limited use by the military and law enforcement in the 1980s.  *See* Carp Decl. ¶¶ 30-33.

[9] *See, e.g.,* Scott Flynn, *Georgia man opens fire on family reunion with AR-15 following racist tirade*, WSB-TV Atlanta (June 12, 2026) (shooter "came back armed with an AR-15 and was wearing body armor"), https://tinyurl.com/s34fzj2z; Daniel Farr, *Body-armored gunman with frightening messages scrawled on rifle arrested after firing shot near Trump's LA golf course*, N.Y. Post (Apr. 14, 2026) (gunman "wearing rifle-rated body armor"), https://tinyurl.com/ysz3uuuj.

for summary judgment, grant the State Defendants' cross-motion for summary judgment, and grant

such other and further relief as it deems just and proper.


Dated:  Buffalo, New York                       LETITIA JAMES
        June 29, 2026                             Attorney General
                                   State of New York

                                By: _____
                                  RYAN L. BELKA
                                  Assistant Attorney General
                                  350 Main Place, Suite 300A
                                  Buffalo, NY 14202
                                  (716) 853-8440
                                  Ryan.Belka@ag.ny.gov

                                  JAMES M. THOMPSON
                                  Special Counsel
                                  28 Liberty Street
                                  New York, NY 10005
                                  (212) 416-6556
                                  James.Thompson@ag.ny.gov

13