UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
OCT 21 2026
ANDREW W. MOELLER, CLERK
WESTERN DISTRICT OF NY

BENJAMIN HEETER, JOSEPH WURTENBERG; and FIREARMS POLICY COALITION, INC.,

Plaintiffs,

v.

24-CV-623 (JLS) (HKS)

LETITIA JAMES, *in her official capacity as Attorney General of the State of New York;*
STEVEN G. JAMES, *in his official capacity as Superintendent of the New York State Police;*
MICHAEL J. KEANE, *in his official capacity as Acting District Attorney for Erie County, New York;*
and SANDRA DOORLEY, *in her official capacity as District Attorney for Monroe County, New York,*

Defendants.

**DECISION AND ORDER**

New York enacted a first-of-its-kind law prohibiting law-abiding residents—who are not engaged or employed in an eligible profession—from purchasing body armor for self-defense.[1] New York enacted this legislation "to further strengthen gun laws."[2] New York's body armor legislation, however, violates the Second

[1] *See* N.Y. PENAL LAW §§ 270.21 and 22 and N.Y. GENERAL BUSINESS LAW § 396-eee.

[2] *See* Official Website of the State of New York, *Body Armor, Overview*, available at: https://dos.ny.gov/body-armor (last accessed Oct. 21, 2026).

Amendment. This result is dictated by the teaching of the Supreme Court's cases addressing individual Americans' right to keep and bear arms. Indeed, body armor is an "Arm" protected by the plain text of the Second Amendment. As such, regulation in this area is permissible only if the State demonstrates that the new enactment is consistent with the Nation's historical tradition of sufficiently analogous regulations. New York fails that test.

Before the Court are cross motions for summary judgment. *See* Dkt. 69 (Plaintiffs); Dkt. 75, 77 (Defendants). Relevant here, Plaintiffs ask this Court to enjoin enforcement of the statute prohibiting the purchase and sale of body armor to residents of New York who are not engaged or employed in an eligible profession. *See* Dkt. 69. For the reasons below, Plaintiffs' motion seeking that relief is GRANTED. Defendants' corresponding motions are DENIED.

## BACKGROUND

### I. THE COMPLAINT

Plaintiff Benjamin Heeter commenced this action in July 2024, joined by Plaintiff Firearms Policy Coalition, Inc. ("FPC"). Dkt. 1. An amended complaint was filed in August 2024, wherein Plaintiffs Mark Braiman[3] and Joseph Wurtenberg were added.[4] Dkt. 19. Plaintiffs sue Defendants Letitia James, Steven

---

[3] On June 2, 2025, Braiman voluntarily dismissed all his claims without prejudice. Dkt. 59.

[4] The Court collectively refers to all remaining plaintiffs named in the amended complaint as "Plaintiffs."

G. James, (collectively, the "State"),[5] and Michael J. Keane, William Gabor,[6] and Sandra Doorley (collectively, the "D.A. Defendants")—all in their official capacities—namely, as Attorney General of the State of New York, Superintendent of the New York State Police, Erie County District Attorney, Madison County District Attorney, and Monroe County District Attorney, respectively. *See id.*

Plaintiffs challenge N.Y. PENAL LAW §§ 270.21 and 22, and N.Y. GENERAL BUSINESS LAW ("GBL") § 396-eee, which, together, prohibit the purchase and sale of body armor as defined by N.Y. PENAL LAW § 270.20.[7] Heeter and Wurtenberg each have a "desire and intention" to purchase body armor. *Id.* ¶¶ 48-53. But because of "Defendants' actions, including credible threat of arrest, confiscation, prosecution, fines, and imprisonment," Plaintiffs have "refrained from acquiring [body armor]." *Id.* ¶¶ 48,50, 52.[8]

In particular, the law prevents individuals from "purchas[ing] or tak[ing] possession of body armor" unless they are "engaged or employed in an eligible

---

[5] The Court notes that only the State opposed Plaintiffs' motion on the merits. The D.A. Defendants only argue that they are not proper parties to this action and should not be subject to any resulting judgment. Dkt. 75-3; Dkt. 76.

[6] On June 2, 2025, Plaintiffs voluntarily dismissed all claims against Gabor without prejudice. Dkt. 59.

[7] The Court refers to the statutes together as "the body armor ban."

[8] N.Y. PENAL LAW § 270.20 defines "body armor" as "any product that is a personal protective body covering intended to protect against gunfire, regardless of whether such product is to be worn alone or is sold as a complement to another product or garment."

profession." N.Y. PENAL LAW § 270.21; N.Y. GEN. BUS. LAW § 396-eee(1) ("No person, firm or corporation shall sell or deliver body armor to any individual or entity not engaged or employed in an eligible profession . . . ."). Plaintiffs claim that the State "bans ordinary citizens from purchasing an entire class of arms . . . while authorizing the Department of State to exempt certain categories of favored groups." Dkt. 19 at 20 ¶ 59.[9]

The amended complaint seeks relief under 42 U.S.C. § 1983 for deprivation of the Constitutional right to keep and bear arms. *See id.* ¶¶ 60-62. Plaintiffs seek declaratory judgment, injunctive relief, as well as fees and costs. *See id.* at 21-22 (prayer for relief).[10]

---

[9] Page numbers refer to the CM/ECF generated pagination in the header of each page.

[10] To the extent the State has reasserted its arguments with respect to Eleventh Amendment immunity, those arguments will not be reconsidered pursuant to the law-of-the-case doctrine. *See Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981); ("The law of the case will be disregarded only when the court has 'a clear conviction of error' with respect to a point of law on which its previous decision was predicated.") (citation modified); *Stegemann v. United States*, 132 F.4th 206 (2d Cir. 2025). The Court previously denied the State's motion to dismiss on Eleventh Amendment grounds explaining that "Plaintiffs seek prospective relief . . . [a]nd the Attorney General has a sufficient connection with the enforcement of [the body armor ban]." *Heeter v. James*, No. 24-CV-623 (JLS), 2024 WL 4729246, at *8 (W.D.N.Y. Nov. 8, 2024); Dkt. 44; *see also Burgio & Campofelice, Inc. v. New York State Dep't of Lab.*, 107 F.3d 1000, 1006 (2d Cir. 1997) ("[W]e agree with those commentators who have concluded that "[t]he best explanation of *Ex parte Young* and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution or laws.'"). And nothing has changed to bring about "a clear conviction of error" with respect to Eleventh Amendment immunity now, at the summary judgment stage.

## II. CROSS MOTIONS FOR SUMMARY JUDGMENT

On March 27, 2026, Plaintiffs moved for summary judgment. Dkt. 69. They ask this Court to "declare the body armor ban unconstitutional, and enjoin its enforcement." Dkt. 71 at 30.

Plaintiffs argue that "[t]he body armor banned by New York is an 'arm[]' covered by the plain text of the Secondment Amendment." *Id.* at 15. And because the plain text is implicated, "the burden is on the State to justify its laws." *Id.* at 20. Since body armor is "not unusual, but in common use for lawful purposes[,]" the State cannot ban it consistent with the Nation's history of arms regulation. *Id.* at 20-25. Indeed, Plaintiffs contend that "[t]here exists no American tradition . . . of depriving citizens of the ability to lawfully purchase, sell, or take possession of defensive armor." *Id.* at 25. As such, they urge this Court "to enjoin enforcement of [the State's] body armor ban. *Id.* at 7.

The State opposed Plaintiffs' motion and cross moved for summary judgment. Dkt. 77. It maintains that "body armor is not an 'Arm' as the term would have been commonly understood in 1791 or 1868" and that there is "a long uncontradicted Anglo-American tradition of armor regulation." Dkt. 77-1 at 6-7. The State contends that, "at most, body armor is better understood as a tactical accessory to firearms" and not subject to protection by the Second Amendment. *Id.* at 6. If a court were to conclude that body armor is covered by the Second Amendment, the State suggests that, "whenever body armor was in common use, English and American governments would regulate it to protect public safety,

generally by prohibiting its use by the public . . . ." *Id.* at 7. Drawing on modern policy arguments, the State argues that its body armor ban "is also legally justified by a long-standing historical tradition of prohibiting weapons and gear that cause public fear or terror." *Id.*[11]

## DISCUSSION

Plaintiffs' motion seeks to have this Court enjoin enforcement of the body armor ban—as to the purchase and sale of body armor by individuals not otherwise engaged or employed in an eligible profession. That is granted.[12] Defendants' cross motion on this issue is denied. As set forth below, the body armor ban violates the plain text of the Second Amendment and the Nation's historical traditions have not permitted such a curtailment of the right to keep and bear arms.

In the absence of a historical tradition in support of the State's restriction, there is no genuine issue for trial. Indeed, on this record, the restriction categorically violates the right of individuals to keep and bear arms for self-defense. Summary judgment for Plaintiffs, therefore, is required.

---

[11] Plaintiffs opposed the State's cross motion and replied in further support of their own motion. Dkt. 80. The State also replied. Dkt. 83. On August 28, 2026, the Court heard argument. *See* Dkt. 92. The parties also submitted supplemental briefing. Dkt. 90, 91, 93, 94.

[12] Nothing contained herein shall affect Section 270.20(1)'s prohibition on the unlawful wearing of body armor. Section 270.20(1) provides: "A person is guilty of the unlawful wearing of body armor when acting either alone or with one or more other persons he commits any violent felony offense defined in section 70.02 while possessing a firearm, rifle or shotgun and in the course of and in furtherance of such crime he or she wears body armor." N.Y. PENAL LAW § 270.20(1).

## I. SUMMARY JUDGMENT STANDARD

Summary judgment "is appropriate when, viewing the evidence favorably to the non-movant, there is no genuine issue of material fact and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Wiggins v. Griffin*, 86 F.4th 987, 992 (2d Cir. 2023) (citing FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (explaining that summary judgment is properly granted when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A "genuine issue exists—and summary judgment is therefore improper—where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Id.* (internal citation omitted).[13]

At summary judgment, "the movant bears the initial burden of demonstrating the absence of a genuine issue of material fact." *B Five Studio LLP v. Great Am. Ins. Co.*, 414 F. Supp. 3d 337, 339 (E.D.N.Y. 2019) (citing *Celotex Corp.*, 477 U.S. at 323). Once the "movant meets that burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial." *Id.* (citing FED. R. CIV. P. 56(c)). The Court "is to view all

---

[13] A fact is "material" if it "might affect the outcome of the suit under the governing law" and an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

such facts in the light most favorable to the non-movant, drawing all reasonable inferences in its favor." *Id.* (citing *Anderson*, 477 U.S. at 255).

## II. STANDING

The Court must first consider its jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.") (quoting *Ex parte McCardle*, 7 Wall. 506, 514, 19 L.Ed. 264 (1868)) (internal citations omitted). Article III courts have power to decide only "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. Standing relates to a court's constitutional power to hear and decide a case and, therefore, implicates subject-matter jurisdiction. *See Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016).

In general, to establish standing, "a plaintiff must demonstrate (i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).[14]

---

[14] The Supreme Court has explained that "Article III requires a plaintiff to first answer a basic question: 'What's it to you?'" *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting A. Scalia, The Doctrine of Standing as an Essential Element of the

### A. Plaintiffs' Pre-Enforcement, As-Applied Challenge[15]

First, the Court rejects the State's argument that Plaintiffs improperly assert a pre-enforcement, as-applied challenge. *See* Dkt. 77-1 at 14-15. The Second Circuit has addressed the approach in this type of case. *See Antonyuk v. Chiumento*, 89 F.4th 271, 336 (2d Cir. 2023) (explaining that plaintiffs have surmounted the "low" and "quite forgiving" bar for pre-enforcement standing because they "adequately demonstrated a credible threat of enforcement—each Plaintiff will accordingly have standing if he can also show 'an intention to engage in a course of conduct arguably affected with a constitutional interest' and 'that the intended conduct is proscribed by the challenged law.'" (quoting *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023))).

Moreover, the Supreme Court has also permitted similar pre-enforcement, as-applied challenges. *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (explaining "that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a

---

Separation of Powers, 17 Suffolk U. L. Rev. 881, 882 (1983); *see also Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 109 (2025).

[15] To the extent that Plaintiffs assert a facial challenge against the body armor ban, the Court is persuaded that "no set of circumstances exist under which [the body armor ban] would be valid . . . ." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (internal citations omitted). The State's concerns are addressed by laws that already specifically apply to criminal actors and prohibit the conduct concerned. *See, e.g.*, 18 U.S.C. § 931(a); 34 U.S.C. § 10534(d)(1); U.S.S.G. § 2K2.6; N.Y. PENAL LAW § 270.20.

constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" (citation omitted)); *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (explaining that the distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint.").

**B. Individual Standing**

Second, Heeter and Wurtenberg have both declared an intention to purchase body armor, and that they "would have already purchased" it but for the body armor ban. *See* Dkt. 19 at 16-19; Dkt. 69-2 at 5-6. Both individual plaintiffs have chosen to forgo that intent in order "to comply with the law solely to avoid prosecution[,]" which affords them "standing to bring a pre-enforcement challenge." *Frey v. City of New York*, 157 F.4th 118, 137 (2d Cir. 2025). This is sufficient to establish standing for the individual Plaintiffs' challenge to the body armor ban.

To the extent the State contends that the individual Plaintiffs' claims are not ripe because "Plaintiffs currently own body armor and have no immediate need to purchase more," the Court disagrees. Dkt. 77-1 at 12. Plaintiffs' injuries flow directly from the body armor ban itself, which prohibits them from taking the necessary steps to purchase body armor in a manner that would comply with state law. The State attempts to draw a distinction between eligibility to purchase body armor and compliance with the criminal law. This distinction "contravenes common sense." *Antonyuk*, 89 F.4th at 311 (when a plaintiff challenges an application itself,

he is not required to first apply for and be refused a license); *see also Holder*, 561 U.S. at 15-16 (plaintiffs had standing where they would engage in the proscribed conduct "if the statute's allegedly unconstitutional bar were lifted").

A plaintiff need not first "expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007)). *See also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights."). And the identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact "necessarily depends on the particular circumstances at issue." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (quoting *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016)). Accordingly, Heeter and Wurtenberg's standing in this case cannot be dependent on an attempt to purchase body armor followed by a refusal by the seller (or even criminal charges if the transaction occurred), before they are permitted to challenge the law.

### C. Associational Standing

Finally, the Court rejects the State's argument that the organizational Plaintiff (FPC) lacks standing. *See* Dkt. 77-1 at 10-11 (citing *Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439 (2d Cir. 2021)). The Second Circuit was recently presented "with an occasion to correct a governing rule in this Circuit."

*Defending Educ. v. Croton-Harmon Union Free Sch. Dist.*, ---F.4th--- No. 24-1900, 2025 WL 5281079, at 2 (2d Cir. Sep. 15, 2026) (*on reconsideration en banc*). There, the Second Circuit explained that an organizational plaintiff, like FPC, indeed has standing when: (1) "'the organization can claim that it suffered an injury in its own right,' or (2) 'it can assert "standing solely as the representative of its members."'" *Id.* at 5 (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)). As a result, organizational plaintiffs, like FPC, are no longer categorically barred in this circuit from asserting claims under 42 U.S.C. § 1983. *See Croton-Harmon Union free Sch. Dist.*, 2025 WL 5281079 at *1.

FPC alleges that its members "are injured by the operation and enforcement of the body armor ban" and that "FPC, as an organization, has been directly injured by the enactment of the body armor ban" because it "has and continues to spend time and other resources, including funding, addressing and responding to the enactment of the Body Armor Ban, consuming resources that would have been directed elsewhere." Dkt. 19 ¶¶ 12, 13. Accordingly, FPC has properly asserted associational standing based on representation of its members—which include Heeter and Wurtenberg—and for injuries it has suffered in its own right.

Here, however, standing in this case is not based on FPC alone. *See* Dkt 44. Plaintiffs Heeter and Wurtenberg have standing individually. *See* Dkt. 19 ¶¶ 48-53 (Both Heeter and Wurtenberg have a "desire and intention" to purchase body armor and cannot legally take the steps to do so under New York's body armor ban). It is

undisputed that neither Heeter nor Wurtenberg can purchase body armor in New York. Dkt. 77-2 ¶ 3 (the State's Counter-Statement and Statement of Undisputed Material Facts). And the State does not disclaim that there is a credible threat of prosecution under the body armor ban if the individual Plaintiffs were to purchase body armor. *See id.*; *see also* Dkt. 75-2 ¶¶ 13, 14 (Erie County District Attorney Keane's Response to Plaintiffs' Statement of Material Facts). Thus, the individual Plaintiffs clearly have standing to challenge the body armor ban and, for "federal courts to have jurisdiction . . . only one named plaintiff need have standing with respect to each claim." *Comer v. Cisneros*, 37 F.3d 775, 788 (2d Cir. 1994) (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 263–64 (1977)). *See also Kwong v. Bloomberg*, 723 F.3d 160, 162 n.4 (2d Cir. 2013) ("Because we are persuaded that the individual plaintiffs have standing, we need not address the standing arguments, left unresolved by the District Court, regarding the two organizational plaintiffs").

Accordingly, the Court rejects each of the State's arguments that the Court is without subject matter jurisdiction to decide this case on the merits.

## III. NEW YORK'S BODY ARMOR BAN

### A. The Right to Keep and Bear Arms

The Second Amendment to the Constitution, ratified in 1791, provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. On several occasions, the Supreme Court has addressed this right and supplied the

necessary framework that resolves the issue here. A thorough understanding of the Supreme Court's articulations is—as in prior cases—essential, so they are explored below.

1. <u>Heller</u>

In *Heller*, the Supreme Court held that the District of Columbia's ban on handgun possession in the home, and its prohibition against rendering any lawful home firearm operable for the purpose of immediate self-defense, both violated the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

The Court methodically analyzed the issue, first noting that, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.' When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation." *Id.* at 584 (citations omitted). The Second Amendment, therefore, "guarantee[s] the individual right to possess and carry weapons in case of confrontation."

The Court also addressed the definition of "Arms." *See id.* at 581. Concluding that "[t]he 18th-century meaning is no different from the meaning today[,]" the Court explained "[t]he 1773 edition of Samuel Johnson's dictionary defined 'arms' as '[w]eapons of offence, or armour of defence.' 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary; see also N. Webster,

American Dictionary of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar)." *Id.*

The Second Amendment's meaning is strongly confirmed by its historical background. The Court explained that "[w]e look to this because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right. The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" *Id.* at 592 (emphasis in original). The Court continued, "[t]here seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Id.* at 595.[16]

After addressing the history related to the Second Amendment's prefatory clause, the Court concluded that, "history showed that the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents. This is what had occurred in England that prompted codification of the right to have arms in the English Bill of Rights." *Id.* at 598.

16 The Court noted that, "[o]f course the right was not unlimited, just as the First Amendment's right of free speech was not . . . . Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*." *Id.* (citation omitted) (emphasis in original).

Indeed, founding-era debate with respect to the right to keep and bear arms, "as with other guarantees in the Bill of Rights, was not over whether it was desirable (all agreed that it was) but over whether it needed to be codified in the Constitution." *Id.* It was understood "across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id.* at 599.[17]

Like most rights, "the right secured by the Second Amendment is not unlimited . . . . [the right is] not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626 (citations omitted).[18]

Striking down the handgun ban, and cementing the notion that the Second Amendment exists as a bulwark against attempts by governments to erode the right to self-defense, the Court concluded that, "the inherent right of self-defense has

---

[17] The Court continued, "[i]t is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right—unlike some other English rights—was codified in a written Constitution. Justice Breyer's assertion that individual self-defense is merely a 'subsidiary interest' of the right to keep and bear arms . . . (dissenting opinion), is profoundly mistaken. He bases that assertion solely upon the prologue—but that can only show that self-defense had little to do with the right's *codification*; it was the *central component* of the right itself." *Id.* (internal citation omitted) (emphasis in original).

[18] The Court also recognized another important limitation on the right, namely, that "the sorts of weapons protected were those 'in common use at the time.' We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (citations omitted).

been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Id.* at 628-30.

And finally, acknowledging the problem of handgun violence in the country, the Court concluded that, "[t]he Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns . . . . *But the enshrinement of constitutional rights necessarily takes certain policy choices off the table.* These include the absolute prohibition of handguns held and used for self-defense in the home. Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of this Court to pronounce the Second Amendment extinct." *Id.* at 636 (internal citations omitted) (emphasis added).

2. McDonald

Two years later, the Court ruled that the Second Amendment applies as well to state governments by operation of the Fourteenth Amendment's Due Process Clause. *McDonald v. City of Chicago*, 561 U.S. 742, 750, 754, 791 (2010). There, the Court noted *Heller's* holding "that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense." *Id.* at 791.

To answer the next question whether "the Second Amendment right to keep and bear arms is incorporated in the concept of due process[, the Court analyzed]

whether the right to keep and bear arms is fundamental to *our* scheme of ordered liberty or . . . whether this right is deeply rooted in this Nation's history and tradition." *Id.* at 767 (emphasis in original) (internal quotation marks and citations omitted). Without hesitation, the Court answered the question in the affirmative: "*Heller* points unmistakably to the answer. *Self-defense is a basic right,* recognized by many legal systems from ancient times to the present day, and in *Heller,* we held that individual self-defense is 'the *central component*' of the Second Amendment right." *Id.* (citations and footnote omitted) (initial emphasis added and second emphasis in original).

The Court continued, "citizens must be permitted 'to use [handguns] for the core lawful purpose of self-defense.'" *Id.* (alteration in original) (quoting *Heller* at 630). And "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id.* at 778. The Court rejected any attempt "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ." *Id.* at 780.

The *McDonald* Court made it clear that, "[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *Id.* at 783.

3. Bruen

The Supreme Court returned to the Second Amendment in 2022, invalidating the "proper cause" requirement in New York's conceal-carry licensing regime. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Starting where it left off in *Heller* and *McDonald*, the Court recognized that "the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *Id.* at 1. Next, the Court held that the Second and Fourteenth Amendments also "protect an individual's right to carry a handgun for self-defense *outside the home*." *Id.* (emphasis added).

The issue remaining, then, was whether New York's licensing regime respected that right. And the Court concluded that it did not. *Id.* Specifically, "[b]ecause the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense . . . the State's licensing regime violates the Constitution." *Id.*

*Bruen*—as in prior cases—offers much to the disposition of the motions currently before the Court. A close examination, therefore, follows.

In the years since *Heller* and *McDonald*, the Courts of Appeals had developed a "two-step" framework for analyzing Second Amendment cases, which combined history with a means-end scrutiny. *Id.* at 17. *Bruen* expressly rejected that approach at the outset. *Id.* at 17-18. Instead, the Court set forth the proper test: "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the

government may not simply posit that the regulation promotes an important interest. Rather, *the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.* Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 24 (citation and internal quotation omitted) (emphasis added). In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.[19]

Highlighting the importance of the right, the Court stated that, "[i]f the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of 'intermediate scrutiny' often defer to the determinations of legislatures. But while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—*it is not deference that the Constitution demands here.*" *Id.* at 26 (emphasis added). The Second Amendment, the Court continued, "'is the very *product* of an interest

---

[19] The Court acknowledged that, "'[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.' *McDonald*, 561 U.S. at 803–804, (Scalia, J., concurring). But reliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable, than asking judges to make difficult empirical judgments about the costs and benefits of firearms restrictions, especially given their lack [of] expertise in the field." *Id.* at 25 (internal quotation marks and citation omitted) (emphasis and alteration in original).

balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Id.* (citation omitted) (emphasis in original).

After setting this high bar, the Court supplied additional guidance. The applicable test "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* Likewise, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality." *Id.* at 26-27.

Addressing the case before it, the Court noted that "New York's proper-cause requirement concerns the same alleged societal problem addressed in *Heller*: 'handgun violence,' primarily in 'urban area[s].' Following the course charted by *Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation. And, as we explain

below, we find no such tradition in the historical materials that respondents and their *amici* have brought to bear on that question." *Id.* at 27 (internal citations to *Heller* omitted).[20]

With the rules and analytical tools articulated, the Court applied them to New York's proper-cause requirement, noting that the petitioners were two ordinary, law-abiding adult citizens and, as such, were part of "the people" whom the Second Amendment protects. *Id.* at 31. Neither party disputed that handguns are weapons in common use today for self-defense. *Id.* As such, the Court turned to whether the plain text of the Second Amendment protects the individuals' proposed course of conduct, namely, "carrying handguns publicly for self-defense." *Id.* at 31. The Court had "little difficulty concluding that it does," noting that "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* at 32. The Second Amendment guarantees the individual right to possess and carry weapons in case of confrontation. *Id.* (citing

---

[20] The Court acknowledged that, while the "historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* The Court continued, "[f]ortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *McCulloch v. Maryland*, 4 Wheat. 316, 415, 4 L.Ed. 579 (1819) (emphasis deleted). Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 27-28.

*Heller*). And the right to "bear arms" refers to the right to carry for self-defense. *Id.* (citing *Heller*).

The Court then reasoned that the right to "bear" naturally encompasses public carry. *Id.* "Most gun owners do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table. Although individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' (*i.e.*, carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." *Id.*

The Court continued, "[m]oreover, confining the right to 'bear' arms to the home would make little sense given that self-defense is 'the *central component* of the [Second Amendment] right itself.'" *Id.* (quoting *Heller*, 554 U.S. at 599). *See also McDonald*, 561 U.S. at 767. After all, "the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' *Heller*, 554 U.S. at 592, and confrontation can surely take place outside the home." *Id.* at 33. "*Many Americans hazard greater danger outside the home than in it. The text of the Second Amendment reflects that reality.* The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to 'bear' arms in public for self-defense." *Id.* (citation omitted) (emphasis added).

With that resolved, the Court next evaluated whether the State met its burden to show that its proper-cause requirement is consistent with the Nation's historical tradition of firearm regulation. Only "if [the State] carr[ies] that burden

can [it] show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct." *Id.* at 33-34.

Rejecting the State's historical arguments, the Court reasoned that, "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions [evaluated at length in the opinion] governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms. But apart from a handful of late-19th-century jurisdictions, the historical record compiled by [the State] *does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense.*" *Id.* at 38 (emphasis added).

Nor is there any such historical tradition "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense . . . . We conclude that [the State has] *failed to meet [its] burden to identify an American tradition justifying New York's proper-cause requirement.* Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional." *Id.* (emphasis added). The Court later noted that "the history reveals a consensus that States could *not* ban public carry altogether." *Id.* at 52 (emphasis in original).

The Court's analysis of one part of the historical record is noteworthy. "To summarize: The historical evidence from antebellum America does demonstrate that *the manner* of public carry was subject to reasonable regulation. Under the

common law, individuals could not carry deadly weapons in a manner likely to terrorize others. Similarly, although surety statutes did not directly restrict public carry, they did provide financial incentives for responsible arms carrying. Finally, States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly. None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.* at 59-60.

Moving to another historical period, the Court noted that, even "during Reconstruction the right to keep and bear arms had limits. But those limits were consistent with a right of the public to peaceably carry handguns for self-defense." *Id.* at 62. Rejecting the relevance of an outlier law and state-court decisions, the Court stated that it "will not give disproportionate weight to a single state statute and a pair of state-court decisions. As in *Heller*, we will not 'stake our interpretation of the Second Amendment upon a single law, in effect in a single [State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense' in public." *Id.* at 65-66 (citation omitted).

In conclusion, the Court reiterated that the Second Amendment is not a second-class right subject to lesser rules. *Id.* at 70. The Court indicated that it knew of "no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is not how the First Amendment works when it comes to unpopular speech or the free exercise of

religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense." *Id.* In sum, then, "New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." *Id.* at 71.

4. *Rahimi*

In *United States v. Rahimi*, 602 U.S. 680 (2024), the Court rejected a challenge to 18 U.S.C. § 922(g)(8), which "prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that he 'represents a credible threat to the physical safety of [an] intimate partner,' or a child of the partner or individual." 680 U.S. at 684 (quoting 18 U.S.C. § 922(g)(8)).

The Court discussed *Bruen*'s framework, stating: "In *Bruen*, we directed courts to examine our 'historical tradition of firearm regulation' to help delineate the contours of the right." *Id.* at 691 (quoting *Bruen*, 597 U.S. at 17). "We explained that if a challenged regulation fits within that tradition, it is lawful under the Second Amendment. We also clarified that when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Id.* (quoting *Bruen*, 597 U.S. at 24).

The Court continued: "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* And a "court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 29). Moreover,

> [w]hy and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'

*Id.* (internal citations and quotation marks omitted). Against this backdrop, the Court held that, "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 698. And "[i]ts prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition the surety and going armed laws represent." *Id.*

5. <u>*Wolford*</u>

In *Wolford v. Lopez*, 609 U.S. 185 (2026), the Court held that Hawaii's law, which severely burdened an individual's ability to carry a firearm "on private

property without the express and affirmative consent of the property owner" was unconstitutional. 609 U.S. at 190; *see also Christian v. James*, No. 22-CV-695 (JLS), 2025 WL 50413 (W.D.N.Y. Jan. 8, 2025), *aff'd*, 176 F.4th 189 (2d Cir. 2026). Specifically, the Court explained that Hawaii's "regime hobbles what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives." *Id.* at 191.

The Court discussed the Second Amendment's meaning as set forth in *Heller*. *See id.* at 192. "The phrase 'to keep and bear Arms,' we held, signifies what its terms mean in ordinary usage—that is, to 'have' and 'carry Arms.' *Id.* (quoting *Heller*, 554 U.S. 583-85). Significantly, the Court in *Wolford* explained that the term "Arms" "refers to implements used for offense or defense." *Id.* (citing *Heller*, 554 U.S. at 581). And that the Amendment's "central concern" was "securing the fundamental right of self-defense." *Id.* (citing *Heller*, 554 U.S. at 577, 581, 599, 628, 635).

The Court clarified the test it set forth in *Bruen*:

> First, a court must determine whether the law before it clashes with the "plain text" of the Amendment's language. This inquiry entails three subsidiary questions. First, does the law apply to "the people"—which is to say, to "all members of the political community"? Second, does it concern any form of "Arms," *i.e.*, any weapon customarily used for offensive or defensive purposes? Third, does the law place any restrictions on either the "keep[ing]" (i.e., possession) or the "bear[ing]" (*i.e.*, carrying) of arms?

*Id.* at 195 (citations omitted). If the law "clashes" with the Second Amendment's plain text, "it is presumptively unconstitutional" and may violate the preexisting

right to keep and bear arms. *Id.* "But because that right was not in every way coterminous with the Amendment's literal language . . .[,]" the relevant government "may be able to show that its challenged law did not infringe the historical understanding of the codified right." *Id.* at 196 (citing *Bruen*, 597 U.S. at 24.).

After concluding that Hawaii's law undisputedly regulated conduct protected by the Second Amendment—carrying handguns for self-defense—the Court examined the historical analogues provided by the State. *See id.* at 206-12. Concluding that the State's analogues "principally targeted unauthorized hunting" and were not "widespread, well-known, and widely accepted," the Court concluded that Hawaii's law "violat[ed] the constitutional right to keep and bear arms." *Id.* at 210-12.

### B. The Body Armor Ban Regulates Conduct Protected by the Second Amendment

#### 1. <u>*Heller*'s Definition of "Arms" Includes Body Armor</u>

In *Heller*, the Court made it clear what the term "Arms" meant when the Second Amendment was ratified.[21] *Heller*, 554 U.S. at 581. In explaining that "[t]he 18th-century meaning" of the term "Arms" is "no different from the meaning today[,]" the Court quoted multiple dictionaries from the Seventeenth Century. *Id.* Specifically, "[t]he 1773 edition of Samuel Johnson's dictionary defined 'arms' as

---

[21] *See e.g.*, *Munoz-Gonzalez v. D.L.C. Limousine Serv., Inc.*, 904 F.3d 208, 219 n.6 (2d Cir. 2018) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: *The Interpretation of Legal Texts* 78 (2012) ("Words must be given the meaning they had when the text was adopted.")). When the Second Amendment was ratified in 1791, the word "Arms" was generally understood to include ". . . armor for defence."

'[w]eapons of offence, or armour of defence.' 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary; *see also* N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)." *Id.* As a result, this Court is bound by *Heller*'s textual analysis, which demonstrates that the word "arms" included armor at the Nation's founding (as it does today).

Defendants urge this Court to adopt a more limiting definition of the word "arms" that would exclude defensive body armor. *See* Dkt. 77-1 at 15-16. *Heller*, however, rejected "secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 577. In other words, it is "not the role of courts to extrapolate from the words of [a constitutional amendment] to the values behind it, and then to enforce its guarantees only to the extent they serve (in the courts' views) those underlying values." *Giles v. California*, 554 U.S. 353, 375 (2008). Indeed, the conclusion that body armor is not an "arm" protected by the Second Amendment illustrates how "climb[ing] up th[e] ladder of purposes" allows an interpreter to "change the text according to the level of generality he has chosen." A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 19 (2012).

The dictionary definitions relied upon in *Heller* confirm that ordinary citizens at the founding understood the term "arms" to include defensive body armor. *See*

*Heller*, 554 U.S. at 581. Accordingly, the body armor ban expressly regulates conduct protected by the plain text of the Second Amendment. *See Wolford*, 609 U.S. at 205.

2. *Heller* Resolves This Case

The Court does not need to look beyond *Heller*'s textual analysis to Defendants' contention that body armor was not in common use at the Nation's founding to resolve this case.[22] The State submits that, during the Founding Era, armor "had become rare or even entirely obsolete in everyday American English" and "the protective leather gear of th[e] pre-Kevlar era was notoriously

[22] The Court notes the divide among the circuit courts as to whether common use is properly analyzed at step one or step two of the *Bruen* analysis. *See Lamont*, 153 F.4th at 234-35 (2d Cir. 2025), *cert. granted sub nom. Grant v. Higgins*, No. 25-566, 2026 WL 1871312 (U.S. June 30, 2026); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 183 F.4th 211, 236 (3d Cir. 2026); *Duncan v. Bonta*, 133 F.4th 852, 900 (9th Cir. 2025) (Bumatay, J., dissenting); *Bevis v. City of Naperville*, 85 F.4th 1175, 1209 (7th Cir. 2023) (Brennan, J., dissenting) (The Second Amendment should be "read as 'Arms'—not 'Arms in common use at the time.'"); *see also* J. Joel Alicea, *Bruen Was Right*, 174 U. PA. L. REV. 13, 26 (2025) (Conducting the common-use inquiry at the first step "would be at odds with the fact that the common-use test is not about the semantic meaning of the Second Amendment's plain text."). Whether common use is analyzed first or second, this Court concludes that the same outcome is required by *Heller*. Nevertheless, "'common use' appears nowhere in the Second Amendment's text . . . [n]or is it 'an inherent part of the definition of "Arm."'" *Ass'n of New Jersey Rifle & Pistol Clubs*, 183 F.4th at 236. Common use analysis has no bearing on *Heller*'s definition of "Arms," and the connection between *Bruen*'s step-one textual inquiry and "common use" is doubtful because the common use inquiry logically fits within step two's consideration of historical analogues. In other words, whether a regulation restricts an arm in common use for lawful purposes is part of "how" the regulation burdens the right—an analysis courts conduct under step two of *Bruen*.

ineffective against bullets, *meaning civilians did not typically wear such body protection either*." Dkt. 77-1 at 17-18 (emphasis added).

This argument runs headlong into the definitions adopted by *Heller*, nevertheless indicating that the term "arms"—as it was defined in the Founding Era—included defensive body armor that (according to the State) was supposedly rarely utilized in 1791. *See Heller*, 554 U.S. at 581; Dkt. 77-1 at 17-18.

Body armor may be used more today than Defendants' understanding of its use in 1791. But it strains credulity to say that an arm that was rarely used during the Founding Era—*yet still protected by the Second Amendment per Heller*—is no longer protected despite being much more common among Americans today.

Moreover, this conclusion is consistent with *Heller*'s clear statement that the Second Amendment "extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. While body armor may not have been in common use at the founding—although the commonly understood definition of "arms" included body armor—neither were other arms commonly used for self-defense, such as resolvers, semiautomatic pistols, and stun guns. *See Caetano v. Massachusetts*, 577 U.S. 411, 416-17 (2016) (Alito, J., concurring). The defensive body armor available today is "no more exempt from the Second Amendment's protections, simply because [it was] unknown to the First Congress, than electronic communications are exempt from the First Amendment, or electronic imaging devices are exempt from the Fourth Amendment." *Id.* at 417; *see also Chatrie v. United States*, 609 U.S. 605, 146 S. Ct.

2193, 2216 (2026) (explaining "[t]hose who drafted the [Fourth] Amendment could not have imagined such a technology[,]" referring to geofence warrants). Simply put, "[w]e do not interpret constitutional rights that way." *Heller*, 554 U.S. at 582.

*a. No Change in the Legal Landscape*

Even if the definitions put forth by the Supreme Court in *Heller* are dicta, this Court has an "obligation to accord great deference to Supreme Court dicta," absent a change in the legal landscape. *United States v. Colasuonno*, 697 F.3d 164, 179 (2d Cir. 2012); *United States v. Bell*, 524 F.2d 202, 206 (2d Cir. 1975) ("While such dictum is not binding upon us, it must be given considerable weight and can not be ignored in the resolution of the close question we have to decide.").

Defendants have not suggested—nor can they—that a change in the legal landscape exists that would require this Court to ignore how *Heller* defined the term "arms."[23] Thus, even if that portion of *Heller* does not constitute established law, this Court must "nonetheless accord deference to such dicta where, as here, no change has occurred in the legal landscape." *Fuld v. Palestine Liberation Organization*, 82 F.4th 74, 100 (2d Cir. 2023). And because "vertical *stare decisis* is absolute," the Court must follow *Heller's* holding and reasoning, including its

---

[23] On June 30, 2026, the Supreme Court granted certiorari in *Viramontes v. Cook County*, which may result in further guidance from the Court. *See* No. 25-238, 2026 WL 1871322 (U.S. June 30, 2026). There, the Supreme Court granted certiorari on "[w]hether the Second and Fourteenth Amendments guarantee the right to possess AR-15 platform and similar semiautomatic rifles." Petition for Writ of Certiorari, *Viramontes v. Cook Cnty.*, No. 25-238, 2025 WL 2532572 (U.S. Aug. 27, 2025) (Question Presented).

reliance on historical dictionaries to assess the meaning of "arms" to include body armor. *See, e.g.*, *Ramos v. Louisiana*, 590 U.S. 83, n.5 (2020) ([V]ertical *stare decisis* is absolute, as it must be in a hierarchical system with [the judicial power vested in] 'one Supreme Court.'") (quoting U.S. CONST., ART. III, § 1). Accordingly, Plaintiffs have demonstrated that body armor is an "arm" protected by the Second Amendment, and Defendants have failed to adduce any material fact to the contrary.

*b. Even if it is Required, Plaintiffs Have Shown Common Use*

Indeed, Plaintiffs have adduced reliable evidence that body armor is in common use today. Plaintiffs' calculations, supported by market reports, conservatively estimate that more 82,000 units of body armor were purchased in 2023, more than 87,000 were purchased in 2024, and more than 93,000 units were purchased in 2025. Dkt. 71 at 22; Dkt. 69-2 ¶ 21; *see, e.g.*, *Avitable v. Beach*, 368 F. Supp. 3d 404, 411-12 (N.D.N.Y. 2019) (concluding that 300,000 tasers constituted "common use"); *Maloney v. Singas*, 351 F. Supp. 3d 222, 237 (E.D.N.Y. 2018) (concluding that "at least 64,890 metal and wood nunchaku" was common use).[24]

In addition to market research evidence, the fact that 49 states do not ban body armor suggests that it is jurisdictionally common as well. *Snope v. Brown*, 605

[24] The Court also notes the amicus brief submitted by Armored Republic Holdings, LLC, wherein it explains that the company has sold over 2.5 million body-armor products to American civilians alone. *See* Dkt. 73-3 at 25.

U.S.__ 145 S. Ct. 1534, 1534 (2025) (Kavanaugh, J., respecting denial of certiorari) ("AR–15s are legal in 41 of the 50 States, meaning that the States such as Maryland that prohibit AR–15s are something of an outlier."); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (explaining that stun guns "are widely owned and accepted as a legitimate means of self-defense across the country" in 45 states based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens."); *Newman v. Clayton F. Summy Co.*, 133 F.2d 465, 467 n.3 (2d Cir. 1942) (explaining that a "federal court in any district takes judicial notice of the laws of all states.").

To the contrary, Defendants have not set forth any evidence that suggests body armor is *not* in common use today. Instead, Defendants merely dispute the admissibility of Plaintiff's market reports. *See* Dkt. 77-1 at 20-23.[25] The Court is satisfied, however, that Plaintiffs' market reports fall within the hearsay exception afforded by FED. R. EVID. 803(17) because the reports simply indicate the general magnitude and trend of the civilian body armor market. *See, e.g., United States v. Arrington*, 634 F. Supp. 3d 57, 62 (W.D.N.Y. 2022) (explaining that "'[t]he kinds of publications contemplated by FED. R. EVID. 803(17) are those which deal with compilations of relatively straightforward objective facts not requiring . . . a subjective analysis of other facts.'") (citation modified); *Mech. Licensing Collective v.*

---

[25] Defendants suggest that the Court should ignore Plaintiffs' market report evidence pursuant to the Federal Rules of Civil Procedure and Evidence. *See* Dkt. 77-1 at 20-23.

*Spotify USA Inc.*, 763 F. Supp. 3d 608, 617 n.6 (S.D.N.Y. 2025) (judicial notice of the "wide market for audiobooks.").

Despite Plaintiffs' evidence demonstrating common use, the Court may also conclude that body armor is in common use based on legislative facts. Legislative facts are "general facts which help the tribunal decide questions of law" and are the only kind relevant to the constitutionality of the body armor ban. *Langevin v. Chenango Ct., Inc.*, 447 F.2d 296, 300 (2d Cir. 1971) (Friendly, J.) (citation modified). In light of Defendants' lack of evidence to the contrary, the Court may reach the (common sense) conclusion that body armor is in common use for lawful purposes based on Plaintiffs' statistical evidence, combined with the assertions of amici, which is consistent with how the Supreme Court reached similar conclusions in *Heller* and *Bruen*. *See New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*.").

### C. The Body Armor Ban is Unconstitutional and Inconsistent with this Nation's Historical Regulation of "Arms"

#### 1. Overview

Because Plaintiffs have demonstrated that body armor is an "arm" protected by the Second Amendment, the burden shifts to the State to justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of arms regulation. *See Bruen*, 597 U.S. at 33-34. The State fails to do so.

The Court's analysis of the State's proffered enactments is guided by fundamental principles for interpreting legal texts. Specifically, under the "fair reading method," the Court "determin[es] the application of a governing text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012). This "endeavor requires aptitude in language, sound judgment," and the "suppression of personal preference regarding the outcome." *Id.* It also "requires an ability to comprehend the *purpose* of the text . . . ." *Id.* (emphasis in original).

The Court must also construe each proffered enactment as a whole. *Id.* at 167. This entails consideration of "the entire text, in view of its structure and of the physical and logical relation of its many parts." *Id.* And "[c]ontext is a primary determination of meaning." *Id.* Indeed, a "legal instrument typically contains many interrelated parts that make up the whole." *Id.* And the "entirety of the document thus provides the context for each of its parts." *Id.* As such, the statutory construction is a "holistic endeavor." *Id.* at 168 (citations omitted).

As discussed below, a fair reading of the historical enactments reveals that the proffered enactments are not "analogous enough" to the State's body armor ban to "pass constitutional muster." *Bruen*, 597 U.S. at 30. The historical enactments identified by the State are far from analogous to the body armor ban here.

The State, moreover, has not met its burden of showing continuity or endurance (of any sort) over time. The enactments—considered together—are a far

cry from a *tradition* supporting a universal ban on body armor. Instead, the body armor ban is a novel outlier unsupported by any mainstream tradition from which Defendants could rely upon. For these reasons, discussed in detail below, the State fails to meet its burden.

2. The Anglo-American Tradition of Armor Regulation

The State argues that there exists a "centuries-long historical tradition" demonstrating that, "when body armor has been in use, it has been subject to government regulation." Dkt. 77-1 at 28. Yet, the State is unable to identify a single regulation on body armor post-ratification. *Id.* at 28-32; Dkt. 83 at 14-16. Instead, the State seeks to support its body armor ban by drawing on foreign law that predates this Nation's founding.

Indeed, the Supreme Court "has long cautioned that the English common law 'is not to be taken in all respects to be that of America.'" *Bruen*, 597 U.S. at 39 (quoting *Van Ness v. Pacard*, 27 U.S. 137, 144 (1829) (Story, J., for the Court)); *see also Roper v. Simmons*, 543 U.S. 551, 624 (2005) (Scalia, J., dissenting) ("the basic premise . . . that American law should conform to the laws of the rest of the world—ought to be rejected out of hand."). Indeed, "'[t]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and adopted,' not as they existed in the Middle Ages. *Id.* (quoting *Ex parte Grossman*, 267 U.S. 87, 108-09 (1925)).

The State contends that its body armor ban is consistent with "English monarchs and parliaments" who "regularly issued laws forbidding or restricting the wearing of armor . . . ." Dkt. 77-1 at 28. Not only is this analogy irrelevant to the regulation of arms in the United States, but it also ignores the historical reason the right to keep and bear arms is "understood to be an individual right protecting against public and private violence." *Bruen*, 597 U.S. at 45. Accordingly, the Court interprets the English history put forth by the State in light of these principals and articulates that it is not "sufficiently probative" to defend New York's body armor ban. *Id.* at 40.

3. <u>The Statute of Northampton</u>

The State points to the Statute of Northampton for support for its position that there is a long-standing tradition of restricting who can purchase body armor. *See* Dkt. 77-1 at 29-31. The law prohibited anyone to "go, nor ride armed by night, nor by day, in fairs markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armor to the King and their bodies to prison, at the king's pleasure." John Collyer, *The Criminal Statutes of England* 4 (S. Sweet 1832); *see also* Dkt. 77-1 at 29-30. Notwithstanding the ink that continues to be spilled over this law, the Supreme Court has stated that "the Statute of Northampton—at least as it was understood during the Middle Ages—

has little bearing on the Second Amendment adopted in 1791." *Bruen*, 597 U.S. at 41.[26]

The State's reliance on the Statute of Northampton ignores the fundamental purpose of the Second Amendment and why "[t]he right of the citizens to keep and bear arms has justly been considered, as the *palladium* of the liberties of a republic . . . ." 3 Joseph Story, Commentaries on the Constitution of the United States § 1890, at 746 (1883) (emphasis added).[27]

The State's analogy to the Statute of Northampton is an attempt to justify its body armor ban by speculating that individuals only wear body armor to terrify the public. *See* Dkt. 77-1 at 37-38. Yet, this ignores the reality put forth by Plaintiffs, that the public is more likely to reach for body armor to protect themselves from terrifying circumstances. Dkt. 80 at 42. In *Rahimi*, the Supreme Court concluded that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi*, 602 U.S. at 702. Here, however, the State is suggesting that a merely

---

[26] "The Statute of Northampton was enacted nearly 20 years before the Black Death, more than 200 years before the birth of Shakespeare, more than 350 years before the Salem Witch Trials, more than 450 years before the ratification of the Constitution, and nearly 550 years before the adoption of the Fourteenth Amendment." *Bruen*, 597 U.S. at 41.

[27] As it happens, this understanding was further animated by those who fought for the Fourteenth Amendment. *See McDonald*, 561 U.S. at 776 (quoting Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens) ("Disarm a community and you rob them of the means of defending life. Take away their weapons of defense and you take away the inalienable right of defending liberty.").

broad-based suspicion over the population at large is sufficient to justify a universal ban on the sale and purchase of a specific type of arm. And to the extent that the State analogizes this to prohibiting criminals from purchasing body armor, other statutes already criminalize the use of body armor while committing violent crimes. *See, e.g.*, 18 U.S.C. § 931(a); 34 U.S.C. § 10534(d)(1); U.S.S.G. § 2K2.6; N.Y. PENAL LAW § 270.20. The State's categorical prohibition of a specific type of arm to *law-abiding citizens at large*, is untethered from any historical tradition—including the Statute of Northampton.

4. Body Armor is Not Dangerous and Unusual

The State also attempts to shoehorn its body armor ban into this Circuit's "unusually dangerous" standard set forth in *Lamont*, 153 F.4th at 227, *cert. granted sub nom. Grant v. Higgins*, 146 S. Ct. 2811 (2026). The State argues that "advanced synthetic materials like Kevlar . . . did not begin to emerge until the late 19th and 20th centuries," "was never contemplated by the Founders," "was not possessed by early Americans," and "descends from historical lineage of tactical gear strictly regulated and restricted to the government's peaceable forces." Dkt. 77-1 at 32. The Supreme Court in *Bruen*, however, noted that the Second Amendment to "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 597 U.S. at 28. And *Heller* left no doubt that "the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582.

That Kevlar did not exist at the Founding does not alter the constitutional principles guiding the Court's analysis. If the Court were to adhere to the State's analysis, technological advancements in handgun technology would render many today to be unusual and dangerous compared to technology that was available at the Founding. *Bruen*, however, concluded that, "[w]hatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today." *Bruen*, 597 U.S. at 47. The same is true of body armor.

That technological changes in body armor have occurred since the Nation's founding does not save New York's ban. *See, e.g.*, *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring) ("Historical regulations reveal a principle, not a mold."). Body armor—in some form—has been available to citizens throughout American history, and the Second Amendment protects an individual's right to purchase it for self-defense—the core right protected by the Second Amendment.[28]

5. The State Fails to Meet its Burden

The State has not established that its sweeping prohibition on the sale and purchase of body armor "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. New York's current statute addresses a societal problem that has persisted since the founding—

[28] *See, e.g.*, Joseph G.S. Greenlee, *The Tradition of Armor Use and Regulation in America*, 23 GEO. J.L. & PUB. POL'Y 1, 35-40 (2025) (analyzing historical use and regulation of body armor in American history).

namely, interpersonal firearm violence. But the State fails to identify a single relevantly analogous law *addressing that problem*. Instead, the State references cherry-picked prohibitions from across the span of Western Civilization. Those analogues were framed on different "why" concerns, and certainly had no "how" methodologies that remotely resemble the State's outright ban on civilians purchasing body armor. And they certainly do not purport to reflect *this nation's* traditions.

Indeed, to the extent that the problem of such interpersonal violence *was*, historically, addressed in the law, it was done through other means—such as surety laws and other laws discussed in *Heller*, *Bruen*, and *Rahimi*. And such laws imposed a *far less onerous* burden than the State's body armor ban.

The Constitution *requires* that individuals be permitted to use arms—including body armor—for the core lawful purpose of self-defense. *See, e.g.*, *McDonald*, 561 U.S. at 767. Nothing in the Nation's history or traditions closes the door on that right by permitting a categorical ban on the purchase and sale of a specific type of arm.

In sum, New York's body armor ban violates "the constitutional right to keep and bear arms." *Wolford*, 609 U.S. at 212. This is another one of the policy choices taken "off the table" by the Second Amendment. *Heller*, 554 U.S. at 636. Plaintiffs' request to enjoin enforcement of the body armor ban is granted.

## IV. STAY PENDING APPEAL

The State requests a fourteen-day stay pending appeal. *See* Dkt. 77-1 at 39. That request is granted. The factors "relevant to granting a stay pending appeal are the applicant's 'strong showing that he is likely to succeed on the merits,' irreparable injury to the applicant in the absence of a stay, substantial injury to the nonmoving party if a stay is issued, and the public interest." *Uniformed Fire Officers Ass'n v. de Blasio*, 973 F.3d 41, 48 (2d Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The first two factors "are the most critical, but a stay is not a matter of right, even if irreparable injury might otherwise result, it is an exercise of judicial discretion, and the party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* (internal citation and quotation marks omitted).

While the Court disagrees that the State is likely to succeed on the merits of any appeal, the Court nonetheless notes that, in part here, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Against this fact, the Court also notes that the body armor ban was enacted in 2022, and no Plaintiff sought a preliminary injunction in this case. Litigated this way, the stay factors, including the balance of hardships and public interest, weigh in favor of granting a fourteen-day stay pending appeal.

## CONCLUSION

For the reasons above, Plaintiffs have demonstrated that there are no triable issues of fact, and that they are entitled to judgment as a matter of law. The State provided no persuasive authority that instructs the Court to ignore the Supreme Court's definition of "arms" or that body armor is "highly unusual." Nor did the State identify any well-established historical evidence to support its body armor ban to rebut Plaintiffs' *prima facie* case that none exists. Finally, the State failed to set forth any evidence on which a factfinder could conclude that body armor—a purely defensive arm—is "uniquely designed to create mayhem" and is subject to regulation under Second Circuit precedent. *Lamont*, 153 F.4th at 242, *cert. granted sub nom. Grant v. Higgins*, 146 S. Ct. 2811 (2026). Because the State has not met its burden under the summary judgment standard on any of these points, its motion is denied.

IT HEREBY IS ORDERED that Plaintiffs' [69] motion is GRANTED with respect to the State's restriction on the sale and purchase of body armor. Defendants' [75] and [77] motions are DENIED as to that issue; and it is further

ORDERED that Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this Order are permanently enjoined,[29] effectively immediately, from enforcing N.Y.

[29] The State suggests that any statewide injunction issued by this Court would run afoul of *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Dkt. 77-1 at 39. In that opinion, the Court concluded that "federal courts do not exercise general oversight of the *Executive Branch*; they resolve cases and controversies consistent with the

GEN. BUS. LAW § 396-eee and N.Y. PENAL LAW §§ 270.21 and 270.22 with respect to the sale and purchase of body armor, and their regulations, policies, and practices implementing it;[30] and it is further

---

authority Congress has given them." *Id.* at 861 (emphasis added). That case concerned a district court's entry of preliminary injunctions against enforcement of an executive order issued by the President. *See id.* at 838.

This point was highlighted by Justice Kavanaugh's concurrence underscoring that the focus of the case was "on only one discrete aspect of the preliminary litigation relat[ed] to major new federal statutes and executive actions—namely, what district courts may do with respect to those new statutes and executive actions in what might be called 'the interim before the interim.'" *Id.* at 860 (Kavanaugh, J., concurring); *see also Welty v. Dunaway*, 791 F. Supp. 3d 818, 843 (M.D. Tenn. 2025) ("*CASA* . . . limits the availability of universal injunctions, not statewide injunctions."); *Sanderson v. Hanaway*, No. 4:23-CV-1242-JAR, 2026 WL 1505958 (E.D. Mo. May 29, 2026) (concluding "*CASA* was not intended to upset longstanding precedent permitting statewide injunctions under *Ex parte Young*" and "proscribes only nationwide injunctions involving federal statutes and executive actions."); *Titan Logistics Grp. LLC v. Tischler*, No. 3:26-CV-1300, 2026 WL 1719313 (N.D. Ohio Jun. 15, 2026) (holding "Defendants do not point to any language in [*CASA*] limiting the authority of a district court to enjoin enforcement of an unconstitutional state statute pursuant to *Ex parte Young*."); *Outmemphis v. Lee*, No. 2:23-CV-2670-SHL-CGC, 2026 WL 881226 (W.D. Tenn. Mar. 31, 2026) ("the Supreme Court limited the use of universal injunctions, not statewide injunctions, the type of relief sought here."); *but see Kiosko Multiservicios LLC v. Fin. Crimes Enf't Network*, No. CV-26-02389-PHX-KML, 2026 WL 1265981 (D. Ariz. May 8, 2026) (holding that "the statewide injunction [Plaintiff] requests . . . is broader than necessary to provide complete relief to the plaintiff before the court." (citing *CASA*, 606 U.S. at 851-52)).

[30] The injunctive relief contained herein shall apply as against each of the named D.A. Defendants who have criminal prosecutorial duties to enforce the body armor ban. *See* N.Y. COUNTY LAW 700(1) ("[I]t shall be the duty of every district attorney to conduct all prosecutions for crimes and offenses cognizable by the courts of the county for which he or she shall have been elected or appointed"); *Knight v. City of New York*, 164 F.4th 173, 179 (2d Cir. 2026) ("Eliminating [a] significant threat of criminal prosecution would provide [Plaintiff] with a sufficiently meaningful benefit to satisfy Article III's redressability prong."); *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) ("voluntary cessation of challenged conduct will not 'ordinarily render a case moot because a dismissal for mootness

ORDERED that Defendants' request for a fourteen-day stay pending appeal is GRANTED.

SO ORDERED.

Dated: October 21, 2026
Buffalo, New York

JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE

---

would permit a resumption of the challenged conduct as soon as the case is dismissed,'. . . in such cases, an injunction provides 'effectual relief' because it precludes the defendant from reviving the challenged conduct in that manner.") (citation modified).